IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR.,           :
Co-Administrator of the Estate of   :        CIVIL ACTION NO. 1:08-627
Ronald Taylor Whitaker, Jr., et al.,  :
                                    :        (Judge Christopher C. Conner)
            Plaintiffs,             :
                                    :
        v.                          :
                                    :
SPRINGETTSBURY TOWNSHIP, et al.,    :        Filed Electronically
                                    :
        Defendants.                 :

## JOINT CONCISE STATEMENT OF MATERIAL FACTS

Pursuant to Local Rule 56.1 of the United States District Court for the

Middle District of Pennsylvania, Defendants Springettsbury Township,

Springettsbury Township Police Department, Chief of Police David Eshbach and

Officer Gary Utter, by and through their undersigned counsel, submit the following

Joint Concise Statement of Material Facts as to which Defendants contend there is

no genuine issue to be tried:

## I.    BACKGROUND

1.    This action is based on claims that Springettsbury Township Police

Officer Gary Utter used excessive deadly force against Ronald Taylor Whitaker, Jr.

("Whitaker").  *See* Compl. (Doc. 1), ¶ 1.

2.    Plaintiffs seek to recover for alleged civil rights violations pursuant to

42 U.S.C. § 1983, the Fourth, Eighth and Fourteenth Amendments of the United

States Constitution, and supplemental state law claims, including the Wrongful

Death Act, 42 Pa. C.S. § 8301.  *See* Compl. (Doc. 1), ¶¶ 1, 58, 59, 61, 62, 64, 65, 68.

## II.     RONALD T. WHITAKER, JR.

3.     Whitaker was born on November 17, 1967, thus making him 39 years

of age at the time of his death.  (PSP 0002.)[1]

4.     At the date of his death,[2] Whitaker was the father of three children:

Taylor Whitaker, Brandi Whitaker and Christopher Hammerstone.  (Whitaker Sr.

20; Lynn 8; PSP 0013.)[3]

5.     Dalea Lynn is the mother of Taylor and Brandi; she is not the mother

of Christopher Hammerstone.  (Whitaker Sr. 23, 31; Lynn 8; PSP 0013.)

6.     In July 1999, Whitaker was charged with reckless driving and fleeing to

---

[1] "(PSP _____)" refers to documents subpoenaed by Plaintiffs from the Pennsylvania State Police, which are included as Exhibit "A" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

[2] The date and time of the incident was July 7, 2007 at approximately 23:55 p.m. (RTW SPD 00065) and Whitaker's death was pronounced on July 8, 2007 at approximately 00:34 a.m. (PSP 0101).  "(RTW SPD _____)" refers to documents produced during discovery by Defendants, which are included as Exhibit "B" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

[3] "(Whitaker Sr. ____)"and "(Whitaker Sr. Ex. ____)" refer to excerpts and exhibits from the deposition transcript of Ronald T. Whitaker, Sr., taken on October 14, 2008, which are included as Exhibit "C" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*  "(Lynn ____)" refers to excerpts from the deposition transcript of Dalea Lynn, taken on October 14, 2008, which are included as Exhibit "D" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

elude a police officer.  (Whitaker Sr. 79-80; Whitaker Sr. Ex. 3; Lynn 37-38, 53-54.)

7.     Whitaker was arrested on March 25, 2004, for purchasing crack cocaine from an undercover police officer.  (Lynn 54-55; Whitaker Sr. Ex. 3.)

8.     Whitaker used crack cocaine in 2007 "on a splurge," which could be as often as every "three months, five months, two weeks."  (Lynn 44-45.)

9.     Whitaker was a user of marijuana, although not as often as he used crack cocaine.  (Lynn 47.)

10.     Whitaker's autopsy report indicated that Whitaker had cocaine and cannabinoids in his system at the time of his death.  (Lynn 45; PSP 0103.)

11.     On the day of the incident, Whitaker had consumed an unknown amount of alcoholic beverages.  (Lynn 72-73, 82-83; PSP 0013.)

12.     At the time of his death, Whitaker was on probation.  (Whitaker Sr. 32; PSP 0014.)

## III.  **GARY UTTER**

13.     In January 2002, Gary Utter was hired as a police officer by the STPD.  (Utter 6-7, 9, 12-13; Eshbach Decl. ¶ 14.)[4]

---

[4] "(Eshbach Decl. ¶ ___)" and "Eshbach Decl. Ex. ___)" refer to paragraphs of the Declaration of Chief David C. Eshbach and exhibits attached thereto, which are included in Exhibit "H" in the *Appendix to Defendants' Joint Concise Statement of Material Facts*.  "(Utter ___)" refers to excerpts from the deposition transcript Gary Utter taken on January 13, 2009, included as Exhibit "F" in the *Appendix to Defendants' Joint Concise Statement of Material Facts*.

14.    Prior to his hiring by STPD, Utter had been an officer with the Stewartstown Borough, a position he held beginning January 2000.  (Utter 9.)

15.    Utter successfully completed his police academy training and received his Certificate of Completion from Harrisburg Area Community College on April 20, 2000.  (Utter 9; Eshbach Decl. ¶ 15; Eshbach Decl. Ex. 8.)

16.    Following his police academy training and certification, Utter received additional training, including both required courses and elective courses. (Eshbach Decl. ¶ 16; Eshbach Decl. Ex. 9.)

## IV.    UNDERLYING CRIME AND ARREST AT GIANT

17.    On July 7, 2007 at approximately 11:25 p.m., Springettsbury Police Officers, including Officer Gary Utter, were dispatched to the Giant supermarket on East Market Street, in Springettsbury Township, Pennsylvania, in response to a report that there was a robbery in progress.  (RTW SPD 00007, 00012, 00013, 00039; PSP 0005; Utter 22; Ford 12; Witmer 12.)

18.    When officers arrived, the suspect, Ronald Whitaker, Jr., was laying face down on the floor and was being held down by two customers and a store employee.   (RTW SPD 00007, 00039; PSP 0005; Ford 13; Witmer 12.)

19.    Apparently, prior to the Officers' arrival, Whitaker had become involved in a dispute with store personnel, had attempted to steal a cash register,

and had struggled with other customers and store personnel.  (RTW SPD 00040-00041; PSP 0004-5; Utter 22; Ford 12; Witmer 13-14.)

20.    Specifically, Whitaker disputed the amount that a Coinstar change machine receipt said he was owed and, when the cashier would not give him the money he claimed he should have received, Whitaker became irate, yelled "give me my money bitch!" and grabbed the cash register.  (RTW SPD 00040-00041; PSP 0004-5, 0090-0092, 0096; Witmer 13-14.)

21.    Two other customers and store employees intervened, tackled Whitaker, and held him down until police arrived.  (RTW SPD 00040-00041; PSP 0004-5.)

22.    During the struggle, Whitaker bit one of the customers in the shoulder, which required the customer to obtain medical attention.  (RTW SPD 00013, 00040-00041; PSP 0004-5, 0082, 0083; Ford 41; Krentz 14; Witmer 17-18.)

23.    Springettsbury Officer Christopher Ford was the first officer to arrive on scene, followed shortly thereafter by Officer Utter, Sgt. Gregory Witmer, Officer William Polizzotto, and Officer John Krentz.  (RTW SPD 00007, 00013, 00039; PSP 0005, 0118; Utter 16, 20; Ford 12; Polizzotto 11; Witmer 12.)

24.    By the time Officer Utter arrived, Whitaker was calm and no longer offering any resistance, and he was handcuffed and taken into custody without

further incident.  (RTW SPD 00007, 00013; PSP 0005, 0081, 0083; Utter 20, 22; Ford 41; Krentz 11; Polizzotto 27; Witmer 38.)

25.    Whitaker displayed remorse for his actions and stated that he had been drinking.  (RTW SPD 00007, 00013; PSP 0005, 0081, 0085, 0088; Utter 22; Witmer 17-18, 38.)

26.    Although Whitaker reported that he had been drinking and Officer Utter could smell alcohol on his breath, Whitaker was not impaired.  (PSP 0125; Utter 29-30, 90; Ford 21-22.)

27.    Officer Utter escorted Whitaker out of the store and to his police cruiser without incident.  (RTW SPD 00007, 00013, 00040; PSP 0005, 0081, 0118; Krentz 14; Utter 16; Witmer 19.)

28.    Whitaker asked Officer Utter to place his keys under the seat of his vehicle so his girlfriend would be able to get the car, and Officer Utter complied.  (RTW SPD 00007; PSP 0119; Utter 17; Witmer 19-20.)

29.    As a result of his actions at Giant, Whitaker was to be charged with robbery, criminal mischief, and two counts of criminal mischief.  (RTW SPD 00039.)

## V.    INCIDENT AT STPD

30.    Officer Utter transported Whitaker back to the Springettsbury Township Police Department, during which Whitaker was calm, cooperative, and relaxed.  (RTW SPD 00007, 00013; PSP 0005, 0120; Utter 22-23, 96-97, 198-99, 201.)

31.    Officer Utter had no indication that Whitaker was suicidal or mentally ill or that he intended to harm himself or anyone else.  (Utter 190, 201-02.)

32.    Whitaker had never attempted suicide.  (Lynn 51.)

33.    Whitaker's father, Plaintiff Ronald Whitaker, Sr., who saw his son at least once each week, spent several hours with Whitaker on the date of the incident and described his son as "happy" and in good spirits.  (Whitaker Sr. 37-39.)

34.    When Officer Utter transported Whitaker into the station, of the five (5) Springettsbury Officers who were on duty at the time, two (2) Officers (Ford and Krentz) remained at the Giant to conduct the investigation, and two (2) (Sgt. Witmer and Officer Polizzotto) were called to a large disturbance.  (PSP 0025, 0081, 0085-86, 0088-89, 0119; Utter 20-21; Ford 23-24; Krentz 14; Polizzotto 17; Witmer 20.)

35.    After arriving at the station, Officer Utter escorted Whitaker inside, placed him in a holding cell, and removed the handcuffs without incident.  (RTW SPD 00007; PSP 0120-21; Utter 25-26.)[5]

36.    None of Whitaker's behavior, demeanor, or actions indicated to Officer Utter that Whitaker might be a suicide risk.  (Utter 31.)

---

[5]  The incident at STPD was captured on the Department's video surveillance system.  Defendants have not attached the video as an exhibit because playback of the video requires a specific computer program which can be somewhat difficult to operate.  However, if the Court would like to view the video, Defendants would be happy to provide a copy of the video and the viewer required for playback.

37.     Officer Utter removed the handcuffs from Whitaker because, based on his observations, he did not think Whitaker would be a problem or a threat to the Officer.  (Utter 41.)

38.     After Whitaker was secured in the holding cell, Officer Utter left the room for a short period to begin preparing the paper work, but the Officer continued to monitor Whitaker via the holding cell surveillance monitor located in the squad room.  (RTW SPD 00007; PSP 0122-23; Utter 32.)

39.     When Officer Utter returned to the holding cell a short time later to obtain information from Whitaker, Officer Utter noticed that Whitaker was holding his side and appeared to be in pain.  (RTW SPD 00007; PSP 0121-22; Utter 33, 36.)

40.     Officer Utter asked Whitaker if he was injured, and Whitaker stated that his side hurt and that it was painful for him to breathe as a result of being tackled by the other customers at Giant.  (RTW SPD 00007; PSP 0122, 0141; Utter 36.)

41.     Concerned for Whitaker's well-being, and in accordance with STPD policy, Officer Utter left the holding cell and called his supervisor, Sgt. Witmer, and advised him that he was calling Springettsbury EMS to have medical personnel evaluate Whitaker.  (RTW SPD 00007; PSP 0122; Utter 36-37, 46; Witmer 21.)

42.     While he waited for the ambulance to arrive, Officer Utter completed paperwork and left the squad room to go to another part of the station to fax the paperwork to York County Control.  (RTW SPD 00007; PSP 0122-23; Utter 46.)

8

43.     However, before leaving the squad room, Officer Utter checked the holding cell video monitor and saw nothing out of the ordinary.  (RTW SPD 00007; PSP 0122-23.)

44.     When Officer Utter returned to the squad room a minute or two later, he again checked the monitor and this time saw that Whitaker was laying face down on the floor with his face toward the holding cell door.  (RTW SPD 00007; PSP 0127; Utter 47.)

45.     Officer Utter immediately rushed to the holding cell and attempted to open the door, but could only open it partially because Whitaker's body was blocking the door.  (RTW SPD 00007-8; PSP 0127; Utter 47.)

46.     With the door partially open, Officer Utter could hear that Whitaker was having difficulty breathing and it sounded to Officer Utter like Whitaker was snoring or gurgling.  (RTW SPD 00008; PSP 0127; Utter 48.)

47.     Officer Utter forced his way into the room and saw that Whitaker had a string tied around his neck with the other end tied to the cell door handle.  (RTW SPD 00008; PSP 0127-28; Utter 48.)

48.     Without hesitation, Officer Utter tried to save Whitaker's life by attempting to remove the string from around Whitaker's neck, but Whitaker became alert and combative and attacked Officer Utter, screaming and punching at

9

Officer Utter and attempting to bite the Officer's arm and wrist.  (RTW SPD 00008; PSP 0128; Utter 49, 70.)

49.    Officer Utter was able to pull away, and he stepped back into the hallway and, as Whitaker continued to scream and throw punches, Officer Utter drew his Taser and fired, striking Whitaker and administering one 5-second cycle. (RTW SPD 00008; PSP 0128, 130; Utter 49.)

50.    The Taser was successful in stopping Whitaker's aggressive actions, but the string was still around Whitaker's neck, so Officer Utter entered the holding cell, placed his Taser on the floor, and again attempted to remove the string from Whitaker's neck.  (RTW SPD 00008; PSP 0130; Utter 49.)

51.    When Officer Utter had the string removed partially, to approximately Whitaker's nose, the effects of the Taser wore off, and Whitaker again started screaming and punching Officer Utter.  (RTW SPD 00008; PSP 0130; Utter 49.)

52.    As Officer Utter looked for his Taser, Whitaker stood and charged at the Officer.  (RTW SPD 00008; PSP 0130-3; Utter 49.)

53.    Officer Utter again pulled the trigger on the Taser, but this time the Taser had no effect, and Whitaker continued to charge at Officer Utter, punching the Officer repeatedly in the head and body.  (RTW SPD 00008; PSP 0134-35, 0137-39; Utter 49-50, 52-53.)

54.    Officer Utter continued to back away from Whitaker, who was screaming and punching wildly, and Officer Utter stepped out of the room, into and down the hallway, where he tried to exit through a door.  (RTW SPD 00008; PSP 0133-34, 0141-43; Utter 50.)

55.    However, the Officer was quickly cornered at the end of the hallway.  (RTW SPD 0008; PSP 0133-34, 0141-43; Utter 50.)

56.    Officer Utter attempted to retreat through a door at the end of the hallway, but Whitaker slammed the door shut and continued to scream and to land numerous punches to Officer Utter's body and head, knocking Officer Utter's glasses off his face.  (RTW SPD 00008, 00065; PSP 0134; Utter 50.)

57.    Officer Utter was concerned that one of Whitaker's punches would knock him unconscious and that Whitaker would then take Officer Utter's gun.  (Utter 66.)

58.    While struggling with Whitaker, Officer Utter felt Whitaker pulling on the right side of the Officer's utility belt as if attempting to remove items from that side of the belt, which held several weapons, including his gun, his expandable baton/ASP, and OC spray.  (RTW SPD 00006, 00008; PSP 0135-36, 0142-43; Utter 50, 195.)

59.    Whitaker was able to remove Officer Utter's expandable baton/ASP, which was located next to Officer Utter's gun.  (RTW SPD 00065; PSP 0006; Utter 180.)

60.    With Whitaker continuing to punch him about the head and body and pull on his utility belt, with the Taser being ineffective, and knowing that he was alone with no assistance on the way, Officer Utter felt that he had exhausted all less-than-lethal means of force and was in fear that he would be severely injured or killed.  (RTW SPD 00006, 00008-9; PSP 0135-36; Utter 50, 111, 196-97, 204-05.)

61.    Officer Utter drew his duty weapon and fired two (2) shots in a law enforcement technique called a "double tap," which is the firing of two (2) shots in quick succession so that it is one continuous motion.  (RTW SPD 00006, 00008-9; PSP 0135-36; Utter 50, 111, 196-97, 204-05.)

62.    Officer Utter testified that: "From the time he attacked me to the time that I fired my trigger the only thing that I was doing was trying to save my life." (Utter 58.)

63.    When Officer Utter fired his gun the first time, Whitaker was facing him and still landing punches.  (Utter 60, 64-65.)

64.    When Officer Utter fired the second shot, Whitaker was still within arm's length.  (Utter 65.)

65.    Officer Utter did not know that the first shot hit Whitaker.  (PSP 0136; Utter 108.)

66.    Officer Utter's gun contained 13 rounds, and Officer Utter could have fired all 13 rounds within a matter of seconds; however, Officer Utter fired only twice, and he stopped firing when the threat was neutralized.  (Utter 193-94, 205.)

67.    The first shot struck Whitaker in the left side of his chest, and the second shot struck him in the back.  (PSP 0006, 0101; Miller 55.)

68.    Once Whitaker was secured, Officer Utter called for both police and ambulance assistance.  (RTW SPD 00009; PSP 0021; Utter 66-67.)

69.    An off-duty Springettsbury Township officer – James Miller – who was out in the station parking lot practicing his bagpipes, heard the "double tap" -- two shots fired in rapid succession – and rushed into the station and began administering aid to Whitaker.  (RTW SPD 00009; PSP 0074-75; Miller 41-44, 46-56; Utter 23, 67.)

70.    The ambulance crew arrived immediately thereafter and attempted to treat Whitaker, but unfortunately the wounds were fatal.  (RTW SPD 00009; PSP 0021; Utter 67; Miller 56.)

71.    An autopsy was performed on July 9, 2007, by pathologist Barbara K. Bollinger, M.D., of Forensic Pathology Associates in Allentown, Pennsylvania, who determined that either of the shots would have been fatal.  (PSP 0103.)

13

## VI.  SPRINGETTSBURY TOWNSHIP POLICE DEPARTMENT AND CHIEF ESHBACH

72.     David C. Eshbach ("Chief Eshbach") is the Chief of Police for STPD. (Eshbach I 6.)[6]

73.     Chief Eshbach began his employment with the STPD[7] on January 13, 1986, as a patrolman; was assigned to criminal investigations in 1988; was assigned to the York County Drug Task Force as a plain clothes investigator in the early 1990s; was promoted to corporal in 1992; was promoted to sergeant in 1993; and was promoted to Chief of Police on March 3, 1997.  (Eshbach I 6-7, 14-17.)

74.     Chief Eshbach is a member of the Fraternal Order of Police, International Association of Chiefs of Police, Pennsylvania Chiefs of Police Association, the Central Pennsylvania Chiefs of Police Association and the York County Chiefs of Police Association.  (Eshbach I 8.)

75.     During his career in law enforcement, Chief Eshbach has been a member of the Law and Legislative Committee for the Pennsylvania Chiefs of Police Association, a past president of the York County Chiefs of Police

---

[6] "(Eshbach I __)" refers to excerpts from the deposition transcript of David C. Eshbach taken on January 16, 2009, which are included as Exhibit "E" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

[7] Prior to his employment with STPD, Chief Eshbach was a police officer for the Borough of Fawn Grove and the West York Borough Police Department in 1985. (Eshbach I 13-14.)  Chief Eshbach obtained his associate's degree in criminal justice from York College in 1998.  (Eshbach I 7, 13.)

Association, past member of the Membership Committee and the Education and Training Committee for the Pennsylvania Chiefs of Police Association. (Eshbach I 8.)

76.    Chief Eshbach is currently the First Vice President of the Central Pennsylvania Chiefs of Police Association, has been Chair of the Training and Education Committee for the Central Pennsylvania Chiefs of Police Association for the past five years, and is a member of the Community Oriented Policing Committee for the International Association of Chiefs of Police. (Eshbach I 8-12.)

77.    In July 2007, STPD had a complement of approximately 32 officers. (Eshbach I 18, 20-21; Utter 14.)

78.    There are no minimum staffing requirements in either the labor contract or any rule or standard operating procedure. (Eshbach I 21.)

79.    On July 7, 2007, one sergeant and four patrol officers were on duty during the night shift. (Eshbach I 21-22; Utter 19.)

## VII.    **STPD POLICIES AND PROCEDURES**

80.    STPD and its policies meet the accreditation standards for the Pennsylvania Law Enforcement Accreditation Commission ("PLEAC"). (Eshbach I 105, 120.)

81.     STPD has been accredited by PLEAC since July 8, 2006.  (Eshbach II 60-61; *see also* Eshbach Decl. ¶¶ 3, 4 and Eshbach Decl. Ex. 1.)[8]

82.     To become PLEAC-accredited, STPD had to show proof to an on-site assessor that it has written standards in place and that those standards are followed. (Eshbach I 120; Eshbach II 60-61, 66-68.)

83.     Each of STPD's standard operating procedures is reviewed at least once a year.  (Eshbach I 126-128; Eshbach II 17.)

84.     Upon hire, each officer is provided with a copy of all SOPs then in effect ("SOP manual").  (Eshbach I 82; Utter 11-12, 114-115.)

85.     Upon hire, Officer Utter received a binder which contained STPD's standard operating policies and procedures as well as any revisions to the same. (Utter 114-115, 118.)

86.     If an SOP is revised in any way during an officer's employment, he or she is provided with a copy of the revised SOP for his or her SOP manual and is provided with training regarding the revised SOP.  (Eshbach I 82-83; Miller 74.)[9]

---

[8] "(Eshbach II __)" refers to excerpts from the second deposition transcript of David C. Eshbach taken on February 9, 2009, which are included as Exhibit "G" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

[9] "(Miller __)" refers to excerpts from the deposition transcript of James Miller taken on February 4, 2009, which are included as Exhibit "I" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

87.     This training involves the officer's supervisor reviewing the material with them, explaining the revisions, and providing the officer with an opportunity to ask questions.  (Eshbach I 82-83, 119-120; Miller 74.)

88.     Chief Eshbach expects that all STPD officers, including Utter, comply with the SOPs in effect.  (Eshbach I 119; Utter 12, 152, 160.)

89.     STPD has an SOP entitled "Use of Force" (SOP #98-02) which was revised in July 2006 and in effect at the time of this incident.  (Eshbach Decl. ¶ 11 and Eshbach Decl. Ex. 4.)

90.     Officer Utter was familiar with the SOP regarding use of force.  (Utter 148-149.)

91.     SOP #98-02 provides that a "police officer is justified in using deadly force only when he believes that such force is necessary to prevent death or serious bodily injury to himself or such other person."  (Eshbach Decl. Ex. 4.)

92.     Although the use of force continuum includes a verbal warning, there are times that an officer may be unable to issue such a warning and deadly force may be used where an officer is in fear of his life.  (Eshbach I 155-156; Eshbach Decl. Ex. 4.)

93.     Every STPD Officer, including Officer Utter, is, and was in 2007, required to complete firearm training and qualifications yearly.  (Utter 154.)

94.     STPD Officers, including Officer Utter, are, and were in 2007, trained to fire their service weapons using the "double tap" technique, in which two shots are fired in quick succession.  (Utter 194, 203-5; Miller 41-43.)

95.     Prior to the incident giving rise to this lawsuit, the Township had never received a complaint alleging that Officer Utter used excessive force or otherwise violated any person's constitutional rights.  (Eshbach Decl. ¶ 17.)

96.     Detainees arrested for a felony are held at the STPD until it is time for transport to Central Booking, which requires the preparation of the necessary paperwork and may include running a criminal history check, inventorying property, speaking with the detainee and completing reports.  (Eshbach I 89-94.)

97.     STPD is a police station, not a jail facility.  (Eshbach II 18, 38.)

98.     Generally, a detainee should not be unhandcuffed in a holding cell if "violent, if they're destructive, if they are trying to hurt themselves, hurt the officer, damage the room" or "desecrate the room."  (Eshbach I 83.)

99.     In an emergency situation, an officer is not required to secure his or her weapon prior to entering the holding room.  (Eshbach I 71; Ford 40; Utter 42-43, 45, 191, 202; Miller 40; Krentz 34; Eshbach Decl. Ex. 7, RTW SPD 0625.)

100.    PLEAC does not have standard policies on a detainee's risk of suicide or his or her mental health.  (Eshbach II 65-66; Eshbach Decl. ¶¶ 6, 7 and Eshbach Decl. Ex. 2.)

101.   STPD's personnel have had training regarding mental health issues but not training specific to prisoner suicide.  (Eshbach II 18; Ford 32, Utter 28, 127-129; Krentz 29-30.) [10]

102.   SOP #2005-02, Section XXIX, Subsection A. 1. requires that either the arresting officer or the officer in charge of the custody of a detainee be on station when there is a detainee on station.  (Eshbach I 71-72; Eshbach Decl. Ex. 7, RTW SPD 0638.)

103.   SOP #2005-002 requires that a detainee be personally checked every 30 minutes if non-violent and every 10 minutes if deemed necessary.  (Eshbach I 93-95, 98, 171-172, 175; Eshbach II 22; Eshbach Decl. Ex. 7, RTW SPD 0632.)

104.   If a detainee exhibits certain characteristics, that person must be personally checked every 10 minutes and constantly monitored through the video surveillance system.  (Eshbach I 171-172; Eshbach Decl. Ex. 7, RTW SPD 0632.)

105.   Officer Utter was aware that there was an SOP in effect regarding holding rooms and received a copy of the revised SOP #2005-002 on April 4, 2006.  (Utter 121; Eshbach Decl. Ex. 7.)

---

[10] "(Ford __)" refers to excerpts from the deposition transcript of Christopher Ford taken on January 20, 2009, which are included as Exhibit "J" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.* "(Krentz ___)" refers to excerpts from the deposition transcript of John Krentz taken on January 20, 2009, which are included as Exhibit "K" in the *Appendix to Defendants' Joint Concise Statement of Material Facts.*

106.    Chief Eshbach's expectation was that officers would determine that a detainee had mental health issues based on their observations of and discussions with the person as well as information communicated by someone at the scene and/or a family member.  (Eshbach II 18-19.)

107.    All detainees are constantly monitored through the video surveillance system.  (Eshbach I 173-174, Miller 20.)

108.    PLEAC does not have a standard policy regarding the removal of items such as shoe laces or shirts from detainees.  (Eshbach II 62; Utter 28; *see also* Eshbach Decl. ¶¶ 5-7 and Eshbach Decl. Ex. 2.)

109.    To be "constantly monitored through the video surveillance system" means that while an officer is in the squad room doing paperwork, he or she is to "look at the monitor every so often to make sure that nothing is going on in the [holding] room."  (Eshbach I 173-174.)

110.    Because the video surveillance system does not always reflect what is actually happening in the holding room and/or the condition of the detainee, to "personally check" means that the officer must go to the holding room to check on the detainee.  (Eshbach I 173-174, 176.)

111.    SOP #2005-002 does not indicate how many times or how often an officer must monitor the video screen when a detainee is in a holding cell. (Eshbach I 176.)

112.   STPD's policy regarding holding rooms (SOP #2005-002) is based on

PLEAC's standard policy on holding rooms.  (Eshbach I 125; Eshbach II 62; *see*

*also* Eshbach Decl. ¶¶ 5-7, 13 and Eshbach Decl. Exs. 2, 7.)

113.   Section IV, Subsection B of SOP #2005-002 provides that

B.     An officer shall not remove the handcuffs from any detainee without
       first securing their firearm in a designated locker.  Officers may only
       enter a Holding Room with their firearm under the following
       conditions:
       1.     The detainee is handcuffed behind their back.
       2.     The detainee is secured to a detention bench per section D.
       below.
       3.     There is an emergency situation where an officer or detainee is
       in need of immediate assistance.

(Eshbach Decl. Ex. 7, RTW SPD 0624.)

114.   In practice, an officer would be in compliance with SOP #2005-002 if

he or she entered the department with the detainee handcuffed, had taken the

detainee to the holding room handcuffed, had secured the detainee in the holding

room handcuffed, had locked up his/her weapon, returned to the holding room and

unhandcuffed the detainee if the officer felt it was okay to unhandcuff the detainee,

secured the holding room (by closing the door), retrieved his or her weapon and

reholstered it.  (Eshbach I 70-74.)

115.   The purpose of the SOP #2005-002, as regards an officer's retrieval of

their weapon is primarily to ensure that an officer is prepared in case something

happens in the station or on the station grounds.  (Eshbach I 70-71; *see also* Eshbach Decl. ¶ 13 and Eshbach Decl. Ex. 7.)

116.   STPD has an SOP entitled "Dealing With the Mentally Ill/Mental Health Emergencies" (SOP #2007-001) which was implemented with an effective date of January 9, 2007.  (Eshbach II 19-21; Utter 159-160; *see also* Eshbach Decl. ¶ 12 and Eshbach Decl. Ex. 5.)

117.   Although an officer must fill out the observation report for a detainee under SOP #2007-001 at some point, there is no requirement that the form must be completed before the detainee is unhandcuffed.  (Eshbach I 84; Eshbach II 23; Eshbach Decl. Ex. 5.)

118.   If Officer Utter determined at any time that Whitaker was suicidal, Chief Eshbach would have expected him to have been in touch with York Hospital Crisis Intervention Unit or some other mental health facility and would have requested an evaluation of Whitaker prior to Whitaker being taken to the Booking Center and prison lockup.  (Eshbach II 32-33; *see also* Eshbach Decl. ¶ 12 and Eshbach Decl. Ex. 5.)

119.   At the time of the incident, the SOP regarding the handling and safety of detainees was appropriate.  (Eshbach II 17.)

120.    In the 24 years that Chief Eshbach has been at STPD, there have never been any incidents at the STPD where a detainee has attempted to commit suicide by using a shoe lace or otherwise.  (Eshbach I 106-107; Eshbach II 36, 71.)

121.    Chief Eshbach was never personally aware of an incident where a person had tried to commit suicide with a shoelace.  (Eshbach I 106-107.)

122.    Prior to the instant incident, the SOP did not require that a detainee's belt or shoelaces be confiscated; rather it was at the officer's discretion based upon the demeanor of the detainee.  (Eshbach I 104, 110-111, Utter 138, 140; Miller 22-23; Polizzotto 24; Witmer 32.) [11]

123.    SOP #2005-002 was revised following the investigation of the instant incident and now requires the removal of shoes with laces and belts.  (Eshbach I 110, 111, 178-180; Witmer 33; Ford 39.)

## VIII.  STPD'S INVESTIGATION OF INCIDENT

124.    On or about July 8, 2007, Chief Eshbach received a telephone call from the 911 Center to inform him of the incident at the STPD.  (Eshbach I 30.)

125.    Chief Eshbach immediately responded and arrived at the STPD approximately 30 minutes later.  (Eshbach I 30.)

---

[11] "(Witmer ___)" refers to excerpts from the deposition transcript of Gregory Witmer taken on January 20, 2009, which are included as Exhibit "L" in the *Appendix to Defendants' Joint Concise Statement of Material Facts*. "(Polizzotto ___)" refers to excerpts from the deposition transcript of William Polizzotto, Jr. taken on January 20, 2009, which are included as Exhibit "M" in the *Appendix to Defendants' Joint Concise Statement of Material Facts*.

126.   Chief Eshbach spoke with Officer Utter after the Chief's arrival at the STPD.  (Eshbach I 31, 38.)

127.   Chief Eshbach assigned Lt. Scott Laird[12] to conduct an internal investigation of the incident.  (Eshbach I 31, 34.)

128.   Lt. Laird was assigned to conduct the internal investigation because he is the operations lieutenant and oversees the patrol division and the criminal investigative division.  (Eshbach I 32.)

129.   Lt. Laird interviewed Officer Ford, Officer Miller, Officer Polizzotto, Officer Krentz, Sgt. Witmer, and Officer Utter.  (Ford 28; Miller 65; Polizzotto 21-22; Krentz 5-6, 20-21; Witmer 31.)

130.   Chief Eshbach requested that Lt. David Trott make copies of the video surveillance prior to the hard drives being transferred to the PSP for the purpose of performing an internal investigation.  (Eshbach II 7-8; PSP 0028; RTW SPD 00071-72.)

131.   The scope of Lt. Laird's investigation was administrative in nature and was to find out the facts of the incident of July 7, 2007, and whether any violations of STPD's policies and procedures occurred.  (Eshbach I 51, 53-54.)

---

[12] Lt. Laird, whom Chief Eshbach has worked with his entire career at the STPD, was hired by the STPD in February 1985.  (Eshbach I 31-32.)

132.    An additional purpose of the administrative investigation was to determine if STPD's policies and procedures should be amended or revised. (Eshbach I 54.)

## IX.    INVESTIGATION BY PSP AND YORK COUNTY DA

133.    Chief Eshbach contacted the Pennsylvania State Police ("PSP") and the York County District Attorney's Office as required by STPD policy following the use of deadly force by one of its officers.  (Eshbach I 34-36.)

134.    The PSP and the York County District Attorney's Office conducted a joint investigation.  (RTW SPD 00033.)

135.    The purpose of the PSP's/York County District Attorney's investigation was to determine whether any violations of law were committed on July 7, 2007.  (Eshbach I 51.)

136.    Trooper Bryan Henneman of the PSP interviewed and/or obtained written statements from Officer Ford, Officer Miller, Officer Polizzotto, Officer Krentz, Sgt. Witmer and Officer Utter.  (Ford 28; Miller 65; Polizzotto 21-22; PSP 0026; Witmer 31-32; Utter 63).

137.    Officer Utter testified in this matter that the statement he gave to the PSP was true and correct.  (Utter 106-07.)

138.    After a complete and thorough investigation, the PSP and the York County District Attorney's Office determined that Officer Utter's deadly use of

force was reasonable and justified under the circumstances.  (RTW SPD 00765-66.)

CAMPBELL DURRANT BEATTY      LAMB MCERLANE PC
 PALOMBO & MILLER, P.C.

                                                By:    s/ David J. MacMain
By:    s/ Brian P. Gabriel                              David J. MacMain (PA 59320)
         Brian P. Gabriel (PA 73132)             Janelle E. Fulton (PA 80027)
         555 Grant Street, Suite 310             24 East Market Street, Box 565
         Pittsburgh, PA  15219                   West Chester, PA  19381-0565
         TEL: (412) 395-1280                     TEL:  (610) 430-8000
         FAX: (412) 395-1291                     FAX:  (610) 692-0877
         bgabriel@cdblaw.com                     *Attorneys for Defendant*
         *Attorneys for Defendants,*             *Gary Utter*
         *Springettsbury Township,*
         *Springettsbury Township PD,*
         *Chief David Eshbach*


Dated:          September 3, 2009

## CERTIFICATE OF ELECTRONIC SERVICE

We hereby certify that on this 3rd day of September 2009, we caused a true and correct copy of the foregoing Joint Concise Statement of Material Facts to be served upon the following via the ECF system of the United States District Court for the Middle District of Pennsylvania:

Matthew B. Weisberg, Esquire
Prochniak & Weisberg P.C.
7 South Morton Avenue
Morton, PA  19070
mweisberg@ppwlaw.com
*Counsel for Plaintiffs*

CAMPBELL DURRANT BEATTY
 PALOMBO & MILLER, P.C.

By:   s/ Brian P. Gabriel
      Brian P. Gabriel
      PA 73132
      555 Grant Street, Suite 310
      Pittsburgh, PA  15219
      TEL: (412) 395-1280
      FAX: (412) 395-1291
      bgabriel@cdblaw.com

      Attorneys for Defendants,
      Springettsbury Township,
      Springettsbury Township PD,
      Chief David Eshbach

LAMB MCERLANE PC

By:   s/ David J. MacMain
      David J. MacMain (PA 59320)
      Janelle E. Fulton (PA 80027)
      24 East Market Street - Box 565
      West Chester, Pennsylvania  19381
      TEL:  (610) 430-8000
      FAX:  (610) 692-0877

      Attorneys for Defendant Gary Utter