# EXHIBIT "A"

| REPORT TYPE | | |
|---|---|---|
| ☒ INITIAL | ☐ CONTINUATION | |
| ☐ SUPPLEMENTAL | | |

**PENNSYLVANIA STATE POLICE**
**INCIDENT REPORT - PART I**

DOMESTIC VIOLENCE

ATTACHMENTS:

☐ FELONY CRIMES AGAINST THE PERSON
☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT
☐ PROPERTY RECORD
☐ MISSING PERSON CHECKLIST
☐ STATEMENT FORM(S)
☐ RIGHTS WARNING AND WAIVER
☐ OTHER

| 62. DATE OF REPORT | 63. OFFENSE |
|---|---|
| 07/27/07 | Aggravated Assault |

ADDRESS: 73 Hellam Street, Wrightsville, PA 17368

Ronald L. WOLFE WHITAKER JR.

| 69. HEIGHT | 70. WEIGHT | 71. HAIR | 72. EYES | 73. MARITAL STATUS |
|---|---|---|---|---|
| 506 | 160 | BRO | BLU | single |

68. NICKNAMES/ALIAS

| 78. RES. STAT. | 79. OFF. CODE | 80. TYPE ARREST | 81. DATE OF ARREST | 82. ARMED WITH | A | STATE |
|---|---|---|---|---|---|---|
| R | | | | | | PA |

| 84. FINGERPRINTED | 85. PHOTOGRAPHED | 86. DISP. UNDER 18 | 87. VIC. NO. REL | | 89. OLN |
|---|---|---|---|---|---|
| ☐ YES ☒ NO | ☐ YES ☒ NO | | 01 | | 21425289 |

90. BIRTHPLACE

91. EMPLOYER/SCHOOL: New Standard Corporation

92. MISC. NO.

| 68. NICKNAMES/ALIAS | | | | 69. HEIGHT | 70. WEIGHT | 71. HAIR | 72. EYES | 73. MARITAL STATUS |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

| 78. RES. STAT. | 79. OFF. CODE | 80. TYPE ARREST | 81. DATE OF ARREST | 82. ARMED WITH | A | | STATE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

| 84. FINGERPRINTED | 85. PHOTOGRAPHED | 86. DISP. UNDER 18 | 87. VIC. NO. REL | | 89. OLN | | 92. MISC. NO. |
|---|---|---|---|---|---|---|---|
| ☐ YES ☐ NO | ☐ YES ☐ NO | | | | | | |

90. BIRTHPLACE

91. EMPLOYER/SCHOOL

**93. NARRATIVE**

Latitude: 39 59:27.83  Longitude: -76 40:13.57

In the commission of this crime, the suspect who was in police custody for robbery attacked the victim (Officer UTTER) after the victim attempted to save the suspect from committing suicide while in custody at the Springettsbury Township Police Department. During the course of the assault, the suspect successfully disarmed the victim of his ASP baton.

Evidence consists of video surveillance footage of the incident which is in evidence (H7-13255) in connection with H07-1679711 (Homicide Report).

On 07/07/07, at approximately 2355 hours, the victim who is a police officer for Springettsbury Township Police Department attempted to save the life of the suspect who was in custody at that time in a police holding cell at the police department. The suspect was observed on video attempting to hang himself with his own shoelace from a door knob of the holding cell. The suspect was in custody at that time for a robbery that had occurred that night at Giant grocery store in Springettsbury Township, York County.

The victim entered the cell and attempted to remove the shoelace from the suspect's neck at which time the suspect began to physically attack the victim. The victim was able to successfully tase the suspect while in the cell but then after the taser cycle was complete the suspect again began to attack the victim. The assault led out into a hallway at the department where the suspect was observed on video footage striking the victim and then removing the victim's duty ASP baton from his gun belt. Directly after the suspect disarmed the victim of his ASP baton, the suspect was shot and killed by the victim in the hallway.

Due to the death of the suspect, I recommend that the investigation be closed.

Please refer to H07-1679711 for additional details regarding this incident and the subsequent death of the suspect.

| 94. OFFICER'S NAME/SIGNATURE | BADGE NO. | 95. INVES. RECM. | 96. SUPV. INIT./BADGE NO. | 97. | 98. PAGE |
|---|---|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | 8636 | ☐ CONT. ☒ TERM. | | ☐ CONCUR ☐ NONCONCUR | 02 |

**DEPARTMENT HEADQUARTERS**

HOMICIDE INVESTIGATION ACTION REPORT

INCIDENT NO.
H07-1679711

ACTION ASSIGNED OR PURPOSE OF REPORT

Synopsis

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

DETAILS

**DECEASED: Ronald WHITAKER JR**                              **DATE OCCURRED: 07/07/07**

This investigation originates out of a police involved shooting by Officer Gary UTTER of Springettsbury Township Police Department which resulted in the death of Ronald Taylor WHITAKER JR. WHITAKER had been taken into custody prior to the shooting at Giant grocery store in Springettsbury Township for a robbery that same night. Officer UTTER was an assisting officer in the robbery investigation and conducted the transport of WHITAKER from Giant to Springettsbury Township Police Department at 1501 Mt. Zion Road, Springettsbury Township where the shooting occurred. While WHITAKER was in the holding cell at Springettsbury Township Police Department, WHITAKER attempted suicide by hanging himself with a shoelace to the doorknob of the holding room door. Officer UTTER observed WHITAKER attempting suicide and attempted to prevent the suicide from occurring. While attempting to prevent WHITAKER from committing suicide, WHITAKER began to fight Officer UTTER. During the fight which started in the holding room and led out into the holding area hallway, WHITAKER attempted to disarm Officer UTTER at which time, UTTER shot WHITAKER twice resulting in WHITAKER's death. It should be noted that a separate Pennsylvania State Police Incident Report (H07-1684847) has been prepared in order to document the offenses committed by WHITAKER during this incident.

**SYNOPSIS:**

This investigation originates out of a police involved shooting by Officer Gary UTTER of Springettsbury Township Police Department which resulted in the death of Ronald Taylor WHITAKER JR, a W/N-M. On 07/07/07 at approximately 2146 hours, WHITAKER entered the Giant grocery store located at 2415 East Market Street, Springettsbury Township, York County and used the Coinstar machine located at the front of the store. WHITAKER received $10.15 in US Currency from the change that he had placed into the machine and left the store. WHITAKER then returned to the store after 5-10 minutes, demanded to see his Coinstar receipt, and then advised Cashier Penelope GWILT that he had over $20.00 in change instead of $10.15 in change. WHITAKER then left the store without incident.

At 2254 hours on 07/07/07, WHITAKER reentered the same Giant store and attempted to utilize the Coinstar machine again. This time, WHITAKER allegedly placed approximately $20.00 in US coin currency into the machine and the machine stopped part way through the counting process. The machine then printed out a receipt indicating that WHITAKER had only placed $2.61 (with the exception of the 8.9% transaction fee) into the Coinstar machine. WHITAKER then proceeded to the front checkout register and complained to Check Out Coach Linda THOMAS. THOMAS attempted to assist WHITAKER with the situation and checked the Coinstar machine for jams but found none. THOMAS also called the Coinstar Office in attempt to rectify the alleged shortage but had negative success.

Due to the fact that Coinstar is an outside vendor, there are policies in place from Giant that if an alleged shortage occurs, the customer must fill out an unverified transaction claim form and submit the form to the Coinstar Office who will then investigate the claim and determine if the machine actually malfunctioned and shorted the customer any currency. THOMAS had WHITAKER fill out the supplied claim form however it was noted that WHITAKER forged the claim form by using a home address of 851 E. Main Street, Ephrata, PA address rather than his correct address of 513 Hellam Street, Wrightsville, PA. It was later determined that WHITAKER had resided at the address listed on the claim form between 2001 and 2004 but forged the claim form for unknown reasons.

WHITAKER was not satisfied with the fact that Giant would not give him the difference between the amount that he allegedly had and the amount that was on the Coinstar receipt. Giant employee Linda THOMAS also made statements that WHITAKER was intoxicated and was demanding his money so that he could purchase gas to get back to his home in Ephrata, PA. After WHITAKER disputed the Coinstar machine shortage for about a half an hour with Giant employees, WHITAKER attempted to physically remove the cash register after stating to THOMAS, "Give me my money bitch!".

-continued-

| | BADGE NO. | DATE |
|---|---|---|
| HENNEMAN | 8636 | 07/23/07 |
| | C.I. SECTION CO. | PAGE NO. 2 |

| REPORT TYPE | | | |
|---|---|---|---|
| ☒ INCIDENT | | JUVENILE | DOMESTIC VIOLENCE |
| ☐ OTHER | | ☐ | ☐ |

| ATTACHMENTS: | ☐ MISSING PERSON CHECKLIST | DISP.: ☐ CLEARED BY ARREST ☐ UNFOUNDED ☐ EXCEPTIONALLY CLEARED- DATE |
|---|---|---|
| ☐ FELONY CRIMES AGAINST THE PERSON | ☐ STATEMENT FORM(S) | |
| ☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT | ☐ RIGHTS WARNING AND WAIVER | |
| ☐ PROPERTY RECORD ☐ OTHER | | 2. DATE OF REPORT  07/23/07 |

| 3. OFFENSE | 4. VICTIM |
|---|---|
| Death Investigation | |

6. NARRATIVE

**DECEASED: Ronald WHITAKER JR**          DATE OCCURRED: 07/07/07

Synopsis Continued:

Directly after WHITAKER began his attempt to steal the entire cash register, Giant customer Theodore MOSLEY tackled WHITAKER and attempted to restrain him. During the struggle with MOSLEY, WHITAKER bit MOSLEY on the arm. Another Giant customer and other nighttime employees joined in and also restrained WHITAKER while THOMAS called 911. Officer FORD from Springettsbury Township Police Department then arrived at the Giant and placed WHITAKER into custody who was at that time laying face down in the front of the store by the front cash register area. Upon FORD's arrival, WHITAKER was calm and appeared to be apologetic for his actions. WHITAKER made statements while in custody at Giant that he was sorry for what he had done and indicated that he had been drinking alcoholic beverages. WHITAKER was then escorted out of Giant and subsequently transported by Officer UTTER to the Springettsbury Township Police Department while Officer FORD finished obtaining witness and victim information from Giant.

On 07/07/07 at 2340 hours, Officer UTTER is observed on video arriving at Springettsbury Township Police Department and at 2341 hours, pulled into the garage bay. UTTER then removed WHITAKER out of the patrol unit who is observed at that time still handcuffed behind the back. WHITAKER is then escorted by UTTER into the station, through the booking area, and into holding room number one. Once inside the holding room, UTTER unhandcuffed WHITAKER and sits down on a chair in the holding room. UTTER shuts the holding room door which is automatically secured and leaves the holding area. UTTER reentered the holding room at 23:46:41 hours and observed WHITAKER holding his side. At this time, WHITAKER explained to Officer UTTER that his ribs hurt and he is having difficulty breathing due to the struggle that occurred at the Giant between WHITAKER and customers and employees. UTTER exited the room after asking a few questions, contacts York County 911, and requested that an ambulance be dispatched to the station to check out WHITAKER's alleged injuries.

On 07/07/07 at 23:52:40 hours, WHITAKER began to untie his shoelace from his left boot and then immediately tied the lace around his neck and attempts to hang himself from the doorknob of the holding room. Officer UTTER observed WHITAKER via a video monitor lying on the floor with his head towards the holding room door and entered the room at 23:54:33 hours to determine what WHITAKER was doing. Officer UTTER observed WHITAKER attempting suicide and attempts to free the shoelace from around his neck. WHITAKER began to fight with UTTER at which time UTTER was able to successfully tase WHITAKER in the upper right shoulder/chest area. After the taser had completed a five second cycle, UTTER placed his taser on the floor and attempts to free the shoelace from WHITAKER's neck. WHITAKER then began to fight UTTER again. UTTER immediately picked up his taser and the fight led out into the holding area hallway.

The holding area hallway has three main escape routes that WHITAKER could have attempted. The first is a doorway in the northern end of the hallway which leads to offices of the main portion of the department and eventually an exterior door. The second doorway is across from holding room one which leads to the booking area and then the garage bay which could be opened. The third is a doorway in the southern side of the hallway which leads to the basement that has another exterior door in which WHITAKER could escape.

During the struggle, UTTER and WHITAKER began the fight in holding room one by the southern end doorway and then out into the hallway and north in the hallway to the northern doorway leading to the main portion of the department. Once the fight led to the northern end of the hallway, Officer UTTER attempted to tase WHITAKER a second time with no success and then opened the northern doorway in an attempt to maneuver more due to the severity of the struggle.

-continued-

| | | 7. INVEST. RECM. | 8. SUPV. INIT./BADGE NO. | 9. ☒ CONCUR | 10. PAGE |
|---|---|---|---|---|---|
| | | ☒ CONT. ☐ TERM | TSL  5593 | ☐ NONCONCUR | 3 |

DEPARTMENT HEADQUARTERS

| REPORT TYPE | |
|---|---|
| ☒ INCIDENT | |
| ☐ OTHER | |

| JUVENILE | DOMESTIC VIOLENCE |
|---|---|
| ☐ | ☐ |

ATTACHMENTS:    ☐ MISSING PERSON CHECKLIST    DISP.: ☐ CLEARED BY ARREST  ☐ UNFOUNDED  ☐ EXCEPTIONALLY CLEARED- DATE

☐ FELONY CRIMES AGAINST THE PERSON    ☐ STATEMENT FORM(S)

☐ VICTIM/WITNESS ASSISTANCE GUIDE RECEIPT    ☐ RIGHTS WARNING AND WAIVER

☐ PROPERTY RECORD    ☐ OTHER

| 1. OFFENSE | | 2. DATE OF REPORT |
|---|---|---|
| | | 07/23/07 |

| 1. OFFENSE | 4. VICTIM |
|---|---|
| Death Investigation | |

5. NARRATIVE

**DECEASED: Ronald WHITAKER JR**          **DATE OCCURRED: 07/07/07**

Synopsis Continued:

Just as UTTER opened the hallway door; the taser fell to the floor and traveled towards the southern doorway.  At 23:55:19, WHITAKER is observed on video reaching around UTTER's body towards his gun/ASP area of his duty belt. Approximately four seconds after WHITAKER is observed reaching around UTTER's gun belt, UTTER fired the first shot striking WHITAKER in the lower left chest area.  Immediately following the first shot, WHITAKER is clearly observed with UTTER's ASP baton and WHITAKER spun to the left and began to travel south in the hallway.  UTTER was not aware if he had struck WHITAKER with the first shot and then aimed the gun towards WHITAKER and fired a second shot in the hallway. WHITAKER then fell to the floor facing a southern direction and is observed picking up UTTER's taser with his left hand. Once UTTER observed WHITAKER laying on the floor with all action at a stop, he immediately exited the northern doorway and called for help using a portable radio.

After UTTER fired the two shots, Officer MILLER who was outside of the rear of the station, heard the gunshots and retrieved the keys for the station from his personal vehicle.  MILLER then entered the station at 23:56:22 to ascertain what had happened.  One second after MILLER entered the rear of the station; EMS arrived at the station and is then notified that WHITAKER is down.  Officer MILLER immediately radioed for assistance and retrieved rubber gloves to begin first aide on WHITAKER.  Since the police department doors are kept locked from the outside, UTTER opened the rear door to allow responding EMS and back up officers inside the building.  EMS begin first aide with the assistance of MILLER and on 07/08/07 at 00:00:40, WHITAKER is placed on a gurney to be transported to a hospital.  WHITAKER is then taken out of the building on the gurney and at 00:04:09, the ambulance left the station to rendezvous with advanced life support personnel. WHITAKER was subsequently transported to York Hospital and officially pronounced dead upon arrival.  It should be noted that all times that are listed on this synopsis in regards to actions that took place at Springettsbury Township Police Department are times reflected on the video footage from the station camera system.

| 6. OFFICER'S NAME/SIGNATURE | 6A. BADGE NO. | 7. INVEST. RECM. | 8. SUPV. INIT./BADGE NO. | 9. CONCUR | 10. PAGE |
|---|---|---|---|---|---|
| | 86352 | ☒ CONT. ☐ TERM. | TSL 5598 | ☐ NONCONCUR | 4 |

DEPARTMENT HEADQUARTERS

HOMICIDE INVESTIGATION ACTION REPORT

| | INCIDENT NO. |
|---|---|
| | H07-1679711 |

**ACTION ASSIGNED OR PURPOSE OF REPORT**

Interview of WHITAKER's family at 513 Hellam Street, Wrightsville Borough

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

**DETAILS**

**DECEASED: Ronald WHITAKER JR**                    **DATE OCCURRED: 07/07/07**

On 07/08/07 at approximately 0925 hours, I conducted a group interview with the family of WHITAKER. During that time, I also advised the family of more details than initially provided to them during the death notification by PSP. Present for the interview were Trooper Mark GRAY from Troop H, York Station, Criminal Investigation Unit, WHITAKER's father, Ronald Taylor WHITAKER SR, W/N-M, DOB: 2/21/46, 763 St. Joseph Street, Lancaster, PA 17603, (717)390-3034, Cell#(717)682-0454, WHITAKER's mother, Shirley A (MIO) WHITAKER, W/N-F, DOB: 11/6/47, 763 St. Joseph Street, Lancaster, PA 17603, Cell#(717)682-0455, WHITAKER's girlfriend, Dalea Jean LYNN, W/N-F, DOB: 06/10/71, 513 Hellam Street, Wrightsville, PA, (717)606-2831, and LYNN's mother, Velma Alverta HARRINGTON, W/N-F, DOB: 01/26/48, 291 Ailes Road, Delta, PA 17314, (717)456-7384.

I was advised during the interview of the following: LYNN and WHITAKER JR had been together for 17 years and had two biological children together. They had a son that was 15 years of age and a daughter that was 10 years of age. LYNN also had a third child being a 5 year old daughter with WHITAKER not being the father however WHITAKER assumed the role as her father as well. On 04/17/07, there was an electrical fire at 513 Hellam Street where the family was living and it damaged the first and second floors. The fire was investigated by the State Police Fire Marshall Tpr. Patrick MCKENNA. Since the fire, WHITAKER and LYNN had a tough time financially.. I was advised that WHITAKER and LYNN and the three children stayed in hotels and motels for awhile and also had to eat their meals in restaurants. LYNN also indicated that they had to rely on food stamps and were fighting all of the time. After staying in hotels for awhile, they moved back into the burnt residence and were currently residing in the basement which was the only portion of the residence that was unscathed by the fire. LYNN indicated that WHITAKER had a full time job at New Standard in Hellam Twp. as a machine operator for the past three months and was doing everything that he could to support his family.

LYNN and WHITAKER SR. indicated that on 07/07/07, LYNN and WHITAKER JR visited WHITAKER SR from approximately 1100 hours to 1400 hours and then returned to the residence. During the evening hours, WHITAKER JR worked on a demolition derby car in the back yard preparing for a demolition derby that was going to be held on the weekend of July 14th. LYNN went to a candle party at a neighbor's residence and returned home at approximately 2000 hours. LYNN indicated that she fell asleep on a couch in the basement watching a NASCAR race and WHITAKER JR came inside from working outside and was with her watching television. She indicated that WHITAKER may have consumed a few alcoholic beverages while working on his demolition derby car but was not intoxicated. LYNN also did not believe that WHITAKER was under the influence of any sort of illegal drugs or narcotics. LYNN indicated that once she fell asleep, WHITAKER JR removed approximately $20.00 in change that was meant for a Laundromat and went to Giant to exchange the bills for US paper currency for unknown purposes. LYNN indicated that she was not sure what time WHITAKER JR left the residence but believed it was around 2200 hours to 2230 hours on 07/07/07.

Written statements in regards to WHITAKER JR were not requested due to the circumstances and emotional state of the family.

| COMPLETED BY | | BADGE NO. | DATE |
|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/19/07 |

| SUPERVISOR'S REVIEW | C.I. SECTION CO. | PAGE NO. |
|---|---|---|
| Sgt. Tr.. S. lel    5575 | | ii |

DEPARTMENT HEADQUARTERS

HOMICIDE INVESTIGATION ACTION REPORT

| | INCIDENT NO. |
| --- | --- |
| | H07-1679711 |

**ACTION ASSIGNED OR PURPOSE OF REPORT**

Phone call to Lancaster County Probation Officer Terri CARR on 07/08/07

| ASSIGNED TO | ASSIGNED BY |
| --- | --- |
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

**DETAILS**

DECEASED: Ronald WHITAKER JR                    DATE OCCURRED: 07/07/07

On 07/08/07, a business card was located in WHITAKER's wallet for Probation Officer Samantha MINTZ of the Lancaster County Adult Probation Office (717)299-8181. On the back of the card was a date with the next appointment on it for 08/31/07 at 1000 hours. On 07/08/07 at approximately 1220 hours, I contacted Lancaster County Probation and spoke with Probation Officer Terri CARR. CARR related that WHITAKER was currently on probation for a Criminal Trespass conviction from 1999. CARR indicated that he was on probation until 11/07 because he had violated probation a few times including one violation in 2004 for a drug charge. CARR also indicated that WHITAKER had passed his last drug urine test which was on 06/22/07.

| COMPLETED BY | | BADGE NO. | DATE |
| --- | --- | --- | --- |
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/19/07 |

| SUPERVISOR'S REVIEW | C.I. SECTION CO. | PAGE NO. |
| --- | --- | --- |
| Sgt. Troy S. Wk____ 5598 | | 12 |

**DEPARTMENT HEADQUARTERS**

| HOMICIDE INVESTIGATION ACTION REPORT | INCIDENT NO. H07-1679711 |
|---|---|

ACTION ASSIGNED OR PURPOSE OF REPORT

Interview of Officer Gary UTTER, Springettsbury Township Police Department

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Sgt. Troy LOKAISER |

DETAILS

**DECEASED: Ronald WHITAKER JR**                    **DATE OCCURRED: 07/07/07**

On 07/16/07 at approximately 1005 hours, I conducted an interview of Officer Gary UTTER of the Springettsbury Township Police Department at PSP York. Present for the interview were myself, UTTER, his counsel Edward PASKEY, and Troop H, Criminal Investigation Supervisor Cpl. Jeffrey RINEER.

UTTER related the following: UTTER began his shift at 2300 hours on 07/07/07. He overheard the dispatch for a theft in progress at the Giant grocery store on East Market Street and also was informed that customers were restraining him. Several other police officers that were on duty also responded to the call. Upon arrival, UTTER indicated that WHITAKER was already in police custody. WHITAKER was then searched by UTTER and placed in UTTER's patrol car. UTTER then transported WHITAKER back to Springettsbury Township PD and opened the garage bay. UTTER related that WHITAKER only made one statement while in route back to the station. UTTER indicated that WHITAKER asked him if he had made "that much of a ruckus". UTTER related that WHITAKER appeared to be calm and relaxed. Upon arrival at the station, UTTER took off the handcuffs that were on WHITAKER and placed WHITAKER into holding cell #1. Once WHITAKER was in the cell, UTTER left and then returned to ask WHITAKER some questions for the investigating officer. While UTTER was asking WHITAKER questions, UTTER noted that WHITAKER was holding his side and appeared to be having a difficult time breathing. UTTER asked him what was wrong and WHITAKER indicated that he thought he may have gotten his ribs injured when he was tackled by customers at Giant and was having difficulty breathing. UTTER then shut the door and contacted Sgt. WITMER and advised him that he was going to contact county and have EMS respond to check WHITAKER out which he did do after the conversation. UTTER then requested a criminal history check on WHITAKER and while he was working, he looked at the video monitor and noted that WHITAKER was lying on the floor in the holding cell with his head facing the door. UTTER indicated that he thought that WHITAKER was having medical problems.

He opened the door slightly to the cell and then observed WHITAKER attempting to hang himself with the shoelace. UTTER immediately attempted to remove the shoelace from his neck and at that time, WHITAKER "came to life and went bizerk". UTTER indicated that WHITAKER started to fight with him and also attempted to bite his hand. At that time, UTTER was able to shoot WHITAKER with the taser which worked. UTTER indicated that WHITAKER never actually said any words during the struggle but rather screamed like a "caged animal". UTTER also indicated that he did not yell or scream at WHITAKER during the struggle. Once in the hallway, WHITAKER was throwing haymakers and punches and UTTER knew that he had to get out of the hallway to get more room. As UTTER and WHITAKER fought and UTTER worked his way to the doorway which leads to the main portion of the police department, UTTER indicated that the fight seemed like it was in slow motion. At this point, UTTER began to think about the force continuum and think about what force he had attempted to employ on WHITAKER and what was next. UTTER attempted to taser WHITAKER again in the doorway but indicated that WHITAKER was, "walking right through it". UTTER indicated that since he was in an enclosed area, he could not use his mace because it would have an adverse affect on himself. UTTER also thought about using his ASP however, at that point during the fight, he was pinned in a corner and couldn't maneuver. UTTER then indicated that he felt WHITAKER tugging and pulling at his gun belt in the area of his ASP, flashlight, and gun. UTTER remembered attempting to protect his weapon and thinking that it was just UTTER and WHITAKER in the hallway and that he didn't want WHITAKER to put UTTER down with a punch. UTTER then indicated that he pulled out his weapon like how he was taught at the range, and fired the first shot. UTTER then indicated that he was not aware at the time whether or not the first shot had struck WHITAKER. After the first shot, WHITAKER peeled around to UTTER's left and then UTTER indicated that he raised his gun and fired a second shot towards his back. After the second shot, WHITAKER went down in the hallway. As soon as he saw that WHITAKER was not moving and made sure that the scene was safe, UTTER immediately went into the patrol room and turned on his portable radio and began to radio for help. UTTER then related that Officer MILLER entered the station and also called for help and began administering first aide. UTTER then realized that responding EMS crews would not be able to enter the station unless someone opened the door so UTTER opened the door and responding EMS personnel and responding officers entered the station to assist.

Please refer to audiotape and transcription of UTTER's main portion of his interview for further details.

| COMPLETED BY | | BADGE NO. | DATE |
|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/18/07 |
| SUPERVISOR'S REVIEW Sgt. Troy S Will—— 5598 | C.I. SECTION CO. | | PAGE NO. 19) |

HOMICIDE INVESTIGATION ACTION REPORT

| | INCIDENT NO. |
|---|---|
| | H07-1679711 |

**ACTION ASSIGNED OR PURPOSE OF REPORT**

Interview of Officer William POLIZZOTTO JR at Springettsbury Township Police Department

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

**DETAILS**

**DECEASED: Ronald WHITAKER JR**            **DATE OCCURRED: 07/07/07**

On 07/17/07 at approximately 1940 hours, I conducted an interview with Officer William POLIZZOTTO JR of the Springettsbury Township Police Department. POLIZZOTTO related the following: On 07/07/07, POLIZZOTTO was working from 2200 hours to 0600 hours. POLIZZOTTO indicated that since he had started at 2200 hours, he did not actually speak or talk to UTTER prior to the Giant Store incident. Sometime after 2315 hours on 07/07/07, he was clearing another call and officers were dispatched to the Giant for a robbery in progress where employees were restraining the suspect. Once Officer FORD advised county that the suspect was in custody, POLIZZOTTO slowed his response and arrived at approximately 2329 hours at the Giant. Once inside of the Giant, POLIZZOTTO observed WHITAKER lying on the floor and as POLIZZOTTO was assisting with escorting WHITAKER out of the store, WHITAKER stated, "I'm sorry, I'm really drunk". POLIZZOTTO indicated that WHITAKER appeared to be calm during that time. POLIZZOTTO also assisted with checking WHITAKER for warrants and turned over WHITAKER's ID and wallet to UTTER that he had retrieved from WHITAKER's pocket. POLIZZOTTO was then dispatched to another call by York County Control and he left Giant to respond to that call as UTTER began the transport of WHITAKER to the station. As he was responding to the other call, POLIZZOTTO overheard a "signal 13" coming from UTTER at the station. He along with several others immediately responded and found MILLER kneeling over WHITAKER. POLIZZOTTO then turned around and observed UTTER collapse onto the floor in the hallway by the Corporal's Office. Since EMS was already on scene treating WHITAKER, POLIZZOTTO directed his attention to UTTER.

POLIZZOTTO then gave a written statement in regards to the incident.

| COMPLETED BY | | BADGE NO. | DATE |
|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/18/07 |

| SUPERVISOR'S REVIEW | C.I. SECTION CO. | PAGE NO. |
|---|---|---|
| SGT. Troy Sull 5518 | | 23 |

DEPARTMENT HEADQUARTERS

HOMICIDE INVESTIGATION ACTION REPORT

| | INCIDENT NO. H07-1679711 |
|---|---|

**ACTION ASSIGNED OR PURPOSE OF REPORT**

Interview of Officer John KRENTZ at Springettsbury Police Department

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

**DETAILS**

DECEASED: Ronald WHITAKER JR                    DATE OCCURRED: 07/07/07

On 07/17/07 at approximately 2015 hours, I conducted an interview of Springettsbury Township Police Officer John KRENTZ at the Springettsbury Township Police Department. KRENTZ related the following: KRENTZ was working from 2300 hours to 0700 hours and responded to Giant around 2315 hours for a subject who was attempting to remove money from a cash register and was being restrained by a customer. KRENTZ indicated that he and POLIZZOTTO arrived at the same time. When KRENTZ entered the store, KRENTZ observed WHITAKER already in custody. KRENTZ indicated that he did not hear WHITAKER make any statements but WHITAKER appeared to be very calm. KRENTZ was then directed to photograph the scene and speak to the customer that restrained him (MOSLEY). KRENTZ also photographed bite marks on MOSLEY from WHITAKER and attempted to convince MOSLEY to go to the hospital to get checked out with negative success. KRENTZ was then looking at the in store video and overheard someone yelling on the radio "signal 13" at "signal 2" and then realized that it was UTTER yelling. Both he and FORD then responded with lights and siren to station. While in route to the station, he also overheard MILLER requesting a blood clot bag. Upon arrival at the station, he was informed that WHITAKER had been shot and was requested by MILLER to assist with loading WHITAKER onto a gurney. Once KRENTZ assisted in placing WHITAKER onto the gurney, he realized that there were two EMT's at the scene. KRENTZ then focused his attention to UTTER for support once WHITAKER left the station.

KRENTZ then gave a written statement in regards to the incident.

| COMPLETED BY | | BADGE NO. | DATE |
|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/19/07 |

| SUPERVISOR'S REVIEW | C.I. SECTION CO. | PAGE NO. |
|---|---|---|
| Sgt. Troy Miller   5598 | | 27 |

DEPARTMENT HEADQUARTERS

**0026**

| HOMICIDE INVESTIGATION ACTION REPORT | INCIDENT NO. H07-1679711 |
|---|---|

**ACTION ASSIGNED OR PURPOSE OF REPORT**

Submission of Springettsbury Township Police Department's computer hard drive and UTTER's in car transport video into evidence

| ASSIGNED TO | ASSIGNED BY |
|---|---|
| Tpr. Bryan R. HENNEMAN | Cpl. Jeffrey RINEER |

**DETAILS**

**DECEASED: Ronald WHITAKER JR**          **DATE OCCURRED: 07/07/07**

   On 07/17/07, Detective Ogden DICKERSON of the Springettsbury Township Police Department transferred custody of the department's hard drive that contained video footage of the incident and also a copy of in car camera footage from UTTER's transport of WHITAKER on 07/07/07 to me.  The items were then transported back to PSP York and placed into evidence (H7-13255G) on 07/17/07.

| COMPLETED BY | | BADGE NO. | DATE |
|---|---|---|---|
| Tpr. Bryan R. HENNEMAN | | 8636 | 07/19/07 |

| SUPERVISOR'S REVIEW | C.I. SECTION CO. | PAGE NO. |
|---|---|---|
| SGT. Trg S Loo | | 26 |

**DEPARTMENT HEADQUARTERS**

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

| 1. VICTIM/WITNESS: James A. Miller | 2. INCIDENT NO.: |
|---|---|
| 3. ADDRESS: 1501 MT-Zion Rd. York, PA 17402 | 1 TELEPHONE: 717-757-3525 |

| 4. PLACE: Springettsbury Twp. P.D. | 5. DATE/DAY: 07/08/07  0450 | 6. TIME: 0450 |
|---|---|---|

7. OFFICERS NAME/SIGNATURE/BADGE NO.: | 8. PAGE NO./INITIALS:

9. STATEMENT:

On 07/07/07 I had just finished working the road in full uniform 3pm to 11pm. I changed & I then walked to my personal vehicle to obtain my bag pipes. I then began to play my pipes while standing under the car port of our station. I saw officer Utter bring back a male prisoner. The police vehicle was parked in the south facing garage due to the prisoner being taken into the station by this way. I played a few more tunes & I then stopped. At this point I heard the sound of pop pop. I then thought shit that sounds like gun shots. At this point I realized it had come from inside. I ran to my personal vehicle to obtain my keys. I ran to the door under the car port and opened the door. At this point I smelled the odor of spent gun powder. I then thought oh my God. I walked forward you slowly & I came upon officer Utter who stated to me "He tried to hang himself, He attacked me." I then made my way to the holding rooms & opened the door. I then saw a white male on the floor, head facing south & feet facing north. I saw a lot of blood around the male who was face down. I saw that he was not hand cuffed & the door was open to holding room #1. I ran to the radio in the finger print room & requested help. I asked for a marine blood clot packs to be brought to me.

*NOTICE*

Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE: James H. Miller

002A

DEPARTMENT HEADQUARTERS

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

| 1. VICTIM/WITNESS: | 2. INCIDENT NO.: |
|---|---|
| James A. Miller | |

| 3. ADDRESS: | TELEPHONE: |
|---|---|
| 1501 Mt. Zion Rd. York, PA 17402 | 717-757-3525 |

| 4. PLACE: | 5. DATE/DAY: | 6. TIME: |
|---|---|---|
| Springettsbury Twp. PD. | 07/08/07 | 0450 |

| 7. OFFICER'S NAME/SIGNATURE/BADGE NO.: | 8. PAGE NO./INITIALS: |
|---|---|

9. STATEMENT:

I then placed rubber gloves on d went back to the male. I then rolled him on his back so he might have ease of breathing. I then checked for a pulse at his coroted artery. The pulse was very Faint & I checked again. I also checked to see were the exit/entrance was so I could apply pressure. At this point the springettsbury Twp. Ambulance arrived. Matt from the ambulance then started working on the male as far as oxygen. I told Matt to just tell me what to do. Dwaine from the ambulance then stated lets load him up & get moving now. The 3 of us then placed the male on the litter & took him to the ambulance. He was loaded up & then transported into York Hospital.

note: while we were pushing the litter up the ramp towards the door to exit I stepped on a taser cartridge that was hanging off of the male. This cartridge then stayed in the hall way ramp.

James A. Miller
07/08/07 at 0450

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:

James A. Miller

**0075**

DEPARTMENT HEADQUARTERS

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

1. VICTIM/WITNESS:
Ptlm. Christopher R. Ford

2. INCIDENT NO.:

3. ADDRESS:
1501 Mt. Zion Rd. York. Pa. 17402

TELEPHONE:
717-757-3525

4. PLACE:
Springettsbury Twp Police Dept.

5. DATE/DAY: 07/17/07 Tues.

6. TIME: 2044

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:

8. PAGE NO./INITIALS: 1  CRF

9. STATEMENT:

On 07/07/07 At Approx 2326 Hrs, I was Dispatched to Giant, 2415 E. Market St, For a Subject Being Physically Restrained By Customers/Employees. York County Control Advised the Subject Attempted to Remove a Cash Register From the Store. I Arrived At Approx 2327 Hrs, I observed Several Male Subjects Physically Restraining Ronald T. Whitaker In Front of the Customer Service Area. Whitaker was Positioned Face Down and was not Combative upon My Arrival. I Verbally Advised Whitaker to Place His Hands Behind His Back, Which He Did. I Placed Whitaker In Handcuffs Behind His Back And Waited until Back up Unit(s) Arrived. Ofc. Utter, Ofc. Pozzatto, And Sgt. Witmer Arrived on Scene. Whitaker Was Assisted with Standing up And Stated "I Didn't Realize I Did All of This, I Have Been Drinking". Whitaker Was Escorted out of the Store By. Ofc. Utter And Ofc. Pozzatto. I Remained In the Store Gathering witness Statements While Of. Krentz Gathered [CRF] took Digital Images of the Crime Scene.

Witness Linda Thomas Advised She was Assisting Whitaker With a Dispute About a "Coinstar" Deposit. She Advised that Whitaker was Intoxicated And Persistent About Receiving His Money. She Advised That Whitaker Then Requested the $2.61 That He was Credited with By the Coin-Star Machine. She Advised That She opened the Cash Register And Whitaker Stated "Give →

**NOTICE**
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:  #4528   Ptlm. Christopher R. Ford   07/17/07

00081

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

1. VICTIM/WITNESS:
Ptlm. Christopher R. Ford

2. INCIDENT NO.:

3. ADDRESS:
1501 Mt Zion Rd. York, Pa. 17402

TELEPHONE:
717 757 3525

4. PLACE:
Springettsbury Twp Police Dept.

5. DATE/DAY:
07/17/07 Tues

6. TIME:
2044

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:

8. PAGE NO./INITIALS:
2 (CRF)

9. STATEMENT:

(Cont) ME MY MONEY BITCH" AND QUICKLY GRABBED AND REMOVED THE CASH REGISTER FROM THE COUNTER. THOMAS ADVISED SHE CALLED FOR HELP AFTER WHITAKER TOOK THE REGISTER.

WITNESS THEODORE J. MOSLEY ADVISED HE OBSERVED WHITAKER "SWING AT THE FEMALE AND GRAB THE REGISTER." HE ADVISED THAT HE ATTEMPTED TO RESTRAIN WHITAKER AND WAS BITTEN ON THE UPPER LEFT SHOULDER / BICEP AREA AS A RESULT.

WHILE GATHERING WITNESS INFORMATION, I HEARD OFC. UTTER YELL OVER THE RADIO "SIGNAL 13". I RESPONDED TO STPD WHERE I WAS TOLD BY SGT. WITMER THAT WHITAKER HAD BEEN SHOT. I MET WITH OFC. UTTER IN THE SGT'S OFFICE AND OBSERVED HIM TO BE SHAKING AND UPSET. OFC. UTTER STATED "I COULD NOT GET HIM OFF OF ME, I HAD NO CHOICE".

WHILE SPEAKING TO WHITAKER AT GIANT, I DID OBSERVE AN ODOR OF INTOXICATING BEVERAGE; HIS EYES WERE GLASSY, AND HE APPEARED TO BE UNDER THE INFLUENCE OF ALCOHOL OR SOME FORM OF INTOXICANTS ———————————————

(CRF)

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:
Ptlm. Christopher R. Ford 07/17/07

0082
DEPARTMENT HEADQUARTERS

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

| 1. VICTIM/WITNESS: John P. Krentz | 2. INCIDENT NO.: 2007-0708-M0001-JPL |
| 3. ADDRESS: 1501 Mt Zion Rd York, Pa 17402 | TELEPHONE: (717) 757-3525 |
| 4. PLACE: Springettsbury Twp Police Department | 5. DATE/DAY: 7-7-07 | 6. TIME: 2015 hrs |
| 7. OFFICER'S NAME/SIGNATURE/BADGE NO.: Ptlm Bryan Thompson #234 | #836 | 8. PAGE NO./INITIALS: 1 JPK |

9. STATEMENT:

ON 7-7-07 AT APPROXIMATELY 2315 HOURS, I RESPONDED TO THE GIANT FOR THE REPORT OF A SUBJECT WHO ATTEMPTED TO TAKE MONEY FROM A CASH REGISTER. WHILE ENROUTE, I WAS ADVISED THAT THE SUBJECT WAS BEING RESTRAINED BY GIANT CUSTOMER. OFFICER POLIZZOTTO AND I ARRIVED AT ABOUT THE SAME TIME, AT GIANT. ONCE INSIDE THE STORE, WE WALKED QUICKLY TO THE CUSTOMER SERVICE AREA WHERE THE SUBJECT WAS BEING RESTRAINED. THE SUBJECT WAS HAND CUFFED BEHIND HIS BACK. I DONT RECALL HIM MAKING ANY STATEMENTS, BUT I KNOW HE WAS CALM AT THAT POINT. HE WAS THEN ESCORTED TO OFFICER UTTER'S PATROL VEHICLE AND PLACED INSIDE. HE WAS BEING ARRESTED FOR ROBBERY AND POSSIBLY CRIMINAL MISCHIEF AND PUBLIC DRUNKENNESS. I OBTAINED A DIGITAL CAMERA FROM MY VEHICLE AND STOPPED THE WITNESS WHO RESTRAINED THE SUBJECT (WHITAKER). THE WITNESS HAD APPARENTLY BEEN BITTEN BY WHITAKER DURING THE RESTRAINT. I TOOK SEVERAL PHOTOS OF THE BITE WHICH WAS ON THE RIGHT DELTOID AREA OF THE WITNESS. I TRIED TO CONVINCE THE WITNESS TO HAVE THE BITE LOOKED AT, BUT I GOT THE IMPRESSION THAT HE WAS NOT GOING TO DO THAT. I THEN EXCUSED THE WITNESS AFTER OBTAINING HIS INFORMATION.

I WENT BACK INTO THE STORE AND TOOK SEVERAL PHOTOS OF THE CASH REGISTER AND NEARBY AREA. ONCE DONE, I FOLLOWED OFFICER FORD TO THE "LOSS PREVENTION" OFFICE TO VIEW THE VIDEO AND TO SEE WHAT WHITAKER DID. JUST AS OFFICER FORD WAS FINISHING UP HIS ON-SCENE INVESTIGATION, WE HEARD SOMEONE YELLING "SIGNAL 13" AT "SIGNAL 2". OFFICER FORD AND I REALIZED IT WAS OFFICER UTTER. WE RAN TO OUR VEHICLES, ACTIVATED OUR LIGHTS AND SIREN AND ENTERED ONTO MEMORY LANE. WHILE TRAVELLING NORTH ON MEMORY LANE, JUST NORTH

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:
John P. Krentz

**0083**

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
**VICTIM/WITNESS STATEMENT FORM**

| 1. VICTIM/WITNESS: | | 2. INCIDENT NO.: |
| --- | --- | --- |
| GREGORY A WITMER | | |

3. ADDRESS: C/O 1501 MT. ZION Road, York PA 17402-9085

TELEPHONE: 717-757-3525

| 4. PLACE: SPRINGETTSBURG TOWNSHIP POLICE HQ | 5. DATE/DAY: 7/7/07; TUESDAY | 6. TIME: 1930 HRS |
| --- | --- | --- |

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:

8. PAGE NO./INITIALS: 1 GAW

9. STATEMENT:

I AM A SERGEANT WITH THE SPRINGETTSBURG TOWNSHIP POLICE DEPARTMENT AND WORKING MY SCHEDULED 10P-6A SHIFT ON SATURDAY NIGHT, 7/7/07 INTO SUNDAY, 7/8/07. AT 2326 HRS, POLICE UNITS WERE DISPATCHED TO THE GIANT FOODS STORE, 245 EAST MARKET STREET, WHERE A SUBJECT WAS BEING PHYSICALLY RESTRAINED AFTER THE SUBJECT TRIED TO REMOVE A CASH REGISTER FROM THE STORE.

ON MY ARRIVAL, OFFICER FORD WAS STANDING AT A W/M SUBSEQUENTLY IDENTIFIED AS RONALD TAYLOR WHITAKER, JR, WHO WAS HANDCUFFED AND LAYING PRONE IN THE AISLE BETWEEN THE "CUSTOMER SERVICE" COUNTER AND THE CASH REGISTERS AT THE FRONT (EAST SIDE) OF THE STORE. SEVERAL STORE EMPLOYEES AND STORE CUSTOMERS WERE SPEAKING WITH FORD ABOUT WHAT HAD JUST OCCURRED. OTHER OFFICERS HAD ARRIVED, AND ASSISTED WHITAKER GETTING UP ON HIS FEET. AS HE STOOD UP, WHITAKER APOLOGIZED TO THE EMPLOYEES AND THE POLICE. WHITAKER WAS WALKED OUT OF THE STORE VIA THE NORTH DOORS AND TAKEN TO THE DRIVER'S SIDE OF OFFICER GARY UTTER'S CRUISER. WHITAKER ASKED IF THERE WAS ANYTHING WE COULD DO TO HELP HIM WITH THIS ARREST. I TOLD HIM HE WAS UNDER ARREST AND SHOULD HAVE THOUGHT ABOUT THAT EARLIER! WHITAKER WAS SEARCHED FOR WEAPONS ON HIS PERSON AND IN HIS CLOTHING, THEN WAS ASSISTED INTO THE REAR SEAT AREA OF UTTER'S CRUISER. UTTER LEFT THE AREA, ENROUTE TO OUR HQ.

I SPOKE BRIEFLY WITH OFFICER FORD, AND WAS ADVISED THAT HE AND OFFICER JOHN KREITZ WOULD COMPLETE THE INVESTIGATION AT THE STORE. I LEFT THE STORE WITH INTENTIONS OF RETURNING TO OUR STATION AND ASSIST OFFICER UTTER WITH THE PRISONER. OFFICER POLIZZOTTO CONTACTED ME VIA THE "NEXTEL" AND ADVISED THAT A HOMEOWNER HAD REPORTED TO YCC/911 THAT HE WAS HAVING TROUBLE

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:

0085
DEPARTMENT HEADQUARTERS

SP 7-0054 (10-98)

PENNSYLVANIA STATE POLICE
**VICTIM/WITNESS STATEMENT FORM**

1. VICTIM/WITNESS:
GREGORY A. WITMER

2. INCIDENT NO.:

3. ADDRESS:
c/o 1501 Mt. ZION RD, YORK, PA 17402-9085

TELEPHONE:
717-757-3525

4. PLACE:
SPRINGETTSBURY TOWNSHIP POLICE HQ

5. DATE/DAY:
7/17/07; TUESDAY

6. TIME:
1930

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:

8. PAGE NO./INITIALS:
2 (GW)

9. STATEMENT:

GETTING PEOPLE TO LEAVE HIS PROPERTY AT THE CONCLUSION OF A PARTY. I RESPONDED TO 1779 FOXWALD LANE TO BACK-UP OFFICER PALIZZOTTO. AT THE CONCLUSION OF THAT CALL, I PROCEEDED BACK TO OUR STATION.

AT 2348 HRS, OFFICER UTTER CONTACTED ME BY "NEXTEL" PHONE TO ADVISE THAT WHITAKER WAS COMPLAINING OF SORE RIBS FROM THE INCIDENT AT GIANT, AND OFFICER UTTER WAS REQUESTING THE AMBULANCE RESPOND FOR MEDICAL TREATMENT. I TOLD UTTER THAT WAS FINE AND I WAS ON MY WAY BACK TO THE STATION.

AT APPROXIMATELY 2353 HRS, I HEARD OFFICER UTTER SCREAMING ON THE RADIO, ADVISING HE NEEDED ASSISTANCE AT THE OFFICE. I WAS ON CONCORD ROAD IN THE VICINITY OF THE YORK COUNTY PRISON, AND COULDN'T UNDERSTAND WHAT UTTER WAS SAYING. OFFICER JAMES MILLER THEN CAME ON THE RADIO AND SAID WE HAD A MAN DOWN. AS I DROVE INTO THE REAR PARKING LOT OF OUR STATION, I SAW THE TOWNSHIP AMBULANCE EMT'S GETTING OUT OF THE AMBULANCE AND WALKING TOWARD THE REAR ENTRY DOOR. OFFICER UTTER BURST THROUGH THE DOOR AND SAID THAT THE SUSPECT WAS INSIDE. I WENT INSIDE THE BUILDING AND DIDN'T SEE OR HEAR WHITAKER. OFFICER MILLER SAID WHITAKER WAS IN THE HOLDING ROOMS AREA. THE HALLWAY DOOR WAS CLOSED BETWEEN ROOMS 2 AND 3, AND WHEN IT WAS PUSHED OPEN, I SAW WHITAKER LYING IN A SEMI-PRONE POSITION, FACING WEST, WITH HIS HEAD TO THE SOUTH, IN THE HALLWAY BETWEEN ROOMS 1 AND 2. THERE WAS A POOL OF BLOOD ON THE FLOOR AT HIS ABDOMEN. OFFICER MILLER AND I APPROACHED HIM, AND OFFICER MILLER STEPPED SOUTH OF WHITAKER'S BODY AND IMMEDIATELY BEGAN TO SEARCH FOR A CAROTID PULSE. AS I STOOD TO THE SIDE, OFFICER MILLER THEN REACHED FOR WHITAKER'S ARM AND SAID HE FELT A FAINT PULSE.

*NOTICE*
Under Section 4904 of the Pa Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:
*Gregory A. Witmer*

DEPARTMENT HEADQUARTERS    0086

SP 7-0054 (10-96)

**PENNSYLVANIA STATE POLICE**
**VICTIM/WITNESS STATEMENT FORM**

| 1. VICTIM/WITNESS: William Pollizotto Jr. | 2. INCIDENT NO.: |
| 3. ADDRESS: 1501 MT. Zion Rd  York, PA 17402 | TELEPHONE: 757-3525 |
| 4. PLACE: Springettsbury Twp Police Dept. | 5. DATE/DAY: 12 Jul 07  Tues. | 6. TIME: 1950 |
| 7. OFFICER'S NAME/SIGNATURE/BADGE NO.: | 8. PAGE NO./INITIALS: 1 of 2 |

9. STATEMENT:

ON 6 Jul 07 to 7 Jul 07 I was working 2200-0600 Hrs. I had been dispatched to a suspicious person call at Canterbury Ct. Apts shortly after 2315 hours. As I was clearing that call, units were dispatched to Giant at 2415 E. Market St. for a robbery in progress and store employees where attempting to restrain the actor. I responded in emergency mode behind Ofc. Krentz and Ofc. Utter. At 2326 hrs. while enroute in the area of Walmart at 2001 E. Market St. Ofc Ford arrived and advised the subject was in custody. Our response slowed and upon arrival to Giant at 2329 hours I responded to the North entrance/exit. I entered the store behind Sgt Witmer and proceeded to Ofc Ford's location by the customer service area. Ofc Ford asked if I had my gloves because he left his in his vehicle. I turned to go back and get my gloves when Ofc. Utter entered the store. Ofc. Utter stated he had gloves and he would take the suspect outside.

The suspect was stood up and he stated that he was sorry and that he was really drunk. I helped escort the suspect outside. I retrieved his wallet from is right rear pocket and removed his I.D. Just prior to walking out ofc. Ford told him that he was gonna be charged with robbery. The suspect acted surprised and said he didn't rob anyone. Sgt Witmer said something to the suspect and then he was taken outside.

Once outside I ran the suspect (Whitaker) for warrants and through Penn Dot. Nothing was found. I turned his I.D. over to Ofc. Utter and advised the same. I was then asked to contact YCC regarding

*"NOTICE"*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:

**0088**

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

**1. VICTIM/WITNESS:**
William Polizzotto Jr

**2. INCIDENT NO.:**

**3. ADDRESS:**
1501 Mt. Zion Rd York Pa 17402

**TELEPHONE:**
757-3525

**4. PLACE:**
STPD

**5. DATE/DAY:**
17 Jul 07 Tues

**6. TIME:**
1950.

**7. OFFICER'S NAME/SIGNATURE/BADGE NO.:**
Arthur Newman _____ # 5836

**8. PAGE NO./INITIALS:**
2 OF 2 _____

**9. STATEMENT:**
Another call I was Dispatched to a Disturbance call on Foxwald W
I Advised Sgt Witmer N/A Nearer of the call And I Responded
to the Address as Ofc. Utter Left Giant With the Suspect. I Handled
this incident on Foxwald with Sgt Witmer who had Responded over.
When I cleared the call I took Pleasant Acres Rd to S. Market St.
While traveling West on Market in the 3400 Block I Heard a Signal
13 called But was Unsure who was Calling And Where to go. I Realized
that it was Ofc. Utter. I immediatory Responded Back to Station.
Upon arrival to Station Ofc. Utter Met Myself, Sgt Witmer And
the EMS Crew Outside the Rear Door. I Entered the Building
and Went Down the Hallway Towards the Holding Rooms. I Opened
the Door And found Ofc. Miller (who was off Duty) Kneeling over the
Suspect/Victim. EMS Responded in Behind Me And once EMS
Entered the Hallway Where the Suspect was I Turned And Watched
Ofc. Utter Collapse in the Hallway Near the CpL's Office. I Then
Directed My Attention to Ofc. Utter Because EMS was Treating/
Loading the Suspect/Victim.

**"NOTICE"**
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

**10. VICTIM/WITNESS SIGNATURE:**

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
**VICTIM/WITNESS STATEMENT FORM**

| 1. VICTIM/WITNESS: Linda Thomas | 2. INCIDENT NO.: |
|---|---|
| 3. ADDRESS: 2415 East Market Street York, PA | TELEPHONE: |
| 4. PLACE: Giant Store 87 | 5. DATE/DAY: 7/17/07 Tuesday | 6. TIME: 5:55pm |
| 7. OFFICER'S NAME/SIGNATURE/BADGE NO.: | 8. PAGE NO./INITIALS: Page 1  ᴸᵀ |

9. STATEMENT:

I Linda Thomas was working at Giant at about 11:00pm customer came in asking for Help that something was wrong with the Giant Coinstar machine. He showed me His coinstar voucher for $2.61 and said He placed $20 in coins in Machine and $2.61 was not correct. I checked screen on machine and Had No message to contact Manager like machine would normally do when jammed. I phoned Bonnie Eyler Manager on Duty and she said get keys and call coinstar for Him. I got keys from service desk and customer followed and stood with Me while we called to coinstar people from phone inside machine. Lady said to pull a Detail Daily Report to show the Day's Transactions. Then I also pulled out trays to make sure no coins jammed in turntable like sometimes would happen. Lady said computer did not show any thing wrong, but customer is welcome to fill out form on having Dollar amount researched if I get Her the Giant Fax machine. I called Bonnie and she said phone number on side of FAX machine. I closed up the coinstar and customer went with Me to Service Desk to wait, I called 1-800 phone number to give coinstar the giant Fax phone number. When fax came though the Man filled out form to state machine did not add

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE: Linda E. Thomas

**0090**
DEPARTMENT HEADQUARTERS

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
**VICTIM/WITNESS STATEMENT FORM**

1. VICTIM/WITNESS: Linda Thomas

2. INCIDENT NO.:

3. ADDRESS: 2415 East Market St. York PA

TELEPHONE:

4. PLACE: Giant Store #87

5. DATE/DAY:

6. TIME:

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:

8. PAGE NO./INITIALS: Page 2 LT

9. STATEMENT: his $20.00 in coins correctly. I told customer Excuse Me a moment while He filled out form and stepped over by produce Exit to phone Bonnie again to say please Help me with Fax since New machine and said this Man smelled of alcohol and says He needed His money. Bonnie came up after Man Had form filled out and Helped me to fax form Back to coin star. I stood with Man at desk while we waited for Fax to go through and said I can make Him copies. He seemed persistant but was calmly waiting. I copied the form request for Him with fax machine and gave Him his copies of form and copy of transaction fax complete. He looked at Me after I gave Him the copies and said OK I have form Done now where is the rest of my money. I said I'm sorry the coin star people will research it and will contact Him that is why they asked for the form to be completed. He said He needed His money now that He needed gas to go Back to Ephrata. I said I'm sorry I can call Manager again for Him. I phoned Bonnie and She said We can't give Him the money that's Not going to happen Explain He has to wait. I said to Bonnie I already said that —

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE: Linda E. Thomas

DEPARTMENT HEADQUARTERS  0091

SP 7-0054 (18-96)

**PENNSYLVANIA STATE POLICE**
**VICTIM/WITNESS STATEMENT FORM**

| 1. VICTIM/WITNESS: Linda Thomas | 2. INCIDENT NO.: |
|---|---|
| 3. ADDRESS: 2415 East Market Street   York PA | TELEPHONE: |
| 4. PLACE: Giant #87 | 5. DATE/DAY: | 6. TIME: |
| 7. OFFICER'S NAME/SIGNATURE/BADGE NO.: | 8. PAGE NO./INITIALS: Page 3   LT |

9. STATEMENT: She said just tell Him He has to wait for coinstar to contact Him and we hung up again. I said sorry again coinstar will be contacting Him as soon as possible. He said He really needs gas money for Ephata. I said I can at least cash the $2.61 voucher for Him. We walked over to the other side of service desk and He was standing on Left side of me in front of desk. I signed on register with my operator number and slammed drawer and then Man Screamed Give me My money Bitch and reached a register drawer and threw entire register off desk and onto the floor. A customer checking out ran over and grabbed the Man and pinned Him and another customer ran over to Help. I grabbed phone and called Bonnie to front and hung up and called 911. I was telling dispatcher to send help to Giant and I could not believe Man threw register to floor and I was watching stockmen Who ran up was struggling to Hold Man down. I knew Man was being persistant But He seemed calm until in a matter a couple seconds all that

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE: Linda E. Thomas

0092

SP 7-0054 (10-96)

PENNSYLVANIA STATE POLICE
## VICTIM/WITNESS STATEMENT FORM

1. VICTIM/WITNESS:
THEODORE JEROME MOSLEY

2. INCIDENT NO.:
H07- 1679711

3. ADDRESS:
805 E. PHILADELPHIA ST. YORK PA 17401

TELEPHONE:
(717) 852-5288

4. PLACE:
RESIDENCE - KITCHEN

5. DATE/DAY:
07/12/07 THU

6. TIME:
1327 HRS.

7. OFFICER'S NAME/SIGNATURE/BADGE NO.:
TPR. KENNETH F. TALLMAN PR. 15[illegible] 3047]

8. PAGE NO./INITIALS:
1/KFT

9. STATEMENT:

from the time I an GirlfrienD check-out
the white male was at the service center, HE
Skin give me my money Bitch too the women
at the service center, at that time I scene
he was trying to get into the cash DrawL, at that
time I try to stop Him, I got HE to the floor
until the Police came with some help.

*NOTICE*
Under Section 4904 of the Pa. Crimes Code, Unsworn Falsification to Authorities, a person commits a misdemeanor of the third degree if he makes a written false statement which he does not believe to be true.

10. VICTIM/WITNESS SIGNATURE:
Theodore J. Mosley

0096

DEPARTMENT HEADQUARTERS

# FORENSIC PATHOLOGY ASSOCIATES, INC.

1210 S. Cedar Crest Blvd., Suite 3900
Allentown, PA  18103
Tel.: 610-402-8144
Fax: 610-402-5637

## AUTOPSY REPORT

Name: WHITAKER, RONALD

Age: 39  Race: WHITE  Sex: MALE

Coroner: MR. BARRY BLOSS

YORK COUNTY CORONER

Pathologist: B. K. BOLLINGER, M.D.

Autopsy Protocol Completed:    7/9/07

Autopsy No.: C-07-462

Hospital No.: N/A

Transported to: YH

Pronounced: 7/8/07 @ 0034 HR.

Date of Autopsy: 7/9/07 @ 0930 HR.

Autopsy  ~33  Hours After Pronounced

## ANATOMIC DIAGNOSES

<u>CAUSE OF DEATH</u>:  GUNSHOT WOUNDS TO TORSO

<u>FINAL PATHOLOGIC DIAGNOSES</u>:

I.   Penetrating gunshot wound to abdomen:
    A.   Entrance: left inframammary region, with stippling
    B.   Bullet recovered:
       1.   Large caliber, copper jacketed slightly deformed projectile
       2.   Recovered from soft tissue, right lower abdominal quadrant, lateral aspect
    C.   Trajectory: right to left, slightly front to back, downwards
    D.   Injuries:
       1.   Perforations of diaphragm, stomach, liver and gallbladder
       2.   Contusions of mesentery and intestines
       3.   Hemoperitoneum (50 ml)

II.   Penetrating gunshot wound to chest:
    A.   Entrance: mid scapular region, without soot or stippling
    B.   Bullet recovered:
       1.   Large caliber, copper jacketed slightly deformed projectile
       2.   Recovered from inferior vena cava
    C.   Trajectory: back to front, downwards, without left/right deviation
    D.   Injuries:
       1.   Perforations of 9th thoracic vertebra, spinal cord, esophagus, aorta, heart
       2.   Contusion, left lung
       3.   Bullet embolization of the inferior vena cava
       4.   Hemopericardium (300 ml)

SARALEE FUNKE, M.D. * SAMUEL LAND, M.D.* BARBARA K. BOLLINGER, M.D.

## AUTOPSY REPORT – Continued

Name: WHITAKER, RONALD          Autopsy No.: C-07-462          Page: 3

IX.  Toxicology:
    A.  Volatile screen:
        1.  Blood (heart): 0.05% ethanol
        2.  Vitreous: 0.08% ethanol
    B.  Blood (leg):
        1.  Cocaine: 74 ng/ml
        2.  Benzoylecgonine: 225 ng/ml
    C.  Urine: positive for cocaine and cannabinoids
    D.  Urine: positive for THC metabolite
    E.  HIV antibody, Western Blot: negative

**OPINION:**

The cause of death in this 39-year-old white man, Ronald Whitaker, is gunshot wounds to torso.

At autopsy, the decedent had two penetrating gunshot wounds: one to the chest and one to the abdomen. The gunshot wound to the chest perforated the spinal cord and heart. The gunshot wound to the abdomen perforated the stomach and liver. Slightly deformed, large caliber copper jacketed projectiles (2) were recovered.

There were multiple blunt force injuries of the head, torso and extremities consisting of abrasions, contusions and rare lacerations. Additionally, there was evidence of hanging without underlying trauma to the neck.

Postmortem toxicology testing showed the presence of alcohol, cocaine, a cocaine metabolite and cannabinoids.

Manner of death will be certified by the coroner.

*BK Bollinger MD*
B. K. Bollinger, M.D.
Forensic Pathologist

BKB/mrs

PENNSYLVANIA STATE POLICE
CRIMINAL INVESTIGATION UNIT

TRANSCRIPT OF INTERVIEW

Interview of  :  Gary Utter

Date          :  July 16, 2007, 10:05 a.m.

Typist        :  Tracy L. Lloyd, Notary Public
                 Registered Professional Reporter

1      TROOPER HENNEMAN:  This is July 16th at

2  about 10:05 a.m.  This is the interview of Gary

3  Utter, Officer Gary Utter from Springettsbury

4  Township Police Department.  Present in the room

5  with me also is Attorney Ed Paskey, Corporal Jeff

6  Rineer, and this is Trooper Bryan Henneman from

7  the Pennsylvania State Police barracks York

8  station.

9      Gary, basically you understand why we're

10  here today?

11      OFFICER UTTER:  Okay.

12      TROOPER HENNEMAN:  I need to talk to you

13  about the shooting incident that occurred back on

14  July 7th.  What I'd like for you to do is just

15  start at the beginning probably at least from the

16  Giant and work your way forward and just in

17  detail, as much detail as you can remember, just

18  tell me exactly what happened and anything that

19  might have been said between you and

20  Mr. Whitaker.  That's about it.  Just go ahead

21  and begin.

22      OFFICER UTTER:  Okay.  Well, we were

23  dispatched to the Giant on East Market Street for

24  a -- basically, a theft in progress.  Advised by

25  the dispatchers that the subject was attempting

3

1  to take a register, was possibly intoxicated, and

2  that he was being held down by either employees

3  and/or customers at the time.

4      Myself, Officer Krentz, Officer Polizotto,

5  Officer Ford, and Sergeant Witmer were on duty,

6  and we were all responding there.  I was

7  responding from about the 3900 block of East

8  Market Street with Officer Krentz and Officer

9  Polizotto.  Officer Ford called out on the scene

10  first.

11      He was still being advised that the subject

12  was inside and was being held inside basically at

13  the customer service area.  He called out that

14  the male was in custody, requested rescue units

15  to slow down their response, arrived with --

16  Sergeant Witmer and myself, Officer Polizotto,

17  Officer Krentz all showed up about the same time.

18      Went inside the Giant.  Saw that the subject

19  was in cuffs laying face down between the

20  registers and the customer service area.  I was

21  asked by Officer Polizotto if I had gloves

22  because he had -- the subject had cut himself and

23  was bleeding a little bit.  I put my gloves on,

24  got him up and on his feet, and then escorted him

25  out to my patrol car.

1    At the patrol car, I padded him down.
2    Removed his belongings which consisted of his
3    wallet, cell phone, and a key. He was placed in
4    the rear of my vehicle. Mr. Whitaker had made a
5    statement that he wanted his key to his vehicle
6    left in his vehicle so that his girlfriend could
7    transport his kids.
8    I found out where his vehicle was. It was a
9    red Ford Astro van. It was parked in the front
10   parking lot. He was placed in the rear of my
11   vehicle. Closed the door. Placed the key
12   underneath the seat like he had requested and
13   came back to the car and told him that the key
14   was there.
15   Officer Ford was obtaining witness
16   statements and victim statements and all that key
17   information for the robbery report. Officer
18   Krentz was staying with him and assisting him. I
19   advised Officer Ford that I'd go ahead and take
20   Mr. Whitaker back to the station and put him in a
21   holding cell.
22   Called out to County that I was in route
23   with mileage and headed on down Memory Lane in
24   route back to the station. In route, set the
25   cameras to record the inside, the interior, so

5

1    the interior and exterior were recording and got

2    back to the station.  Opened up the south bay.

3    Saw Officer Miller who was off duty playing his

4    bagpipes in the back.

5        MR. PASKEY:  While you were heading out, did

6    he make any statements to you while he was in the

7    car?

8        OFFICER UTTER:  I guess prior to leaving,

9    the only thing that he said to me was that "did I

10   cause this much of a ruckus" or something to that

11   effect, and I said, "yeah, you did".  That was

12   the only statement that he made going back to the

13   station.

14       Like I say, got back to the station.

15   Officer Miller was off duty playing his bagpipes

16   in the park.  Thought it was funny.  Turned off

17   the car.  Realized that I hadn't called out to

18   County that I was back at the station.  I hadn't

19   given my end mileage, but I figured I'd just do

20   that when I got inside.

21       Mr. Whitaker was calm.  Relaxed.  Mellow.

22   Just laid back as can be.  Walked him inside.

23   Put him in the holding cell.  I guess it was

24   Holding Cell Number 1, I guess is what it's

25   called, the furthest one south.  Took his cuffs

6

1   off.  Told him to have a seat, I'd be with him in

2   a second.  Shut the door.

3       Went into our squad room area.  I knew there

4   was some information that Officer Poole was going

5   to have to do eventually, particularly, get this

6   23 block info which is just all this -- date of

7   birth, name, full name, place of birth, that type

8   of information.

9       Put his belongings, his cell phone and his

10  wallet in a holding box.  I had his Social

11  Security card, his driver's license, his change

12  of address, got all the information that I could

13  get.  Went back to the cell.  Stood in the door

14  frame, and he was sitting on the metal seat bench

15  that was bolted down to the ground.  There was

16  also a table, a couple chairs in there, but he

17  was sitting on that bench.

18      He was kind of holding the side.  As I was

19  asking him the questions, he was kind of like

20  labored breathing, like he was having difficulty

21  breathing.

22      TROOPER HENNEMAN:  Were you outside of the

23  cell or inside of the cell as you were talking to

24  him?

25      OFFICER UTTER:  I was like in the door

1   frame.  I had the door opened.

2       TROOPER HENNEMAN:  The door open, okay.

3       OFFICER UTTER:  But I was outside.  I had my

4   distance to him.

5       TROOPER HENNEMAN:  Okay.

6       OFFICER UTTER:  Asked him the information I

7   needed.  I didn't know where he was born.  I

8   didn't know whether he was married or single.  He

9   told me he was single.  Born in Lancaster, I

10  believe.  Told me where he worked.  I asked him

11  what was wrong with him.  He said that he thought

12  that when he got tackled that he injured his ribs

13  and was having problems breathing.  I said all

14  right, so I shut the door.

15      Went back in the squad room.  Got a hold of

16  Sergeant Witmer on the Nextel.  Advised him that

17  Mr. Whitaker was having difficulty breathing, and

18  I was going to have an ambulance come down and

19  check him out.  Called 911.  Had the ambulance

20  board.  Had the ambulance dispatched out to have

21  him checked out.

22      I knew Officer Poole was going to need a

23  criminal history, so I did that.  She checked on

24  Mr. Whitaker on the monitor that we have in the

25  squad room.  I don't recall what he was doing or

1   where he was.  I just remember seeing him that he

2   was there, and then went up front, faxed off the

3   criminal history to Scope, and then came back to

4   (inaudible).

5        TROOPER HENNEMAN:  What do you mean faxed

6   the criminal history off to Scope?

7        OFFICER UTTER:  When we request a criminal

8   history, we send it to Scope, and then they

9   actually run it.

10        TROOPER HENNEMAN:  Okay.

11        OFFICER UTTER:  We don't have that

12   internally done.  I don't have access to

13   (inaudible) criminal history, so we fill out a

14   911 form and send it to them, and then they fax

15   us back the criminal history.

16        TROOPER HENNEMAN:  All right.

17        OFFICER UTTER:  A little different than I

18   guess what you guys do.

19        CORPORAL RINEER:  The call at Giant was

20   after 11:00 p.m.; correct?

21        OFFICER UTTER:  Yeah, I started at 11:00.

22        CORPORAL RINEER:  So your shift that day

23   was --

24        OFFICER UTTER:  Was 11:00 to 7:00.

25        CORPORAL RINEER:  11:00 to 7:00.

1    rib pain was when he was back at the station?

2        OFFICER UTTER:  That was the first -- yeah.

3    And he didn't even say anything on the ride back.

4    He wasn't complaining of any pain.  He wasn't

5    labored breathing.  I didn't even notice he was

6    in the back of my car on the way back.  Got him

7    out of the vehicle.  Like I said, he never said

8    anything.  Told him where to go.  He never said a

9    word to me.  He went into the room.  Like I said,

10   he was basically defeated, I mean, no resistance,

11   no resistance to me leading him into the room,

12   nothing.

13       CORPORAL RINEER:  He remained in handcuffs

14   then until he was placed in the holding cell?

15       OFFICER UTTER:  I put him in the room.  Took

16   the cuffs off of him.  Told him to have a seat,

17   and then I shut the door.

18       TROOPER HENNEMAN:  Did he appear to be on

19   any type of drugs or did he smell like alcohol?

20       OFFICER UTTER:  You know, they had

21   dispatched that he was possibly intoxicated.  I

22   remember getting a faint odor of an intoxicating

23   beverage from him, but not to a degree that I

24   would think he was hammered or severely

25   intoxicated.  Nothing to worry about.

1     CORPORAL RINEER:  All right.

2     OFFICER UTTER:  Unless you hit the record

3  button, it doesn't actually record.  It goes to

4  the hard drive, but I actually hit record, so

5  that actually made a chapter of it.

6     TROOPER HENNEMAN:  Okay.  All right.

7     OFFICER UTTER:  After I got the criminal

8  history, I came back to the squad room.  I

9  checked the monitor, and, at that time, I saw

10  that Mr. Whitaker was laying face down almost at

11  a, like, 45 degree angle to the door.  His head

12  was facing the door.

13     My first thought was that he had -- you

14  know, his labored breathing, he had some type of

15  medical problem that he was trying to get to the

16  door.  Ran back to the room.  Looked in through

17  the window in the door.  Saw that he had moved

18  from what I saw on the camera, and I opened up

19  the door and just basically cracked it, and the

20  door met his body's resistance.  You know, I

21  couldn't open it all the way.

22     The first thing I noticed is that he was

23  like gurgling, almost like he was snoring, like

24  he was having problems breathing.  I pushed the

25  door open further, and he basically rolled over

1     so I could see the front of his chest area to see

2     his head. I could see at that point that he had

3     a string around his neck.

4          I looked back behind the door. Saw that it

5     was attached to the door and then to his neck. I

6     tried getting it off lifting it up trying to get

7     it off his neck. And as I did that, then

8     Mr. Whitaker came to life, and then he was just

9     berserk. He just started screaming. Started

10    throwing punches. Tried pulling me down. I got

11    away from him.

12         As I was trying to get back away from him,

13    he, at one point, grabbed my arm. Attempted to

14    bite my hand. Again, I forced him away from me.

15    Got back into the doorway. Pulled my Taser out,

16    and I shot him in the chest with the Taser.

17         ATTORNEY PASKEY: When you say that he was

18    screaming, describe what he was screaming.

19         OFFICER UTTER: He never spoke any English.

20    No words. It was just somebody that was like

21    berserk. Just crazed. I mean just "aahh", just

22    yelling, throwing arm punches. Like I said, just

23    nothing -- no, "I'm going to fuckin' kill you",

24    "you're dead". You know, nothing. I mean no

25    words. It was just screaming like a caged animal

1    Got away from his grasp.  Shot him with the

2    Taser.  The Taser went through its cycle, its

3    five second cycle.  At which point, he got the

4    full dose of it, and it was a good contact.  He

5    went limp.  He basically fell down, rolled over

6    so that his back was towards the door.  He was

7    looking towards the far side of the cell.  I

8    guess that would be west.  His legs were west,

9    and his body weight had dropped so that the full

10    resistance was on -- the string was fully taunt.

11    When I dropped the Taser, I used both hands

12    to get up underneath the string and slowly was

13    pulling it apart and trying to lift him up as I

14    was doing it trying to get the string off of his

15    throat.  Got up to about -- I was thinking about

16    his nose almost ready to slip it off, and all of

17    a sudden he came to again.

18    Again, started making -- throwing punches,

19    making the noises again, screaming, hollaring.

20    Got away from him again.  Knew I needed to get

21    the Taser again because that seemed like the only

22    thing that paused everything, and if I could Tas

23    him again, maybe at which point I could get it

24    fully off.

25    Reached down for the Taser.  Grabbed it.  I

1   never took my eyes off of it because I saw it

2   down on the floor. Grabbed it. When I looked

3   back up, he was -- he must have taken it off

4   himself, but he was coming right at me. Charged

5   me in the doorway. I remember trying to back up,

6   and he just came at me. He was just swinging.

7        ATTORNEY PASKEY: When you say he must have

8   taken it off?

9        OFFICER UTTER: The string because he was

10  free. I mean the string distance was only maybe

11  two feet at the most.

12       CORPORAL RINEER: Did you know where this

13  ligature came from? Did you know what it was?

14       OFFICER UTTER: The ligature? The string?

15       CORPORAL RINEER: The string.

16       OFFICER UTTER: I'm -- he didn't have

17  anything in his pockets, so I was assuming it was

18  a shoelace.

19       CORPORAL RINEER: Okay.

20       OFFICER UTTER: That was just an assumption.

21  I knew right away --

22       CORPORAL RINEER: You did not see him remove

23  the shoelace?

24       OFFICER UTTER: No. No.

25       CORPORAL RINEER: Okay.

1   OFFICER UTTER:  And I couldn't even tell you

2   if he had shoes that had laces on it.  It's not a

3   policy that we have that we take everybody's

4   shoes.  I know central booking had everybody

5   taking their laces off their shoes if they want

6   to keep their shoes on.

7   CORPORAL RINEER:  Right.

8   OFFICER UTTER:  But we don't -- we've never

9   had an issue with that before.  It's not policy.

10  CORPORAL RINEER:  Along with that, with the

11  handcuff issue, when he is taken into the holding

12  room, is it standard to remove his handcuffs?

13  OFFICER UTTER:  Yeah.  If he's not a

14  problem, if he's not a disturbance, yeah, we'll

15  take the handcuffs off and have him sit.  If they

16  are being combative, then normally what we do is

17  we'll keep them handcuffed and we'll handcuff

18  them to the bench that's in the center of the

19  room that is permanently fastened to the floor.

20  CORPORAL RINEER:  So there are, in fact,

21  cases where if a person is not compliant, they

22  would be --

23  OFFICER UTTER:  They would be cuffed.

24  CORPORAL RINEER:  -- still in cuffs?

25  OFFICER UTTER:  Yup.  They would be put down

1  in the chair, and if they were kicking and any

2  type of resistance like that, we'll get the

3  shackles out and we'd shackle them so they

4  wouldn't be able to kick.

5      TROOPER HENNEMAN:  Does that door of the

6  holding room automatically lock whenever you shut

7  it?

8      OFFICER UTTER:  Yeah.  It's not -- if you

9  are on the inside of it, you need a key to get

10  out.

11      TROOPER HENNEMAN:  All right.  So he was

12  still secure or was he then secure in that room?

13      OFFICER UTTER:  Yeah.  He could have not got

14  out of the room.

15      TROOPER HENNEMAN:  He couldn't of?

16      OFFICER UTTER:  No.

17      TROOPER HENNEMAN:  Okay.

18      OFFICER UTTER:  He could have pulled the

19  handle and pulled on it all he wanted, and it

20  wouldn't have opened unless you had a key on the

21  inside.

22      TROOPER HENNEMAN:  All right.  So the

23  fight's gone out, I guess, into the hallway now,

24  as you were describing it.

25      OFFICER UTTER:  Yeah.  He came at me and was

1   just basically just throwing punches, just

2   hail makers, just over his head just swinging. I

3   got hit a few times. Kept going back and further

4   and further back. I kept pushing him back trying

5   to get some space. At one point I knew that I

6   needed to get out so I had more room because I

7   felt confined in that hallway.

8       Tried grabbing the door. I pulled the door

9   open, and the door was shut on me, either by him

10  running into me or he shut it. I'm not exactly

11  sure how it shut. I just remember the door

12  shutting. I remember my glasses getting knocked

13  off, at which point basically everything went in

14  slow motion.

15      I thought about what I had done so far and

16  what I was going through, was going through my

17  (inaudible) force continuing. I had tried

18  getting him away with using my hand, and that

19  wasn't working. I Tased him. I remember as I

20  was backing up as he was charging me, I remember

21  hitting the Taser again and thinking to myself,

22  my God, he's just walking right through it, you

23  know.

24      I could hear it clicking, and I knew it was

25  working, but he was just driving through it, and

1   he was still making those noises like -- I,

2   myself, was hit with a Taser, and I remember

3   laying on the floor screaming. That's all you

4   could do is friggin' scream because there's no

5   words to describe what it feels like, and I was

6   thinking it's got to be working because he's

7   screaming. He's screaming, but he is coming

8   straight at me. He's still coming at me.

9        And what I remember is that I just had the

10  trigger left down on it. I was just praying that

11  it was going to work, you know, he was going to

12  drop right there. Like I said, he just kept

13  coming at me. I remember thinking I can't use my

14  mace because it's just going to affect me, you

15  know. I'm in a confined area. It's just not

16  going to work.

17       I remember thinking, well, I can get my ASP

18  out, but I didn't have any maneuver to swing that

19  because I was basically pinned in that corner. I

20  remember as I'm thinking all this, I remember

21  feeling my right side where I had my ASP, my

22  flashlight, my gun, that things were getting

23  moved around. That somebody was going for it or

24  going for something. I remember bringing my hand

25  down protecting my gun and thinking that he's

1    trying to get my gun, he's trying to get my gun.

2        I remember thinking that, you know, I'd come

3    to that point.  I mean it's just me and him, and

4    one of these punches he keeps throwing is going

5    to be a lucky punch, you know.  I'm going to go

6    down, and I can't go down.  I remember walking

7    through like if I was out on the range just

8    pulling the snap out, pulling it up, bringing it

9    tight to my body, and, at which point, he was to

10   my left.  I was in the corner, and he was on my

11   left, and I remember having my arm up and just

12   bringing it up and pointing it in his general

13   direction and pulling the trigger for the first

14   shot.

15       I remember hearing the noise.  I remember

16   him peeling away and then not knowing if I hit

17   him or not.  And then as he came around towards

18   the left, like wheeling away from the second bay

19   or the holding cell and turning to the first

20   cell, I remember pulling the weapon up again and

21   firing the second shot aiming towards his back,

22   and then basically he went down, laid on the

23   ground.

24       I remember thinking to myself, you know,

25   like what they always teach you in the academy,

22

1  you know, if he had a weapon, make sure you

2  secure him. I knew he didn't have anything

3  because I had already searched him. I knew he

4  didn't -- I didn't think he had any -- any

5  weapons at all.

6       I remember watching him. He went down. He

7  wasn't moving, and then going through the door

8  into the squad room for my portable, turning it

9  on and calling it out, calling for back up.

10      TROOPER HENNEMAN: If we could back up a

11  second, as far as do you remember exactly where

12  you were when you tried -- whenever you attempted

13  to Tas him the second time?

14      OFFICER UTTER: The second time I pulled the

15  trigger was as I was in the door. I had just

16  picked it up off the floor. I remember looking

17  up as I was pulling it up off the ground and

18  seeing him come at me in the hallway. He came

19  through the doorway. I started backing up. And

20  as I was backing up, I was pulling the trigger.

21  Like I said --

22      ATTORNEY PASKEY: On the Taser?

23      OFFICER UTTER: On the Taser, yeah. The

24  Taser activated. It was clicking. I don't

25  know -- I don't know if I ever let go of the

1   trigger as I kept backing up and as he was coming

2   at me towards the door going to the holding cell.

3        CORPORAL RINEER:  In regards to the Taser,

4   once you pull the trigger and the probes are

5   actually deployed, how, at that point, do you

6   know that the Taser is working or is effective?

7        OFFICER UTTER:  You don't.  If you pull the

8   trigger, you know it's working because it's

9   making that noise, that tick, tick, tick, tick,

10  tick, tick.

11       CORPORAL RINEER:  That means that the probes

12  are deployed or they are attached?

13       OFFICER UTTER:  It just means that the

14  gun -- the Taser is working.  If I had a Taser in

15  this room right now, I could take the probes out

16  to prevent them from shooting.  Once they are

17  shot, they are out.  They are attached by the

18  cables.  And pulling it again will send the

19  current -- you know, the volts down to the

20  probes.  If the probes aren't in the person, it

21  doesn't matter.  That gun is still working.  You

22  can drive start it if you need to.

23       But all I remember is that I pulled the

24  trigger, and I heard that noise, and I knew that

25  the gun was working.  And as far as I knew, what

1    I was hoping is that those probes were still on

2    him.  I couldn't tell if they were still on him

3    or not.  I just remember pulling that trigger.

4    Hearing that noise knowing that the gun was

5    functioning, that it was responding to my pulling

6    the trigger on the Taser and that it was going

7    through another cycle.  That cycle is five

8    seconds.  But if you hold that trigger down, it's

9    going to run until the battery runs out.

10    CORPORAL RINEER:  Is there anything other

11    than the noise?  Is there a light or anything

12    that indicates that you actually keep your finger

13    on the trigger?

14    OFFICER UTTER:  No, because once you

15    activate the power, the -- the pointer, the laser

16    pointer is on and the light's on.  That will stay

17    on even if you don't pull the trigger.  It just

18    knows that the power is on.  It's like throwing

19    the safety on.

20    CORPORAL RINEER:  You said you observed a

21    physical reaction when the initial deployment,

22    the first time that you remember firing?

23    OFFICER UTTER:  Yeah, and he went -- it hit

24    him and "aahh" and he went down, and, you know, I

25    could hear him (making sounds) you know, like his

1    his hand.  I mean, he never had -- I knew I

2    searched him, so I knew he didn't have any guns

3    on him.  I knew he didn't have any knives on him.

4    I knew he didn't have anything in his pockets

5    because I emptied his pockets.  So as far as my

6    mind knew that he didn't have any weapons on him

7    that I needed to secure.  I knew he didn't have a

8    gun.  I knew he didn't have a knife or anything

9    like that.

10        TROOPER HENNEMAN:  From the first time that

11   you shot him with the Taser, from that point up

12   until the point that you had to pull your weapon

13   out to fire, do you remember him saying anything?

14        OFFICER UTTER:  He never said -- like I

15   said, he never said a word of English other than

16   the -- the only words that he said to me was the

17   comment that he made outside of Giant and then

18   the answers that he gave to me when I asked him

19   his 23 block info, and then his comment saying

20   that his ribs hurt and he was having trouble

21   breathing because somebody must have landed on

22   his ribs when it happened.  That was the only

23   words he ever said.  Anything other than that

24   was just screams and hollars and yells and just

25   pure aggression, just somebody who was berserk.

1    I mean just screaming nonstop. I mean, there was

2    no words.

3        TROOPER HENNEMAN: And during the fight, did

4    you have a chance to say anything to him while he

5    was trying to fight? Do you remember saying

6    anything?

7        OFFICER UTTER: I was just reacting. I

8    mean, I don't recall getting anything out. I

9    just remember it was just -- it was (inaudible)

10    it was just -- I was -- right away I was on the

11    defense, and I was just reacting to what he was

12    doing. I remember just trying to cover up, you

13    know. Cover my head because I was getting hit on

14    the head. Blows were coming down on my

15    shoulders, on my body.

16        TROOPER HENNEMAN: Earlier you also

17    mentioned that you said that it felt like he was

18    going for your gun or he was going for a weapon

19    previously. What do you mean? Did you actually

20    feel his hand on your gun or on your ASP Baton?

21        OFFICER UTTER: I was in the corner. My

22    right side was in the corner. I remember -- I

23    remember my belt -- my utility belt getting

24    pulled.

25        TROOPER HENNEMAN: Was it being pulled from

1    him or was it being pulled from you?

2       OFFICER UTTER:  It wasn't being pulled from

3    me, so I can only assume that it was being pulled

4    by him.  He was the only other person there.  I

5    knew that somebody was grabbing for something

6    specifically on my right side.  I could feel

7    definitely on my right-hand side, and I knew my

8    gun was there.

9       And I remember pulling my hand down to my

10    gun to protect my gun, but I still remember

11    basically my body being pulled, I guess that

12    would be clockwise, back around, and I was trying

13    to keep my side up against that corner up against

14    the wall and up against in that corner.

15       TROOPER HENNEMAN:  All right.

16       OFFICER UTTER:  As the door's there, I mean

17    the door opens to the inside and I was pinned in

18    that corner.  I remember backing up -- being

19    backed up in that corner and wanted to basically

20    stay in that corner to protect my side, but

21    that's when it was getting pulled.

22       TROOPER HENNEMAN:  Do you remember seeing

23    your ASP Baton in his hands?

24       OFFICER UTTER:  No.

25       CORPORAL RINEER:  Do you know what happened