# EXHIBIT "E"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND        : CIVIL ACTION
DALEA LYNN, CO-ADMINISTRATORS      :
OF THE ESTATE OF RONALD TAYLOR     :
WHITAKER, JR.; AND RONALD T.       :
WHITAKER SR., TAYLOR WHITAKER,     :
BRANDI WHITAKER AND CHRISTOPHER    :
HAMMERSTONE, INDIVIDUALLY,         :
    PLAINTIFFS                     :
                                   :
    V                              : NO:1-08-CV-00627
                                   :
SPRINGETTSBURY TOWNSHIP,           :
SPRINGETTSBURY TOWNSHIP POLICE     :
DEPARTMENT, CHIEF OF POLICE        :
DAVID ESHBACH AND POLICE OFFICER:
GARY UTTER,                        :
    DEFENDANTS                     : JURY TRIAL DEMANDED


    VIDEO
    DEPOSITION OF:   DAVID ESHBACH

    TAKEN BY:        PLAINTIFFS

    BEFORE:          DIANE A. SMITH, REPORTER
                     NOTARY PUBLIC

    DATE:            JANUARY 16, 2009, 10:15 A.M.

    PLACE:           HAGGERTY & SILVERMAN
                     240 NORTH DUKE STREET
                     LANCASTER, PENNSYLVANIA



HAEN

Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1    A    I think I'm okay.

2    Q    All right.  Had you ever -- have you ever been

3    deposed before?

4    A    Yes, I have.

5    Q    All right.  In what -- first of all, how often or

6    how many times, if you know?

7    A    Honestly, I don't know.  It would be less than a

8    half a dozen.

9    Q    All right.  The times that you were deposed, do

10    you know what types of claims they were?

11    A    Oh, I was deposed in an accident, like a wrongful

12    injury claim, that -- an accident that I investigated years

13    ago as a police officer, mostly things like that from what

14    I -- the best that I can recall.

15    Q    Have you ever been involved or provided testimony

16    in any other type of litigation or claim that involved an

17    alleged civil rights violation?

18    A    Not that I'm aware of.

19    Q    Okay.  If you could, just give us a little bit of

20    a background of who you are.  Where did you grow up as a

21    child?

22    A    Sure, my name is David C. Eshbach.  I'm the Chief

23    of Police for Springettsbury Township Police Department.

24    I've been employed by Springettsbury Township Police

25    Department since January 13, 1986.  I was promoted to Chief

1  of Police on March 3rd, 1997.  I graduated from Dover Area

2  High School in 1982.  I attended Gettysburg College, and I

3  received then later a degree from York College in criminal

4  justice in 1998, December of 1998.  I've also attended the

5  FBI National Academy Program in Quantico, Virginia, Command

6  Institute for Police Executives in a multitude -- just a --

7  basically a pleather of other training involving police

8  operations, police management, you know, budgeting,

9  administration of a police department, that kind of thing.

10      Q    And I assume you've also taken some courses post

11  receiving your degree at York in 1998 in training?

12      A    Yes, we -- we train regularly in our police

13  department.

14      Q    And prisoner safety, have you taken courses on

15  that?

16      A    A course in prisoner safety, no.

17      Q    Have you taken any courses in the law relating to

18  what the legal obligation is as it relates to handling

19  prisoners?

20      A    Not a course, no.

21      Q    Okay.  Are you a member of any organizations, you

22  know, Fraternal Order of Police, other -- a chief's

23  organization, anything like that --

24      A    I am.

25      Q    -- currently?

1   A   I am.

2   Q   Can you, please, tell me what you're involved --

3   A   I'm a member of the Fraternal Order of Police, the

4   lodge for the county, in York County. I'm a member of the

5   International Association of Chiefs of Police. I'm a

6   member of the Pennsylvania Chiefs of Police Association.

7   I'm a member of the Central Pennsylvania Chiefs of Police

8   Association. I'm a member of the York County Chiefs of

9   Police Association.

10   Q   The organizations that you just indicated you are

11   a member of, do you hold any positions or have you hold --

12   or have you ever held any position, you know, like a

13   director or vice president, anything like that?

14   A   Yes, they are elected positions.

15   Q   Okay.

16   A   I mean I've been past president of the York County

17   Chiefs of Police Association. I'm a member of the Law and

18   Legislative Committee for the Pennsylvania Chiefs of Police

19   Association. I'm a past member of the Membership Committee

20   for the Pennsylvania Chiefs of Police Association. I'm a

21   past member of the Education and Training Committee for the

22   Pennsylvania Chiefs of Police Association. I'm the First

23   Vice President of the Central Pennsylvania Chiefs of Police

24   Association and Chair of the Training and Education

25   Committee. And I'm also a member of the Community Oriented

1   Policing Committee for the International Association of

2   Chiefs of Police.

3       Q    You had mentioned you were the Chair of the

4   Training and Education program of which -- what was that?

5   I'm sorry.

6       A    For the Central Pennsylvania Chiefs of Police

7   Association.

8       Q    Let's focus on -- on that particular organization

9   for a moment.  How long have you been a member of that

10  organization?

11      A    Since 1997.

12      Q    And how long have you been the Chair of the

13  Training and Education Department?

14      A    It's not a department.  It's just a committee.

15      Q    Sorry.

16      A    Without going back and looking at the past

17  minutes, I really don't recall.  But it's probably been

18  five years.

19      Q    Okay.  Do you know if the Central Pennsylvania

20  Chief of Police organization has -- has any type of mission

21  statement or goal?  Well, let's just start -- I'm sorry.

22  Does it have a mission statement that you know of?

23      A    I'm not aware of it.

24      Q    All right.  Do you know what is the goal or the

25  purpose of that organization?

1       A    Central Pennsylvania Chiefs of Police Association

2   is we basically are a group of chiefs located from the

3   central region of the state.  And each -- in the PA Chiefs

4   of Police Association, the state is divided into four

5   regions.  Central is one of those.  There's the west,

6   central, northeast and southeast.  Central is one of the

7   sub-organizations of the Pennsylvania Chiefs of Police

8   Association.  We do a variety of things.  One of the things

9   we try to do is provide training, in regards to your

10  question, at a very beneficial cost to organizations that

11  are members of that Central Pennsylvania Chiefs of Police

12  Association.

13      Q    Would you agree it's kind of an opportunity for

14  all of the other chiefs to get -- to get together in a --

15  in a way that they can kind of share ideas, exchange ideas,

16  learn what they know so hopefully to make everybody better

17  at what they do?

18      A    Yes, there's a -- I mean there's a certain amount

19  of networking that goes on within the Association, but it's

20  not a policy-formulating board of any kind.

21      Q    Okay.  The -- the Training and Education

22  Committee, what's the -- what is the purpose of that

23  particular committee?

24      A    Basically what we do is we review training

25  requests that are brought to us by members.  If a member

1  wishes to have training sponsored by the Central

2  Pennsylvania Chiefs of Police Association in a monetary

3  way, the member brings an application -- forwards an

4  application to me.  I review it.  I send it out to the

5  Training Committee.  They review it.  If it passes mostly

6  with the Training Committee, it goes to the Executive Board

7  of the Central Pennsylvania Chiefs of Police Association.

8  We take a final vote on whether or not to approve funding

9  for that training or not.

10     Q     Okay.  Can you just give me an example of a

11  situation?

12     A     Of?

13     Q     Well, let me -- let's back up.  Has your

14  department ever submitted a request for additional training

15  through the Central Pennsylvania Chiefs of Police?

16     A     Yes, we probably have.  It may have been -- it's

17  been a lot of years since I chair the committee.  I

18  typically don't send requests in since I'm the chair of

19  that committee.  Typically the requests come from other

20  entities.  We -- we look at -- if we have a request, we

21  basically meet quarterly, and we review those requests

22  prior to the quarterly meeting and then vote on them.

23     Q     Okay.  Now how long have you been the chair of

24  that department or that committee?

25     A     As I said before, I don't recollect without

1  looking at the minutes, but I would say probably about five

2  years.

3      Q    Okay.  And you're currently the chair?

4      A    Yes.

5      Q    All right.  Just again, I'm a little -- I'm having

6  a little hard time understanding because I don't do what

7  you do.  But just can you give me an example of what

8  somebody may ask for and kind of go through how it would

9  work?

10     A    Yeah, two -- the two most frequent -- or I'm

11  sorry -- the two most recent requests were we had a request

12  to sponsor a crime prevention through an environmental

13  design class that was hosted up in Hershey.  That was one.

14  And then another recent request was a request from the

15  Center for Highway Safety to put on a seminar on safe

16  traffic stops, traffic safety, new changes in the law

17  regarding to traffic.

18     Q    And -- so the last one you said, who -- and I

19  don't mean who like John Smith or John Doe.  But would that

20  come from another chief of a department typically?

21     A    Not necessarily.  It could come from another chief

22  of a department.  It could come -- like the Center for

23  Highway Safety, because they work closely with the chiefs'

24  organizations, they make the requests themselves.

25     Q    Okay.  And so when they make the request, who are

1 became a patrolman in January of 1986 at Springettsbury

2 Township.  In -- sometime in 1988, I was assigned to

3 criminal investigations.  And at the end of 1990, beginning

4 of 1991, I was assigned to the York County Drug Task Force

5 as a plain clothes investigator.  I remained in that

6 position until mid 1992 when I was promoted to the rank of

7 corporal.  Near the end of 1993, I was promoted to the rank

8 of sergeant.  In January -- I'm sorry -- in March of 1997,

9 I was promoted to chief, and that's the position in which I

10 serve today.

11      Q     So you've been the chief for the last 11 -- or

12 almost 11 years?

13      A     I'll be starting my 13th year actually in March

14 because I started in the beginning of 1997.

15      Q     '97?

16      A     Yes.

17      Q     Oh, okay.  My math was off.  I'm sorry.  Okay.

18 And when you were at the Drug Task Force, you were still

19 with Springettsbury.  Right?

20      A     Yes, I was a Springettsbury Township police

21 officer just assigned to that assignment.

22      Q     All right.  Would it be fair to say that in your

23 long career that you've arrested many people?

24      A     Yes, that would be a fair assumption.

25      Q     Okay.  After you left the Drug Task Force, you

1  said you became a corporal?

2      A    Yes, sir.

3      Q    What year was that?

4      A    1992.

5      Q    Let's focus to prior to 1992 when your -- would

6  your title be police officer at that point?

7      A    Patrolman.

8      Q    Patrolman.  Okay.  And I recognize as a patrolman

9  certain days you're doing different things, whether you're

10 doing traffic stops or investigating, you know, a burglary.

11 And at some point, you were on the Drug Task Force.  But is

12 your overall duties kind of the same?  In other words, not

13 your -- I guess, you know, on day-to-day activities, you

14 might do different things.  But are your overall duties as

15 a police officer the same?

16     A    Yes, I think I understand your question.  If

17 you're asking me if my overall duties as a patrolman were

18 the same as to what Officer Utter testified to as his

19 overall duties, yes, they were similar.

20     Q    All right.  Now as you then go to the next level

21 as a corporal, how does a corporal differ than a patrolman

22 other than hopefully a higher pay rate and a little more

23 respect from your --

24     A    A corporal in our department is a first line

25 supervisor.  They're what we would -- we would refer to as

1  a road supervisor.  They are a supervisor that's out on the

2  road with the officers.  If they have a question, a

3  decision that needs to be made or if there's an assignment

4  that needs to be given, a corporal does that.

5      Q    All right.  So you're kind of like the -- the boss

6  in the field so to speak?

7      A    So to speak.  First line supervision.

8      Q    All right.  Do you still have the same or

9  primarily the same duties as a patrolman would have, plus

10  the ability then to supervise?

11     A    Yes, although you're not tasked as much as a

12  corporal with answering every call that comes in.  Your

13  task is to direct traffic and make sure that the calls get

14  to who they need to get to and that they're handled.  But,

15  yes, you could still answer calls and do very many times.

16     Q    So, in other words, like if a call comes in that

17  there's five ducks crossing the road at three in the

18  morning, can somebody come get them, you'd have the ability

19  to tell someone else to do it?  Whereas a patrolman, you'd

20  have to go do it?

21     A    Correct.

22     Q    Okay.  Now when you got promoted to a corporal, do

23  you have to go through any specific additional training?

24     A    There's no requirement that you do.  I did go to a

25  class called First Line Supervision.

1    Q    All right.  And when you went to the class First
2    Line Supervision, where is that provided?  Who provides it?
3    A    That particular class was held and sponsored by
4    the Harrisburg Area Community College.
5    Q    Is it one course, two courses?  I mean what kind
6    of time involvement?
7    A    It was a course.  Honestly, I can't recollect
8    how -- how long or how many hours it was.  It was multiple
9    days.  I don't remember.
10    Q    Did you get any type of certificate to show
11    completion of the requirements?
12    A    Yes, I believe that I did.
13    Q    Okay.  Now it looks like relatively quickly you
14    were promoted from corporal to sergeant from '92 to '93?
15    A    Yes.
16    Q    As a -- what are the difference in the duties of a
17    corporal to a sergeant?
18    A    A sergeant's duties are more administrative.  They
19    are still obviously like a platoon commander or a watch
20    commander.  They are -- they have the overall
21    responsibility for running the shift, not necessarily on
22    the road like the corporal does.  But they have more
23    administrative duties above and beyond what the corporal
24    would have.
25    Q    All right.  So you're on the road less?

1    A    Correct.

2    Q    If we were going to kind of do an analogy to a

3  football team, would you kind of say the corporal might be

4  like the quarterback and the sergeant might be like the

5  coach on the sidelines?

6    A    I guess so.  I mean it's a pretty simple analogy.

7  But I guess you could do it like that.

8    Q    Okay.

9    A    The sergeant -- my charge as a sergeant, I was in

10  charge of our Criminal Investigations Unit.  So a lot of

11  what I did had to do with that.

12    Q    Okay.  How many units are there in the -- you

13  know, your police department?

14    A    Currently?

15    Q    Currently.

16    A    We have three platoons with a sergeant and a

17  corporal on each platoon and five patrolmen under each.  So

18  there's seven members of each platoon, A, B and C.  And

19  then there's also a Criminal Investigations Division that

20  has a sergeant, whose charge is to run that show, and there

21  are three plain clothes detectives that work under him.

22  Then we have some other officers that -- we have school

23  resource officers.  We have two that are assigned to the

24  school on a full-time basis during the school year, and we

25  also have officers that -- what we -- we have them in

1        MR. GABRIEL:  Just an objection to the form of the

2    question so far as your recitation might not match the

3    testimony.

4        MR. SILVERMAN:  Right.  The record speaks for

5    itself.  And I'm clearly not trying to mischaracterize

6    anything.

7    BY MR. SILVERMAN:

8        Q    But what -- let me ask you a different question.

9    Hopefully it will clear up the objection.  You recall that

10   Officer -- Ex-Officer Utter and I did discuss the staffing

11   issues.  Correct?

12       A    Yes, I do recall that.

13       Q    And what was your understanding of his answer?

14       A    I believe he stated that our compliment was 32

15   officers plus the chief.  That's incorrect.  Our compliment

16   is 32 sworn officers.  I'm a sworn officer.  So I'm one of

17   those 32.

18       Q    Okay.  Were -- when -- in July of '07 when the

19   Whitaker shooting took place, was your department fully

20   staffed in accordance with the way you wanted it to be

21   staffed?

22       A    With our compliment as of July 2nd, 2007, we had

23   32 officers sworn and working.  The 32nd officer was in the

24   police academy.

25       Q    Okay.  Now you had talked about the A, B and C.

1  Can you -- how many people were in that?

2      A    There are seven members of each platoon.

3      Q    Okay. And you have a -- what, a corporal and six

4  patrol? Is that how it is?

5      A    No, it's a sergeant, a corporal and five patrol.

6      Q    Okay. Now on the shift that Ex-Officer Utter was

7  on on the date of the Whitaker shooting, was there a

8  sergeant, corporal and five patrol people on duty?

9      A    There was a sergeant and four patrol people on

10  duty.

11      Q    No corporal?

12      A    No, not everybody works every day of the week.

13      Q    Okay. Is there a minimum -- when I ask if there's

14  a minimum, do you have internal requirements that you --

15  that either you put into effect or they're in effect

16  through the department that direct how many officers need

17  to be on duty on any given shift?

18      A    We have no minimum staffing requirements in our

19  labor contract nor do we have any minimum staffing

20  requirements in any rule or SOP that I've written.

21      Q    Okay. How about in ones that are -- that anyone

22  else may have written?

23      A    No.

24      Q    All right. Now do you have a belief as to what

25  you believe is the appropriate minimum requirements for any

1   given shift the amount of officers, including sergeants and

2   corporals, that should be on duty?

3       A    Sure, I have a personal belief.

4       Q    And what is that?

5       A    Basically a minimum of three people on day shift,

6   four people on second shift and three people on night

7   shift.

8       Q    Okay.  And the shift that Ex-Officer Utter was on

9   on the day of the shooting was what shift?

10      A    It was night shift.

11      Q    Now it was -- they were on the transition.

12  Correct?  Wasn't there a transition going on then or am I

13  mistaken?

14      A    I'm not sure if I understand what you mean by

15  transition.

16      Q    All right.  What times do the shifts begin and end

17  or is it always the same?  Sorry.

18      A    No, it's not always the same.  It's staggered.

19  Like, for instance, on day shift, we have people that come

20  in at 6 a.m. and work till 2 p.m.  We have people that come

21  in at 7 a.m. and work till 3 p.m.  On second shift, we have

22  people that come in at 2 p.m. and work till 10 p.m.  We

23  have people that come in at 3 p.m. and work till 11 p.m.

24  On the night shift, we have people that come in at 7 p.m.

25  and work till 3 a.m.  We have people that come in at 10

1    A    Yeah, I was off.

2    Q    Okay. When did you first hear about the Whitaker

3  shooting and how did you hear about it?

4    A    The 9-1-1 Center called my residence.

5    Q    Okay. And when you heard about it, what did you

6  do?

7    A    I took the phone call, got the information from

8  the dispatcher. I probably asked her a couple of questions

9  if it was a -- I don't even know if it was a she or a he.

10  I don't remember what the dispatcher was. But right

11  thereafter, I called the station then to try to get some

12  more information about what was going on because the

13  information that the 9-1-1 dispatcher had was pretty

14  limited at that point because it was pretty much right

15  after it happened I think.

16    Q    Did you -- on that day, did you go to the station?

17    A    Yes, I did. It actually was the next day though.

18  I got the call -- by the time I got the call -- this

19  incident happened on a Saturday shortly before midnight. I

20  got the call shortly after midnight on a Sunday. I'm off

21  on both Saturday and Sunday. But, yes, I did respond to

22  the station on Sunday morning.

23    Q    About how long after you got the call was it till

24  you actually got to the station?

25    A    This is an approximation. About 30 minutes.

1    Q    Okay.  So I mean basically you got the call, and

2  you didn't go back to bed.  You went --

3    A    Oh, no, no, no.  Yeah, I went right there.

4    Q    All right.  This was a significant issue --

5    A    Absolutely.

6    Q    -- that needed to be addressed?

7    A    Absolutely.

8    Q    Did you speak with EX-Officer Utter on that day?

9    A    I did.

10   Q    Would you agree that as it related to internal

11 investigation -- and what I mean by internal was your

12 department, not the district attorney or the State

13 Police -- but internal, that it was your responsibility to

14 oversee the internal investigation?

15   A    Yes, typically in an internal investigation, I

16 assign an internal investigator, and they do the

17 investigation and then they report back to me.

18   Q    And who did you assign as your internal

19 investigator?

20   A    Lieutenant Scott Laird, L-a-i-r-d.

21   Q    How long has -- is it Lieutenant Laird you said?

22   A    Yes, sir.

23   Q    And he was a lieutenant back then?

24   A    Yes, sir.

25   Q    How long had Lieutenant Laird worked with you

1    prior to that incident?

2        A    He was hired to the Springettsbury Township Police

3    Department in February of 1985.  So I worked with him my

4    entire career.

5        Q    Was there any particular reason you selected

6    Lieutenant Laird to head up the investigation?

7        A    That's part of his duty as the operations

8    lieutenant.

9        Q    Okay.  What is operations lieutenant?

10       A    We have two lieutenants in the department.  One is

11   an administrative lieutenant.  One is an operations

12   lieutenant.  The operations lieutenant basically oversees

13   the patrol division and the criminal investigative

14   division.

15       Q    Okay.  And how about the administrative?  What are

16   his duties?

17       A    I'm just giving you a smattering of their duties.

18       Q    Understand.

19       A    There's way more than that.

20       Q    Absolutely.  And you probably have a book on what

21   they do --

22       A    Yeah.

23       Q    -- but understood.

24       A    The administrative officer is in charge of support

25   staff, scheduling, records management system,

1  overseeing them and patrolling them. Would you agree that

2  your job -- a part of your job is to oversee and control

3  the people under you?

4      A    Yes.

5      Q    And when I ask that question, I'm not asking for a

6  legal conclusion because what the responsibilities may be

7  for you -- if somebody does something on a legal basis may

8  be something different. But I'm talking on a -- kind of as

9  running it, like, as a business. You're ultimately

10  responsible what everyone does?

11     A    Correct.

12     Q    Now when this was assigned to Lieutenant Laird,

13  would you agree that -- strike -- well, forget that.

14  Officer Laird was investigating this internally for you.

15  Correct?

16     A    Lieutenant Laird, yes.

17     Q    Lieutenant Laird. I'm sorry. And the State

18  Police were also investigating this I guess on behalf of

19  the Commonwealth. Correct?

20     A    Correct. At our -- at our request.

21     Q    At your request. All right. And the -- are you

22  suggesting that if you didn't request it the State Police

23  would not have investigated it?

24     A    They don't -- they would have to receive the

25  request from us to come and investigate the incident. They

1  don't come on their own, in other words.

2      Q    Okay.  So are you suggesting then -- and I don't

3  think you are -- that if you didn't make the request, that

4  this would not have been investigated by an outside agency?

5      A    Not necessarily.  What I'm saying is if I didn't

6  request the State Police the State Police would not have

7  shown up on their own will.  Our policy requires that we

8  have the State Police and the district attorney's office

9  investigate it jointly or whatever -- however you want to

10  say that.  But we contact both entities.  The State Police,

11  we contacted them, and they responded.  We contacted the

12  district attorney's office, and they responded also.

13      Q    Okay.  You said you have -- I think you said an

14  obligation -- and if I misstate it, correct me -- to

15  contact the district attorney and the State Police to

16  investigate.  What are -- what times must you ask either

17  one or both of those organizations to conduct an external

18  investigation?

19          MR. GABRIEL:  Just in terms of the form, he

20  referenced the policy.

21          MR. SILVERMAN:  Okay.

22          THE WITNESS:  Yes, I did.

23          MR. SILVERMAN:  I'll re-ask the question.

24          THE WITNESS:  Okay.

25  BY MR. SILVERMAN:

1     Q    Under what circumstances do your policies or

2  your -- require you to ask an outside agency such as the

3  district attorney or the State Police to investigate a

4  matter?

5     A    Use of deadly force.

6     Q    Okay.  So anytime deadly force is used, you would

7  agree that you are required by your own internal procedures

8  to contact the district attorney and the State Police to

9  investigate?

10     A    Yes.

11     Q    All right.  The -- we know this was a fairly --

12  well, there was a lot of press coverage on this.  Would you

13  agree with that?

14     A    There was -- I don't know what your definition of

15  a lot is.

16     Q    Fair enough.

17     A    But there was press coverage on it, yes.

18     Q    And you spoke to some of the press?

19     A    I did.

20     Q    All right.  Do you recall if -- when the press

21  investigated, did this make the news on the television?  Do

22  you remember seeing any articles on TV on this?

23     MR. MACMAIN:  I'm sorry.  The question was when

24  the press investigated the incident?

25     MR. SILVERMAN:  I'll rephrase it.

1  that, yes, that, you know, that some of this was captured,

2  you know, by video.  I don't remember if I said it or they

3  introduced it.  I honestly don't.

4     Q   Okay.  Do you remember what, if anything, you said

5  relating to your thoughts as to whether or not what

6  Ex-Officer Utter did in your mind was appropriate?

7     A   I think I made a statement to the effect that the

8  State Police and district attorney's office were

9  investigating it.  We weren't trying to rush to judgment.

10  But preliminarily from what I saw, he was justified in what

11  he did.

12     Q   Okay.  All right.  At that point in time, do you

13  recall what information you had at your disposal that you

14  actually reviewed?

15     A   Not particularly.  I mean there was -- a lot of

16  the information that I had was through conversation with,

17  you know, my lieutenant, the officers, the other officers

18  that were on duty and whatnot.  Very minimal conversation

19  with Officer Utter that evening, just to get an idea of

20  what had occurred.  And I had seen the video at that point.

21     Q   I don't think I asked you this.  And if I did, I

22  apologize.  But when the shooting took place, who was the

23  sergeant on duty?  Did I ask you that?

24     A   I don't think you asked me that.  You asked

25  Officer Utter that.  It was Sergeant Gregory Witmer.

1  relates to that area of questioning, yes.

2      MR. SILVERMAN:  All right.

3  BY MR. SILVERMAN:

4      Q    When you asked Officer -- or Lieutenant Laird --

5  and I don't -- and I apologize -- to investigate the

6  shooting of Mr. Whitaker, was there a specific scope that

7  he was looking into?  What was the scope of the

8  investigation?

9      A    Just to find out what the facts of the incident

10 was.

11     Q    Would you agree that the reasons Officer Laird

12 would investigate would be different than the reason -- or

13 some of the reasons that the State Police would

14 investigate?

15     A    Yes, Lieutenant Laird was doing administrative

16 review of the incident.  That's not what the State Police

17 was doing.

18     Q    Okay.  What was the purpose, if you know, of the

19 State Police review?

20     A    To determine whether or not there were any

21 violations of law committed.

22     Q    Okay.  Any criminal violations?

23     A    Yes.

24     Q    All right.  And can we agree as a general

25 proposition that the fact that there may -- the fact

1  interaction between Utter, the police department and

2  whitaker?

3      A    When he -- he talks to an officer, a situation

4  like that, I mean he wants to get all the information he

5  can of what occurred before, during and after, whatever led

6  up to the incident.  So he would have -- when he talked to

7  the officers in regards to that, he would have spoken to

8  them about all those things.

9      Q    okay.  And would part of his investigation focus

10 on whether or not there was any criminal conduct conducted

11 by Utter?

12     A    No, what happens is when we internally investigate

13 something, if we find during that internal investigation

14 that there is a violation of criminal law, then that is

15 outsourced to an outside agency to investigate so that

16 there's no appearance of impropriety on our part.  That was

17 not the case in this instance.  The State Police was called

18 in immediately because that's what our policy requires.  It

19 was not done subsequent.  It was done immediately.

20 Actually they were investigating before Lieutenant Laird

21 was.

22     Q    okay.  what is the -- the purpose of -- since

23 you're not -- you said your internal investigation has

24 nothing to do with the criminal investigation.  Correct?

25     A    Right.  Up until the point -- if they would find

1    during that investigation a violation of criminal law that

2    they weren't aware of at the beginning of that

3    investigation, then they would turn that part of it over to

4    an outside agency such as the State Police or the district

5    attorney's office.  But up until that point, it's an

6    internal review of what occurred and what, if any,

7    violations of our policies and procedures occurred.

8        Q    Would you agree that -- well, what is the purpose

9    of conducting that type of investigation?

10       A    To find out whether there were any violations of

11   our policies or procedures or rules.

12       Q    Is also part of the purpose used to evaluate

13   whether or not your rules need to be amended or revised or

14   changed in any fashion?

15       A    Yes, that could be part of it.

16       Q    Okay.  Now in this instance, when Laird

17   investigated the Whitaker shooting and the relationship

18   with Ex-Officer Utter, did you find any violations of your

19   operating procedures?

20           MR. GABRIEL:  Just -- you are asking basically for

21   the Laird memo.

22           MR. SILVERMAN:  No, I'm not.  I'm not.  I'm asking

23   him factually what he found.

24           MR. GABRIEL:  But that's based on the Laird memo.

25   Laird did the investigation.  He concluded what he

1   you agree that -- you said you read the Laird memo.  And I

2   don't have it here.  Maybe if you'd like, I'll be happy to

3   take a break and let you look at it because I think your

4   counsel probably has it or can get it.  Would you like to

5   look at the Laird memo so we -- you know, there's no

6   question as to what's in there and what's not?  So I'll

7   give you the opportunity to do that.

8       A    That would be fine.

9            MR. SILVERMAN:  Let's take a break.

10           VIDEO OPERATOR:  We're going off the video record.

11  The time is 11:27.

12           MR. SILVERMAN:  Do you have it.  If not --

13           MR. GABRIEL:  It's in my car.

14           MR. MACMAIN:  It's really not that complicated.

15           MR. SILVERMAN:  Here's the deal.  I'd like him to

16  read it.

17           MR. GABRIEL:  Here's the thing though.  The court

18  reviewed it.  The court --

19           MR. SILVERMAN:  I understand that.  What's the big

20  deal?  I just want to make sure we're straight and that the

21  facts are all disclosed.  You made a representation, and

22  I'm going to ask him if it's accurate.

23           MR. GABRIEL:  Well, the court found it accurate

24  basically, and that's the problem with your question.

25  You're asking him --

1          MR. SILVERMAN:  Are you going -- I'm asking to

2    have him read it.  Do you want him to do it or not?  It's

3    really simple.

4          MR. GABRIEL:  I can walk to the car and dig it

5    out.  I don't see the purpose in it.

6          MR. SILVERMAN:  Please.  I don't want to go back

7    and forth.  Do you want him to do it or not?  I'm not going

8    to fight with you.

9          MR. GABRIEL:  I'll walk to the car and get the

10   memo.  I think it's a waste of time.  He's reviewed it

11   before, and he can review it again.

12         MR. MACMAIN:  What is it you want him to --

13         MR. SILVERMAN:  Let him review the memo.  We're

14   spending more time talking about it.  Let's just do it.

15         MR. MACMAIN:  You can ask him what did so and so

16   say.

17         MR. SILVERMAN:  Please just show it to him.  It

18   will be much easier.

19         MR. GABRIEL:  I'm not following, but sure.

20         MR. SILVERMAN:  You know, we were discussing the

21   court's order of November 14th, 2008, and there's an issue

22   as to what it means.  I guess my position is subparts C,

23   disciplinary reports of the discussion, and paragraph four

24   of the order provide that we are entitled to obtain

25   information relating to disciplinary action other than as

1      A      The purpose of the rule is officer safety.

2      Q      Okay.  Would you agree that it's officer safety

3   and prisoner safety?

4      A      It's officer safety because the prisoner has no

5   access to the radio.  So they couldn't call and do

6   anything.  I mean there's no -- there's no way for the

7   prisoner to access the radio.  You know, the intent is to

8   document from when the person leaves point A and when they

9   arrive at point B with the prisoner so -- number one, for

10  officer safety; number two, that there's no allegation that

11  something happened in between point A and point B.

12     Q      Okay.  The next operating procedure that we've

13  discussed in relation to what Officer Utter did relating to

14  the locking of the handgun, how should that -- back in July

15  of '07, what was the standard operating procedure with

16  regard to how that should have happened?

17     A      He should have walked into the department from the

18  sally port with the prisoner handcuffed.  He should have

19  taken the prisoner into the holding room handcuffed.  He

20  should have secured the prisoner in the holding room

21  handcuffed.  He should have then locked up his weapon.  He

22  should have then returned to the room and unhandcuffed the

23  prisoner if he felt it was okay to unhandcuff the prisoner.

24  After which, then he could have gone back and reholstered

25  and should have gone back and reholstered his weapon in the

1  event something else came up while he was on the station.

2      Q    When you say that he should have gone back and

3  reholstered in case something else happened in the station,

4  do you mean in case something literally happens in the

5  station or in case that he's called out of the station?

6      A    No, in case something happens either literally in

7  the station or on the station grounds.  Many times we have

8  people come to the doors, beating on the doors asking for

9  assistance, and we've had domestic disputes in the parking

10 lot.  We've had people try to run people over in our

11 parking lot.  So the officer has to be ready to act upon

12 whatever situation is put before him whether or not there's

13 a prisoner there.

14     Q    Okay.

15     A    And the other reason that they can re, you know,

16 holster their weapon is if there's an emergency in the

17 holding room involving an officer or a prisoner they can

18 enter the room at that point armed.

19     Q    Are there any standard operating procedures that

20 you had in July of '07 that dealt with minimum requirements

21 of officers that need to be at the station when there is a

22 prisoner?

23     A    No, the first SOP that you're referring to as far

24 as the holding rooms requires that either the arresting

25 officer or the officer that's in charge of the custody of

1  that person be present on the station when the prisoner is

2  on the station.  So the requirement without being stated is

3  one.  It's either the arresting officer or the officer in

4  charge of the custody of that person.

5      Q    Okay.  Now if you could go through the -- what you

6  understand the standard operating procedure is from the

7  time an officer, whether it's arresting officer or an

8  officer in charge of the prisoner, gets back to the

9  station, gets out of the car.  What are they supposed to do

10 from that point until either release or transfer to

11 sheriff?

12     A    It's a pretty broad question.  I mean there's a

13 lot of things that they have to do.

14     Q    Let's talk about what they have to do.

15     A    As I stated before, the officer would bring the

16 prisoner into the building, place them in a holding room,

17 secure the holding room while they're still handcuffed,

18 secure their weapon, go back in and then unsecure the

19 prisoner, that is remove the handcuffs if they feel that's

20 okay to do that.  Obviously if they didn't feel that was

21 okay to do that, they would leave the prisoner handcuffed

22 in the holding room.  If the prisoner is handcuffed in the

23 holding room, as long as they're handcuffed, there's no

24 requirement to relinquish the weapon to the safe box.

25     Q    Okay.  Let me -- let me interrupt you a second.

1   So they get to the holding room with the prisoner.  And you

2   used the word secure the holding room.  what does that

3   mean?

4      A   Shut the door.

5      Q   Okay.  Is there a requirement to go in and

6   actually inspect the holding room?

7      A   Yes, there is to make sure that there's not

8   contraband or something laying in there that could be used

9   as a weapon against the officer.

10      Q   And would you agree that the requirement to

11   inspect the holding room is a non-discretionary mandatory

12   requirement?

13      A   Yes, it's stated in the policy.  It doesn't say

14   how you have to do it.  It just says that you have to check

15   the room and make sure that there's no weapons or

16   contraband or anything like that in the room.

17      Q   When you viewed the video -- and we'll look at it

18   later -- did you observe Ex-Officer Utter inspect the room

19   for contraband?

20      A   The video you can't -- I don't even know if you

21   can see, like, the heads of the people on the video all the

22   time.  But if he opened the door up and looked into the

23   room, that's a visual inspection of the room.  I don't know

24   if you can tell or I can tell you that's what he's doing.

25   I don't know if I can do that or not.

1    Q    Is sticking your head in the room and looking
2    around, is that a sufficient inspection of a holding room?
3    A    It may be.  It depends on what the officer sees.
4    Q    Okay.  Were you involved at all in writing the
5    standard operating procedure relating to checking the
6    holding room before you unhandcuff a prisoner?
7    A    Yes, all the SOP's within our department come out
8    under my signature.  If you're asking do I write personally
9    every single SOP, no, I don't.
10   Q    That wasn't my question.  But you're involved in
11   the --
12   A    Yes.
13   Q    Okay.  Now would you agree that the purpose of
14   that SOP is to make sure there is no weapons or other
15   contraband in that room?
16   A    Yes, I would.
17   Q    And would you agree that rule is in place for many
18   reasons, including prisoner safety?
19   A    Yes, that could be part of it.
20   Q    Officer safety?
21   A    Yes, that would be part of it.
22   Q    Okay.  So now when that rule was put into place,
23   did -- was it your expectation that all you had to do was
24   kind of look around the room and -- and that would be
25   sufficient to comply with that standard?

1  BY MR. SILVERMAN:

2      Q    Did you understand what I meant when I said --

3  asked that question?

4      A    Well, if you mean is there a training course that

5  an officer goes to to decide when to take handcuffs on and

6  when -- when to take them off and when not to --

7      Q    I don't mean --

8      A    -- no, there's no training course. But during

9  their field training, during -- you know, during their

10  field training, the field training officer would instruct

11  the field trainee that if you have somebody that's violent,

12  you know, if you have somebody that is actively trying to

13  harm you even though they are handcuffed, don't take the

14  handcuffs off of them. You either leave the handcuffs on;

15  or if they get extremely violent in the holding room, they

16  can be handcuffed to the detention bench.

17          The training that happens with that as far as --

18  in other words, let's go back in time a little bit. When

19  that holding room SOP was formed -- I believe it was formed

20  in 1995 -- there was training given out when that was given

21  to the officers. If an officer was hired post 1995, when

22  they got their SOP manual, they were trained in that SOP

23  then. And anytime that SOP was updated, they were trained

24  in it again, that training being their supervisor providing

25  them with the material, going over the material with them,

1    asking them if they have any questions about it, explaining

2    what any of the changes are or clarifying any of the

3    questions that they might have had and then having them

4    sign saying that they received it.

5        Q    Would you agree that you expect -- back in July of

6    '07, you would have expected your officers to do a -- to

7    make -- do, like, a screening process?  It could be just a

8    check in their head or some type of screening process to

9    determine whether or not they should take the handcuffs

10   off?

11       A    It's basically something that's done in their

12   head.  I mean the officer has to know what they're

13   comfortable with and what they aren't comfortable with.

14       Q    Is there any type of standardization that you

15   expected of your officers relating to, you know, under what

16   situations they should and should not take handcuffs off?

17       A    Basically if somebody is violent, if they're

18   destructive, if they are trying to hurt themselves, hurt

19   the officer, damage the room, you know, desecrate the room

20   shall we say, you know, if they're doing something like

21   that, then they should not be unhandcuffed.

22       Q    Is there any type of formal screening process

23   that -- like a checklist or something that they must go

24   through before they make that determination?

25       A    Not before they make that determination.  I mean

1    we have checklists as far as inventory reports for property

2    and transporting of the prisoner and things like that.  But

3    it's not something that they have to go over the checklist

4    before they take a handcuff -- the prisoner and unhandcuff

5    them.

6        Q    Okay.  Are there any medical reports that are

7    required to be complied with -- or done before you

8    determine -- or strike that.  When you take a prisoner back

9    to the station, do you have to do any type of a medical

10   screening?

11       A    We aren't doctors.  We aren't nurses.  We don't

12   medically screen anybody.  There's an observation report

13   basically that does list some medical factors on that.  But

14   it's not required to be done before they are at the

15   station.  It's not required to be done before they are

16   unhandcuffed.  It just becomes part of the report after the

17   person is a prisoner if they live past the incident, if you

18   will.

19       Q    Understood.  Is there any type of checklist that

20   officers must do to find out if someone is -- strike that.

21   Would you agree that there are certain factors that the

22   officers are trained to look for to determine if someone is

23   at a higher risk of suicide?

24       A    Yes.

25       Q    Okay.  What other -- can you tell me what maybe

1    A    They don't get the 200.

2    Q    Never get the 200. Okay. They get cheap bread or

3    something. So basically when someone comes into the

4    station, one of three things hopefully is going to happen.

5    They are either going to go to prison, they are going to go

6    to Central Booking or they're going to release -- if it's

7    their right situation that they're released for?

8    A    Correct. If it would be a situation that would

9    allow a summons to be sent after all the appropriate

10   information is gathered, then they can be released either

11   on their own recognizance, if you will, if they're

12   non-intoxicated or into the custody of somebody else if

13   they are.

14   Q    And is there a normal amount of time -- and I

15   understand there are times you're busy. You're not -- and

16   I'm not asking for the extremes. But is there a normal

17   amount of time that somebody would be kept at the station?

18   A    With Central Booking operating, it's typically

19   about an -- no more than an hour now.

20   Q    All right. So you're normally -- I mean your

21   typical prisoner is at your station for an hour give or

22   take?

23   A    Or less.

24   Q    Or less.

25   A    It just depends. I mean it depends what the

1  situation is.  If it's a situation where you're going to

2  interview the prisoner, they may be there a little bit

3  longer than that until the interview is done and they are

4  taken to Central Booking.  But if it's just a situation

5  where there's no interview necessary, you're preparing

6  charges and taking them down there -- it basically depends

7  on how long it takes the officer to prepare those charges.

8      Q    Take a situation like Whitaker.  I don't mean --

9  where, you know, if the arresting officer was the one who

10 took him to process --

11     A    Okay.

12     Q    -- and, you know, you're not dealing with other

13 calls or called out on, there's no snow, Central Booking is

14 not, you know, crazy.

15     A    Okay.

16     Q    So in that situation, that prisoner would not

17 expected to be at the station more than hour.  Is that

18 correct?

19          MR. MACMAIN:  Objection to form.

20          MR. GABRIEL:  You can answer.

21          THE WITNESS:  It's very dependent on the incident.

22 I mean this man was involved in a felony crime.  It was,

23 you know, reported to us as a robbery that was being

24 investigated by us as a robbery.  And those types of crimes

25 take longer to deal with than a summary offense.  So it

1  just -- and the other factor is the speed of the officer,
2  how quick he can type and everything else.
3  BY MR. SILVERMAN:
4      Q    Okay.  But what I was saying was not -- I'm not
5  talking about this incident.  I'm talking about your
6  typical incident where, you know, you're not going to
7  investigate him, you're not going to question him so to
8  speak.  You're doing your outside investigation.  And
9  everything being your normal flow of business, an hour or
10  less you would expect the prisoner to be in and out?
11         MR. MACMAIN:  Objection to form.  He's testified
12  there's all kinds of variables.
13         MR. SILVERMAN:  I said --
14         MR. MACMAIN:  You're asking him to give a typical
15  case.
16  BY MR. SILVERMAN:
17      Q    Do you have typical cases?
18      A    I don't know.  It depends what your definition of
19  typical is.  In reference to what you said, if it's stated
20  the way you stated it --
21      Q    Right.
22      A    -- that there's no investigation to be done,
23  there's nothing other than to bring them in there, do what
24  you got to do to get them ready to transport them, yes,
25  typically it would be an hour or less.

1    Q    All right.  And would you say that that is most of
2  your prisoners, that situation?  Hour or less is most of
3  your prisoners?
4    A    I can't answer that question.
5    Q    Fair enough.  All right.  So after the officer,
6  you know, leaves the prisoner in the holding cell, what is
7  he next expected to do?
8    A    Prepare the necessary paperwork.  If he's the
9  arresting officer, to take that person forthwith to the
10  Central Booking area so that the judge that is going to
11  arraign that person has everything necessary to do so.
12    Q    Now in the Whitaker situation, Ex-Officer Utter
13  was not the arresting officer.  Correct?
14    A    That's correct.
15    Q    Who was the arresting officer?
16    A    It would have been Officer Ford.
17    Q    All right.  Now is there a standard operating
18  procedure that you're aware of that relates to how an
19  arresting officer that stays at the scene is to transfer
20  the prisoner to the custody of someone else?  So, like, as
21  an example, in this situation, Ford was the arresting
22  officer.  Correct?
23    A    Yes.
24    Q    And Officer Ford stayed at the scene to do further
25  investigation.  Correct?

 1      A      Correct.

 2      Q      All right.  And when Officer Utter got there, he

 3   volunteered or was asked somehow to take the prisoner back

 4   to the station.  Correct?

 5      A      Yes.

 6      Q      Now is there a -- when a situation like that

 7   occurs, is there a standard operating procedure that

 8   relates to what information, if any, the arresting officer

 9   is supposed to give to the officer who is taking him back

10   to the station?

11      A      I don't believe so, not specifically like that.

12      Q      All right.  Now again not on the Whitaker case.

13   So after the prisoner, you go back, you start filling out

14   your paperwork.  Is that what you said?

15      A      Did you say not on the Whitaker case?

16      Q      I'm just talking about generally.  I'm not talking

17   about what happened.  Again what should have happened and

18   what -- if -- if Whitaker had not been shot and was

19   processed in accordance with your standard operating

20   procedures and was eventually taken to Central Booking, I'm

21   trying to figure out what your expectation would have been,

22   what would have happened.  And I think we got to the point

23   where you would have expected the room to be searched, the

24   prisoner to be searched, Whitaker to have been left in the

25   room, the officer to have then left -- locked up the room,

1  left the room, and then I think you said go back and start

2  doing the paperwork.  Correct?

3      A    I don't know if I said it all exactly the way you

4  just presented it.  But, yes, if we're to the point like

5  what happens after the prisoner is placed in the holding

6  room, the officer then there that's in charge of that

7  prisoner would -- if there was property that was removed

8  from him, they would inventory that property and put it in

9  a locker until which time the person is released or

10  transferred into somebody else's custody.  They would most

11  likely run, like, criminal history information, try to

12  verify the identification that the person has on their

13  person, if they have any.  If they didn't, start the work

14  on identifying the person, try to find out if who they say

15  they are is who they really are because we have issues with

16  that all the time.

17          And basically if the person is non-violent, isn't,

18  you know, showing any signs of any type of destructive

19  behavior, they're required to personally monitor that

20  person every 30 minutes and note that on a report.  That's

21  above and beyond the video monitoring, which they can

22  pretty much do continually while they are in the squad room

23  because there's video monitors there.  If the person was

24  extremely violent or showed -- exhibited signs of violent

25  behavior, then they are required to monitor them every 10

1    Q    Okay.  All right.  You had said that the -- about

2 the monitoring of the prisoner, that it can be done

3 continually through video system?

4    A    Yes, as long as you're looking at the video

5 system.

6    Q    And is there a -- do you have an expectation that

7 your officers will continually monitor or will not

8 continually monitor?

9    A    No, the expectation is what I had said previously,

10 that the monitors are there for their use, but the

11 expectation is 30 minutes if the person is non-violent.

12 They have to personally go and monitor them or 10 minutes

13 if they are violent.

14        MR. SILVERMAN:  Okay.  Why don't we take a break

15 since we're almost done with this.

16        VIDEO OPERATOR:  This is the conclusion of tape

17 number one.  Tape number two will follow.  The time is

18 12:38.

19        MR. MACMAIN:  One just housekeeping.  It doesn't

20 necessarily have to be on the video.  Occasionally you

21 refer to Officer Utter as ex-officer.

22        MR. SILVERMAN:  He is ex-officer.

23        MR. MACMAIN:  I'm making sure we're clear.  If you

24 use the transcript or the tape if this matter goes to

25 trial, the fact he was terminated may not be admitted.  If

1     A     Define for me what you mean differently.  We treat
2  all people the same but --
3     Q     Okay.  The way -- the way it -- they're processed.
4  As an example -- all right.  Let me ask you this question.
5  In -- do you agree that in July of '07 it was not your
6  standard operating procedure to remove belts from
7  prisoners?
8     A     In July of '07, it was not our standard operating
9  procedure to remove belts from prisoners.  That's correct.
10     Q     In July of '07, was it standard operating
11  procedure to remove shoe laces from prisoners?
12     A     No, it was not.
13     Q     Okay.  Today is it standard operating procedure to
14  remove belts from prisoners?
15     A     Yes.
16     Q     Today is it standard operating procedure to remove
17  shoe laces from prisoners?
18     A     Yes, as well as a multitude of other things.
19     Q     Okay.  Why is it that now -- what is the purpose
20  of removing shoe laces from prisoners as a standard
21  operating procedure now?
22     A     The purpose of it is so it can't be used as a
23  weapon against the officer or used to hurt themselves.
24     Q     Okay.  And that -- that procedure is in place for
25  whether or not there's a suicide risk.  Correct?

1    A    That's correct.  It's across the board.

2    Q    All right.  When did that -- do you believe

3  there's a need for that?

4    A    Do I believe that there's a need for that?

5    Q    That procedure.

6    A    If I didn't think there was a need for it, I

7  wouldn't have put it in place.

8    Q    Okay.  Prior to July of '07, had you been aware

9  that other -- other police departments or organizations

10  where prisoners are detained as a standard operating

11  procedure took away shoe laces from all prisoners?

12         MR. GABRIEL:  Objection to the form of the

13  question.  You can answer it.

14         THE WITNESS:  No, I don't -- I don't have all the

15  standard operating procedures of other police departments,

16  from other prisons or anything like that.  We have what we

17  have.  And what we had prior to July of 2007 as what we

18  have today both meets the accreditation standard for the

19  Pennsylvania Law Enforcement Accreditation Commission,

20  which we were accredited at the time of that particular

21  incident on 7/7/07.

22  BY MR. SILVERMAN:

23    Q    The -- the accreditation that you just mentioned,

24  does that -- to be accredited, does it require -- today,

25  does it require that your standard operating procedures

1  provide that all prisoners must have shoe laces taken away

2  if they are going to be held in custody?

3      A    No, it doesn't.

4      Q    Okay.  Now going back to before July of '0 -- of

5  2007, had you received any training -- I don't mean a

6  training course -- it could be from an organization member

7  or from something you learned in a school, from other

8  people -- about the risks associated with having prisoners

9  have shoe laces in a cell?

10     A    Not training.

11     Q    Okay.  And before the Whitaker shooting, were you

12 aware that prisoners could be -- not would be -- could be

13 at a greater risk to harm themselves if they had shoe laces

14 while locked up?

15         MR. MACMAIN:  Objection to form.  Are you asking

16 him -- are you asking him whether or not or are you stating

17 that that's --

18         MR. SILVERMAN:  I'm asking whether or not.  I'm

19 not -- I'm not stating anything.

20         THE WITNESS:  Can you ask me the question again?

21         MR. SILVERMAN:  Can you read it back?

22         THE WITNESS:  Whether or not what?

23 BY MR. SILVERMAN:

24     Q    I'll rephrase it.  Prior -- prior to July of '07,

25 prior to the whitaker incident, did you have any beliefs as

1  to if allowing a prisoner to keep his shoe laces on prior

2  to being held, you know, in a prison while unhandcuffed

3  created any greater risk for that prisoner to harm himself?

4        MR. GABRIEL:  Objection to the form of the

5  question.  You can answer.

6        THE WITNESS:  No, I didn't.  we had never had an

7  incident where anybody had tried to use a shoe lace to kill

8  themselves.  I'd never heard of an incident where anybody

9  tried to use a shoe lace.  I had heard of other incidents

10  in prisons and whatnot where somebody had used a bed sheet,

11  a T-shirt, a belt or something like that.  But I had never

12  heard of anything about a shoe lace up until this incident.

13  BY MR. SILVERMAN:

14     Q    Okay.  So would you agree that prior to the

15  whitaker shooting, you were aware or you had heard of other

16  incidents where prisoners tried to hang themselves with

17  belts?

18     A    In a prison -- I'm sorry.  In a prison cell

19  situation, yes, where they had used the belt to hang

20  themselves from, like, a bar from the bars in the prison

21  cell.

22     Q    Okay.  Now as it relates to -- do you agree that

23  when you take a prisoner or a person into custody they --

24  you're taking away their freedom of -- freedom of to come

25  and go as they please?

1    duty to safeguard your prisoners?

2        A    Yes, I think I said that.

3        Q    Okay.  Right.  And my question is, do you believe

4    that the duty that you have now is the same duty that you

5    had in July of '07?

6        A    Yes, we had a duty of care in July of '07, and we

7    have a duty of care now.

8        Q    Okay.  Now you had said -- all right.  Now you had

9    said previously that prior to the incident, the Whitaker

10   shooting, you had heard of situations where prisoners not

11   in your custody or control but in other prisons, that you

12   had heard of those prisoners trying to hang themselves with

13   belts?

14       A    I heard of it, yes.  I didn't witness any of it.

15   I didn't -- I wasn't partial to that or privy to that or

16   anything.  I just heard of it.

17       Q    Okay.  Prior to July of '07, it was not the

18   practice of your department to remove the belts of all --

19   of all prisoners.  Correct?

20       A    Correct.  I think I've already said that I

21   believe.

22       Q    All right.  The -- was the reason that your

23   standard operating procedures relating to removal of belts

24   and shoe laces from prisoners related at all to the

25   Whitaker shooting?

1      MR. GABRIEL:  Just only an objection continuing in

2  nature in terms of subsequent changes.

3      MR. SILVERMAN:  I'm not asking that.

4      MR. GABRIEL:  But you can answer the question.

5      THE WITNESS:  If you're asking did we change the

6  SOP as a result of that, yes, we did.

7  BY MR. SILVERMAN:

8      Q    Were you aware in July of '07 that when a prisoner

9  was transferred from your facility to Central Booking that

10  Central Booking required all prisoners to remove their shoe

11  laces and belts?

12      MR. MACMAIN:  Objection to form.  Are you asking

13  him whether or not he knew that or whether it was a fact?

14      MR. SILVERMAN:  Whether he knew it.  Whether he

15  knew it.

16      MR. MACMAIN:  Well, are you stating --

17      MR. SILVERMAN:  I'll ask him.

18  BY MR. SILVERMAN:

19      Q    All right.  Were you aware that in July of '07

20  when a prisoner was transferred to your -- from your

21  facility to Central Booking that the sheriff's department

22  required all prisoners to remove their belts and shoe

23  laces?

24      MR. MACMAIN:  Same objection.  The way you're --

25  let me just tell you why, and then you can cure it.  You're

1    Q    Can we agree that a guideline would be a minimum

2  standard?

3    A    It could be a minimum standard.

4    Q    The guidelines which you have -- had signed off

5  on, did you expect all of your officers to comply with

6  them?

7    A    Yes.

8    Q    And you expected Ex-Officer Utter to comply with

9  them?

10    A    Yes.

11    Q    What procedures were in place, if any, to ensure

12  compliance with the standard operating procedures back in

13  the months prior to -- you know, the few months prior to

14  July of '07 through July of '07?

15        MR. GABRIEL:  Just a point of clarification.

16  You're talking in general?

17        MR. SILVERMAN:  In general.

18        THE WITNESS:  Our rules of conduct require that an

19  officer follow the rules, policies, procedures, SOP's and

20  things like that.  And also when the officer is given those

21  SOP's, whether it's in field training or in-service, during

22  in-service training or any other time that they are

23  updated, they are also given instruction on what the

24  changes are, what's expected of them and then they sign off

25  saying that they have read and understand them and agree to

1  follow and abide by them.

2  BY MR. SILVERMAN:

3      Q    Other than what you just testified to, are there

4  any other systems in place to basically check up or follow

5  up on the officers to make sure they're doing what you want

6  them to do?

7      A    Yes, as part of our accreditation, we have to show

8  proofs to an on-site assessor that the SOP is not just

9  written but it's also followed.  Part of the accreditation

10  process is having the written standards in place, and then

11  the second part of it is showing proof that you do follow

12  the standards.

13      Q    Okay.  Do you agree that part of the purpose of

14  the standard operating procedures relating to holding rooms

15  is to afford the highest degree of safety for detainees

16  while in police custody?

17      A    Yes.

18      Q    And now previously you -- strike that.  Where Mr.

19  Whitaker was placed, the room he was placed in, that would

20  be considered a temporary holding area?

21      A    No, that's a holding area.

22      Q    And what's the difference between a temporary

23  holding area and a holding area?

24      A    A holding area is a secure area.  In other words,

25  when the door is closed, it's a locked door.  The person

1    revised in April of 2006.

2        Q    Okay. Obviously it says an effective date of

3    January 26th, 2005, but we know that it's been revised

4    since then. And clearly the revisions couldn't be

5    effective prior to the revisions being put in here.

6    Correct?

7        A    That's correct.

8        Q    All right. So is there a way to tell -- and maybe

9    what you said these numbers. What do the PLEAC stand for?

10        A    Pennsylvania Law Enforcement Accreditation

11    Commission.

12        Q    Okay. Now these numbers, can you, please -- and

13    just take the first series. It looks like it's 3.1.1 --

14    comma. What does that stand for?

15        A    It stands for basically the first standard in

16    Chapter 3 of the Accreditation Standards Manual and that

17    every one subsequent is a different standard.

18        Q    Okay. So if I had that book in front of me, I

19    probably would be able to follow it?

20        A    Yes, you would.

21        Q    All right. And the designated ones at the top,

22    are they the ones that reflect how the versions have been

23    changed from subsequent -- from subsequent versions?

24        A    Not the PLEAC numbers.

25        Q    All right.

1     A     They have nothing to do with revisions of the SOP.

2     Q     Okay. All right. So -- all right. Is there a

3 way by just looking at this particular one to ascertain the

4 revisions either made from the very first one, which would

5 have been sometime in January '05, till now or the

6 revisions that were made from this one to the one that had

7 immediately preceded this?

8     A     Not on this current copy. What happens is when

9 this was revised in April of '06, whatever the revision

10 was, it was highlighted. The next time it came up for

11 review, if there were no more revisions, those highlights

12 were removed from it so that it's no longer new

13 information. It's information that's already been in

14 effect.

15     Q     So is it possible you could have a revised

16 document with no changes?

17     A     Yes, because the revision could be just taking

18 out -- taking the highlighting off of it.

19     Q     Understood.

20     A     Yeah.

21     Q     Okay. So if we would look through this and if we

22 saw something highlighted, that would simply mean that that

23 was a revision from the last revision. Correct?

24     A     Yes, and it would also mean that we haven't

25 reevaluated it since that revision date. Because once we

1    do, then we take the highlights off.

2        Q    Right.  And is there any way of looking at this

3    one to say, okay, we know this one is now April '06, when

4    we revised it before without looking at the actual -- the

5    previous document?

6        A    Not by looking at this there's not.

7        Q    All right.  Now under -- what's the -- when and

8    why do you decide to revise standard operating procedures?

9        A    We have -- we probably have well over 100 standard

10   operating procedures, and we have those set up on a

11   revision matrix so that every procedure is reviewed and

12   either revised or kept the same at least one time during

13   every calendar year.  We have them split apart by month.

14   We have a monthly staff meeting.  We review the SOP's that

15   come up on the matrix for that month, which may be five or

16   six of them for one month, seven or eight of them for

17   another month.  It floats back and forth.  But when that

18   month comes up, we review the SOP.  If there's no change to

19   be made to the SOP, there's no change made obviously.

20   Other than if there's highlighting on there from before and

21   now we get to that and it's no longer new information, we

22   take the highlighting off.  So the next time if there is a

23   revision and the highlighting comes on, it's very easy to

24   see what the revision is.

25       Q    Understood.  Okay.  So standard operating

1  procedures then get revised on a kind of ongoing cyclical

2  basis depending on when it comes up.  That's one way?

3      A    Yes, sir, that's one way.

4      Q    And the other way is if you determine that there

5  is a need based upon either a change in the law or a change

6  in your perception of what needs to be done.  Correct?

7      A    Correct.  That's correct.

8      Q    All right.  So if we just -- again let's just take

9  a look.  If you look at page two of twenty-four, I don't

10  see anything highlighted on here.  So that would mean that

11  this page, whatever it says on here, is the same as the

12  most --

13          MR. MACMAIN:  Continue.  You said there's nothing

14  highlighted.  The one -- unless we're looking at a

15  different -- the one that I thought we were talking about,

16  there appears --

17          MR. SILVERMAN:  This is why it's hard not having

18  bate stamped documents.  But go ahead.  I don't see

19  anything highlighted.

20          MR. MACMAIN:  Would it be helpful --

21          MR. SILVERMAN:  Just tell me what you need.

22          MR. MACMAIN:  Well, let me back up because it

23  ain't going to be helpful.  So we're all reading off the

24  same book.

25          MR. SILVERMAN:  I agree with that.

1  Correct?

2     A   Yes, and it also goes out to the garage.

3     Q   Okay. So he literally -- if he had secured his

4  weapon the first time, he could have gone back into that

5  room and unsecured it and then take it back in here.

6  Correct?

7     A   He could have. He could have. But I mean it

8  wouldn't be wrong if he had secured it within --

9     Q   And kept it --

10    A   -- that short of time frame he kept it secured and

11 then went back and got it after the second time. That --

12    Q   That I understand. But my question is a little

13 different. Once he -- assuming -- once it was unsecured,

14 however -- for whatever reason, he had an obligation to

15 secure it before he went back in the second time?

16      MR. GABRIEL: Objection to the form of the

17 question.

18      THE WITNESS: The weapon, just for the record,

19 was secured in his holster. He did not secure it in a

20 weapon's locker per the SOP, yes.

21 BY MR. SILVERMAN:

22    Q   Right. All right. Now this is the -- obviously

23 the event?

24    A   Right.

25    Q   All right. Let's talk for a second before we go

1   on about the use of deadly force.  Before the actual

2   discharge of deadly force, are there any requirements to

3   provide verbal warnings?

4        A    No, there's no requirement to.  It's in the

5   officer's perception.  If they are in fear of their life or

6   committing serious bodily injury, they may use deadly

7   force.  The law doesn't require any type of verbal warning.

8   And we don't require a verbal warning.  A verbal warning is

9   on the use of force continuum.  It's suggested, but there

10  are times that you may not be able to do that.

11       Q    Okay.  I had tried to ask this question artfully

12  before, and I had trouble with it.  Maybe I'll do better

13  today.  But do you agree that there could -- you could go

14  through a continuum -- an officer go through a continuum,

15  think he's in -- you know, his life is at risk, could

16  determine I now have the right to save myself by using

17  deadly force; and just because that happens, doesn't mean

18  he can stop evaluating the situation such that if

19  the -- the risk changes he now would have to kind of

20  re-assess -- or if he can re-assess and then determine

21  should I still be using deadly force?  As an example -- let

22  me try to give -- a guy is coming after you, you think he

23  is going to kill you and now you come up when you're -- I'm

24  allowed to use deadly force.  I go through my continuum.

25  You pull your weapon.  You're ready to use it.  If

1      A    -- because they may be charged with public

2  drunkenness and they may not be severely intoxicated.  They

3  may just be intoxicated -- or mildly intoxicated.

4      Q    So are you suggesting that you could be charged

5  with public drunkenness but not be -- have severe alcohol

6  intoxication?

7      A    Yes.

8      Q    Okay.

9      A    You could be charged with public drunkenness and

10 not even come in as a detainee.  You might be cited and

11 released to somebody.

12     Q    Well, I understand that.  But we're not -- we are

13 talking about people that are detained.

14     A    Okay.  Yeah, I don't have to be severely

15 intoxicated to be publicly drunk.

16     Q    Now can we also agree -- if you look at subpart C

17 of that same section --

18     A    Okay.

19     Q    -- that even though it's under the heading of

20 segregation of certain prisoners, that subpart C truly is a

21 different standard that you expect of your officers if

22 someone is severely intoxicated?  Take a second to look at

23 it.

24     A    Yeah, I got it.  It's not a different standard.  I

25 mean that standard is referred to in other parts of the

1   SOP.  But when dealing with segregation of certain

2   prisoners, it's just a reiteration of what's already been

3   stated before; where if they display those aspects of

4   behavior, they have to be checked on every 10 minutes as

5   opposed to every 30 minutes if they don't display those.

6        Q    Okay.  And that personally check, is you're

7   talking about literally walking up to the facility and --

8   you know, looking in the window or opening the door?

9        A    Yes.

10       Q    Okay.  Now it also says persons meeting a list of

11  criteria shall be constantly monitored through the video

12  surveillance system?

13       A    Yes.

14       Q    Okay.  Are you saying to me that that requirement

15  is for all prisoners whether they're intoxicated or not?

16            MR. MACMAIN:  What requirement?

17            MR. SILVERMAN:  The requirement to constantly

18  monitor through the video surveillance system.

19            THE WITNESS:  They are monitored through the video

20  surveillance system.  So it's done automatically by the

21  system.

22  BY MR. SILVERMAN:

23       Q    Okay.  So is it then -- so what -- so are you

24  saying that all prisoners must be constantly monitored

25  through the video surveillance system?

1          MR. GABRIEL:  Just -- when you say monitor --
2          MR. SILVERMAN:  I'm reading it right from there.
3          MR. GABRIEL:  I know.  But we're -- he's talking
4     about -- you have TV monitors.
5          MR. SILVERMAN:  Let him answer.  If he can answer,
6     he can answer.
7          MR. GABRIEL:  Well, objection to the form of the
8     question.
9          MR. SILVERMAN:  Okay.  That's fine.
10    BY MR. SILVERMAN:
11      Q    And I just want to know.  I mean it says what it
12    says.  And I'm just -- all I'm asking is, the standard,
13    whatever it means, the first line of subpart C, does that
14    apply to all prisoners or only prisoners that meet the
15    criteria in A1 through 4 above?
16      A    I'll try to clarify it for you.  All prisoners are
17    constantly monitored via the video monitoring system.  It's
18    done automatically by the system.
19      Q    I understand.
20      A    What it means is is if you're in the squad room
21    working on your paperwork, as you're working on your
22    paperwork, you have to look up and look at the monitor
23    every so often to make sure nothing is going on in the
24    room.  That's -- the constant monitoring is when they're
25    taken into the room they are constantly monitored by the

1  system.  When you're out working in the room, you can sit

2  there and look at the monitor and watch what they're doing.

3  But every 10 minutes you got to go personally and check on

4  them to make sure that they are okay --

5      Q    Okay.

6      A    -- because -- I'll explain that so that you

7  understand it.  Somebody that appears to be sleeping might

8  not be sleeping.  They might be suffering some kind of a

9  medical problem.  So if you go and personally check on

10  them, then you'll know whether or not they're sleeping or

11  suffering a personal medical problem.

12      Q    But you might not be able to tell looking through

13  a window.  Could you?

14      A    You might not.  But you could yell.  And if they

15  don't respond, then go in and check.

16      Q    Okay.  But this -- because the words are the

17  words.  Whatever they mean they mean.  But it says persons

18  meeting a list of criteria shall be constantly monitored

19  through the video surveillance system.  And then it says

20  and.  But let's just leave it to where we got.  So I just

21  want to make sure I understand.  Is that standard the same

22  for all prisoners?

23      A    Yes, they are all constantly monitored through the

24  system.

25      Q    Okay.  Now if you look at 224, please, where it

1  talks about the purpose of the video surveillance.  Just

2  take a look and -- I assume you agree that this -- as it's

3  set forth, this is the purpose of the system?

4      A    Yes, I'm looking at again the version that's April

5  of 2006.

6      Q    Okay.  And it doesn't seem to be any different

7  than page 224?

8      A    Probably not.

9      Q    Okay.  And if we could just take a look under B.

10 It says monitoring of the video surveillance will be

11 conducted by the arresting officer or in this case the

12 officer in charge of the detainee?

13     A    Yes.

14     Q    The obligation of an officer to monitor the video

15 surveillance, does that change at all based upon the

16 criteria described in the paragraph we discussed before,

17 which -- I lost that page -- that's at Roman Numeral 18?

18          MR. GABRIEL:  Objection to the form of the

19 question.

20          THE WITNESS:  Yeah, there's -- there's a

21 difference between somebody that's not showing any of these

22 signs listed.  They have to be checked every 30 minutes

23 personally.  Somebody that is showing those signs has to be

24 checked personally every 10 minutes.

25 BY MR. SILVERMAN:

1    Q    All right.  But that's different than monitoring
2   the video surveillance?
3    A    Right.  The video surveillance system
4   automatically monitors anybody anytime they are in a room.
5    Q    Well, again looking at -- at Roman Numeral XXX --
6   I guess that's 30 --
7    A    Thirty.
8    Q    -- do you agree that when the first sentence --
9   when it talks about the monitoring of the video that it
10  makes reference to the officer's obligation to monitor the
11  video?
12   A    Yes, in other words, you can't put somebody in a
13  room and never look at the monitor screen.  Because if you
14  did that, you wouldn't know something was wrong or not.
15   Q    Agreed.
16   A    Yes, that's correct.
17   Q    But my question to you is -- and you may have
18  answered it earlier -- does the obligation to monitor the
19  video surveillance screen change or is it always the same
20  for each detainee?
21   A    No, they have an obligation to monitor the video
22  screen.  It doesn't say how many times they have to look at
23  the screen.
24   Q    Okay.
25   A    But, yes, they have to check it.

 1     Q    Okay.  Is use of deadly force permitted if a
 2   prisoner is trying to escape?
 3        MR. GABRIEL:  Objection to the form of the
 4   question.  There aren't any other facts with your
 5   hypothetical.
 6        MR. SILVERMAN:  I'm just asking the question.  He
 7   can answer it.  If he can't, he can't.
 8        MR. GABRIEL:  You can answer it.
 9        THE WITNESS:  Under the law, it is permitted if
10   they're incarcerated in, like, a prison.  Like if they are
11   committed to an institution, it is permitted in that
12   instance.
13   BY MR. SILVERMAN:
14     Q    Okay.  How about if they are in your station?
15     A    No, we're not -- we're not a detention facility.
16     Q    Okay.  You have standard operating procedures
17   dealing with, like, mentally ill.  Correct?
18     A    Yes, we do.
19     Q    All right.  Does mentally -- do any of the
20   provisions consider alcohol or being drunk as a temporary
21   mental illness or temporary medical condition which could
22   require things to be handled differently?
23        MR. MACMAIN:  Objection.  It's a compound
24   question.  You said alcohol or drunk.  Which --
25        MR. SILVERMAN:  Okay.  How about -- we'll --

 1  BY MR. SILVERMAN:

 2      Q    Are you aware if the standard operating procedures

 3  related to dealing with mentally ill have provisions

 4  relating to intoxicated people?

 5      A    I'd have to go through and review the entire SOP.

 6  But it's not -- it wasn't written to deal with intoxicated

 7  persons.  It was written to deal with mentally ill persons

 8  or people that suffer mental illness.  Now if you're asking

 9  could one of those people also be intoxicated, yes, they

10  could.  In that case, the provision would provide what an

11  officer is supposed to do for a mentally ill person that's

12  intoxicated.  But I don't know if it specifically states

13  that.

14      Q    Okay.  Now we had talked about the -- why it is

15  that you'll change standard operating procedures.  And we

16  know that we have the ones relating to the holding rooms

17  from '06, and then they did change after the Whitaker

18  shooting.  Were any of the changes -- and you may have

19  answered this -- and if you did, I apologize -- related to

20  the Whitaker shooting?

21      A    Yes.

22      Q    Okay.  Were there any other standard operating

23  procedures that were related to the Whitaker shooting other

24  than ones relating to holding rooms?

25      A    That were -- are you asking that were revised?

1    Q    Yeah.  Were there any other -- were there any

2    standard operating procedures other than the ones relating

3    to holding rooms that were revised as a result of the

4    Whitaker shooting?

5         MR. GABRIEL:  Just an objection to the form of the

6    question.

7         THE WITNESS:  We revised quite a few since that

8    date.  But as far as it relates to that shooting, that's

9    the only one that I can recollect right now.  When you ask

10   me that question, that's the only one that I can recollect

11   that was changed as a result of that.

12   BY MR. SILVERMAN:

13   Q    Okay.  And if I could, you -- we talked earlier

14   about securing and control.  And I will show you -- it has

15   not been bate stamped, but it is on the revised 10/07 SOP's

16   for the holding rooms.  And I think we had looked at this

17   earlier, Roman Numeral four-three.  Is that the only --

18   sitting here today, is that the only provision of the

19   standard operating procedures that you can think of that

20   were changed as a result of the Whitaker shooting?

21   A    Do you have the beginning of this SOP?

22   Q    I do.  I'm sorry.

23   A    Let me look at the whole thing real quick.  Yes,

24   that -- out of the changes in that SOP that I just looked

25   through, that appears to be the one that was changed as a

 1  result of that incident.  There's some others that were

 2  changed for accreditation purposes, but it had nothing to

 3  do with that incident.

 4          VIDEO OPERATOR:  Do you want to change?

 5          MR. SILVERMAN:  Well, he needs to go.

 6          VIDEO OPERATOR:  Do you want to just quit, end it?

 7          MR. SILVERMAN:  Yeah, we can end it.

 8          VIDEO OPERATOR:  This concludes the deposition of

 9  Chief of Police David Eshbach.  The time is 3:52.

10          MR. SILVERMAN:  You know, a couple things.

11  Certain documents were handed to me that I didn't -- and I

12  also want to let the Chief out of here.  I know he's got

13  somewhere to go.  My suggestion -- and it's up to you

14  guys -- is that, you know, we have four depositions

15  scheduled for Tuesday, that we end today and with -- with

16  reserving the right to come back if need be.  I don't want

17  to keep him.

18          MR. GABRIEL:  That's fine.

19          MR. SILVERMAN:  If you say no, then we're going to

20  keep him here.

21          MR. GABRIEL:  I don't want to do that at all.

22          THE WITNESS:  Do you think we're going to do this

23  another hour or five more minutes?

24          MR. SILVERMAN:  If I didn't have any other

25  depositions that were scheduled, it would probably be at