# EXHIBIT "F"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


RONALD T. WHITAKER, SR., AND      :   CIVIL ACTION
DALEA LYNN, CO-ADMINISTRATORS     :
OF THE ESTATE OF RONALD TAYLOR    :
WHITAKER, JR.; AND RONALD T.      :
WHITAKER, SR., TAYLOR             :
WHITAKER, BRANDI WHITAKER, AND    :
CHRISTOPHER HAMMERSTONE,          :   NO. 1:08-CV-00627
INDIVIDUALLY,                     :
        PLAINTIFFS                :
                                  :
            V                     :
                                  :
SPRINGETTSBURY TOWNSHIP;          :
SPRINGETTSBURY TOWNSHIP POLICE    :
DEPARTMENT; CHIEF OF POLICE       :
DAVID ESHBACH; AND POLICE         :
OFFICER GARY UTTER,               :
        DEFENDANT                 :   JURY TRIAL DEMANDED




        VIDEOTAPED
        DEPOSITION OF:   GARY UTTER

    TAKEN BY:        PLAINTIFFS

    BEFORE:          DONNA E. GLADWIN, REPORTER
                     NOTARY PUBLIC

    DATE:            JANUARY 13, 2009, 10:10 A.M.

    PLACE:           HAGGERTY & SILVERMAN, P.C.
                     240 NORTH DUKE STREET
                     LANCASTER, PENNSYLVANIA



APPEARANCES CONTINUED ON NEXT PAGE



Hughes
Albright
Foltz
Natale

through high school?

    A    I'm an Army brat, so I lived several places.  I was born in Southern Florida, lived overseas.

    Q    Okay.

    A    Various places.

    Q    And when did you move to York County?

    A    In 1998.

    Q    Okay.  And where did you graduate high school from?

    A    Frederick High School in Frederick, Maryland.

    Q    And after high school did you have any post-high school formal education?

    A    I have a degree from Western Maryland College.

    Q    And that degree is in what subject?

    A    It's a four year degree.

    Q    Okay.  What was the subject?

    A    Liberal arts.

    Q    Okay.  Was there any emphasis, criminal justice, political science, anything like that?

    A    History.

    Q    Now -- so when did you graduate college?

    A    1992.

    Q    If you could describe your -- your work background from the time you graduated through and including the job with Springettsbury Township.

    A    After graduation from college I was commissioned,

1    spent four and a half years on active duty in the Army.

2    After the Army I was -- I worked for J.C. Penny's and Macy's

3    Incorporated, loss prevention.

4         For a brief time I worked for Hechinger's, same

5    type of position, retail thefts, loss prevention.  Worked

6    for Home Depot for, I think, two weeks.

7         And then I was hired by Stewartstown Borough Police

8    Department.  Went through the Academy.  They placed me

9    through the Academy through HACC.  Was there for two years.

10   And then January 21st of 2002 I was hired by Springettsbury

11   Township Police Department.

12        Q    Okay.  Would it be fair to say that since your

13   graduation from college in 1998 through your first job as a

14   police officer most of your jobs dealt with security or loss

15   prevention at a retail establishment?

16        MR. MacMAIN:  Until the time of the police job?

17   BY MR. SILVERMAN:

18        Q    Yes, until the time of the police job?

19        A    Yeah.

20        Q    And through those entities that you worked for did

21   they give you any type of training on -- on how to deal

22   with, you know, people that you thought maybe were doing

23   something inappropriate in a store?

24        A    They gave me training on how to -- what to look for

25   as far as apprehending somebody or -- I did interviewing

1    A    that I had some type of dealing with somebody

2    that they filed paperwork in some court to say that I did

3    something wrong.

4        Q    Okay.  Now, you said you were -- you were hired by

5    Stewartstown Police Department?

6        A    Stewartstown Borough.

7        Q    And what county is that?

8        A    York County.

9        Q    And you were hired there when?

10       A    January of 2000.

11       Q    And you indicated you went through the Academy, and

12   obviously you passed it successfully?

13       A    Correct.

14       Q    Okay.  And what was the circumstances surrounding

15   you leaving that police department?

16       A    I got hired by Springettsburg Township Police

17   Department.

18       Q    All right.  Was that -- were you looking for a

19   different job?

20       A    I was.

21       Q    Okay.  And when you got hired by Springettsbury you

22   were -- had a year probationary period, correct?

23           MR. MacMAIN:  In which department?  The department

24   he left or when he got to Springettsbury?

25   BY MR. SILVERMAN:

A    No.

Q    Okay.  Why are you no longer employed there?

A    I was terminated October 10th.

Q    Okay.  And what type of job, if any, are you doing now?

A    I'm not.

Q    And October 10 of 2008, correct?

A    Correct.

Q    Are you looking for another job as a police officer?

A    I have taken an exam, but I'm not really looking for any employment right now.

Q    Okay.  Now, when you first began your position with Springettsbury, and I'm -- am I pronouncing it right?

A    Um-hum.

Q    Springettsbury, okay.  You discussed the field training, getting familiar with the computer systems.  Did you -- were you given any manuals to read?

A    We had policies and procedures.

Q    Okay.  And were you provided with a copy?

A    I was.

Q    Okay.  Did you read them?

A    We went through them all and continually reviewed them.

Q    Okay.  And you understood that they were meant --

1    following the rules and the guidelines within those manuals

2    was an affirmative obligation of your position?

3        A    Correct.

4        Q    And being familiar with those rules and regulations

5    was an affirmative obligation of your position?

6        A    Correct.

7        Q    Okay.  And a -- if you breached a rule and an

8    excuse wouldn't be to understanding --

9            COURT REPORTER:  I'm sorry.

10           MR. MacMAIN:  Yeah.

11   BY MR. SILVERMAN:

12       Q    I'm sorry.  If you -- well, I'll come back to that.

13   All right.  Now, in your first year on the job what was your

14   -- what did you primarily do?

15       A    Handled day-to-day calls.

16       Q    Okay.  And what type of calls were they?

17       A    Anything and everything that came through.

18       Q    Everything from --

19       A    Anything that came in through the station, a walk

20   in, somebody -- a 9-1-1 call, any type of on-view call, just

21   normal patrol, witnessing a traffic violation or seeing

22   somebody in distress or somebody in need or somebody waves

23   you down or whatever.

24       Q    Okay.  And it seems -- it sounds like you were --

25   before the shooting incident of July of '07 you were with

the Department for approximately five years, correct?  Did

you say from January, '02?

    A    Yeah.

    Q    Okay.  During the time period of hire, let's say

through July of '01, did your description of what you had to

do on a day-to-day basis change?

            MR. MacMAIN:  Objection.  You said --

            THE WITNESS:  I wasn't hired in 2001.

            MR. MacMAIN:  You mean July of '07, from the time

he was hired at Springettsbury in '02 through July of '07?

You said July of '01.

            MR. SILVERMAN:  Correct.  Oh, I'm sorry.

            MR. MacMAIN:  Okay.  So during the five years at

Springettsbury you want to know if his job description

changed?

BY MR. SILVERMAN:

    Q    Correct.

    A    I had -- I was a patrolman the entire time.

    Q    Okay.  And a lot of it -- you did a lot of traffic

work, correct?

    A    Correct.

    Q    All right.  Now, could you please describe, you

know, how large in '07 was the -- was your police

department?  How many officers were there?

    A    If -- well, since I've been there we haven't been

1   ~~full strength for probably -- I'd say maybe four to six~~

2   months of that entire time were we at full strength.  We've

3   had additional officers since I was hired to the time that I

4   left.

5           Our department has grown.  I believe probably by

6   July I think we had 33 officers, including the Chief.

7   Q    Okay.  And you had said you weren't full strength.

8   What do you mean by that?

9   A    Meaning that the Township or the police department

10  had authorized X amount of bodies, but we only had so many

11  patrolmen.  We were always in the process of hiring somebody

12  or going through a process, or somebody was in the Academy,

13  in field training, not quite yet able to take calls on their

14  own.  And by the time that person came on the road and they

15  were handling calls somebody else left for a retirement or

16  left for another job or resigned or things like that.

17  Q    Okay.

18  A    We were never really full strength.

19  Q    In July of '07 were you at full strength?

20  A    I don't recall.

21  Q    If you could, let's -- let's focus on the -- the

22  events of the day of the shooting.  Do you recall what day

23  that was?

24          MR. MacMAIN:  What calendar day or what --

25  BY MR. SILVERMAN:

1     A    I did.

2     Q    Okay.  Do you recall how it was called in?  Was it

3  an emergency?

4     A    It was a theft, theft in progress or robbery in

5  progress.

6     Q    And were you alone that day in your patrol car?

7     A    Yes.

8     Q    And could you tell me -- so you drove with your

9  lights on.  You got to the -- to the Giant, and then what

10  did you -- what did you personally do next?

11     A    What did I do?

12     Q    Um-hum.

13     A    By the time I arrived the subject had been in

14  custody.  He was down on the ground.  He was in handcuffs.

15  And I got him up off the ground, took him to my patrol car,

16  patted him down for weapons, and placed him in the rear of

17  my patrol car.

18     Q    Okay.  Did he have any weapons?

19     A    No.

20     Q    When you patted him down did he have any contraband

21  on him?

22     A    Contraband?

23     Q    What did he have on him?

24     A    I believe he -- if I recall right, he had a wallet,

25  keys, and that was all I can recall right now.

1    Q    Okay.  And did you take possession of his wallet

2    and keys?

3    A    I took possession of his wallet.  He had requested

4    that his keys be placed in his vehicle.

5    Q    Okay.  So that his girlfriend could pick them up?

6    A    He -- he said his wife, yeah.

7    Q    Okay.  When you got to the Giant were there other

8    police officers on site?

9    A    There was one other officer that arrived prior to

10   my arrival, and myself and a couple other officers arrived

11   at generally the right exact same time.

12   Q    All right.  How many police officers were on the

13   scene at any given time that you observed?

14   A    There were five of us on duty that night, and all

15   of us were there.

16   Q    Is there a reason that the entire on-duty police

17   department appeared at the Giant on that -- for that call?

18   A    Is there a reason?

19   Q    Um-hum.

20   A    I don't know of any reason.

21   Q    Would that be standard operating procedure, that if

22   there's a call such as the one that was received on the --

23   on the Whitaker issue, that the entire on-duty police

24   department would show up?

25   A    Do you want to repeat that again?

BY MR. SILVERMAN:

Q    If you can answer it.  If you can't answer it --

A    Am I aware of any standard operating procedures that are commonly --

Q    That were -- during your tenure as an police officer.

A    Okay.

Q    Okay.  Were there -- are you aware of any standard operating procedures that were commonly overlooked or not followed by police officers?

A    Not without specific questions, no.

Q    Okay.  Fair enough.  Okay.  When -- would it be fair to say before -- when you got to the Giant and before you left the Giant with Mr. Whitaker in your vehicle that you said there were -- you and four other officers were there, correct?

A    Correct.

Q    Do you recall their names?

A    Supervisor on duty was Sergeant Gregory Witmer. There was myself, Patrolman Christopher Ford, Patrolman William Polizzotto, and Patrolman John Krentz.

Q    I'm sorry, John who?

A    Krentz, K-R-E-N-T-Z.  Polizzotto is P-O-L-I-Z-Z-O-T-T-O.

Q    Okay.  When you left with Whitaker were all four of

those others still at the Giant?

   A    For a period of time they were.  When we arrived
basically everything had calmed down.  We realized
everything had been calmed down.  Officer Ford was the first
one to respond.  He was handling the incident.

        He was going to do -- file the charges, if any
charges were going to be filed.  He was going to do the
investigation.  He was there talking to the victims, getting
the information about the case, talking to witnesses.

        Officer Krentz was assisting him with interviewing
witnesses.  I had told Officer Ford that I would take the
prisoner back to the station to help him out so that he
could stay there and continue to investigate the call.

        Shortly either just after I left or just prior to
me leaving another call came in.  I believe it was a noise
complaint or a party that was, I guess, an evening party
that was too loud because of the hour.  The call came in,
and Sergeant Witmer and Officer Polizzoto were in route to
there.

   Q    Okay.

   A    So there were two people at Giant, two people going
to another call, and I was going to the station with the
prisoner.

   Q    When you were -- when you put Mr. Whitaker in your
vehicle and intending to take him back to the station were

you aware that there would be no other on-duty officers at

the station?

    A    Was I aware?

    Q    That there were no other on-duty --

    A    Well, I knew who was on duty, and I knew I was

going back to the station.  So, yeah, I knew that nobody

would be back at the station except for me.

    Q    Okay.

    A    For -- there might have been people at the station

without me knowing, but --

    Q    Okay.  But as far as you were aware that there

would be no on-duty officers at the station when you arrived

with Mr. Whitaker?

    A    For a period of time, yeah.

    Q    Okay.  Is -- are there any standard operating

procedures that relate to how many officers must be at the

station when bringing a -- a detainee or prisoner in?

    A    I don't recall.

    Q    Okay.  Do you recall any training relating to how

many people need to be at the station when bringing a

prisoner in?

    A    I don't recall.

    Q    Okay.  So I assume what you're saying is you don't

know if there are or aren't?  Sitting here today you don't

recall?

A    I don't recall any -- any facts or any -- anything

specifically says one thing or another.

Q    Okay.  Now, when you first got to the Giant I think

the -- you indicated that Mr. Whitaker was -- was subdued,

correct?

A    He was in custody.

Q    He was calm.  Okay.  Did you ever learn before you

got back to the station that he had been in some sort of

heightened state of excitement or was crazed, for lack of a

better word, during the incident at the Giant?

MR. MacMAIN:  Objection.  When you say heightened

state of excitement, what do you mean?

BY MR. SILVERMAN:

Q    Okay.  Could you please tell me what you learned

about how Mr. Whitaker reacted during the events before he

was under control or in custody?

A    When we were dispatched we were told that there was

a -- an active robbery or retail theft in progress and that

there was a struggle between employees, Mr. Whitaker, and

customers, and that it was active.

And by the time I got there Officer Ford had

already had him in custody.  And from that point on I wasn't

handling the investigation.  I was there to assist another

officer, and I didn't ask anymore questions.

Q    Okay.  When you were transporting Mr. Whitaker back

to the station did you have a conversation with him?

A    The only thing Mr. Whitaker said was prior to us

leaving I guess he has -- was asking me to secure the keys

in his vehicle.  And then just prior to me leaving I guess

he was looking around and saw the police cars and he asked

did I cause this much of a raucous?  And I said, yep, you

did.  And that was the only conversation I had with him.

Q    How would you describe his demeanor from the time

he was with you and you took him into the car until you got

to the police station?

A    He was defeated, cooperative, passive.

Q    Now, when you got back to the station tell me --

you know, from the time you -- you parked your car or you

pulled into the station what you -- what you did, what you

saw, what you observed.  And I'll break it down.  First I

believe you saw an off duty officer nearby, correct?

A    Correct.

Q    And he was playing bagpipes?

A    Correct.

Q    What's his name?

A    James Miller.

Q    Did you have any conversation with Mr. Miller prior

to going into the station with Mr. Whitaker?

A    No.

Q    Okay.  Did he see you?  Do you know?

lawyer?

A     David MacMain.

Q     And he's your only lawyer, correct?  You have one lawyer?

A     As far as I know, yeah.

Q     Did you have any -- prior to this counsel did you have any lawyer -- did you retain a lawyer at all prior to the filing of this civil action?

A     Initially Ed Paskey was assisting me.  He was the representative of the FOP.

Q     Okay.  So through the FOP you were provided an attorney?

A     He came and said that he'd take care of things, yes.

Q     Okay.  And what is his full name?

A     Ed Paskey.

Q     Okay.  Now, getting back to -- tell me what -- when you got to the station, if we can go through it sequentially, tell me everything that you -- kind of go through it step by step what you did.

A     Arrived at the station, parked in the south bay. Mr. Whitaker and I walked into the station, placed him in a holding cell.

Q     Was he -- I'm sorry.  I might interrupt.  Was he still cuffed?

A    He was.

Q    Okay.  And the cuffs behind him or in front?

A    Correct.

Q    Okay.

A    He was placed in a holding cell, removed the cuffs, told him to have a seat, shut the door, and went into the -- I guess I got his personal stuff.  I think I went back to my car and gathered that stuff up, and then I went in the squad room.

Q    Okay.  Let's take the time from when you got to the station until he was -- you basically -- you for the first time walked out of the holding cell where you had placed him.  Let's focus on that time for a second.

First of all, how many holding cells are in the facility?

A    Two.

Q    Can you please describe basically what was in that room?

A    There is a toilet.  There is a sink, both of them metal.  From time to time I -- I don't recall whether it was there or not, there is a metal table.  There's generally some chairs with the table used for interviewing.  There's a metal bench that's fastened to the floor in each one of the cells.

Q    Okay.  Does the metal bench have an area where if

1    Q    Did you ever look to see if he had shoelaces?

2    A    No.

3    Q    Would it be fair to say then that if you didn't

4    look, you didn't take away belts or shoelaces?

5    A    I didn't.

6    Q    Is there a requirement before you leave someone in

7    a detention room to take away belts or shoelaces?

8    A    No.

9    Q    Okay.  Are you trained at all with regard to

10   suicide prevention?

11   A    I mean, generally we're trained to preserve life.

12   Whether or not we had specific training to stop somebody

13   from committing suicide or talk them out of suicide, I would

14   not say that we did.

15   Q    Okay.  Do you recall at any time from the time you

16   first entered into the academy, which I think you said was

17   somewhere --

18   A    January, 2000.

19   Q    -- in January.  Right, January of 2000 through this

20   incident did you have any specific training on suicide

21   prevention?

22   A    I don't recall.

23   Q    Okay.  Were you ever given any training regarding,

24   you know, taking away someone's belt or shoelaces prior to

25   putting them in detention?

1    A    No.

2    Q    When Mr. Whitaker was in your custody from the time

3    you left the Giant through the time you left him in the

4    detention room for the first time did you believe he was

5    intoxicated?

6    A    I smelled an odor of an intoxicating beverage

7    coming from him.

8    Q    Okay.

9    A    From his expired breath.  I'll leave it at that.

10   Q    I think what you had testified about, or in a

11   statement earlier, and we'll go through it in a little more

12   detail later, that you said that you did smell the

13   intoxicating -- the breath, or it smelled of alcohol, but he

14   wasn't -- the word you used was hammered?

15   A    Yeah.

16   Q    Okay.  Can you please describe what would make

17   someone -- how you would see they were hammered or not

18   hammered?

19   A    He was -- he wasn't falling down drunk.

20   Q    Okay.  All right.

21   A    He was able -- he was coherent enough to follow my

22   instructions, and he was able to walk by himself without my

23   assistance.  He didn't need to be carried or lifted, and he

24   wasn't staggering.  He wasn't bouncing off walls.

25   Q    Did you notice -- other than the alcoholic breath,

1    did you notice anything else that either alone or in

2    connection with the alcoholic breath that would lead you to

3    believe that he may be impaired, even -- even very slightly?

4        A    No.

5        Q    All right.  Would it be fair to say then other than

6    the -- you didn't think that he was impaired at all?

7        A    I -- obviously I smelled an alcohol -- you know,

8    intoxicating beverage.  So I would assume that he had

9    something in his system or recently had it so that it would

10   be on his breath.

11       Q    Okay.  Had you received any training with relating

12   to handling of detainees as it relates to -- to do things

13   differently if there is alcohol involved or if they're

14   intoxicated at all?

15           MR. MacMAIN:  Objection.  Do you -- that's really

16   two questions, alcohol versus being impaired by alcohol.

17   BY MR. SILVERMAN:

18       Q    Fair enough.  I will rephrase the question.  First

19   of all, did you have any reason to believe that he may have

20   -- be on any other drugs?

21       A    No.

22       Q    All right.  Have you received any training relating

23   to handling individuals that you have reason to believe may

24   be intoxicated?

25       A    Yeah.

Q    And is any of that training relating to increased

risk of suicide?

A    I don't recall specifically.

Q    Okay.  Is any of that training relating to

providing the officers having heightened duty to watch out

to make sure they don't hurt themselves?

A    His behavior and his actions didn't elevate to a

point where I was taking any other circumstances than what

I'm dealing with you today.

Q    Okay.  But -- and I understand that, but my

question is just a little different.  My question is have

you ever received any training relating to if you come

across someone that you believe is intoxicated, that they

could be at a greater risk to either harm themselves or to

harm someone else?

A    Yes.

Q    And could you please describe your understanding of

the increased risks of someone hurting themselves if they're

intoxicated?

A    You're going to have to rephrase or explain that

one better.

Q    Okay.  Sorry.  Basically if you think someone is

intoxicated --

A    Okay.

Q    -- do you think they're at a greater risk to hurt

themselves?

    A    Yes.

    Q    Do you think if somebody's intoxicated that they have a greater chance to hurt people around them?

    A    They might have a potential to, yeah.

    Q    Okay.  And if you're with an intoxicated prisoner do you think there's a greater chance that you could be hurt by that prisoner?

    A    Sure.

    Q    Okay.  And, again, I'm not asking the questions -- you've already said to assume that you think he was intoxicated.  All right.  So he's put into the room, as you described, and you then left, correct?

    A    Correct.

    Q    All right.  And what did you next do?

    A    I went into the squad room area.  I secured his personal belongings minus his driver's license and Social Security card, which I found.  I knew that Officer Ford was going to need some required information from him that any one of our officers that are making an arrest would need.

    We -- we commonly refer to it as their 23 block information, which is just their -- their name, their height, weight, place of birth, current employment, current address.  Just general info, race, sex.  So --

    Q    Basic identifying information?

1    A    Yeah.  Everything that we put into our system, our

2    database.

3    Q    Okay.

4    A    I got the form that has the appropriate blocks, and

5    then I returned to Mr. Whitaker to obtain the information

6    that I didn't already have.  I mean, I had his driver's

7    license.  I had some of the information.  I had his Social

8    Security card.

9    Q    Okay.  Okay.  I must have misunderstood.  I thought

10   you said you didn't have his Social Security and driver's

11   license initially?

12   A    I --

13   Q    You did?

14   A    I had that in his wallet.  I located that in his

15   wallet.

16   Q    Okay.

17   MR. MacMAIN:  I think you said you did, and is that

18   what you had on the transcript?

19   BY MR. SILVERMAN:

20   Q    Okay.

21   A    I'll clarify that.  I had his driver's license and

22   his Social Security number.  So I had some of the

23   information that I would need for Officer Ford, but I didn't

24   have all of it.

25   Q    Okay.  All right.  If I heard you wrong, I

1    Q    Okay.  What else did you talk about?

2    A    At that time he was complaining of an injury or

3    holding his side and was having difficulty breathing.

4    Q    Okay.

5    A    I asked him about his injuries, and he said that

6    during the scuffle at Giant he thinks that he injured his

7    ribs.

8    Q    Okay.  Was this the first he had complained to you

9    about having an injury from the -- from the incident at --

10   A    That's the first time he complained, yeah.  It's

11   not the first time I saw an injury.

12   Q    Okay.  When was the first time you saw an injury?

13   A    At Giant.

14   Q    And what injury did you see?

15   A    He had a very minor laceration on his hands.

16   Q    Okay.

17   A    There was some blood, but there was no -- nothing

18   dripping or profusely -- nothing requiring any serious

19   medical attention.  I mean, if I had a Band Aid handy, it

20   would have done more than enough.  Paper towel or a tissue

21   would have sufficed.

22   Q    Okay.  So then -- so after the conversation about

23   his injury and the additional indexing you go back to the

24   patrol room?

25   A    Correct.

Q     And what do you then do in there?

A     I used my Nextel phone.  I contacted my supervisor, Sergeant Witmer, advised him that the -- Mr. Whitaker was complaining of his side and advised him that I was going to have an ambulance respond to the station to check him out prior to Officer Ford coming back.

Q     Okay.

A     And I did that because he wasn't my prisoner, and I just wanted to let the supervisor know what I was doing since he wasn't my prisoner.

Q     He was or was not your prisoner?

A     He was physically in my custody, but it wasn't going to be my case.

Q     Understood.

A     Officer Ford was going to be the arresting officer. It was going to be his name on all the paperwork if there were any charges.

Q     Are there, that you're aware of or that you recall, operating procedures or standard operating procedures that deal with securing weapons while in the station or as it relates to dealing with a -- or while in the station?  Leave it at that.  Sorry.

A     Yes.

Q     Okay.  And what are they?

A     I don't know what they are word for word, but --

1    you tell me about that?

2        A    I was going to a call, physical domestic, pulled

3    out of the covered porch.  They have metal posts there, and

4    just cut the corner too sharp as I pulled out and just

5    clipped the nose of the car.

6        Q    Okay.

7        A    Took out the turn signal.

8        Q    Do you recall if -- strike that.  You just

9    testified a moment ago that you today understand that not

10    securing the weapon was a violation of the standard

11    operating procedure.

12        In your five years that you worked there was it --

13    did you usually secure your weapon?  Was this kind of a one

14    time occurrence, or is this kind of the way you normally

15    operated?

16        A    Unless the person was at a high rate of risk or I

17    felt threatened, generally I would not be taking the

18    handcuffs off of somebody -- if I thought that they were

19    going to be a problem or I felt threatened, I would never

20    take the handcuffs off them.  They would just sit in the

21    room with the handcuffs on.

22        Generally in situations where I was taking

23    somebody's handcuffs off it was because they were

24    cooperative, and I didn't feel threatened.

25        Q    Okay.  So would you agree that the way you normally

1   operated was if you took the handcuffs on you didn't feel

2   threatened, therefore, you didn't feel it was necessary to

3   secure your weapons?

4       A    I generally didn't secure my weapon, yes.

5       Q    Do you know sitting here today why the -- there is

6   a standard operating procedure with regard to secure -- the

7   securing of weapons?

8       A    I can understand why it was written, yeah.

9       Q    Okay.  Tell me what you think that reason is.

10      A    So that somebody doesn't grab your weapon and use

11  it against you or against themselves or others.

12      Q    Okay.  And the rules with regard to securing of

13  weapons, is that just the hand gun, or are there other

14  weapons as well?

15      A    I know it's the hand gun.

16      Q    Okay.

17      A    The firearm.

18      Q    Okay.  And how about the taser?

19      A    I don't recall.

20      Q    Okay.  And how about your baton?

21      A    Anything else besides the firearm I'm unsure of.

22      Q    Okay.  All right.  Now, other than the failing to

23  secure the weapon on the date of the shooting are there any

24  other standard operating procedures that sitting here today

25  you're aware that -- that were violated?

1    A    Yeah.  My violation with the terms of the firearm

2    was just the mere fact that I did not secure it while I

3    removed the handcuffs off.  The way I should have done it,

4    and what I'm aware of now is as I brought Mr. Whitaker in, I

5    should have secured him in the room, shut the door, secured

6    my weapon, returned to Mr. Whitaker, removed his handcuffs

7    off, shut the door, gone back to my weapon, put my weapon

8    on, and that any emergency situation inside the cell or

9    anything else I would have been all right to go in to the

10   cell with my weapon.

11        Q    Okay.

12        A    If I was moving him to another room or taking him

13   to central booking or anywhere else, the same procedure

14   would have happened.  Prior to putting the handcuffs on I

15   would have secured my weapon.  Once he's in handcuffs,

16   returned -- retrieve my weapon, and then escort him out once

17   he's in handcuffs.

18        Q    Okay.

19        A    But, yes, there was another violation that night

20   that I am aware of that I did not do.

21        Q    And what is that?

22        A    I did not call out at the station that I had

23   arrived at the station.  I had advised through county

24   control or YCC that I was leaving Giant with a prisoner, and

25   that once I arrived at the station I did not call out with

1  on, correct?

2      A    Correct.

3      Q    Okay.  Is there a requirement that you're aware of

4  that if you're going to be with the -- the prisoner while he

5  is not handcuffed, whether you -- is there a time where you

6  can have -- strike that.

7          Let me try -- rephrase that so it makes sense.

8  Basically if the prisoner is not handcuffed are you supposed

9  to have your weapon secured?

10         MR. MacMAIN:  You mean --

11         THE WITNESS:  If he's secured in the room, I can

12 have my gun on, and it doesn't matter.

13 BY MR. SILVERMAN:

14     Q    Okay.

15     A    If I'm in the room with a prisoner who's unsecured

16 without handcuffs, then I'm supposed to have my firearm

17 secured.

18     Q    Fair enough.

19     A    Unless it's an emergency situation, which --

20     Q    Okay.  Understood.  Okay.  So we had -- we had

21 talked about you went back to the room.  You got some

22 additional information.  You then went back to the patrol

23 room, and you were -- I know you were filling out some

24 information.  You were faxing, I assume, some information,

25 do a criminal background.  Tell me what -- you know, while

1    this was happening what you then observed and what happened.

2          MR. MacMAIN:  Do you know where we are in the

3    sequence?

4          MR. SILVERMAN:  I'm sorry.

5          MR. MacMAIN:  You're at the point -- what you want

6    to know is he's gone back into the room.  He's spoken to Mr.

7    Whitaker.  Mr. Whitaker expresses difficulty breathing.

8          MR. SILVERMAN:  Um-hum.

9          MR. MacMAIN:  He then leaves the room, calls on his

10   Nextel for an ambulance to be assigned to the station.

11         MR. SILVERMAN:  Correct.

12         MR. MacMAIN:  And that's where you want him to pick

13   up from?

14   BY MR. SILVERMAN:

15   Q     Right, correct.

16   A     Called Sergeant Witmer by Nextel, told him I was

17   calling the ambulance.  I called directly into the 9-1-1

18   center, talked to the ambulance board.  I had the dispatch

19   for the ambulance.

20         I knew that Officer Ford was going to need a

21   criminal history on Mr. Whitaker.  Since I had all the

22   information there I filled out the form and walked the form

23   up and faxed it off.

24   Q     And if you can, just continue with what you then

25   did, saw, and observed?

1      A      Once I returned back to the squad room I checked

2    Mr. Whitaker on the camera system that was in the cell.  We

3    had monitors in the squad room and saw that he was laying on

4    the floor with his head towards the door.

5           I ran back to -- went back to the cell, looked

6    inside.  It's a small window in the door.  I saw that Mr.

7    Whitaker was still there on the floor and that he hadn't

8    moved since I had walked back there and attempted to open

9    the door.

10     Q      Okay.  When you looked through the wall before you

11   -- or the window before you attempted to open the door,

12   could you see anything around his neck at that point?

13     A      No.

14     Q      Okay.  And what had -- when you observed that did

15   you conclude anything as to what you thought was happening?

16     A      The only thought that was going through my mind was

17   that, you know, because he said he had difficulty breathing

18   that maybe he was having some type of medical problem and

19   that he had made it to the floor.

20     Q      Okay.  And then you -- you reached down to the

21   door, tried to open it, pushed it open.  There was some

22   pressure against the door because of his body, correct?

23     A      Correct.  The door opens inside.  The way he was

24   laying, the door basically would have had to push through

25   his body.

1    Q    Okay.

2    A    As I opened it up I heard him having difficulty

3    breathing, like he was gurgling.  As I forced the door open

4    it rolled his body over so that he was face up.  At that

5    time I could see that there was some type of string or

6    material, whatever it was.  I didn't immediately identify

7    it, what exactly it was, but that it was tied around his

8    neck, and that the other end was somewhere tied on the other

9    side of the door.

10   Q    Okay.  Have you since learned what that string was?

11   A    Yeah.  It was his shoelace.

12   Q    And it came from his shoe?

13   A    I'm assuming.

14   Q    Okay.

15   A    I don't know.  I know it was a shoelace.  I can

16   only assume that it came from his shoe.  I don't know for

17   sure whether it was his shoelace.

18   Q    Okay.  Other than it coming off the shoes he was

19   wearing, whether he --

20   A    I have no idea if it came off of his shoes.

21   Q    Okay.  I think you had testified earlier that you

22   searched the room.  It wasn't in there before you put him

23   in, correct?

24   A    Correct.

25   Q    Okay.  All right.  So, again, I know this is

1   probably not the easiest thing, but if you could just again

2   go through what transpired when you saw that happen.

3       A     Okay.  As I flipped him over I saw that he was

4   strangling -- he was hanging himself.  I attempted to reach

5   down and get the string from underneath his chin around his

6   neck.  It was pretty tight with his body weight making the

7   -- the rope taught on the door handle.

8       The only way to really do that was to actually lift

9   his body up to make some slack to get it up over.  As I was

10  lifting the string around his neck Mr. Whitaker basically

11  came to and -- and just went bizzerk and started swinging,

12  screaming.  At some point he attempted to bite me.

13      I eventually was able to break free from him.  I

14  withdrew my taser.  I aimed and shot him center mass with

15  the taser.  The taser went through its initial cycle in

16  which Mr. Whitaker went limp again, unresponsive.  He was

17  still attached to the string.

18      I put my taser down, again tried to remove the

19  string from his neck.  Again, I had just about gotten it to

20  about his nose when Mr. Whitaker came to again, and again

21  just went bizzerk, started swinging and everything again.

22      Thinking that the taser was still attached, the

23  probes were still attached to him, I reached down to grab

24  the taser and to shoot it again.  When I looked up Mr.

25  Whitaker was charging at me and in the doorway, basically

charged me there.  I retreated back into the hallway.  I was

forced back into there.

     The fight continued to the corner of the hallway.

At one point I attempted to get out of the room by opening

the door.  He had shut it.  Again, I was trapped in the

corner, started feeling tugging on my waste belt, my weapon.

Reached down to secure my weapon and withdrew it, aimed it

in his general direction, fired first shot, and then

subsequently fired the second shot.

     Q    All right.  Could you please describe your weapon

belt, where everything is?

     A    I can -- I'm sure it's documented somewhere.  I

could try the best of my ability.  I know that I had changed

it after the incident, so I'm not sure if I'm remembering

exactly.

     Front left I had my ammo pouches.  To the left of

that I had my taser.  To the left of that I had my radio,

flashlight.  I'm not sure at that point if I had my

handcuffs in the rear or not.  I changed to a two-cuff case,

and I think I moved it to my front right.  But at the time I

think I was still carrying a single-cuff case, and I think I

had it in my right rear.

     Then I had my asp.  To the left of that my weapon,

and then my OC, and then my cell phone.

     Q    Okay.  The taser weapon, was it the type of taser

1    through, and the person will go through the cycle again.

2    However, even if the prongs are in and the weapon

3    is placed on to the person and you fire the trigger, there's

4    still two metal connectors at the end of the cartridge that

5    will act the same as probes.

6    Q    Okay.

7    A    So if you take the cartridge off and use the

8    weapon, it's the same thing.  So it doesn't matter if the

9    cartridge is there or not.

10   Q    Okay.  Did you ever -- it appeared, I guess --

11   strike that.

12   Do you agree that it appeared that on the first

13   shot the taser worked appropriately?

14   A    Yes.

15   Q    Do you -- did it appear to you that when you tried

16   to reuse the taser it did not work appropriately?

17   A    My feeling was that he was walking right through

18   it.

19   Q    Okay.  And when you say he was walking right

20   through it, do you think it was operating properly if you --

21   MR. MacMAIN:  You're asking him at -- you're asking

22   him at the time this is happening what's in his mind?

23   BY MR. SILVERMAN:

24   Q    Okay.  That's fine.  At the time did you think it

25   was operating properly?

1    A    I believed the gun itself was working, because I

2    was pressing the trigger, and it was making a noise that's

3    telling me that the device is working.

4    Q    Okay.  Now, did you ever try to use the -- to use

5    it like as a prod against him?

6    A    No.

7    Q    All right.

8    A    I was -- no.

9    Q    Okay.

10    MR. MacMAIN:  You can answer.  If you have an

11    answer, you can --

12    THE WITNESS:  From the time that I grabbed it and

13    was going to use it again I was being charged at.  And I

14    was, at that time, trying to make a stand where I could stop

15    from going backwards.  I was trying to set my right foot to

16    then go on the offensive.  And while I was doing that I was

17    just holding the trigger down or pressing the trigger trying

18    to stop him thinking that it was still attached.

19    Q    Okay.

20    A    And he was continually coming at me.  And my

21    thought at the time was the gun's making the noise, that

22    it's working.  It should be working, and he's walking

23    through it.  Therefore, he's defeating the taser, not that

24    the taser was broken.

25    Q    Do you know if the taser was ever checked to see if

you recall to him, stop or I'm going to shoot, stop, I'm

going do something additional?

    A    From the time that he attacked me to the time that

I fired my trigger the only thing that I was doing was

trying to save my life.

    Q    Okay. And I respect that. Now, when the tussle

ensued and you said you felt a -- I think -- again, I'm not

trying to put words in your mouth, so correct me if I'm

wrong. I think you said you felt a tug at your weapon belt,

correct?

    A    Correct.

    Q    Do you know if that tug came from your right or

from your left?

    A    I knew it came from my right hand side.

    Q    Okay. And that's where your --

    A    Where my firearm was.

    Q    All right. And I think you had said that when you

felt that you secured your weapon. Was that the secure

meaning to pull it out?

    A    No.

    Q    What does secure mean?

    A    Initially what happened was I felt -- I was

defending myself with my arms, and then I felt the right

side of my belt being pulled up towards my gun. And what I

did is I reached down and grabbed the handle of my gun and

1    A    Generally from what I recall, yes.

2    Q    Okay.  And when the first shot was fired you were

3    in arm's length of each other, is that what you said?

4    A    I'm assuming, yeah.

5    Q    Okay.  And so I understand when you say arm's

6    length, I assume you don't mean if you each put your arm's

7    length that you would be that far separated, just one arm's

8    length so he could still reach you, in other words?

9    A    I was still feeling him on me, and I was still

10   feeling punches.  So I'm assuming that one of our arms was

11   within reach if he was reaching out and touching me or I was

12   still able to touch him.

13        MR. MacMAIN:  Howard, just so I'm clear, when

14   you're asking him these questions are you asking him first

15   what was in his mind or now looking back looking at the

16   video, looking at reports?  I mean, which?

17        MR. SILVERMAN:  What he -- what he recalls

18   happening back then.

19        MR. MacMAIN:  At the time while this was unfolding?

20        THE WITNESS:  At the time he was on top of me?

21   BY MR. SILVERMAN:

22   Q    Well, no.  What I think your counsel is asking, we

23   all can think something happens, and then when we see it, we

24   go later and look at it and say, God, I was wrong just based

25   upon a perception.

1    A    So yesterday's memories of what actually happened,

2    what I saw on the video, is more recent than when I made

3    statements there.

4    Q    Fair enough.

5    A    So yes and yes.

6    Q    Can we agree -- like we had talked earlier about

7    perception and reality, and it may be different even though

8    we're being completely honest with one another, but can we

9    agree that on July 16th -- first of all, do you remember the

10    Pennsylvania State Police investigating this?

11    A    Yes.

12    Q    All right.  And do you recall sitting down with

13    Trooper Hennaman on July 16th to be interviewed?

14    A    I'm not very good with names, but I remember being

15    at the York barracks and being interviewed with counsel

16    there and a couple troopers there.

17    Q    All right.  And your attorney, do you remember him

18    being there?

19    A    Ed Paskey, yes.

20    Q    And Jeff Rineer, was he there?

21    A    I've read the reports.  I saw the names.

22    Q    Okay.

23    A    So if that's true and correct, then I'll swear that

24    that's who they are.  Like I said, I'm terrible with names.

25    I won't remember your name when I leave here.

1    Q    All right.  Okay.  I don't know if that's a good

2    thing or a bad thing, but I'll accept it as neither.

3    A    All right.

4    Q    Can we -- when you gave your statement on July 16th

5    you were being -- you agree that you were being as honest as

6    you could?

7    A    Hum, correct.

8    Q    And you were recanting the story to the best of

9    your ability?

10    A    Correct.

11    Q    All right.  All right.  And on July 16th, if you

12    said it was one to two seconds, whether it turns out to be a

13    half second or three minutes, your belief that --

14    A    Correct.

15    Q    -- was that?  All right.  And we'll go back and

16    deal with this later, but now I think you said when you --

17    your recollection of the shooting when the first shot was

18    you were in arm's length, and you shot him as you were both

19    facing each other, correct?  So would it be that your

20    shoulders would have been parallel?

21    A    If we're thinking the way that I was thinking at

22    the time, I have no idea whether or not he was facing me,

23    whether I was facing him.  We were generally facing each

24    other.

25        How -- if I was looking at the 12:00 position, he

1    ~~was looking at the 5, I have no idea how we were facing.~~

2    But I basically was under the impression that we were

3    generally facing each other, and that he was on top of me,

4    and that we were both -- I was able to reach out and grab

5    him, and he was throwing punches at me.  So, yes, we were

6    within arm's length.

7         Q    Okay.  And would that hold true also for shot No.

8    2?

9         A    That I can reach him?

10         Q    Um-hum.

11         A    That we were still within arm reach, yes.

12         Q    All right.  And do you recall if shot No. 2 hit him

13    in the front, back, or side?

14         A    It would have been in his back.

15         Q    Okay.  Okay.  After the shots were -- at the time

16    the shots took place your taser was not on you, correct?

17         A    I have no idea where my taser was.

18         Q    All right.  When you looked at the video yesterday

19    did you -- do you recall seeing the taser on the floor?

20         A    I remember seeing the taser sliding --

21         Q    Okay.

22         A    -- south.

23         Q    All right.  And south would be?

24         A    Away from me.

25         Q    To your left?  The record will reflect it.  We'll

1    get back to that.

2         A    To the top of the screen.

3         Q    Did you have -- did you have -- that's right.  Did

4    you have any -- back then did you have any belief that he

5    was going for the taser?

6         A    No.

7         Q    Was it your concern that he was going for the

8    taser?

9         A    No.  I was --

10        Q    So your fear for your life, I think you testified

11   earlier, was based upon his hands beating you and knocking

12   you out and then maybe taking the weapon or something?

13        A    Right.

14        Q    All right.  All right.  So after the event

15   occurred, after the shooting occurred, what did you next do

16   then?

17             MR. MacMAIN:  Okay.  Now, the shooting's -- the two

18   shots are fired.  You want to know where he goes or what he

19   does then?

20   BY MR. SILVERMAN:

21        Q    The two shots are fired.

22        A    Okay.

23        Q    Whitaker is down.

24        A    Okay.

25        Q    What do you do next?

1    A    I went back into the squad room, pulled out my

2    portable.  I called Signal 13, asked for back up at the

3    station.  I think I returned to check on Whitaker to make

4    sure he was still there.  I was hearing additional units on

5    the radio calling in and county verifying what I needed and

6    status of whatever.

7         I heard other departments coming in, Spring Garden

8    and York Area Regional.  I heard our units saying that they

9    were in route to the station.  My thought was if somebody

10    outside of our department reaches our station first, nobody

11    can get into our building because the doors are locked.

12    We're the only ones that have the keys.

13    Q    Okay.

14    A    So that I needed to prop open an outside door so

15    that people could come in.  As I went towards the door Jamie

16    Miller had come in.  I told him what happened just quickly;

17    that, you know, shots fired, that he's down in the hallway

18    in the squad room.

19         He ran that way.  I don't know if I ran back with

20    him to show, but eventually I went back out to the bay doors

21    or the doors by the squad room.  When I opened the door the

22    ambulance crew had just basically were getting out of their

23    ambulance.

24         I told them, you know, the shots fired.  The guy's

25    down.  And they came running in.  And then basically enough

A    Um-hum.

Q    -- did you -- did you give any thought to doing anything other than what you did?

A    Yeah.  We -- what was going through my mind or what I should do and what I thought was the priority at the time are two different things.  I knew that I needed somebody else there and that I needed to help.

But the priority was to save this guy's life, that he was trying to kill himself, and that if I could get the rope off of his neck, and if nothing else secure him in a room without the rope, then he can't harm himself any further.  And I can just contain him in the room until I got more help there.

But I wasn't going to not go in there and not help him out, sit back for five minutes waiting for somebody to come to the station to help me out to go in with another body.

Q    Okay.

A    You know, really I had -- my primary concern was his safety and going in there and helping him out as fast as I could.

Q    Okay.  You said your -- I think you said your primary goal was his safety?

A    Um-hum.

Q    Are you trained that when you take a -- a person

Q    Okay.  Have you or were you trained that when you're arresting people that are drunk you must handle that particular person differently?

A    Define drunk.

Q    Okay.  Well, I think you already testified that you didn't think he was drunk?

A    I -- I don't even think that I thought that he was mildly intoxicated.  I think there was just -- there was a hint of alcohol on his breath.  And, you know, if you had -- you and I had a drink at a bar and we were saying goodbye at the end of the night, I would -- I don't even know if I'd smell that much alcohol on you.

Q    Okay.

A    His level of intoxicity had really no factor on or made me think anything was going to happen.

Q    Okay.  Well, let me ask you this question then.  And really what I was asking was more of a general question.  But if you thought he was intoxicated, would you have -- and -- would you have handled him differently?

A    Yeah.  If he was falling down, you know, intoxicated where he was going to slip and fall and injure himself, then, yeah, I might make sure that he wasn't going to be getting up and walking around a lot.  I would make sure that there were things in the room that he wasn't going to bump into.  Checking on him a little more regularly to

1  the country to war?

2      A    No.

3      Q    Do you recall that when you were dispatched to the

4  Giant to see Mr. -- to deal with the Whitaker matter that

5  you were told he was possibly intoxicated?

6      A    I seem to recall that that was part of the

7  dispatch, that he was possibly intoxicated.

8      Q    You had testified on July 16th that as you returned

9  to the station you noticed Officer Miller playing the

10  bagpipes in the park and you thought that was funny.  Is

11  that something that you had seen before?  Is this the first

12  time you had seen that?

13      A    No.  Officer Miller had a habit of playing his

14  bagpipes after duty or at odd places.  He's been known to

15  walk the parking lot, Wal-Mart, and play 11, 2:00 in the

16  morning, 3:00 in the morning, whatever.  He's gone out to

17  the Township park numerous times and played.  It calms him,

18  relaxes him, and doesn't bother too many people.

19      Q    Okay.  Previously you had testified that when you

20  got back to the station Mr. Whitaker -- I don't want to -- I

21  want to make sure your testimony is the same today.  You

22  said that he was calm?

23      A    Yeah.

24      Q    Okay.  That he was relaxed?

25      A    Seemed to be.

```
 1      Q    That he was mellow?

 2      A    Correct.

 3      Q    And you also said, quote, just layed back as he can

 4   be, end quote?

 5      A    He was relaxed.

 6      Q    Okay.

 7      A    He was passive.

 8      Q    Okay.  When -- the second time you went back to Mr.

 9   Whitaker in the holding was at the time that he expressed to

10   you that he was injured, correct?

11      A    No.

12      Q    That was -- okay.

13      A    That was the first time.

14      Q    First time, okay.  Actually you're right.  The

15   first time you went back, but the second time you were with

16   him?

17      A    Right.

18      Q    The first time was when you left him -- either way,

19   I agree.  It was the first time you went back.

20      A    Okay.

21      Q    All right.  You had testified that you opened the

22   door and you said, but I was outside.  I had my distance to

23   him.  What did you mean by you had your distance to him as

24   you were outside the door?

25      A    I was in the door frame, and he was inside sitting
```

1    break and get you a copy now.  Here, if you take a look, I

2    think it's bate stamped 0016.  That's the beginning of the

3    transcript.

4              MR. MacMAIN:  What page?  Because the set that I

5    have that I think were produced by Attorney Keepers don't

6    have bates numbers.  I have them, but they don't have bates

7    numbers.

8              MR. SILVERMAN:  Okay.  Why don't we go off the

9    record for a second and let me show you what I've got.  And

10   if I need to, I'll pull you a folder.

11             MR. IRVIN:  We're going off the video record.  The

12   time is 12:56.

13             (Discussion held off the record.)

14             MR. IRVIN:  We're back on the video record.  The

15   time is 12:58.

16   BY MR. SILVERMAN:

17       Q    I show you a document.  It's a transcript.  It says

18   interview with Gary Utter dated July 16th, 2007.  Have you

19   had an opportunity at all to read this transcript?

20       A    I breezed through it.

21       Q    Okay.  When did you breeze through it?

22       A    Yesterday.

23       Q    Okay.  As you breezed through it did you see

24   anything in here that was inaccurate?

25       A    Not what I saw.

1     Q    Okay.

2     A    It's consistent.

3     Q    And if I could take your attention to page 16.

4     A    Is that at the top, or is that at the bottom?

5     Q    The bottom. It says -- I'll read a few lines. You

6 did not see him remove a shoelace. Officer Utter, no, no.

7 Corporal Rineer, okay. Officer Utter, and I couldn't even

8 tell you if he had -- shoes had laces on it. It's not a

9 policy that we have that we take everybody's shoes. I know

10 central booking had everybody taking their laces off their

11 shoes if they want to keep their shoes on. Corporal Rineer,

12 right. But we don't?

13     A    Could I ask you to pause? I have page numbers on

14 the top, and I have State Police 126 at the bottom. So --

15     Q    It's the numbers on the top right. I'm sorry.

16     A    Okay. I asked --

17     Q    You're right.

18     A    So you're at 16?

19     Q    16 and 17.

20     A    Okay.

21     Q    And if you could look now at the top of 17.

22     A    Okay.

23     Q    And --

24     A    Okay.

25     Q    And I'll read again from 17, line 1. And I

1    couldn't even tell you if he had shoes that had laces on it.

2    It's not a policy that we take everybody's shoes.  I know

3    central booking had everybody taking their laces off their

4    shoes if they want to keep their shoes on.  Officer Rineer,

5    right.  Officer Utter, but we don't.  We've never had an

6    issue with that before.  It's not a policy.

7         Now, my question is when you said it's not a

8    policy, was it not a policy to take shoes off, to check for

9    laces, or to take laces out of shoes, or all three of the

10   above?

11        A    It was -- it was never a requirement that we had to

12   do any of those three.

13        Q    Okay.  Okay.  Thank you.  If you could turn to page

14   21, please.  And I'll just -- I'm going to ask you to look

15   at the -- starting at line 15, if you could just take a

16   second and look at it, 15 through 23.

17        A    Okay.

18        Q    Now, sitting here today do you have a recollection

19   that -- thinking back then that you weren't sure if the

20   first shot hit him?

21        A    Correct.

22        Q    All right.  Can we agree that if you go -- if

23   there's a determination that deadly force is necessary, that

24   it is possible that the -- that deadly force at some point,

25   before it's actually carried out, could no longer be

1    who may be dangerous to you is close to you, that in and of

2    itself doesn't make it a risk to you?

3              MR. MacMAIN:  Objection.

4              MR. GABRIEL:  Objection to the form.

5    BY MR. SILVERMAN:

6         Q    In other words, I understand he was close to you,

7    but he -- after the first shot he was going away from you,

8    correct?

9         A    Correct.

10        Q    Okay.

11             MR. GABRIEL:  When you say -- you're talking about

12    whether it was the second or two seconds between the first

13    and the second shot?

14             MR. SILVERMAN:  Right.

15             MR. GABRIEL:  You're not talking about at any point

16    after the first shot?

17    BY MR. SILVERMAN:

18        Q    No, right, exactly.  So after the first shot but

19    before the second shot he was going away from you.  What led

20    you to believe after the first shot, before the second shot,

21    that at that moment he was still a risk to come back at you?

22        A    It was still -- it was one continuous act.

23        Q    Okay.  Would you agree that before you fired the

24    second shot you aimed it towards his back?

25        A    I aimed center mass.

1    that went through your head, correct me if I'm wrong, is

2    that you're in a closed environment, that it would affect

3    you as well, so that was not an appropriate measure,

4    correct?

5        A    Correct.

6        Q    And I think that I saw that you also had the same

7    thought process with regard to the baton?

8        A    Correct.

9        Q    So under certain circumstances would you agree that

10   the use of a baton could be deadly force, just generally

11   speaking?

12       A    It would be a use of force.  If I used it and

13   killed somebody, therefore it turns into deadly force.

14       Q    Okay.

15       A    But it would be a use of force.

16       Q    Okay.

17       A    You're -- you're confusing words in there.

18       Q    All right.  I apologize.  I'm not trying to do

19   that.  Okay.  Now, when you were first hired were you given

20   the standard operating procedures?

21       A    Yeah.

22       Q    Where did you -- did you maintain a copy for your

23   -- for review as you may need to review?

24       A    Yeah.  Each officer was given a binder that had all

25   the SOPs in it.

Q     All right.  Where did you keep your binder?

A     Mine was in the squad room in my box.

Q     I'm sorry.  Where?

A     We have assigned boxes.

Q     Like a locker?

A     In the officer area.

Q     All right.  And would you agree that when a --
every once in a while the procedures were -- there were
either new ones added or some ones were updated?

A     Correct.

Q     And when that happened were you given new papers, a
whole new book?  What happened?

A     If any changes or additions were made, generally
what happens is the chief will have a supervisor's meeting
where they regularly, I guess, sign certain SOPs that are
going to be reviewed, seeing if there aren't any changes
that need to be made or updates.

      If it's deemed that any changes or updates need to
happen, then our supervisors are given copies of the changes
or the updates or additions.  And then the platoons will
meet, all that are available will review the changes,
replace the entire chapters if needed or just one page if
that's needed, and then we initial off that we've reviewed
the changes.

Q     Okay.  And who was your immediate supervisor?

1      A     Am I in the right binder or what?

2            MR. MacMAIN:  Yeah, at the bottom.

3      BY MR. SILVERMAN:

4      Q     I'm sorry, at the bottom right.

5      A     Okay.  Rules of conduct.

6      Q     We had previously discussed the rules of conduct

7      and documents that you were provided during training, and

8      that may or may not have been updated as may have been

9      appropriate.  Is this one of the documents that you had seen

10     before the one that you're looking at?

11     A     Yeah, I'm familiar with this.

12     Q     Okay.

13     A     It is used by our department.

14     Q     All right.  Now, and I -- I think you testified

15     earlier they were given to you when you began your -- your

16     job with the Township, correct?

17     A     Correct.

18     Q     All right.  Did -- during your tenure, I think it

19     was about a five year tenure that you were with the

20     department, did you, on occasion, go back and review the

21     rules and read the rules to update, refresh yourself with

22     them?

23     A     On occasion.

24     Q     Okay.  Do you agree that the rules require that

25     officers conduct themselves at all times, both on and off

1    me.

2        Q    Okay.  Okay.  Now, let's -- are you aware that

3    there are rules related to standard operating procedures for

4    holding rooms?

5        A    Yes.

6        Q    Do you know what the purpose of those rules is?

7        A    The purpose of the rules?

8        Q    Um-hum.

9        A    I could guess at it.

10       Q    Well, I don't want you to guess.  If you -- if you

11   know, that's fine.  If you don't, that's fine as well.

12       A    I couldn't quote the exact purpose of it in the

13   SOP.

14       Q    I'm not asking you to quote it, but --

15       A    I have a general concept of it.

16       Q    That's fine.  What is your general concept?

17       A    Probably to protect the persons inside the room,

18   both the employees and prisoners, or anybody else that might

19   be in the rooms.

20       Q    Okay.  If you could take a look -- and you go to

21   209.  And the -- if you take a look, and please don't read

22   it into the record, but there is a purpose set forth in the

23   handling -- or the purpose of holding room standards.

24            Is -- and you had previously given testimony as to

25   what you believe that those standards are.  Is that about

1    Springettsbury Police did you have a -- an understanding or

2    did you have an obl -- a requirement to do any type of a

3    medical evaluation when you took someone into custody?

4          MR. MacMAIN:  And you mean they haven't complained

5    about injury, just as SOP everybody gets a medical

6    evaluation?

7          MR. SILVERMAN:  Right.

8          MR. MacMAIN:  By a police officer?

9    BY MR. SILVERMAN:

10     Q     Correct.

11     A     I am aware that we have a form that asks general

12   questions as to health and welfare.  I do know that since we

13   became accredited there have been numerous changes, and I'm

14   not sure if those took place after this incident or prior to

15   the incident.

16         I do know in this situation and in past situations

17   the arresting officer's the one that's required to do those

18   paperwork and not somebody who's assisting them.  So

19   generally the things that I did that night were above and

20   beyond what I was required to do.

21         And Officer Ford was, therefore, required to do all

22   those things.  And so if those things were a requirement,

23   they would have been done by Officer Ford and not required

24   by me.

25     Q     Okay.  Do you know if back in July of '07 if there

1   was a -- if there was a procedure that you would have

2   followed if it was -- if you made the arrest and your --

3   your prisoner was in detention as it related to completing a

4   medical evaluation?

5       A    Again, because of the accreditation there was

6   numerous changes that were made.  And I do know that prior

7   to my -- while I was employed there that there was a form

8   that was a general questionnaire.  I don't recall the exact

9   questions that are on there, but it was general -- general

10  welfare, well being.  But I'm not sure if it was prior to

11  the incident, at the time of the incident, or after.

12      Q    Okay.  Did you -- let's say back in -- in July of

13  '07 were you trained by your employer at the time to do any

14  suicide assessment?

15      A    No.

16      Q    Okay.  Was a suicide assessment a standard

17  operating procedure back in July of '07 when someone was

18  detained in the holding cell?

19      A    Not to my knowledge, unless they were given some

20  type of verbal or physical indication that they were going

21  to do harm to themselves or others.  We had an obligation if

22  somebody said I'm going to kill myself to seek help for

23  them.  But if we didn't witness any type of signs that they

24  were heading that way, then we didn't have any obligation to

25  ask them whether or not they had any intention of hurting

1    themselves or not.

2        Q    Okay.  Would you say that Mr. Whitaker exhibited

3    any violent behavior at the Giant?

4            MR. MacMAIN:  That he observed or that he was told

5    of or he learned about later?

6    BY MR. SILVERMAN:

7        Q    Okay.  I think you testified earlier that when you

8    showed up he was already restrained.  While -- after you had

9    spoke with him -- when you got to the scene of the Giant you

10   had spoken to the other officers about Mr. Whitaker,

11   correct, a little bit?

12       A    He was in cuffs, and basically my conversation is,

13   is he under arrest?  Yes, he's under arrest.  I'll take him

14   back to the station for you while you handle this call.

15       Q    Okay.  Did anyone tell you he was or was not

16   violent before you got there?

17       A    According to the dispatch.

18       Q    He was violent?

19       A    The dispatch said that it was active, and that

20   there was a possibility that he was being detained by

21   employees and/or customers.  And by the time Officer Ford

22   arrived, Officer Ford notified that the prisoner was in

23   custody and was not being -- not being resistant or

24   combative, and that the responding units could slow down

25   their response.

1        A      If it -- if it was in effect, then I guess I had

2    to.

3        Q      Okay.  Well, whether it was or was not in effect,

4    and I'm not suggesting that it was or was not --

5              MR. IRVIN:  Excuse me, Howard.  When you -- that's

6    causing distortion.

7    BY MR. SILVERMAN:

8        Q      Oh, I'm sorry.  In any time during your training

9    for police officer's duties, whether it was at HACC or

10    anywhere else, were you given any training relating to the

11    -- the -- you know, the items or the description of what's

12    set forth at Roman Numeral IV-A-3?

13        A      Prior to this incident the items that we would take

14    away that are included in here would be the phones, the

15    purses, the wallets, the necklaces, lighters, matches,

16    cigarettes, because there was no smoking in the area.  We

17    generally take away their medications.  We did not take away

18    shoes with laces, belts, or chain, unless it was like a

19    necklace or a pendant or something like that that was overly

20    large, something like that.

21        Q      Do you know what the purpose of taking necklaces

22    away was, why you took necklaces away?

23        A      Why would we take it away?  So that it wouldn't be

24    used as a weapon.

25        Q      Okay.  When you took things like necklaces, other

1    A    The thickness of it.

2    Q    When you think of the reason you take weapons away

3    though, is it so somebody can't use it to hurt somebody

4    else?

5    A    Or themselves, correct.

6    Q    Okay.  Now, I think you had said during the time of

7    the Whitaker incident there was no requirement to remove

8    shoelaces and belts and some other clothing items?

9    A    Prior to the Whitaker incident I was not aware of a

10   requirement to do it, nor was it a habit of myself, or nor

11   did I see any of my other officers regularly do it.

12   Q    Okay.  Was there ever a point in time before you

13   left your employment with the police where that did become

14   part of your regular way that you handled detainees?

15   A    Me personally or the department?

16   Q    You personally?

17   A    I still consistently did not do it.

18   Q    Okay.  And you did -- did you have occasion after

19   January of '08 to arrest or deal with any detainees?

20        MR. MacMAIN:  '07.

21        MR. SILVERMAN:  '08.

22        MR. MacMAIN:  '08, July of '08?

23        MR. SILVERMAN:  Did I say July?  I'm sorry, January

24   of '08.

25        MR. MacMAIN:  Okay.

completion of the PSP investigation and the ruling from the

DA's office when I came -- was reinstated back to full duty

I did change platoons.  So I had two new supervisors.

Q    Okay.  Do you know why you changed platoons?

A    Specifically, no.  I was reassigned to a platoon.

MR. SILVERMAN:  Okay.  Can we take a two minute

break so I can go to the men's room?

MR. MacMAIN:  Sure.

MR. IRVIN:  We're going off the video record.  The

time is 2:43.

(Discussion held off the record.)

MR. IRVIN:  We're back on the video record.  The

time is 2:56.

BY MR. SILVERMAN:

Q    Okay.  I think where we were last talking was about

the rules and regulations or standard operating procedures

with regard to the -- the holding rooms.  And I think I had

asked you some questions -- and correct me if I'm wrong, I

asked you questions about do you recall receiving any

training on any new rules post both July, '07 and again

January, '08.  And I think you said you don't recall any

specific training, any additional training from your

supervisors?

A    No.

Q    Okay.  If you would just take a look for a second

1    in that -- the documents I gave you starting at No. 176.  If

2    you could just take a quick look and see if you recognize

3    this document or these documents, which I will represent go

4    through 188.

5        A    Use of force?

6        Q    Right.  Were you familiar with these procedures as

7    of July, '07?

8        A    I had gone over them, yes.

9        Q    Okay.  And were you expect -- or do you believe you

10   were expected to comply with these procedures?

11       A    Yes.

12       Q    Okay.  Do you believe that as it relates to the

13   shooting of Whitaker you did comply with these procedures?

14       A    Yes.

15       Q    If you could take a look at page 182, and 2, B-2,

16   it talks about verbal commands, dialog.  Is that just

17   something that you -- do you do that any time there is a --

18   an issue where your simple presence will not keep a

19   situation under control?  Is that your first kind of

20   deterrent or effect to get things under control is

21   verbalizing commands?

22       A    Yeah, I guess.  I guess telling somebody to put

23   their hands behind their back, they're under arrest, would

24   be a verbal command.

25       Q    After a case involving the death or injury there's

BY MR. SILVERMAN:

Q    Please, yes.

A    Prisoner transport.

Q    And I assume you were familiar with the standard operating procedures relating to prisoner transport?

A    This was an SOP that was put in place while I was employed there, yes.

Q    And just like other SOPs, you were expected to comply with them and expected to understand and know all the rules, correct?

A    Correct.

Q    To the best of your knowledge did you comply with all the SOPs that were in effect on the date of the incident of July, '07?

A    Best of my knowledge I did everything that I thought I should do.

Q    Okay.  Do you know if after the Whitaker shooting there were any changes put in place with regard to prisoner transportation?

A    Do I know of any?

Q    Um-hum.

A    I couldn't quote you any right now.

Q    I'm not asking you if you can quote any specific ones.  My question is do you know if any new ones were put in place after that?

1    already had plans for vacation while I was on administrative

2    leave.  That I do know because they still took my vacation

3    days away.

4          MR. MacMAIN:  And if you don't know, you don't have

5    to guess where you were two years ago.

6    BY MR. SILVERMAN:

7      Q    That's right.

8      A    I'm sure it's on record somewhere.

9      Q    Okay.  If you can take a look -- what kind of --

10   what kind of weapon do you carry?  Did you carry a Sig 40?

11     A    At the time, yeah, a Sig.

12     Q    If you look on page 127, it talks about

13   qualifications.  Were you qualified at the time of the

14   shooting in accordance with the requirements of Section 6?

15     A    As far as I know I qualified twice a year.

16     Q    Okay.

17     A    I never missed a qualification.

18     Q    Okay.

19     A    I never did not qualify.

20     Q    Do you still have a license to carry?

21     A    I don't know.

22     Q    Okay.  Do you still carry a weapon?

23     A    I haven't recently.

24     Q    Okay.  Have you since you left the -- your job?

25     A    Have I carried a weapon?

1     A    When I started with Springettsbury we didn't have

2    tasers.  And with the process of accreditation, I think

3    almost every single policy was probably changed or modified.

4     Q    Were you trained at all to evaluate a prisoner or

5    detainee that's intoxicated under the similar guidelines

6    that you would evaluate or deal with someone that was either

7    mentally ill or mentally not -- not, you know, fully there

8    at the moment?

9     A    Meaning that if they were in an altered state?

10     Q    Correct.

11     A    Either mentally or physically?

12     Q    Yes.

13     A    That we were supposed to increase our care or our

14    watch of them, yes.

15     Q    Okay.  And why do you think it was -- you were

16    required if somebody was mentally impaired to increase the

17    watch?

18     A    Because they might do something stupid.

19     Q    Okay.  And if you take a look at the standard

20    operating procedures beginning at page 189 through 203, and

21    take a moment to look at them.

22     A    Okay.

23     Q    All right.  I don't -- if you want you're welcome

24    to read them all, as you were any of the others.  But if the

25    -- if you -- if you need to, if not, can you tell me if

1    these appear to be the standard operating procedures that

2    were in place as of January, '07 through, at a minimum,

3    July, '07 that you were expected to comply with relating to

4    dealing with mentally ill or mentally -- and mental health

5    emergencies?

6         A    I'm assuming.

7         Q    Okay.  Is that assumption based upon you --

8         A    That assumption --

9         Q    Not sure if these are the actual documents?

10        A    Yeah, I have no idea.  I'm just looking at dates.

11        Q    Fair enough.  Fair enough.

12        A    Effective date 1/9 of '07.

13        Q    I will represent to you that these were the ones

14   that were provided to me by your counsel, and I believe an

15   effective date of January 9, '07.  Assuming that these were

16   in effect on January 9, '07 do you have any reason to

17   provide -- or do you have any -- provide testimony that you

18   were not required or expected to comply with these in July

19   of '07?

20        A    I was expected to apply to all the policies that

21   were in effect for Springettsbury Township.

22        Q    Okay.  Without going through the documents, do you

23   recall what you believe -- and I understand that the

24   standard operating procedures show differently.  They show

25   what they show.  But what was your belief as it related to

1    kind of replaying it, putting it back forward, replaying it

2    again, putting it in slow motion.

3    BY MR. SILVERMAN:

4        Q    Right.  All right.  So I hit play, hit the play.

5        A    Hit pause.  That's frame by frame.

6        Q    All right.  All right.

7             MR. MacMAIN:  Can I ask a question?

8             MR. SILVERMAN:  At this -- go ahead.  I'm sorry.

9             MR. MacMAIN:  Can I ask a question while we're

10    doing the replay and the fast forward and all this?  Right

11    now we're 23:55:24.  There's an object in Mr. Whitaker's

12    right hand.  Now, did you know at the time this was

13    happening what that was?

14             THE WITNESS:  No.

15    BY MR. SILVERMAN:

16        Q    Do you know what it is now?

17        A    It's my asp.

18        Q    Okay.

19        A    My expandable baton.

20        Q    But I think you testified earlier you didn't know

21    he had it, nor were you afraid at that time that he was

22    going to use that on you at -- that particular weapon?

23        A    I didn't know he had that weapon, no.  That was

24    located right next to my gun.

25        Q    Now, at this point that we're looking at have you

1    handle detainees once you got back to the station?

2        A    Yeah, I guess.

3        Q    Okay.  And did you -- to the best of your knowledge

4    as you understood what you had learned through training did

5    you follow the training as provided to you in the hand -- in

6    the way in which you handled Mr. Whitaker prior to the

7    shooting?

8        A    Best of my ability.

9        MR. SILVERMAN:  Okay.  I -- I don't think I have

10   anything further, if you wanted to get a couple questions in

11   then.

12                    CROSS-EXAMINATION

13   BY MR. MacMAIN:

14       Q    Okay.  Let me start then.  I had a few questions

15   about things we covered both this morning and this

16   afternoon.

17       First of all, is there anything during your course

18   of dealing with Mr. Whitaker that indicated to you that he

19   was suicidal?

20       A    No.

21       Q    Was there anything during the course of your

22   dealing with Mr. Whitaker that indicated that he had a

23   mental illness?

24       A    No.

25       Q    Was there anything during your dealing with Mr.

191

1    Whitaker that you thought that he was intoxicated?

2        A    No.

3        Q    You were asked questions about -- I think it was

4    this morning -- about policies and procedures about securing

5    your gun and that gun locker.  Remember those questions?

6        A    Correct.

7        Q    And just so I'm clear, your testimony was that it

8    was your understanding that you would secure your gun in the

9    gun locker when you went into the room the first time to

10   remove the handcuffs?

11       A    Yeah.  Knowing what I know now, the way I should

12   have done that whole process was upon entering the station,

13   securing the prisoner in the holding cell while still

14   handcuffed, closing the door, securing him inside of the

15   holding cell, turning to the lockers, taking the firearm

16   off, securing it, retrieving the key, securing the key on --

17   on your body, entering into a holding cell, removing the

18   handcuffs, closing the door again and securing him inside,

19   and then securing a weapon again.

20             And that any additional instance in which I needed

21   to enter the room because of an emergency, medical, other,

22   whatever way, that I was justified to have the weapon on me.

23             However, if -- if say he needed to be -- he or she

24   needed to be transported to another facility, say central

25   booking or York County Prisoner -- Prison, that it would

1  emergency?

2      A     Yeah.   Base -- based on his complaint of pain and

3  difficulty breathing that he told me and the reason why I

4  had dispatched the ambulance, my initial thought was when he

5  was laying on the floor was that he had some type of medical

6  problem, and that perhaps he had made his way to the door

7  and had been banging on the door while I was up front faxing

8  the form off.

9          And when I saw him in the monitor laying there,

10  then went back to the room and again saw him in the exact

11  same position and not moving, that's when I thought he had a

12  medical emergency.   And when I tried yelling at him at the

13  door or say anything I knew I wasn't going to be able to be

14  heard through the door.

15          So I opened the door to try to talk to him, you

16  know, just crack it open.   And at that point is when I heard

17  his gurgling sounds like he was having difficulty breathing.

18  And that's when I forced my way open and saw the string on

19  his neck and realized that he was hanging himself.

20      Q     Okay.   Now, just -- I'm going to try to orient you

21  because we're trying to cover --

22      A     The whole day.

23      Q     -- six hours of things.   The gun that you were

24  carrying, how many shots were in it?   How many bullets could

25  you have fired if you wanted to?

A    I believe it's a 12 plus one.  12 in the magazine, one in the chamber.  So 13 total rounds, plus I had two other magazines that were fully loaded with 12 rounds.

Q    Okay.  Just the ones that were in your gun, how long would it have taken you to unload all of those shots if you wanted to?

A    Only a matter of seconds.

Q    Okay.

A    As fast as I could pull my trigger.

Q    Now, you mentioned something earlier about double tap.  What is -- just for the record explain what double tap is.

A    Basically it's a term that we use that when firing that we fire multiple rounds.  Double tapping being that we fire two consecutive quick-fired rounds, basically trying to maintain those two rounds on target.

Basically it's been determined that any additional rounds above that, basically because of recoil and everything, that you're just going to throw rounds outside of wherever you're supposed to aim.

And basically it's just a consecutive -- basically a one motion type of thing.  And it's a fluid motion that you pull -- pull the first one, the trigger the first time, and then again pulling the trigger the second time.  It's almost -- it's almost automatic.

Q    Okay.  Now, I just want to go right to the shooting itself.  You described a couple of times, we've looked at the video.  Why did you fire the first shot?

A    The first shot, basically I was in fear for my life.

Q    Okay.  And --

A    And I knew that my utility belt and my pants were getting messed with and pulled and yanked.  I knew the location of my hands.  I knew that they weren't there.  The only other person in the station to my knowledge that was there was Mr. Whitaker.

So my assumption was -- is that he was the one that was moving my belt around.  Because of the location of where I was feeling the tugs and everything was the location where my -- my firearm was.  My first instinct was that he was going for my gun.

My immediate thing was as I was reaching down for my gun, to hold it, to retain it, and while there I was in the corner.  I had already gotten my -- my glasses knocked off my head.  I was still getting hit with punches.  I was trying to force him back.  I had already tried getting out of the room, out of the -- the space that I was at unsuccessfully.

Again, like I testified, I think, I don't know how clear I was, but basically time stopped for me, and I

started going through my options of what I could do.  That's
when I started talking about whether I could use my spray or
whether I could use my asp and things like that.  And I
determined that because of my confined spaces that they just
weren't going to be able.

It came to a point where I knew it was just him and
me, and basically it was just going to take one lucky punch,
and I was going to be out of the game.  And it was just
going to be him or me.  And that's when I determined that my
life was in danger.  And if I hadn't done something, then
that was my last option that I could do was to pull my
firearm and fire.

Q    Okay.  And was that the same analysis for the
second shot?

A    It was just one fluid motion.

Q    Okay.

A    The first shot that I fired I fired underneath my
left arm that I was using to shield from Whitaker -- Mr.
Whitaker's blows.  So I knew the general direction that he
was at based on where I could feel his body against my arm
and where I was feeling the punches coming from.

I basically withdrew my weapon, tucked it close to
my body, and aimed in a general direction I thought was best
where the blows were coming from, fired the first round.  At
that point I could see -- rotate around, and then I came up

1    with one more, aimed second shot and fired a second shot.

2        Q    During the sequence of events beginning when he

3    first attacked you in the holding room, and you've looked at

4    the video now, were there periods where he'd come closer to

5    you and move away, come closer to you, move away?

6        A    He was always on top.  He was charging me.  I mean,

7    my whole thing from the point in which I got out of the

8    holding cell itself in the doorway when I had tried to grab

9    the taser, that I had put it on the ground, my whole frame

10   of thinking was I just needed to set my right foot to stop

11   me retreating so that I could go on the offensive.

12       At no point was I able to set that foot to go

13   forward.  Whitaker was constantly on the attack, and I was

14   reacting every single second.  The one chance that I had to

15   do something different was when I had gone for the door to

16   try to get some -- basically my idea was I needed to get out

17   of the confined hallway so I had more room, more options to

18   go for.

19       I could use my spray.  I could use the baton, just

20   I had more room to go anywhere.  And when that option was

21   taken away from me that was -- that was it.

22       MR. MacMAIN:  Okay.  That's all the questions I

23   had.

24   BY MR. GABRIEL:

25       Q    Prior to the point in time when Mr. Whitaker

1    attacked you did you have any reason to believe that he was

2    going to do that?

3        A    No.

4        Q    And do you have any way of knowing when he

5    formulated that intent, whether it was before or after he

6    used the shoelace?

7        A    He -- he gave me absolutely no indications that he

8    was not going to be anything but compliant and cooperative

9    the entire time.  From the second that I picked him up at

10   Giant he followed all my commands as I escorted him to the

11   car.  He followed all my commands as I patted him down,

12   placed him in the vehicle.

13       The conversation I had with him as far as securing

14   his -- his keys, I mean, generally that's not the type of

15   thing that we would do is to throw a set of keys into

16   somebody's vehicle and just leave it there for a spouse

17   member.  But he had been so cooperative that I was like, you

18   know what, sure.  You know, that's what you want.  I'll go

19   ahead and do that.  It's not something that we would

20   normally do.

21       Even on the ride home -- or home -- to the station

22   he didn't say anything.  He was just sitting there.  You

23   know, he -- he was like the person who said, you know, hey,

24   I -- I did something wrong, and yeah, this is just the end

25   of it.

1    It was like he was going over his consequences what

2    might happen.  You know, hey, I messed up.  And getting back

3    to the station, even getting him out of the station and

4    escorting him into the room, he, again, got out of the car

5    without any problems.

6        I had no -- I could have easily asked Officer

7    Miller -- yelled at him to come over and help me get him out

8    of the car or get him into the station, but I had no reason

9    to think that I needed anybody else.

10       Generally I knew I was the only one at the station.

11   I knew where the other officers were.  I took the cuffs off

12   because I didn't think he was a problem.  In the past if the

13   guy's been -- guy, girl, whoever's been combative or

14   resistant, then they can sit in there with their handcuffs

15   on.  You know, we don't need to take it off.  They can sit

16   in there.

17       But, again, he was cooperative just like anybody

18   here in this room today.  I mean, went in and took the cuffs

19   off, told him to have a seat.  Even when I came back in to

20   ask him the information he was calm and relaxed about his

21   injuries, about his -- his rib injuries.

22       I asked him if he wanted an ambulance, and I don't

23   recall if he said yes or no.  But, you know, I was at the

24   point where it's not going to hurt anything because I

25   figured that Officer Ford was going to be tied up for a

201

1   be, but you're really not 100 percent certain, wouldn't you

2   then -- wouldn't it be better to err on the side of taking

3   extra precautions to do something to safeguard you and the

4   prisoner?

5       A    If I took that approach, then coming into this city

6   today I would have a gun on me.

7       Q    Okay.

8       A    You know, it's -- it's just that's -- that

9   situation for me it just seems like it was overkill.  He was

10  so compliant, so passive.  So --

11      Q    Almost lethargic?

12      A    -- textbook.  No, he wasn't lethargic.  He was just

13  cooperative.

14      Q    Okay.

15      A    Just like you're being cooperative.

16      Q    Okay.  Okay.

17      A    You know, if I told you to have a seat, you'd have

18  a seat.  If I told you to stand up, you'd stand up.  If I

19  told you to turn around, you'd turn around, and I'd take the

20  handcuffs off you.  He did everything a model citizen would

21  do.  I had no suspicions whatsoever.  I didn't think he was

22  intoxicated even though I smelled alcohol on his breath, or

23  intoxicating beverage on his breath.

24      Q    Okay.

25      A    You know, but in no way did he give me any signs

1    that he was under the influence of anything or that he was

2    contemplating suicide, that he was intending to injure

3    himself, that he was intending to injure me or anybody else

4    up until the point in which I opened up the door and tried

5    getting the noose off of him and he started attacking me.

6        Q    Okay.  You had talked in response to your counsel's

7    questions about the procedure with regard to locking down a

8    weapon and when it's required and when it's not.

9        Would you -- I mean, even though you said if you --

10   the procedure would have been you should have locked the

11   weapon until he was secure in the room, but that would have

12   only dealt with the first time in the room.

13       You had the right under the SOP to go in the room

14   armed the second time and also when you confronted him the

15   third time when he was hanging himself.  You had the right

16   under the SOP to have the gun, correct?

17       A    Yeah.

18       Q    Okay.  But do you also have the discretion to keep

19   the gun in the lock box if you -- if --

20       A    Well, yeah.  I mean, the department's not going to

21   take that away.

22       Q    Okay.

23       A    But --

24       Q    Was there any reason that while you were in the

25   precinct with Whitaker before anyone else got into the --

any other officers got there why you needed to have your

weapon on you?

    A    It's part of my uniform.

    Q    Okay.

    A    It's -- being in a uniform every single day, if I

don't have my gun on me, it's like I don't have my head on

me.  You feel like something's missing.  It's a part of you.

It's a -- it's a distinct weight on your belt and on your

person that you know it's not there.  I mean, you know it's

missing, and you feel incomplete like you're not doing your

job, that something is missing.  And, I mean, it's -- it's

instinctive.  You know.

    Q    Okay.  The procedure that you described in response

to your lawyer's questioning, after this incident did you

start following that procedure?

    A    I had to.

    Q    Okay.  You had mentioned a -- a double tap, and I

wrote the words, and I quoted it, fluid motion?

    A    Um-hum.

    Q    So it's like bang, bang, right?

    A    Pretty much, yeah.

    Q    And I think when you said it you even talked about

you stay focused on the same target, you don't re-aim for it

to be a double tap?

    A    Yeah.

Q    Okay.  Can we agree then with these two shots that
were fired it was not a double tap?  They could have had --
it could have happened sequentially, and it could have
happened in a short period of time, but it wouldn't be a
double tap as you described it?

A    Well, I would disagree with that.

Q    Okay.

A    Because even out on the range doing a double tap at
close distance we can -- the idea is to quickly draw the
weapon and fire the two rounds.  I mean, that's how we drill
it.  It's a two round double tap.  And basically to make
sure that you, as quickly as possible and as accurately as
possible, fire those two rounds down.

And ultimately the second shot should be at a
firing position that would be the ideal firing position.  In
other words, you have both hands on your weapon.  You're
holding it steady, and that you're able to aim now in the
gun sites for the second shot.

The first shot was fired like this.  (Indicating.)
And as he rotates around the hands -- my hands -- second
hand was able to drop down and was brought up to aim, and
the second shot was fired.

So the -- the time it took me to go from this to
this to this and fire is a fluid motion.

Q    Okay.  So this would -- you would -- what you --

1    these two shots you would call a double tap?

2        A    If I -- yeah.  If I asked any of my other officers

3    that are familiar with the same thing and describe that,

4    they would say, yeah, that was a double tap.

5        Q    Would you agree that when you do a double tap

6    there's really no additional thought from shot one to shot

7    two?  In other words, it happens so quick, once you make the

8    decision to shoot it's bang, bang?

9        A    Once the -- once an officer or a person makes the

10   decision to shoot, basically it's because there's a threat,

11   and you shoot until there is no more threat.

12           And basically a weapon goes to a low ready position

13   after you determine that there's no longer a threat, and

14   that if the threat is reactivated that you're at a low ready

15   so that you can bring it up to a high ready and, again, make

16   the determination of whether or not you have to pull that

17   trigger.

18           So up until the point -- and you can see it in the

19   video of where there's movement by Whitaker after the second

20   shot, and I am in low ready, and it's brought up again where

21   I could have shot a third or fourth or fifth, whatever I

22   needed to.  But there was no threat, and the weapon was

23   dropped back again.

24       Q    Okay.  And just going back for that -- the double

25   tap.  I thought you said it -- it means two rounds on