# EXHIBIT "G"



# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND   :   CIVIL ACTION
DALEA LYNN, CO-ADMINISTRATORS  :
OF THE ESTATE OF RONALD TAYLOR :
WHITAKER, JR.; AND RONALD T.   :
WHITAKER, SR., TAYLOR WHITAKER, :
BRANDI WHITAKER AND CHRISTOPHER :
HAMMERSTONE, INDIVIDUALLY,     :
    PLAINTIFFS                 :
                            :
    V                   :  NO:1:08-CV-00627
                            :
SPRINGETTSBURY TOWNSHIP,      :
SPRINGETTSBURY TOWNSHIP POLICE :
DEPARTMENT, CHIEF OF POLICE   :
DAVID ESHBACH AND POLICE OFFICER:
GARY UTTER,              :
    DEFENDANTS            :  JURY TRIAL DEMANDED


DEPOSITION OF:  DAVID ESHBACH

TAKEN BY:      PLAINTIFFS

BEFORE:       DIANE A. SMITH, REPORTER
              NOTARY PUBLIC

DATE:         FEBRUARY 9, 2009, 10:40 A.M.

PLACE:       HAGGERTY & SILVERMAN
              240 NORTH DUKE STREET
              LANCASTER, PENNSYLVANIA



HAFEN
Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

**DAVID ESHBACH**
**FEBRUARY 9, 2009**

Multi-Page

---

### Page 6

1 with a viewer so we could look at all the different scenes,
2 we got views -- I think it was designated as one, four,
3 five, six, seven, ten and thirteen.  Is there any reason we
4 didn't get the other -- well, first of all, does each of
5 those numbers, if you know, link up to a particular camera?
6    A  Yes.
7    Q  All right.  So if we don't have camera two, that
8 doesn't mean -- or strike that.  If we don't have a file
9 that says camera two, we just didn't get the video from
10 camera two?
11    A  Correct.
12    Q  All right.  Is there any reason that we didn't get
13 all of the camera views?
14    A  Yes.
15    Q  Okay.  And what is that reason?
16    A  Not all the camera views show what that
17 incident -- how that incident occurred.  Some of the camera
18 views are outside in a parking lot.  They are at -- some of
19 them are at doorways to the department that had nothing to
20 do with the incident.
21    Q  All right.  And you may not know this, but I'll
22 ask.  Like do you know what each camera designates?  Like
23 camera number one, do you know what that shows?
24    A  We have a list of it, but I can't recite it to you
25 out of my head.

---

### Page 7

1    Q  All right.  Now when -- and I'm sorry.  It was
2 Lieutenant Trelb who did --
3    A  Trott, T-r-o-t-t.  His first name is David.
4    Q  Do you know why David Trott would have made copies
5 of the disks before it went to the State Police -- or
6 copies of the hard drive?  Excuse me.
7    A  As I said before --
8       MR. GABRIEL:  Objection just in terms of the form
9 of the question.  You said before it went to the State
10 Police.  You mean before the hard drive?
11       MR. SILVERMAN:  Correct.  And what I think was
12 said -- let me back up.
13 BY MR. SILVERMAN:
14    Q  Do you agree that after the hard drives were given
15 to the State Police they were never back in your possession
16 again?
17    A  That's correct.
18    Q  All right.  So the tapes that I got were made
19 presumably prior to the transfer of the hard drives to the
20 State Police?
21    A  Yeah, the DVD that you have would have been
22 made -- would have been recorded prior to that disk being
23 removed from the system and transferred to the State
24 Police.  Once that occurs, we have no access to it anymore.
25    Q  Understood.  Now what was the reason that David --

---

### Page 8

1 Lieutenant Trott made copies of the hard drives?
2    A  Because I asked him to do it.
3    Q  Okay.  And did you ask him to do that based on
4 your own internal purpose or in anticipation that there may
5 be a lawsuit?
6    A  For our own internal purposes to do our
7 administrative review.
8    Q  Okay.  Now when -- at some point during this
9 litigation process, there was -- you were aware that there
10 was a request made by counsel for the plaintiffs for those
11 tapes.  Correct?
12    A  Yes, I was made aware of that.
13    Q  All right.  And whose job was it within the
14 confines of litigation to make sure that the tapes were
15 given to us?
16       MR. MACMAIN:  Well, that would be me because I
17 think you sent a letter within a week of the incident and I
18 at that point indicated to you I represented the
19 department.
20 BY MR. SILVERMAN:
21    Q  Okay.  And I'm not looking for any communications
22 that you had with your lawyer.
23       MR. SILVERMAN:  And I'll ask if you can stipulate
24 to this if you can.  If you can't, that's fine.  Can we
25 agree that the tapes that your client gave to you are the

---

### Page 9

1 same ones that you gave to us?
2       MR. MACMAIN:  Yes.
3 BY MR. SILVERMAN:
4    Q  All right.  So the tapes that were given, you
5 know, to your lawyer, did you review them before they were
6 given?
7    A  Yes, we saw them.
8    Q  Okay.  And did you review all 16, I guess, views
9 before they were -- before you decided which ones to give?
10       MR. GABRIEL:  Objection to the form of the
11 question.  I think you're assuming that all 16 were in
12 operation.
13 BY MR. SILVERMAN:
14    Q  Okay.  To the best of your knowledge, were all 16
15 cameras in operation?
16    A  To the best of my knowledge.
17    Q  Okay.  Are you aware of any of the 16 cameras that
18 were not in operation?
19    A  No.
20    Q  Are you aware back when the shooting incident
21 occurred of any problems that you had with any of the video
22 recording equipment that would monitor -- that would have
23 copied or recorded what was shown on the 16 cameras?
24    A  Are you referring to on the date that it occurred
25 or are you talking about anytime since we've ever had it?

---

Page 6 - Page 9

Page 14

1 described, is because nothing was going on in there?
2    A  Yes, there was nothing there to activate the
3 camera to record.
4    Q  All right.  Do you know, you know, with the
5 activation, once it's activated, how long it will stay on
6 until it would shut off assuming there's no further
7 activation?  Do you understand what I mean?
8    A  Yes, I do, but I don't have that information.  I
9 don't know what that is.
10    Q  All right.  Now you indicated that the holding
11 room is always on.  There's an override for that.  Correct?
12    A  No, it's on if the light switch is turned on, if
13 the lights are on in the room.  If the room is dark, it's
14 not.  And if the room is dark and there's no motion in
15 there, it's not recording.  The camera always monitors --
16 every camera always monitors every view that it's looking
17 at.  But the digital recorder doesn't record unless there's
18 motion or it's overridden in one of the holding rooms by the
19 light switch.  So if the light switch is off and there's no
20 motion in that room, it doesn't record.
21    Q  Okay.  But if the light switch is on --
22    A  Yes, it records.
23    Q  All right.  So when Mr. Whitaker was in the room,
24 the light switch was on.  Correct?
25    A  When he was in the room?

Page 15

1    Q  When he was in the room.
2    A  Yes, it was.
3    Q  Would there be any reason that we would have three
4 minutes missing from the video while he was in the room?
5    A  I don't know.
6    MR. GABRIEL:  Are you still there?
7    MR. SILVERMAN:  Yeah, I'm just looking at my
8 notes.  What I was thinking is maybe we'll get the video,
9 and we'll come back to that.  And we'll put that on and
10 maybe it will be easier to explain.
11    MR. MACMAIN:  The easier thing might be is the
12 State Police has the original and you can have a duplicate
13 made of the original.  And if there's anything that we
14 didn't produce, that you think is missing, you'd have that.
15    MR. SILVERMAN:  Okay.  We can do that as well.
16 BY MR. SILVERMAN:
17    Q  Did you ever look at the actual hard drive or did
18 you only look at the videos that were copied and given to
19 me?
20    A  As far as I know, what I was looking at were
21 copies because there's no way to view the hard drive from
22 the system.  It has to be downloaded to a computer.  So
23 you're already making a copy of it to the computer to view
24 it.  So that's -- that's what I looked at, and that's the
25 only thing that I've ever seen.  I don't have anything to

Page 16

1 do with recording, making the disks or viewing them off the
2 hard drive.  I'm not even sure if we can view them off the
3 hard drive.  We go in there, and we pull what we call the
4 Chapter and download that to the computer.  And that's the
5 way we view it because the computer has the player on it.
6 That's what it does.
7    Q  Okay.  We -- I don't think you and I actually
8 spoke about it.  I think I did with Mr. Utter.  When --
9 first of all, I think you testified that typically when
10 someone comes into your holding area or to your precinct
11 while under arrest typically they are there an hour or so?
12 I mean obviously if something -- a strange situation.  But
13 that's your expectation, give or take an hour?
14    MR. GABRIEL:  Just an objection to the form of the
15 question.  You went over this a couple times the last time.
16 I think his testimony was a little bit different than that,
17 but it speaks for itself.
18    MR. SILVERMAN:  It does.  And I'm not trying to
19 put words in anyone's mouth.
20 BY MR. SILVERMAN:
21    Q  But you're pretty much a holding transfer center
22 until -- for booking, processing, etc.?
23    A  It depends on what the situation is of the amount
24 of time somebody is there.
25    Q  And we had previously talked about the rules or

Page 17

1 standard operating procedures.  They pretty much were set
2 up by you.  Correct?
3    A  Most of them were.  There's some that are in
4 effect from chiefs that were prior to me that have just
5 been reviewed and updated as time goes on.
6    Q  And obviously --
7    A  Nothing prior to '97 was done by me.
8    Q  Okay.  But if there was something in there that
9 you thought was either inappropriate or missing or not
10 appropriate, you would have had the opportunity to evaluate
11 it, change it, modify it.  Correct?
12    A  We do that annually.
13    Q  All right.  And as of the date of the Whitaker
14 incident, you believe -- or correct that -- did you believe
15 that the rules that you had in place, the standard
16 operating procedures in place were appropriate for the
17 handling and safety of prisoners?
18    A  Yes.
19    Q  Now you've been in law enforcement quite some
20 time.  Correct?
21    A  I'm in my 24th year.
22    Q  And in that time, I am sure that you've read
23 material, took courses.  Have you ever heard about, you
24 know, prisoners committing suicide in prison?
25    A  Mostly I heard about it in the news.

Page 18

1    Q  Okay.  You've had -- you had no training about it?
2    A  I wouldn't say that we had specific training.  We
3  have training in, like, dealing with mental health issues,
4  things like that.  But if you're asking me did we have
5  specific training on a prisoner suicide, we aren't a jail
6  facility.  And, no, we didn't.
7    Q  Okay.  Well, let's talk about the mental health
8  training that you had.  First of all, do you agree that
9  someone with a mental health problem may be a higher risk
10  for suicide than someone without some sort of a mental
11  health issue?
12    A  They could be.  They aren't necessarily, but they
13  could be.
14    Q  When a prisoner is taken into custody and taken
15  into your facility, did you have an expectation relating to
16  what, if anything, the police officers working under you
17  would do to screen the prisoners for any mental health
18  issues?
19    A  Yes.
20    Q  Okay.  And what is your -- what was your
21  expectation back in July of '07?
22    A  Basically they have to use the totality of the
23  circumstances in which they are in.  They have to
24  observe -- you know, physically observe the person to see
25  what, you know, the behavior is that they're exhibiting.

Page 19

1  They speak to them, talk to them.  If they realize that
2  they are saying things that would give them rise to be
3  concerned, that certainly is an issue.  If they would be
4  given information from somebody at the scene, maybe a
5  family member or whatnot, that the person had a mental
6  health issue, that would certainly be something they would
7  have to take into account and any behavior exhibited by a
8  person while in their presence.
9    Q  Was there any training given relating to the use
10  of either alcohol or drugs and how that related to mental
11  health?
12    A  I don't know if there was training specifically to
13  that effect.  But we did -- our policy dealing with the
14  mentally ill and dealing with the developmentally disabled,
15  those things are listed as, you know, possible things that
16  could exacerbate a problem.
17    Q  And when -- is there a requirement that all
18  prisoners have some sort of screening to determine whether
19  or not they are mentally fit or -- I'll ask it a different
20  way.  Do you have a -- back when the Whitaker incident
21  happened, was there a screening process that was in place
22  to determine whether or not a prisoner may be at a greater
23  risk for suicide?
24    MR. MACMAIN:  Objection.  Other than what he's
25  already told you they would do?

Page 20

1    MR. SILVERMAN:  Yeah.
2    MR. GABRIEL:  I join the objection.  I think we
3  went over this ground in some detail.
4    THE WITNESS:  You want me to answer it, Brian?
5    MR. GABRIEL:  Yes.
6    THE WITNESS:  They have a form that they can use
7  their observations, that they can list -- you know, if
8  somebody -- if somebody makes a statement that, you know,
9  they wish to kill themselves or something, obviously
10  there's, you know, a way to record that and to deal with
11  it.
12  BY MR. SILVERMAN:
13    Q  Okay.  Is there a requirement that -- or excuse
14  me.  Back on the day of the Whitaker incident, was there a
15  requirement that this form that you described be completed
16  by the -- either the arresting officer or the officer that
17  was in charge of handling the prisoner?
18    A  It's sometime during the course of the arrest or
19  the handling of the incident, yes.  It's not required to be
20  done before or after specifically.  It just has to be done.
21  You know, if it would be like a -- many times the officer
22  will bring the prisoner in, deal with what they have to do
23  and get ready to go to the Booking Center and they may
24  do -- you know, do the form at the end when they are all
25  done doing the paperwork.  It's not something that has to

Page 21

1  be done at a specific time, but it's one of the
2  requirements when arresting people to do that.
3    Q  Okay.  The purpose of getting that information,
4  what is the purpose of needing the information that's on
5  that form?
6    A  To document the demeanor of the prisoner, to
7  ensure that they get the proper care that they need, if
8  they are saying that they are not feeling well whether it
9  be physically or mentally or whatever.
10    Q  Would you agree then that getting that information
11  sooner than -- well, would you agree that getting
12  information relating to what a prisoner may need should
13  happen as soon as possible?
14    A  No --
15    MR. GABRIEL:  Objection to the form of the
16  question.
17    THE WITNESS:  No, I don't necessarily agree with
18  that.  You have -- when you encounter somebody, you have to
19  see something or hear something or be told something that
20  would give you, you know, rise to be concerned immediately.
21  If you don't see, hear or are told anything like that, you
22  may not be concerned about it immediately.
23  BY MR. SILVERMAN:
24    Q  Have you ever received any training that a drunk
25  prisoner is a greater risk of suicide than a prisoner that

DAVID ESHBACH
FEBRUARY 9, 2009

Multi-Page

**Page 22**

1 is not drunk?
2    A No -- are you talking about me personally?
3    Q You personally.
4    A No, I mean basically when we've had training
5 through our in-service training or whatever, the way it's
6 been put to us is that those -- you know, alcohol or drugs,
7 the combination of both can exacerbate any -- you know, all
8 those issues. But it's not necessarily an indicator just
9 simply because somebody is drunk or simply because somebody
10 is on drugs that all of a sudden there's a mental health
11 issue.
12    Q Okay. Now other than the -- you know, I think
13 what you had said was an officer is to evaluate the
14 totality of the circumstances. There's a requirement that
15 a form be filled out. And other than those two things,
16 were there any policies in place when the Whitaker incident
17 occurred that were intended to help evaluate whether or not
18 a prisoner should be considered a suicide risk?
19    A Yes, we have dealing with the mentally ill policy
20 and we also have the holding room and prisoner
21 transportation policies, which again on that form lists
22 things that can be looked at or things that can be
23 documented when they bring somebody in that there is an
24 issue.
25    Q Okay. And I don't want to put words in your

**Page 23**

1 mouth. But is it your testimony that the items that are
2 set forth in the standard operating procedure with regard
3 to evaluating whether or not a prisoner may be a greater
4 risk of suicide doesn't have to happen at the beginning of
5 the incarceration period?
6    MR. GABRIEL: Objection to the form of the
7 question.
8    THE WITNESS: Yes, that's my testimony. It's just
9 like charges don't have to be typed up before something
10 else is done with the prisoner. It's -- you're dealing
11 with a lot of things at the same time, and it's just a
12 requirement that -- you know, that it be done at some point
13 during the arrest. However, if there's nobody -- you know,
14 in this particular incident, this person was deceased. The
15 officer did not complete the form, if that's what you're
16 asking.
17 BY MR. SILVERMAN:
18    Q Okay. Do you know -- and you raised a good point.
19 There's a difference between completing a form and doing
20 the evaluation. Correct?
21    A Yes.
22    Q All right. And is it -- would your testimony to
23 those previous questions change if -- if it was -- do
24 you -- when the officer has to -- I'll spit it out. Let me
25 start over. When the officer does or is supposed to do an

**Page 24**

1 evaluation and determine if someone is mentally fit or may
2 have a mental problem, should that happen at any particular
3 time during the incarceration or is that -- can that happen
4 anytime?
5    A There's --
6    MR. GABRIEL: Objection to the form of the
7 question.
8    THE WITNESS: There's no requirement that it
9 happen at any specific time. Typically it would -- I can
10 only speak for the way that I operated when I was working
11 on the street. But it's not something that you do in the
12 car on the drive back to the station. You can't write and
13 you can't drive and you can't watch out for traffic at the
14 same time. You take the person back. You put them in a
15 holding room, and you sit down in there and talk with them.
16 You know, if you have that amount of time, if there's, you
17 know, ample time to do that and the person is able to do
18 that, they aren't, you know, either intoxicated to the
19 point that they can't speak or they aren't combative to the
20 point that they won't speak, that's typically when it would
21 be done at some point in the station.
22 BY MR. SILVERMAN:
23    Q Okay. Would you agree that if an officer has any
24 doubt in his mind that a prisoner may do something harmful
25 to himself that he should, you know, keep the handcuffs on?

**Page 25**

1 In other words, if there's any question that a prisoner
2 could do something inappropriate to himself or some other,
3 that you should always keep the handcuffs on?
4    A No, I don't agree with that.
5    Q Okay. When someone is in a -- a prisoner is in a
6 holding room -- and I may be mixing the terms up. Was
7 Whitaker in a holding room or was he in a different room?
8 I forget what it was called.
9    A He was in a holding room.
10    Q Okay. When a prisoner is placed in a holding
11 room, the officer has the discretion to either handcuff or
12 unhandcuff. Correct?
13    A Yes.
14    Q And if they want to keep him handcuffed, they got
15 to handcuff him to the bench?
16    A That's one option that they can use, yes.
17    Q Okay. And you have a method, a way it's done?
18    A Yes.
19    Q All right. Now what are the reasons -- why don't
20 you keep all prisoners just handcuffed in the holding room?
21    A Actually we basically recommend that they be
22 unhandcuffed when they are in the holding room so we don't
23 end up with some kind of a claim that the handcuffs injured
24 them.
25    Q Okay.

HUGHES, ALBRIGHT, FOLTZ & NATALE 717-540-0220/717-393-5101

DAVID ESHBACH
FEBRUARY 9, 2009

Page 30

1 department is required to have in place a program for the
2 screening and evaluating -- and evaluation of those
3 individuals in order to determine whether they may be --
4 whether they would require mental health treatment?
5      MR. MACMAIN: Objection. You can answer it. I
6 mean Brian can tell you to answer it.
7      MR. GABRIEL: Yeah, you know, I'm going to
8 reiterate the same objection to the question. The witness
9 has already answered in detail about what the duty was,
10 what the obligation was, if any. And so I don't see either
11 a new question here or one that's appropriately framed.
12 But if you can answer something else, if there's anything
13 in addition to what you already testified to, that's fine.
14      THE WITNESS: Well, what do you mean by a person
15 like Whitaker? What do you mean by that?
16 BY MR. SILVERMAN:
17   Q  Well, how would you classify -- he's not an inmate
18 because he hasn't been convicted. Okay? What would you
19 call him, someone like Whitaker, a detainee, a prisoner?
20   A  A defendant.
21   Q  A defendant. Okay. And as it relates to a
22 defendant, when you take a defendant into custody, do you
23 believe you have a requirement -- you being the department
24 have a requirement to screen and evaluate that defendant to
25 ascertain whether or not he's a risk to himself?

Page 31

1   A  We have a duty of care under the constitution for
2 a lot of different things. You asked me originally was I
3 aware that we had to have a program set up. I don't think
4 the constitution requires us to have any type of program
5 the way it's written. I've read it, and I don't remember
6 seeing the word program in the 8th amendment. We have a
7 duty of care to protect those that are in our custody, and
8 we do that.
9   Q  Okay. And does that duty of care require an
10 evaluation of the defendant before he is left alone?
11   A  It may.
12   Q  Okay. I'm not sure -- what do you mean it may?
13 Obviously if it may, it may not. I'm not sure I understand
14 what that means.
15   A  If the person is obviously no threat to themselves
16 or anybody else, I don't know that there's anything else
17 that we can do.
18   Q  That's exactly right. But you need to evaluate
19 that. Correct?
20   A  Yeah, we do that every time we handle somebody.
21   Q  All right. And the system -- and when Whitaker
22 was taken into custody, you had a -- the department had a
23 method to do just that. Correct?
24   A  Yes.
25   Q  And was Whitaker handled within the confines of

Page 32

1 the department's standard protocol?
2   A  As far as I know, yes, he was.
3   Q  Okay. If it had been determined that Whitaker was
4 at an increased risk of suicide, what would have been done
5 differently?
6   A  By Officer Utter?
7   Q  Yes.
8      MR. GABRIEL: Objection to the form of the
9 question.
10      THE WITNESS: I can't testify as to what Utter
11 would have done differently. I can only tell you what he
12 should have done.
13      MR. SILVERMAN: Perfect.
14      THE WITNESS: If he was -- if he felt that the
15 subject was suicidal, he would have been in touch with the
16 York Hospital Crisis Intervention Unit and would have
17 requested to bring that person there for evaluation prior
18 to being taken to the Booking Center and prison lockup.
19 BY MR. SILVERMAN:
20   Q  Okay. What would -- and I agree you can not
21 testify as to what Whitaker would have done -- or not
22 Whitaker -- what Officer or Ex-Officer Utter would have
23 done. What I'm asking is what you would have expected of
24 him to have done. Once Whitaker was back at the station
25 with Mr. Utter and at that point before he was

Page 33

1 handcuffed -- or the handcuffs were released, what would
2 you have expected to happen if Officer Utter had determined
3 or had felt that Mr. Whitaker was at a risk to hurt
4 himself?
5   A  He may have been handcuffed to the detention
6 bench. Like I said, Officer Utter would be in contact with
7 mental health parties, authorities, whatever you want to
8 call them, to ask them -- you know, to tell them, make
9 notification that he will be bringing the person forthwith
10 for an evaluation, explaining why. We can do that under
11 the Mental Health Act, No. 302 Involuntary Mental Health
12 Commitment. We don't need permission to take someone in.
13 We fill the paperwork out at the site of the hospital. And
14 the doctor evaluates and decides whether or not the person
15 needs to be kept in-house for treatment or released. And
16 if they are released, they would be taken to the Booking
17 Center.
18   Q  Let's look at the specifics of the Whitaker
19 situation. We already know that Officer Utter was the only
20 person at the station when he got back to the station.
21 Correct?
22   A  Yes, that's correct.
23   Q  All right. So it sounds like what you're saying
24 under that situation if there was a belief or if Officer
25 Utter had a belief that Mr. Whitaker was at a greater risk

HUGHES, ALBRIGHT, FOLTZ & NATALE 717-540-0220/717-393-5101

**Page 34**

1 of suicide he would have -- he should have left him
2 handcuffed?
3    A  No, I believe what I said was he may have wanted
4 to handcuff him to the detention bench. But typically what
5 happens is when we get to a scene and make an evaluation or
6 assessment of somebody and realize that they are a threat
7 to themselves or have other mental health issues they never
8 come to the station. They go right to the hospital. So if
9 Officer Utter would have thought that was the case, he
10 would have taken him directly to the hospital.
11    Q  Understood. But it's also possible that your
12 evaluation could change down the road based upon any number
13 of different events. Correct?
14    A  Absolutely.
15    Q  When standard operating procedures are devised, do
16 you agree that there's various goals that are looking to be
17 achieved? Correct?
18    A  Yes.
19    Q  And would you agree that one is to basically
20 ensure control of the precinct?
21    A  I wouldn't necessarily say that. An SOP tells the
22 officer how to do a particular function. That's what it's
23 intended to do, explain to them what the department expects
24 of them and the accomplishment of that goal.
25    Q  I'll ask you this question. You may or may not

**Page 35**

1 know. Are you aware that the most common method of suicide
2 in prison is hanging or self-strangulation?
3    MR. MACMAIN: Objection. Is that being quoted
4 from somewhere? Is that a fact or is that something you're
5 assuming, in fact, to be true?
6    MR. SILVERMAN: I'm asking him if he knows that to
7 be true or not to be true.
8    MR. MACMAIN: You're stating it as though it's a
9 fact.
10    MR. SILVERMAN: I'm not asking --
11    Q  Are you familiar with the most
12 common method of suicide in prisons?
13    THE WITNESS: No, I'm not.
14 BY MR. SILVERMAN:
15    Q  Do you agree that most prison suicides occur
16 within the first 24 hours of being detained?
17    MR. MACMAIN: Objection.
18    MR. GABRIEL: Objection to the question.
19    MR. SILVERMAN: This is not a prison.
20    MR. GABRIEL: Again this is just argumentative.
21 This isn't a prison. And you're asking him things that he
22 can't answer. So --
23    MR. SILVERMAN: Okay. I'll ask it differently.
24 BY MR. SILVERMAN:
25    Q  When a prisoner is detained, do you agree that the

**Page 36**

1 first hours of detention the risk of suicide is greater
2 than as you get further into the detention period?
3    A  No, I don't agree with that. I have no basis to
4 know that. We've never had a suicide attempt in the 24
5 years I've been there.
6    Q  Okay. And I think you already agreed with this,
7 that there is -- you have a responsibility to house
8 defendants in a safe manner. Correct?
9    A  Yes.
10    MR. GABRIEL: I'm sorry. I missed that last
11 question.
12    MR. SILVERMAN: That he has an obligation to house
13 defendants in a safe manner.
14    THE WITNESS: My answer was yes, Brian.
15    MR. GABRIEL: Okay.
16 BY MR. SILVERMAN:
17    Q  Do you know if the state has any minimum standards
18 that must be adhered to relating to the removal of clothing
19 from defendants?
20    MR. GABRIEL: Just objection to the form of the
21 question. As of what point?
22 BY MR. SILVERMAN:
23    Q  Okay. When a defendant is taken back to the
24 station, do you know if there are any minimum requirements
25 that the state has with regard to removal of any type of

**Page 37**

1 clothing, belts, shoe laces, anything like that?
2    A  I'm not aware of any.
3    Q  Is there any -- to the best of your knowledge, is
4 there any body of law other than the constitution that
5 governs the rules that must be in place with regard to
6 handling of a defendant?
7    A  Of a defendant?
8    Q  Well, that's what we called Whitaker.
9    MR. GABRIEL: I'm sorry. What did you say,
10 Howard?
11    MR. SILVERMAN: Well, I'm just using the word
12 defendant because that's what he called Whitaker, a
13 defendant. We can call him a detainee, defendant.
14    MR. MACMAIN: So your question is whether there's
15 anything other than just case law, if there's any
16 requirement anywhere that talks about --
17    MR. SILVERMAN: If he knows.
18    MR. MACMAIN: -- how arrestees are to be -- other
19 than clothing removed or --
20    MR. SILVERMAN: Um-hum.
21    THE WITNESS: No, I mean the Rules of Criminal
22 Procedure basically outline how we deal with a prisoner
23 when it comes to the arrest of that prisoner. There's no
24 Rules of Criminal Procedure that I'm aware of that has
25 anything to do with removing property or clothing from the

Page 38

1  prisoner.
2  BY MR. SILVERMAN:
3     Q  Are you aware of any national standards -- first
4  of all, I think you called -- what would you call your
5  precinct, a jail?  It's not a prison.  Would you call it a
6  jail?
7     A  No.
8     Q  What would you call it?
9     A  It's a police station.
10    Q  Okay.  Are you aware of any standards -- let's
11  start with any national standards that relate to police
12  stations as it relates to preventing suicide?
13    A  No, I'm not.
14    Q  Okay.  Are you aware of any state standards?
15    A  No, I'm not.
16    Q  I believe your standard operating procedures have
17  a suicide checklist.  Correct?
18    A  I'm sorry.  Say that again.
19    Q  Is there a suicide checklist that's in place that
20  you -- as part of your mental health screening?  Correct?
21    A  It's not called that.  It's not -- I mean we don't
22  have a sheet that says suicide checklist, if that's what
23  you're asking.  We have a sheet that asks for the demeanor
24  and, you know, observable things about the defendant.  But
25  it's not -- it's not titled suicide checklist.

Page 39

1     Q  Do you recall the charges that would have been
2  levied against Mr. Whitaker if he hadn't died?
3        MR. MACMAIN:  Objection.  This clearly has been
4  asked and answered at the prior deposition --
5        MR. SILVERMAN:  Well, I'm going -- go ahead.
6        MR. MACMAIN:  -- in great detail.
7        MR. SILVERMAN:  I'll ask a different question.
8  This wasn't answered.
9  BY MR. SILVERMAN:
10    Q  There were three charges that would have been
11  levied.  Were they felonies or misdemeanors?
12       MR. GABRIEL:  Objection to the form of the
13  question.
14       THE WITNESS:  There were some of each, and I think
15  it was four charges originally that was listed on the
16  report.  But the most serious one was a robbery, which is a
17  felony.  And I believe there was a resisting arrest charge.
18  I think there was a simple assault charge -- and those are
19  both misdemeanors -- and then a public drunkenness charge,
20  which is a summary, if my recollection serves me correctly.
21  I'm not looking at the report right now.  I
22  may -- I may not have those cited correctly without the
23  report in front of me.  I can tell you real quickly if I
24  have the report.
25       MR. SILVERMAN:  Okay.  I want to get the video,

Page 40

1  and we can look through that.  There's a lot of times
2  missing on it.  And we can put it up.
3        MR. MACMAIN:  He just testified that they copied
4  everything they had and provided it to me and I provided it
5  to you.  If you think there's -- I mean he's explained why
6  there may be portions that aren't there as opposed to
7  missing or --
8        MR. SILVERMAN:  Well --
9        MR. MACMAIN:  Let me finish.  Or -- quote --
10  redacted or -- quote -- withheld or -- quote -- not
11  provided.  If you think there's portions that you don't
12  have, we both now know that the original hard drive is with
13  the Pennsylvania State Police.  You can have a duplicate
14  made from that.  I also have offered a number of times, and
15  I think we have provided the name of the company that sets
16  up this system, knows how it works, can answer questions
17  such as the time it activates, the time it shuts off, etc.
18  To ask him -- he said he's not familiar with the technical
19  stuff -- about different portions of the tape seems to me
20  to be the wrong witness and seems to be a waste of time.
21       MR. SILVERMAN:  That wasn't where I was going.
22  Where I was going is we've gotten I think it's six or seven
23  different angle views, and I wanted to ask as you look down
24  a hallway it looks like there may have been another angle
25  that would have been available.  And I want to find out if

Page 41

1  there were cameras within that area, not so much as it
2  relates to the time that's missing.  Now if you want to
3  represent that there is no angle that was given to us or
4  maybe if you just want to give us the rest of the angles,
5  that may answer it.  There's 16 different angles.  We were
6  given I think seven of them.
7        MR. GABRIEL:  Well, we don't have more to give
8  you.  I think that's been part of the response this morning
9  and before --
10       MR. SILVERMAN:  I'm sorry.  Say that again.
11       MR. GABRIEL:  Just that David mentioned the hard
12  drive is available through the state.  We don't have more
13  to give you.  If you think there's more, then it has to
14  come through the hard drive.
15       MR. SILVERMAN:  Okay.  Well, then maybe that's a
16  different question.  Are you saying that -- we were given
17  views that were -- let's see.  We were given views
18  designated one, two, four, five, six, seven, ten and
19  thirteen.  Are you saying that they are the only views that
20  you have?
21       MR. MACMAIN:  The only views that they are
22  currently in possession of.  If there's other views, which
23  I think he's explained have nothing to do with the
24  incident, if you want to look at, you can get them from the
25  State Police, but they don't have anything else.  You have

Page 58

1  read the reports. Was there anything that indicated to you
2  based on what you learned from Officer Utter or looked at a
3  report that would give any reasonable officer any belief
4  that Mr. Whitaker was suicidal up until the point that the
5  officer went into the room that final time?
6     A  No, there wasn't
7     Q  You were asked questions about -- all kinds of
8  questions about suicide. Based on your experience as a
9  police officer, either personal knowledge or things you've
10 read about, are you aware that people have attempted to
11 commit suicide by tearing off a piece of their cloth off of
12 a shirt or pants or a sock?
13    A  Yes, I've heard of that.
14    Q  Okay. Have you heard of people trying to hang
15 themselves with their shirt?
16    A  Yes, I have.
17    Q  How about with a T-shirt?
18    A  Yes.
19    Q  How about with a pair of pants?
20    A  Yes.
21    Q  Pair of socks?
22    A  I don't know about socks.
23    Q  Okay. You were asked questions about how long
24 typically it would take to process someone. I think your
25 testimony says it varies?

Page 59

1     A  Yes, it does.
2     Q  Okay. You were asked questions about whether
3  someone who was intoxicated may be a greater risk for
4  suicide. Can you give any percentage, even if it's a rough
5  percentage, how many people that your department arrests
6  that's either under the influence of alcohol, under the
7  influence of drugs or is under the influence of something?
8     A  By percentage?
9     Q  (Nods head up and down.)
10    A  That's a difficult question.
11    Q  Let me ask you --
12    A  We make a lot of DUI arrests. We make a lot of
13 drug arrests. It doesn't mean that everybody we arrest for
14 drugs is under the influence of drugs. I mean people that
15 we arrest a lot of times are under the influence. We
16 encounter drunk people and high people regularly. That's
17 part of our job.
18    Q  Okay. And your testimony is over the 20 some
19 years that you've been with the department there's never
20 been an attempted suicide?
21    A  That's correct. Within our department.
22       MR. MACMAIN:  Right. Okay. That's all the
23 questions I have.
24       MR. GABRIEL:  Just very briefly.
25          CROSS EXAMINATION

Page 60

1  BY MR. GABRIEL:
2     Q  Chief, you at least testified briefly to being
3  accredited and making the accreditation process. Can you
4  summarize what that is and what that means?
5     A  Yes, the Pennsylvania Law Enforcement
6  Accreditation Commission I believe was formed in about
7  calendar year 2000. And they put together a process by
8  which police departments within the Commonwealth of
9  Pennsylvania can become accredited through the PLEAC.
10 There's approximately I think about 145 to 150 standards
11 that a department would have to meet to become accredited
12 as long as they provide services within those standards.
13       For instance, one of the standards has to do with
14 courtroom security, and we don't provide courtroom
15 security. So that's a standard we don't have to meet. On
16 the other hand, there are standards which basically every
17 department would have to meet such as administering the
18 oath of office to an officer when you hire them so they are
19 duly sworn. We obtained accredited status in July of 2006
20 and have remained accredited since that time. And
21 basically what the process involves is there's -- those
22 standards require certain policies to be formulated and put
23 into place. And then for each year of the accreditation
24 process, the department has to show proof that they
25 actually followed those policies. And the proof can be

Page 61

1  done in several different ways. It's typically done by a
2  written report. It can be done with photographs or an
3  actual tour of the facility by the assessor or it can be
4  done by interview with the person that has knowledge about
5  the particular things that they are looking into.
6     Q  And if you can estimate, over what period of time
7  or amount of time would the department's SOP's have been
8  looked at, reviewed or, you know, revised leading up to the
9  actual accreditation in July of '06?
10    A  Oh, very many times. We review everything
11 annually. But during that process, there was SOP's that
12 needed to be revised. There were some that needed to be
13 implemented in and of themselves. So it's an arduous task
14 to go through all that and make sure that you have those
15 policies outlined and also proven.
16    Q  And in terms of one area of guidance with regard
17 to SOP's or particular policies, does the PLEAC have
18 standard or formed policies in some areas?
19    A  Do they have -- do they have standards for what,
20 Brian?
21    Q  Do they have standard policies or policy language
22 with regard to police department SOP's?
23    A  Yeah, some of the -- they have some policies I
24 believe posted on their site. It's recommended that
25 accredited agencies share their policies, which are

Page 62

1 accredited with agencies that are non-accredited because
2 obviously they are passed amongst for the Accreditation
3 Commission. We also look at policies through the IACP and
4 things like that when we form a policy. So we share
5 policies. Some of them are posted on the PLEAC web site,
6 and we also use the IACP'S policies, model policies to help
7 formulate policies within our department.
8    Q And a follow-up question which you may have
9 answered last time. With regard to the department'S SOP on
10 holding rooms, at the time of or prior to this particular
11 incident involving Mr. Whitaker, was there any standard
12 policy in terms of PLEAC that spoke to removing shoe laces
13 or others like that of a detainee?
14    A No, not -- not like shoe laces or a shirt or
15 anything like that, no. There's a holding room policy
16 that's one of the standards, and we formulated our policy
17 on holding rooms in 1995 in preparation for that -- I'm
18 sorry -- 2005 for the 2006 accreditation.
19    Q And was that policy reviewed in the accreditation
20 process --
21    A Yes.
22    Q -- by the PLEAC?
23    A Yes, it was.
24    MR. GABRIEL: Okay. Those are all the questions I
25 have.

Page 63

1    MR. SILVERMAN: I got a few.
2            REDIRECT EXAMINATION
3 BY MR. SILVERMAN:
4    Q You were talking about the accreditation process.
5 You said there's model policies?
6    A We use model policies from the IACP. They have
7 policies -- I don't know if I would call them a model.
8 But, in other words, they may take a look at Springettsbury
9 Township's policy on X, Y, Z like to post that policy on
10 their web site. They may take a department's entire policy
11 manual as it relates to the accreditation and post their
12 entire policy on their web site. But there are other
13 departments that are accredited, and we share those
14 policies amongst each other.
15    Q Okay. Back in -- let's say as you were going
16 through the accreditation process, would it be fair to say
17 that you did review other departments' standard operating
18 procedures?
19    A Yes, we did.
20    Q Okay. Did any of them that you recall have
21 provisions relating to taking away shoe laces from
22 prisoners?
23    A I don't recall that because that's not a
24 requirement of that standard.
25    Q Okay. And when you say a requirement of the

Page 64

1 standard, that is the -- from the organization you
2 mentioned. It's their standard. Correct?
3    A Correct.
4    Q And are those standards -- they're the minimum
5 standards, not the maximum standards. Correct?
6    A I don't --
7    MR. GABRIEL: Objection to the form of the
8 question.
9    THE WITNESS: I don't -- I just know them as the
10 standard. I don't know if they are minimum or maximum.
11 BY MR. SILVERMAN:
12    Q Okay. And the standards that they have in place,
13 where would they be listed or designated? Would that be in
14 the model policies?
15    A No, they have a standards manual that lists each
16 standard.
17    Q Okay. Do you have that manual?
18    A Sure, I have a copy of it. I don't have it with
19 me. It's changed over the years also.
20    Q Okay. That was my question. So do you know from
21 the time you first became accredited till now how many
22 times it's changed?
23    A No, I don't. I know we've received every change.
24 I just don't know how many times it's changed.
25    Q Do you have them all?

Page 65

1    A Do I have the changes?
2    Q All the changes since --
3    A Sure.
4    Q I will ask that you get them to your counsel, and
5 we'll make a formal request for them. Do you maintain --
6    MR. GABRIEL: Howard, I'm sorry. Before you move
7 on, are you referencing changes with regard to the holding
8 room policy?
9    MR. SILVERMAN: We'll send you a letter what we're
10 looking for. It's going to be -- and I'll get it out to
11 you in a day or two, and then you can talk to your client.
12 You guys will discuss it.
13 BY MR. SILVERMAN:
14    Q Do you know if the standards -- if there are
15 minimum standards with regard to -- strike that. Do you
16 know if there are any standards with regard to screening
17 detainees to determine whether they are at risk of suicide?
18    A The standard has to do specifically with the
19 physical aspect of a holding room.
20    Q Well, okay. But are there standards that you know
21 that deal with screening of detainees to see if they are at
22 risk for suicide?
23    A Not specifically, not the way you're stating it,
24 not -- I mean there's not a suicide risk standard. There's
25 not.

Page 66

1  Q  Is there a mental health standard?
2  A  No.
3  Q  Okay.  Are there any standards that you recall
4  that relate to handling detainees that are drunk?
5  A  No, no, not specifically.  It doesn't have to do
6  with intoxicated persons.  The standards that have to do
7  with an incident, such as the one we're talking about,
8  would be a holding room and the temporary holding room
9  standards.
10  Q  Okay.  But to become accredited, the standards are
11  not limited to holding rooms.  Correct?
12  A  Oh, no, there's probably between 140 to 150
13  standards.
14  Q  And as you said, certain ones do not apply to you
15  because you don't provide those services?
16  A  Correct.
17  Q  But to the extent you provide the services, do you
18  need to meet their standards on all of them to become
19  accredited?
20  A  To the ones that apply to us --
21  Q  The ones that apply to you.
22  A  -- yes.
23  Q  And do you maintain a file -- a personal file
24  on -- based on accreditation that would have material that
25  you have received or reviewed to determine whether or not

Page 67

1  your operating procedures were appropriate in your
2  estimation?
3  A  Yeah, when we go through an accreditation, every
4  standard has a separate file, and there's a standard
5  compliance sheet that's listed in the file for the assessor
6  when he reviews it.  He can check off either compliant or
7  non-compliant.  And we have those -- all the standards.  In
8  other words -- I'm not sure if that's what you're asking
9  me.
10  Q  Yeah, that's what I'm asking.  And when they check
11  off to see if your're compliant or non-compliant, what they
12  are looking at is to see if your rules are compliant and
13  they're not really looking at to see if you actually carry
14  out the rule?
15  A  No, they are looking at both.
16  Q  Okay.  How do they determine whether or not you
17  actually carry them out?  Do they do on-site monitoring or
18  something?
19  A  They do an on-site assessment.  They do, like I
20  said, a lot of what we call proofs or something that's
21  documented in writing in the file.  It could be
22  photographs.  For instance, one of the standards is we have
23  to provide portable water to a detainee.  So they can
24  either walk back to the holding room cell and see that
25  there's a fountain in there or they can look at a picture

Page 68

1  of us pushing the button and watching the water run,
2  something like that.  It's a two-part process.  You have to
3  have the policy and also have to have the proof.
4  Q  Compliance with the policy?
5  A  Correct.
6  Q  And you had said, you know, these are broken down
7  into categories.  Do you know -- is there one that deals
8  with the initial screening of detainees?
9  A  Not specifically.  If there's something in there
10  that talks about the detainee's care, it comes under one of
11  those other -- like the holding room facility.  It's not
12  specific to that.
13  Q  Okay.  Now you had -- there was a question posed
14  to you about the percentage of your detainees that are
15  drunk or illegal drugs.  And you said that you couldn't
16  tell or you don't know.  If you do know someone is drunk,
17  do you handle them -- do different rules come into play
18  with regard to, you know, holding room procedures or --
19  let's start with holding room procedures.  Are there
20  different rules?
21  A  It doesn't necessarily have to do with
22  intoxication.  It has to do with their demeanor.
23  Q  So the simple fact that someone is drunk doesn't
24  mean you treat them or handle them differently?
25  A  Correct.

Page 69

1  Q  If Mr. Whitaker -- you know, you heard Officer
2  Utter testify he didn't know Mr. Whitaker was drunk.
3  Correct?
4  A  I'm not sure if that's the way he -- what he
5  testified to or not.
6  Q  I think what he said was he did smell a little bit
7  of alcohol, but he wasn't -- I don't want to use the quote
8  or word -- but basically wasn't hammered, wasn't
9  falling-down drunk?
10  A  Yes, I recollect him testifying to that, yes.
11  Q  All right.  And is there any reason not to remove
12  belts and shoe laces from all prisoners?
13      MR. MACMAIN:  Objection to the form.
14      MR. GABRIEL:  Objection to the form of the
15  question.
16  BY MR. SILVERMAN:
17  Q  Not prisoners, but defendants such as Whitaker.
18  Is there any reason that you know of not to remove belts
19  and shoe laces from all detainees?
20      MR. MACMAIN:  Objection.
21      MR. GABRIEL:  Objection to the form of the
22  question.
23      THE WITNESS:  Do you want me to answer, Brian?
24      MR. GABRIEL:  You can answer it if you're able.
25      THE WITNESS:  So their clothes don't fall off.  We

Page 70

1 don't take clothing from a person that we have into
2 custody. We don't put them in other clothing other than
3 what they're wearing.
4 BY MR. SILVERMAN:
5   Q   Okay. I think you now do take shoe laces and
6 belts --
7   A   Yes.
8   Q   -- from prisoners. Correct?
9   A   Yes, we do.
10   Q   Now my question is back when the Whitaker incident
11 happened -- well, first of all, have you seen -- are
12 people's pants falling off now that they don't have belts?
13   A   We have people with their pants down around their
14 knees every day. That's the way they wear them. Their
15 underwear is out. If we take the belts off of somebody
16 like that, their pants are down to their ankles.
17   Q   Okay. The simple fact that someone's pants may
18 fall down now doesn't mean you don't take the belt away?
19 You still take the belt away?
20   A   We currently do that.
21   Q   All right. And you currently take the shoe laces
22 away?
23   A   We basically take their shoes.
24   Q   Take their shoes. Okay.
25   A   I mean what the officers have typically been doing

Page 71

1 is just taking their shoes and taking them outside the
2 holding room if they're a shoe with a lace. If there's no
3 laces, then there is no issue unless they feel that they
4 are going to use them as a weapon or something and then
5 they'll take them.
6   Q   Is there any reason -- or what is the reason, if
7 you know, back in -- when the Whitaker incident happened
8 you didn't take belts and shoe laces away?
9   A   When the Whitaker incident happened, we didn't
10 have a requirement to do that in our standard operating
11 procedure, and we had never had reason to believe that
12 anybody would use a shoe lace to try to kill themselves.
13      MR. SILVERMAN: Okay. I have nothing further.
14      MR. MACMAIN: I have nothing.
15      MR. GABRIEL: I have nothing.
16      (Whereupon, the deposition concluded at 12:15
17 p.m.)
18
19
20
21
22
23
24
25

Page 72

1 COUNTY OF DAUPHIN        :
                           SS
2 COMMONWEALTH OF PENNSYLVANIA :
3      I, Diane A. Smith, a Notary Public, authorized to
4 administer oaths within and for the Commonwealth of
5 Pennsylvania, do hereby certify that the foregoing is the
6 testimony of David Eshbach.
7      I further certify that before the taking of said
8 deposition, the witness was duly sworn; that the questions
9 and answers were taken down stenographically by the said
10 Reporter-Notary Public, and afterwards reduced to
11 typewriting under the direction of the said Reporter.
12      I further certify that the said deposition was
13 taken at the time and place specified in the caption sheet
14 hereof.
15      I further certify that I am not a relative or
16 employee or attorney or counsel to any of the parties, or a
17 relative or employee of such attorney or counsel, or
18 financially interested directly or indirectly in this
19 action.
20      I further certify that the said deposition
21 constitutes a true record of the testimony given by the
22 said witness.
23      IN WITNESS WHEREOF, I have hereunto set my hand
this 12th day of February, 2009.
24
25      Diane A. Smith, Reporter

# EXHIBIT "H"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| RONALD T. WHITAKER, SR. and DALEA LYNN, Co-Administrators of the ESTATE OF RONALD TAYLOR WHITAKER, JR., and RONALD T. WHITAKER, SR., TAYLOR WHITAKER, BRANDI WHITAKER and CHRISTOPHER HAMMERSTONE, individually, Plaintiffs, | Civil No. 1:08-627 |

Honorable Christopher C. Conner

*Electronically filed*

v.

SPRINGETTSBURY TOWNSHIP,
SPRINGETTSBURY TOWNSHIP
POLICE DEPARTMENT, CHIEF OF
POLICE DAVID ESHBACH and
OFFICER GARY UTTER,
         Defendants.

## DECLARATION OF DAVID C. ESHBACH

I, David C. Eshbach, declare as follows:

1.    I am Chief of Police of the Township of Springettsbury, and a Defendant in this action.

2.    I make this declaration based upon my personal knowledge and in support of Defendants' Motion for Summary Judgment.

{DocNo=00098309.1 }

3.    Springettsbury Township Police Department received accreditation by the Pennsylvania Law Enforcement Accreditation Commission ("PLEAC") on July 8, 2006, a year prior to this incident.

4.    A copy of the certificate evidencing the accreditation is attached hereto as Exhibit "1."

5.    During the accreditation process, I received a copy of Standards Manual from the PLEAC.

6.    The table of contents and relevant portions of the Standards Manual, dated February 2007, are attached hereto as Exhibit "2."

7.    The February 2007 version of the Standards Manual was in effect at the time of the incident in this action.

8.    During the accreditation process, I received a copy of Assessor Manual from the PLEAC.

9.    The table of contents and relevant portions of the Assessor Manual, dated March 2006, are attached hereto as Exhibit "3."

10.    The March 2006 version of the Assessor Manual was in effect at the time of the incident in this action

11.    A true and correct copy of Standard Operating Procedure #98-02, entitled Use of Force, revised July 2006 and in effect during the incident in this matter, is attached hereto as Exhibit "4."

{DocNo~00096309.1 }

2

12.    A true and correct copy of Standard Operating Procedure #2007-001, entitled Dealing With the Mentally Ill/Mental Health Emergencies, effective January 9, 2007, and in effect during the incident in this matter, is attached hereto as Exhibit "5."

12.    A true and correct copy of Standard Operating Procedure #2003-002, entitled Prisoner Transportation, revised November 2006 and in effect during the incident in this matter, is attached hereto as Exhibit "6".

13.    A true and correct copy of Standard Operating Procedure #2005-002, entitled Holding Rooms, revised April 2006 and in effect during the incident in this matter, is attached hereto as Exhibit "7."

14.    In January 2002, Gary Utter was hired as a police officer by the STPD.

15.    Utter successfully completed his police academy training and received his Certificate of Completion from Harrisburg Area Community College on April 20, 2000.  A copy of the Certificate of Completion is attached hereto as Exhibit "8."

16.    Following his police academy training and certification, Utter received additional training, including both required courses and elective courses. Copies of the lists of courses taken by Utter are attached hereto as Exhibit "9."

{DocNo-00096309.1 }

3

17.    As an employee of STPD, Gary Utter ("Utter") was never the subject of a complaint that he used excessive force or otherwise violated any person's constitutional rights prior to the incident giving rise to this lawsuit.

I declare under penalty of perjury that the foregoing is correct to the best of my knowledge and belief.

Executed on _27TH_ day of _AUGUST_, 2009.

David C. Eshbach





# STANDARDS
# MANUAL



# Standards Manual
## Table of Contents

**Chapter 1 – Standards for Organization and Management Role**

Section 1 — Law Enforcement and Authority................................................................1

Section 2 — Limits of Authority........................................................................................2

Section 3 — Use of Force..................................................................................................4

Section 4 — Direction .......................................................................................................8

Section 5 — Allocation and Distribution of Personnel and Personnel Alternatives ............ 10

Section 6 — Fiscal Management and Agency Owned Property....................................... 12

Section 7 — Compensation, Benefits and Conditions of Work ..................................... 13

Section 8 — Disciplinary Procedures............................................................................ 14

Section 9 — Selection .................................................................................................... 15

Section 10 — Training and Career Development........................................................... 16

**Chapter 2 – Standards for Law Enforcement Functions**

Section 1 — Patrol.......................................................................................................... 20

Section 2 — Unusual Occurrences and Special Operations......................................... 22

Section 3 — Internal Affairs........................................................................................... 23

Section 4 — Traffic ......................................................................................................... 24

Section 5 — Prisoner Transportation............................................................................ 25

Section 6 — Court Security............................................................................................ 28

Section 7 — Legal Process............................................................................................. 30

**Chapter 3 – Standards for Staff Support Responsibilities**

Section 1 — Cell Areas................................................................................................... 33

Section 2 — Temporary Holding Area........................................................................... 39

Section 3 — Communication.......................................................................................... 41

Section 4 — Records....................................................................................................... 43

Section 5 — Collection and Preservation of Evidence ................................................. 44

Section 6 — Property and Evidence Control ................................................................. 45

Section 7 — Fitness and Wellness Program ................................................................. 47

**Chapter 4 – Pennsylvania Legal Mandates**

Section 1 — Pennsylvania Legal Mandates .................................................................. 49

*February 2007*

STANDARDS FOR LAW ENFORCEMENT FUNCTIONS

# Section 5

# PRISONER TRANSPORTATION

**Transport Operations**

**2.5.1** - A written directive that requires the transporting officer to thoroughly search the prisoner prior to transport.

***Narrative:*** *The transporting officer is responsible to conduct a thorough search of the prisoner and all possessions of the prisoner before placing the person in the officer's vehicle. The officer should also ensure that the prisoner is properly restrained in the vehicle to prevent injury and to protect the officer.*

*An additional search of the prisoner should always be conducted whenever the person is returned to the custody of the transporting officer. The officer should never assume that the prisoner has not had an opportunity to obtain a weapon or an implement of escape.*

*It is the responsibility of the officer and the law enforcement agency to ensure the safety of the prisoner being transported, the safety of the officer, and the prevention of an escape.*

**2.5.2** - A written directive requiring a thorough search at the beginning of each shift of all vehicles used for transporting prisoners and the search of any transport vehicles prior to and after transporting prisoners.

***Narrative:*** *At the beginning of each shift, any vehicle used for prisoner transportation should be thoroughly searched for contraband, weapons, or implements for escape. This should also be done before and after each prisoner transport.*

**2.5.3** - A written directive prescribing necessary actions at the destination by officer(s) transporting prisoner(s) to any facility, to include at a minimum:
   a.   securing firearms for safekeeping;
   b.   removing restraining devices just prior to securing the prisoner in the cell;
   c.   delivering documentation to the receiving officer;
   d.   documenting the transfer in a report and/or obtaining a signed receipt for the prisoner, attached to the report; and
   e.   advising the receiving personnel of any potential medical or security concerns or hazards posed by the prisoner.

***Narrative:*** *Upon arrival at the destination of the transport, certain actions are necessary and important for public safety, officer safety, and the safety and security of the prisoner. The listed procedures are the responsibility of the law enforcement agency and the completion of them is a requirement of the transporting law enforcement officer(s). Necessary exceptions, if desired, to the removal of restraining devices should be provided in the directive.*

## STANDARDS FOR LAW ENFORCEMENT FUNCTIONS

**2.5.4** - A written directive describing the procedures to be taken by the transporting officer(s) in the event of an escape of a prisoner in transit, the officer(s) shall be aware of:

   a.   persons to be notified;
   b.   reports to be prepared; and
   c.   any further required actions to be taken.

***Narrative:*** *A written procedure is necessary for the information of all agency personnel in the event of an escape of a prisoner being transported. The law enforcement officer(s) shall make an immediate notification to the agency regarding the escape.*

**2.5.5** - A written directive requiring that agency personnel notify the appropriate agency or court officials when a prisoner is to be transported to another agency or court and is considered an unusual security risk.

***Narrative:*** *It is a professional responsibility for law enforcement agency personnel to make appropriate notifications to other authorities of a prisoner who may be a danger or an escape risk.*

### Restraining Devices

**2.5.6** - A written directive regarding restraining devices and the methods to be used during prisoner transports with necessary exceptions noted.

***Narrative:*** *All law enforcement officers need to be familiar with the proper use of restraining devices for officer safety and for maintaining the safe custody of the prisoner. It is necessary that the agency develop a policy on the appropriate use of restraining devices and restraining techniques.*

*The policy should include the types of devices and techniques approved for use by agency personnel, the required training, the circumstances when they should be used, and any other factors deemed necessary by the agency.*

### Special Transportation Situations

**2.5.7** - A written directive prescribing the procedures for transporting sick, injured or disabled prisoners.

***Narrative:*** *The law enforcement agency policy for these transports should outline the procedures necessary for the safe and humane transportation of disabled prisoners. These transports will create additional demands for the transport officers.*

*Safety and security are still concerns during these transports. A prisoner may attempt to take advantage of the situation to overpower the officer or to attempt an escape from custody.*

**STANDARDS FOR LAW ENFORCEMENT FUNCTIONS**

**2.5.8** - A written directive establishing procedures for the security and control of prisoners transported to medical care facilities or hospitals for treatment, examination or admission.

***Narrative:*** *The transportation of a prisoner to a medical facility creates additional concerns. While the prisoner is at a hospital, the opportunities for an escape are greater due to procedures that may require the removal of restraining devices from the prisoner or examinations of the prisoner that may be conducted without allowing the officer to be present.*

STANDARDS FOR STAFF SUPPORT
RESPONSIBILITIES



**Chapter**

# 3

# STANDARDS FOR STAFF SUPPORT RESPONSIBILITIES

## Section 1

## CELL AREAS

*Cell – A location controlled by the law enforcement agency specifically used for the short term secure detention, without continuous physical attendance of persons awaiting transportation to another facility or for other law enforcement purpose. These areas are used to maintain custody of persons for extended periods of time, usually not to exceed 24 hours.*

**Organization, Administration, and Management of Cells and Cell Areas**

**3.1.1** – A written directive requiring that agency personnel receive training on the operations of the cell area, to include the use of fire suppression and other emergency equipment provided by the agency.

***Narrative:*** *It is the responsibility of the law enforcement agency to ensure that the cell area is operated in a safe and appropriate manner.*

*Agency personnel assigned to the cell area must be trained on the proper procedures and agency policies relating to the facility. That training must include fire, safety, first aid, and emergency responses to incidents that may occur within the facility.*

*Appropriate procedures are necessary because of the possibility of incidents occurring in the cell area that may result in illness, injury, or death. Adequately trained and supervised personnel assigned to the facility should lessen agency exposure to allegations of wrongdoing and lawsuits.*

## STANDARDS FOR STAFF SUPPORT RESPONSIBILITIES

### Physical Plant

**3.1.2** – A written directive that cells provide the listed minimum conditions for detainees:
a.  adequate lighting; **(O)**
b.  circulation of fresh or purified air; **(O)**
c.  availability of a flush toilet; **(O)**
d.  source of potable drinking water; **(O)**
e.  access to wash basin or shower for a detainee held in excess of eight hours; **(O)**
f.  bed and bedding for each detainee held in excess of eight hours; and **(O)**
g.  any other standards required under the laws and regulations of the Commonwealth of Pennsylvania and/or its political subdivisions. **(O)**

*Narrative: This standard identifies the required minimum physical conditions that are necessary in order for a law enforcement agency to operate cells.*

### Safety and Sanitation

**3.1.3** – A written directive requiring the cell area to have an automatic fire alarm, a heat and smoke detection system, fire fighting equipment approved by local fire officials, and a written plan prescribing fire prevention practices and procedures to include:
a.  a weekly documented visual inspection and a semiannual documented testing of fire equipment; and
b.  a daily visual inspection and required documented testing of the automatic fire detection devices and alarm systems in accordance with the law and local fire code regulations.

*Narrative: The cell area must have an automatic fire, heat and smoke detection system. Appropriate fire suppression equipment must also be available in the cell area in case of fire.*

*A written plan is required which prescribes necessary emergency procedures and fire prevention practices.*

*All fire prevention and fire suppression equipment needs to be inspected as required by local and state fire regulations. Drills should also be conducted to ensure that the procedures are adequate and that agency personnel are prepared to respond and handle any fire emergency that may occur in the cell area.*

**3.1.4** – A written directive requiring that there is a posted emergency evacuation plan for the cell area and a designated emergency exit directing evacuation of persons to a hazard-free area. **(O)**

*Narrative: For the safety of the inmates and the staff, an emergency evacuation plan needs to be prepared for the cell area. The plan should be posted for the information of all people who are in the facility. Emergency exits need to be known and posted so that any necessary emergency evacuation could be accomplished with a minimum of confusion.*

**STANDARDS FOR STAFF SUPPORT RESPONSIBILITIES**

### Security and Control

**3.1.5** - A written directive requiring the agency to have a specific policy regarding firearm handling and firearm security in the cell area.

*Narrative: The law enforcement agency must develop this policy which best meets the needs of the agency. The policy, once developed, must be enforced.*

**3.1.6** – A written directive requiring a complete security check, including a thorough search for weapons and contraband, prior to the use of an unoccupied cell.

*Narrative: It is necessary that the cell be thoroughly searched for any type of contraband after the departure of a detainee, but before another person is detained in the cell. Procedures for these searches will be outlined in the directive.*

**3.1.7** – A written directive that requires supervised monitoring of tools and culinary equipment in the cell.

*Narrative: Agency controls and inventory of tools and culinary items in the cell is necessary. Without a strict accountability system, those items pose a serious security and safety concern.*

**3.1.8** – A written directive requiring the agency to have a system in the cell area to alert the designated control center of an emergency. **(O)**

*Narrative: An audible system needs to be installed within the cell area to alert agency personnel of an emergency. The system will allow agency personnel and detainees to notify the control center if there is a need for assistance.*

### Detainee Processing

**3.1.9** – A written directive establishing procedures for a search of the detainee in the cell to include:
a.  a complete inventory search of the detainee at the time of booking prior to entry into the cell; and
b.  an itemized inventory of all property taken from the detainee.

*Narrative: This policy requires all detainees to be thoroughly searched as they enter the cell. It also requires that a written inventory shall be completed for any property taken from the person at the time of the search.*

**3.1.10** – A written directive requiring the secure storage of any items taken from cell detainees. **(O)**

*Narrative: An accurate inventory of detainee items taken needs to be recorded. A formalized process will eliminate most allegations of theft made by detainees.*

**STANDARDS FOR STAFF SUPPORT
RESPONSIBILITIES**

**3.1.11** – A written directive requiring that an intake form, developed by the agency, shall be completed for every person booked into the cell and that it contains at least the following information:
   a.   personal identification information;
   b.   arrest information;
   c.   property inventory and disposition;
   d.   current health of the detainee;
   e.   medications taken by the detainee;
   f.   behavior, involving state of consciousness and mental status; and
   g.   any body deformities, trauma markings, bruises, etc.

*Narrative: A formal intake process is necessary in order to manage a cell. An intake form must be completed for each person detained in the facility. Certain information must be documented as determined by the agency.*

**3.1.12** - A written directive specifying the procedures required for the detention and separation of males and females within the cell(s). If adults and juveniles are detained at the same time, their detention areas shall be separated from each other by sight and sound and in conformance to the laws and regulations of the Commonwealth of Pennsylvania. **(O)**

*Narrative: The detention of prisoners by age and gender in the cell(s) shall be segregated by sight and with provisions made to assure normal sound from any segregated area is not audible where others are held.*

*Detainees who may be considered a risk, who may be self-destructive, or who are likely to create unusual concern for the staff should be observed more frequently and at irregular intervals not to exceed 10 minutes.*

**3.1.13** – A written directive prescribing methods for holding, detaining, and segregating persons in the cell(s) who are under the influence of alcohol, drugs, or who are violent or self-destructive.

*Narrative: These detainees may be at risk to themselves or to other prisoners, as well as possibly being victimized by other inmates.*

**3.1.14** – A written directive prescribing space arrangements and procedures to follow in the event of group or mass arrest situation that exceeds the maximum capacity of the cell area.

*Narrative: It is necessary for the agency to develop a contingency plan in the event that the cell(s) is not sufficient to house detainees in cases of mass arrests. When such group arrests occur, it becomes necessary to find alternative detention facilities.*

**3.1.15** – A written directive requiring the identity of any detainee released from the cell be verified prior to release.

*Narrative: It is a necessary precaution that all detainees being released or transferred from the cell, for whatever reason, be identified. It is also important and necessary to identify and verify the authority of the official taking custody of a detainee.*

**STANDARDS FOR STAFF SUPPORT RESPONSIBILITIES**

**3.1.16** – A directive requiring that when a detainee's property is returned upon release or transfer from the cell that the return of the property shall be documented on an agency form.

*Narrative: The personal property of a person being detained shall be returned or accounted for upon the release or transfer of the detainee from the cell. This return of property will be documented and signed for by the detainee.*

## Medical and Health Care Services for Detainees

**3.1.17** – A written directive, approved by a licensed physician, identifying the policies and procedures to be followed when a detainee is in need of medical assistance.

*Narrative: It is the responsibility of the law enforcement agency to ensure the medical health and welfare of detainees.*

*It is probable that some detainees will require medical attention at some time. As a result, this policy should be developed in consultation with a licensed physician.*

**3.1.18** – A written directive requiring first aid kits are available in all areas of the cell area and which are inspected weekly and replenished when necessary. **(O)**

*Narrative: First aid kits are necessary for the initial treatment of detainees or staff members who may be injured. This is necessary for the welfare of all people in the cell area.*

**3.1.20** – A written directive controlling the distribution, and requiring documentation, of all pharmaceuticals within the cell, to include all medically approved medications belonging to or in the possession of the detainee.

*Narrative: The control of all drugs and pharmaceuticals within a cell is a necessity. They must be regulated, whether they are prescribed or over the counter drugs.*

*Appropriate medical professionals should assist in the development of this protocol in order to ensure proper procedures for the handling and distribution of the drugs. This is vital to the welfare of the detainee and the safe management of the facility.*

## Supervision of Detainees

**3.1.21** - A written directive requiring supervision of detainees by agency staff, including establishment of procedures to ensure that:
a. observation, whether by physical or electronic (video and audio) means, occurs at least every thirty minutes;
b. observation provides reasonable assurance that the safety and welfare of the detainee is adequately addressed;
c. observation is accomplished by persons in the same structure;
d. there is an immediate response, including a maximum time limit until arrival with a back-up system in case of non-availability; and

**STANDARDS FOR STAFF SUPPORT
RESPONSIBILITIES**

e.   non-sworn respondents are trained to recognize potential medical emergencies, provide medical assistance and have been adequately trained in self defense to protect themselves in cases of assault or subterfuge.

**Narrative:**  *Close supervision of all detainees by agency personnel, on a 24-hour basis, is necessary for the proper and safe management of the facility.  This is essential from a safety and liability standpoint.*

*Detainees who may be considered a risk, who may be self-destructive, or who are likely to create unusual concern for the staff should be observed more frequently and irregular intervals not to exceed 10 minutes.*

**3.1.22** – If audio and/or electronic surveillance equipment is used for detainee supervision in the cell, that the equipment will be regulated to allow the detainees to have a reasonable expectation of privacy.  **(O)**

**Narrative:** *Control of the use of audio/visual surveillance equipment to regulate detainees must be established by the agency to reduce the likelihood of litigation.  The use of such monitoring methods shall be posted in the cell area(s) in compliance with current law and utilized in a manner consistent with safety and security concerns.*

**3.1.23** – If the agency permits visitors, a written directive governing the procedures for visits to detainees in the cell area shall be prepared.

**Narrative:**  *A cell area is a temporary detention location within a law enforcement agency. Visits to detainees create security concerns and most visits should be deterred until the person is released or incarcerated in a correctional facility.*

*Most cell areas are not designed or equipped to accommodate visits.  If visits are allowed, security considerations are of primary concern and must be addressed in the directive.*

STANDARDS FOR STAFF SUPPORT
RESPONSIBILITIES

# Section 2

# TEMPORARY HOLDING AREA

*Temporary Holding Area – Any location controlled by the law enforcement agency that is used for a brief period of time to process and/or question a person in custody, control or care of the law enforcement agency. In the Temporary Holding Area the detainee will be routinely physically attended by agency personnel. Periods of non-supervision may occur, not exceed 10 minutes and the detainee must be secured during that period.*

**Temporary Detention**

**3.2.1** – A written directive describing the use of temporary holding areas, which identifies the following procedures:

    a.   supervision and accountability for temporary detainees;
    b.   authorization for use of the temporary holding area;
    c.   temporary restraint of detainees by securing them to fixed objects; and
    d.   separation of adults and juveniles in accordance with the laws and administrative regulations of Pennsylvania.

**Narrative:** *Most law enforcement agencies have an area within the agency for the temporary control or temporary detention of individuals. Those areas are primarily used for the temporary custody of people being questioned, processed, or tested by a law enforcement officer.*

*Due to the use of temporary holding areas within the agency, it is necessary that regulations and procedures are developed to provide for their use.*

**3.2.2** – A written directive establishing the minimum physical conditions for the temporary holding area and requiring access to potable water and a toilet. **(O)**

**Narrative:** *These are the minimum physical conditions necessary for a temporary holding area within a law enforcement agency.*

**3.2.3** – If a detainee is to be secured to an immovable object, a written directive shall be prepared that identifies which objects were designed and intended for such use within the temporary holding area. **(O)**

**Narrative:** *If it is necessary to secure the person being detained to an immovable object in the temporary holding area, the object shall have been designed or fabricated for that purpose. The use of such immovable objects may be appropriate for the temporary detention if no other accommodation is available.*

**STANDARDS FOR STAFF SUPPORT RESPONSIBILITIES**

**3.2.4** - A written directive requiring a plan for fire prevention, fire evacuation and fire suppression for the temporary holding area.

**Narrative:** *As with a holding cell area, a temporary holding area requires that fire suppression and fire alarms are available in case of an emergency.*

**3.2.5** – A written directive addressing the following security concerns in the temporary holding area:
   a.   weapons control;
   b.   panic or duress alarms;
   c.   access to area and prisoner;
   d.   escape prevention;
   e.   search of detainee;
   f.   security inspection;
   g.   detainee shall be physically attended; however
   h.   the detainee may be left unsupervised for a period of no longer than 10 minutes when secured.

**Narrative:** *These are safety and security concerns for the agency when a temporary holding area is used.*

**3.2.6** – A written directive requiring training for all agency personnel who will have any responsibility for detainees in temporary custody within the temporary holding area.

**Narrative:** *This requirement will ensure agency personnel will know and understand the operation and security of the temporary holding area. This is important in regard to the safety and welfare of the detainees, but it will also provide the agency and its officers with protection from possible lawsuits.*

# Assessor Manual



## Pennsylvania Law Enforcement Accreditation Program

*A Grant Project to Pennsylvania Chiefs of Police Association from Pennsylvania Commission on Crime and Delinquency*

# Assessor Manual
## Table of Contents

**Chapter 1 – Assessment Procedures**

On Site Assessment ........................................................................................1

File Set Up ......................................................................................................1

Standard Components .....................................................................................2

Proofs of Compliance .....................................................................................3

Standards Not Applicable by Function or Commission

Granted Waivers from Compliance ................................................................4

Compliance/Non-Compliance Issues and Terms ...........................................5

Determining Non-Compliance and Referring to Staff ....................................5

Final Report ...................................................................................................6

Critiques .........................................................................................................6

**Chapter 2 – Assessors**

Accreditation Assessors ..................................................................................7

Assessor Training Requirements .....................................................................7

Team Leaders ..................................................................................................8

Additional Assessor Responsibilities ..............................................................8

Media Inquiries ...............................................................................................9

**Chapter 3 – Logistics and Assessment Activities**

Coordinating Schedules ............................................................................... 10

After the Assessment .....................................................................................11

**Chapter 4 – Summary**

**Chapter 5 – Appendages**

Appendage A - PLEAC Assessor's Contract

Appendage B - Standard Compliance Form

Appendage C - Expense Voucher

Appendage D - Assessment Worksheets

Appendage E - Final Report Format

Appendage F - Final Report Example

Appendage G - Assessment Protocol

Appendage H - Assessor Critique

*March 2006*

ASSESSMENT PROCEDURES



**Chapter**

**1**

# ASSESSMENT PROCEDURES

## On Site Assessment

The assessment process for any professional accreditation program involves an evaluation of a prescribed collection of acknowledged standards against the performance of the organization being evaluated. If the agency being assessed meets or exceeds the established professional standards, the institution will receive accredited status from the awarding association. The Pennsylvania Law Enforcement Accreditation Commission has established an array of professional standards for police agencies that have been determined to be necessary for professional performance resulting in the awarding of accredited status by the Pennsylvania Chiefs of Police Association. Law enforcement agencies that succeed in receiving accreditation through the Pennsylvania Law Enforcement Accreditation Program will be acknowledged as professionally competent agencies.

The Pennsylvania accreditation program relies upon compliance verification that is established when a team of Accreditation Assessors visit and evaluate an agency using specific accreditation standards as the norm for that determination. Their compliance assessment will provide the basis for the recommendation to the Commission to grant accredited status to the department.

Certified Accreditation Assessors have the responsibility of determining whether or not an agency has demonstrated compliance with all elements of the program standards. Although assessors should refer to the Standards Manual and Administrative Manual for guidance, assessors will have to be flexible in their evaluations during the verification process. *(See Appendage G - Assessment Protocol)*

## File Set Up

In order to streamline the assessment process, Accreditation Managers are asked to set up their files in a consistent manner. Each folder should be labeled with the standard number and title on the tab. On the inside cover of the folder, the applicable standard should be stapled or taped. Documentation should then be filed in the order listed on the Standard Compliance Form (SCF). The Standard Compliance Form should lay loose in the folder and be the first piece of paper in the file. *(See Appendage B - Automated Program Forms)*
If there are bulleted items in the standard, these items should be separated by a page titled with

**ASSESSMENT PROCEDURES**

the bullet number. If the Accreditation Manager chooses to highlight relevant text within documents, the highlighting method should be consistent throughout all folders.

Each folder should be labeled and have a copy of the applicable standard, Standard Compliance Form, related policy and proof of compliance, filed in that order.

A separate file folder for each accreditation standard must be prepared. An agency has the burden of demonstrating compliance with each standard. The agency must compile proofs sufficient to indicate compliance for every element of each standard. It is very important that the agency adequately prepare the file folders with several different examples to verify compliance. This does not mean including 10 examples of the same document, but instead include diverse samples demonstrating compliance. Again, each folder shall include a copy of the standard affixed to the inside left of the folder, a Standard Compliance Form, the written directive relating to the standard and sufficient documentation that demonstrates that the agency is in compliance to that standard.

The Standard Compliance Form enables both the agency and the assessors to quickly determine how compliance is being met. Agency personnel complete that form during the self-assessment phase of the project. The agency identifies specific sources used to establish compliance and then places the corresponding documentation in the file folder. The assessors will use the bottom portion of the form to indicate whether or not the agency has successfully demonstrated compliance.

An agency must confirm compliance with every applicable standard. All of the Pennsylvania Accreditation Standards are considered to be mandatory, unless the standard(s) is not applicable to the agency because of function and/or the Commission issues a "Waiver." More than one method of compliance may be used by an agency Accreditation Manager or assessor to document compliance. An assessor may be able to conclude that the intent of a given standard has been met after reviewing a type of documentation or other method that is not described in the manual. Assessors will have to be creative as well as flexible during the verification process. It is nevertheless essential to remember that the agency always has the burden of proving that the standards are implemented and complied with. Assessors should never feel constrained in asking for additional proofs of compliance when needed.

Assessors should not be surprised if some agency files are not complete during the initial assessment review. The Accreditation Manager should be asked in such cases to provide any missing documentation as quickly as possible. To help assessors track the status of agency files during the assessment, staff has provided each assessor with a Final Log Sheet.

## Standard Components

Each standard is made up of two basic components. First is the standard statement. Second, in italics, is the standard narrative.

The standard statement is mandatory and must be complied with. You will note that the standard statement dictates what must be done, but not how to do it. It is recognized that there are

ASSESSMENT PROCEDURES

many ways to accomplish one goal. On this premise, the participating law enforcement agencies of Pennsylvania are encouraged to define for their individual agencies what processes, procedures and directives are most appropriate.

To prove compliance with a standard statement, an agency can implement a directive that contains policy, procedure or a combination of both. A policy is a statement of principle. Also important as a proof is a procedure. A procedure is a step by step instruction demonstrating how to accomplish the policy intent or reach a goal. A procedure should not be confused with a plan. A plan is not a policy or procedure, but a step by step process offering opportunities to vary procedure due to changes in situation.

It should also be recognized that there are several "if" standard statements. An "if" standard is applicable to an agency only if they are accomplishing the specified activity.

The standard narrative must be recognized as a commentary which is advisory, but NOT binding. This narrative offers additional information to guide the participating agency in the intent of the standard.

## Proofs of Compliance

*Agencies can prove compliance with any combination of the following six methods:*

<u>Written Directives</u> – These include written information (regulations, rules, policies, procedures, etc.) that is distributed to personnel of the agency from the chief executive officer of the agency. The type of directives that infer "If I say 'DO IT' then I mean DO IT!" These are documents that have command and control authority over the agency and agency personnel that are issued and signed by the Chief Executive Officer of the department. This category may also include directives signed by other authorized personnel, state laws when the agency directs its personnel to comply and training directives which require compliance.

<u>Written Documentation</u> – These are most other forms of written materials that guide or demonstrate the operation of the department. These may include internal memorandums used to explain or clarify the formal written directives, copies of statutory laws or administrative regulations of Pennsylvania and/or local ordinances, agency news releases, email messages, newspaper articles, completed department reports, lesson plans, copies of minutes from governmental meetings, or any other materials that can be used to demonstrate agency compliance with the Accreditation Standards.

<u>Other Documentation</u> - These include photographs, videotapes, booklets and pamphlets, audio tape recordings, recorded press conferences/public service announcements, public relations materials, or any other documentation that would be useful to verify Standard compliance.

<u>Interviews</u> – Assessors should pose questions to agency personnel who exhibit a particular expertise in relation to a Standard that would apply to their area of responsibility. It is recommended that the agency indicates which standards may be documented through interviews, but the assessors themselves will conduct the necessary interviews. It is the responsibility of the agency to

**ASSESSMENT PROCEDURES**

see that the assessors are able to contact these people. The assessors may conduct independent interviews of agency personnel in addition to those suggested by the agency. Interviews should be listed for each standard.

Observations – This method involves the verification of a Standard through direct observation by the assessors examining the Standard(s) for compliance. Assessors often overlook this method of verification, but it may supply the most direct method of proof for some Standards. An example would be viewing the soft body armor in the patrol vehicles which is available to agency personnel as required in Standard 2.1.3.

Individual Standard Status Reports (ISSR's) – CALEA accredited agencies may submit their ISSR's (equivalent to PA Standard Compliance Form) as documentation proofs. (Proofs must be provided for any time period that is not concurrent with the submitted ISSR's. Additionally, PLEAC assessors may request to see the proofs of compliance indicated on the submitted ISSR's)

## Standards Not Applicable by Function or Commission Granted Waivers from Compliance

Participating agencies are expected to show compliance with all of the Pennsylvania accreditation standards. There are nevertheless two situations in which an agency may not have to prove compliance with certain standards. The first exception is when the standard is deemed to be not applicable by function. The second exception is when compliance has been waived by the Accreditation Commission after receiving a written request from an agency for a waiver.

Not Applicable by Function – An agency may declare "not applicable by function" status for standards that involve functions that the agency **NEVER** performs. The following examples illustrate how this situation may arise.  Examples:

*SECTION 2 - Chapter 4 - TRAFFIC - Traffic Enforcement - Standard 2.4.1 would not apply to a county detective agency that does not have responsibilities for taking traffic law enforcement violations.*

*or*

*SECTION 3 - Chapter 1 - CELL AREAS - the entire section (Standards 3.1.1 through 3.1.23) would not apply for accreditation purposes if the law enforcement agency does not have any cells within the agency or under the control of the department.*

Waiver from Compliance – A Waiver from Compliance request is a formal process that does not involve decision making by the on-site assessment team. Agencies that cannot comply with a given standard can apply to the Accreditation Commission for a waiver from compliance with a standard(s). The waiver process is explained in the Administrative Manual. Each waiver is reviewed by the Commission on a case by case basis and will be granted only under extraordinary circumstances when approved by a two-thirds vote. If the waiver is granted, the agency will receive a letter from the Accreditation staff confirming that the agency is not required to comply with the Standard in question. A waiver is provided only under extraordinary circumstances such

**ASSESSMENT PROCEDURES**

as a labor contract prohibition, court order, case law, etc. The waiver approval shall be placed in the applicable file folder for the assessor's review.

## Compliance/Non-Compliance Issues and Terms

*Compliance* - Substantiated by appropriate directives and documentation proofs.

*Non-Compliance* - Directive and/or documentation proofs do not reveal compliance with the standard.

Attempt to provide the examples of appropriate language if a directive change is required and/or specify the documentation proofs necessary to prove compliance. Be prepared to substantiate your non-compliance decision and be open to suggestions of ways to comply with the standard other than that which you suggest.

*Wet Ink Directives* - Directives that are so new that proofs are not available to document compliance. Wet ink should not be confused with revised directives that change the language of a directive, but for which there are adequate proofs. Also, agencies seeking initial accreditation may have wet ink standards. These would only be considered non-compliant when previous policy required the activity and no proof of compliance is available or in conjunction with Pennsylvania Legal Mandate Standards. It is the assessor's responsibility to determine whether wet ink standards constitute non-compliance. It is the staff's responsibility to determine the appropriate remedy.

*Applied Discretion* - The ability of assessors to use their knowledge and experience along with various means and methods, in addition to those presented in the files by the assessed agency, to prove compliance. This may include additional documentation found in other files, observations, interviews or any combination.

*File Repairs* - Changes, required by assessors, to the submitted files that are done during the on-site to prove standard compliance. This may include additional directives, revised directives or language, and additional documentation.

## Determining Non-Compliance and Referring to Staff

1. All assessors must agree that the standard is non-compliant and what is required to bring the standard into compliance.

2. The standard file should be returned to the accreditation manager who should be advised how to repair the file to bring it into compliance, if possible. A reasonable amount of time should be given to achieve compliance.

3. If the team and/or agency disagree and concurrence cannot be achieved, the matter must be referred to staff for a final decision.

4. All non-compliant issues must be reported in the final report.

ASSESSMENT PROCEDURES

## Final Report

The assessment team's final task is the submission of a report to the Accreditation Commission outlining and summarizing all activities conducted during the on-site assessment. The team leader coordinates and personally prepares this report that reflects the entire team's perspective on the ability of the agency to comply with all applicable standards.

The final report shall be as complete and detailed as possible. It must also accurately reflect the activities and findings of the assessment team. The members of the Accreditation Commission will be relying heavily on the information provided in this report when it makes its decisions to grant or defer accreditation to the law enforcement agency. *(See Appendages 5 and 6)*

The final report should include all the required information. The report format will be provided to the Team Leader on disk in Microsoft Word format. The Accreditation staff will provide background data, but most of the necessary information will come from the on-site assessment itself. The final report should be sent to the PCPA accreditation staff within the predetermined, allotted time in order for the Accreditation Commission to receive a copy of the formal assessment report 30 days before they are to meet, if possible. The staff will also mail a copy of the report to the assessed agency.

## Critiques

Both the assessed agency and the assessors are asked to complete critiques concerning the assessment process. The assessor critique requires feedback from the assessors regarding accreditation staff, fellow assessors, the agency and suggestions to improve the process. The agency will be critiquing the assessors, and the law enforcement accreditation program as a whole.

These critiques are an important element of the entire process as we continue to grow. This feedback will assist the staff and Commission in enhancing the program. Ideas are always welcomed and appreciated.

***Please Note:*** Expense vouchers will not be approved until assessor critiques and required assessment forms are submitted.

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. and
DALEA LYNN, Co-Administrators of
the ESTATE OF RONALD TAYLOR
WHITAKER, JR., and RONALD T.
WHITAKER, SR., TAYLOR
WHITAKER, BRANDI WHITAKER
and CHRISTOPHER
HAMMERSTONE, individually,
      Plaintiffs,

    v.

SPRINGETTSBURY TOWNSHIP,
SPRINGETTSBURY TOWNSHIP
POLICE DEPARTMENT, CHIEF OF
POLICE DAVID ESHBACH and
OFFICER GARY UTTER,
      Defendants.

Civil No. 1:08-627

Honorable Christopher C. Conner

*Electronically filed*

## NOTICE OF FILING PAPER MATERIALS WITH THE CLERK

Exhibits 4 through 9 of the Declaration of David C. Eshbach are subject to confidentiality agreements among the parties. Therefore, the same are being filed in paper form with the Clerk's Office of the Middle District of Pennsylvania. These exhibits will remain in the Clerk's custody until appropriate disposition pursuant to the Local Rules of the Middle District of Pennsylvania. Copies of the same will be mailed to the Honorable Christopher C. Conner and all counsel of record.

CAMPBELL DURRANT BEATTY
PALOMBO & MILLER, P.C.

By:   s/ Brian P. Gabriel
      Brian P. Gabriel
      PA 73132

# EXHIBIT "I"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND          :
DALEA LYNN, CO-ADMINISTRATORS        :
OF THE ESTATE OF RONALD TAYLOR       :
WHITAKER, JR.; AND RONALD T.         :
WHITAKER, SR., TAYLOR WHITAKER,      :
BRANDI WHITAKER AND CHRISTOPHER      :   CIVIL ACTION
HAMMERSTONE, INDIVIDUALLY,           :
        PLAINTIFFS                   :   NO: 1-08-CV-00627
                                     :
        V                            :
                                     :
SPRINGETTSBURY TOWNSHIP;             :
SPRINGETTSBURY TOWNSHIP POLICE       :
DEPARTMENT; CHIEF OF POLICE          :
DAVID ESHBACH AND POLICE             :
OFFICER GARY UTTER,                  :
        DEFENDANTS                   :   JURY TRIAL DEMANDED


DEPOSITION OF:    JAMES MILLER

TAKEN BY:         PLAINTIFFS

BEFORE:           DIANE F. FOLTZ, RMR
                  NOTARY PUBLIC

DATE:             FEBRUARY 4, 2009, 10:10 A.M.

PLACE:            HAGGERTY & SILVERMAN, P.C.
                  240 NORTH DUKE STREET
                  LANCASTER, PENNSYLVANIA



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1      A     Yeah.  I mean, again you are given that through

2    the police department, and then I'm sure you guys -- you

3    know how like yearly all officers in Pennsylvania have to

4    go through the 16 hours of MPOETC training.  I know that

5    they -- they are some of the classes that they throw in

6    here and there, stuff like that, you know, just refreshers

7    on, you know, obviously do this, don't do that.

8      Q     What are the differences in how you should handle

9    an intoxicated detainee as opposed to one who is not?

10     A     Well, I know like at our station we actually have

11   a form for somebody that is intoxicated that we have to

12   keep a log, an observation log.  I believe it's -- I think

13   it's either every 20 minutes or every 30 minutes you must

14   check.  You know, we have the monitoring systems in the

15   squad room so that you can continuously have a visual on

16   them, stuff like that.

17     Q     Did this form exist before July 8th, 2007?

18     A     Now, I'm going to say yes, I believe it did, but

19   I can't swear to it, but I do believe we had that form.

20     Q     Do you know what it's called?

21     A     No.

22     Q     Okay.

23     A     And that's terrible because we use them all the

24   time.

25     Q     Is it just a one-page form?

1   A    Yes.

2   Q    Okay.  Now, what was the practice before July

3   8th, 2007, as far as what articles to take from the person

4   before you put them in the holding cell?

5   A    You would take cell phones, lighters, any

6   obviously kind of weapons, pocket knives, stuff like that,

7   matches, change, even money, change, stuff like that, and

8   then we have these little Rubbermaid, Tupperware type boxes

9   you put it in, and then you put it in a locker, and, you

10  know, lock the locker up, and then once they go they

11  actually -- that form I was telling you about, on the front

12  side where it says the articles that you took, they have to

13  sign that they got it back, and then that's pretty much it.

14  Q    Was it the practice before July 8, 2007, to take

15  the person's shoes, laces and belt?

16  A    Now, I can tell you, like I said, I've been with

17  Springettsbury -- well, I've been a cop 11 years, and I had

18  never done that, and I can honestly say, I mean, like I

19  have not even taken a belt.

20  Q    Okay.  Have you had occasion to transport

21  detainees to their next stop after the police station?

22  A    Like to central booking or --

23  Q    Yeah.

24  A    Yes.  Oh, my, all the time.

25  Q    Have you had the opportunity to observe what they

1    do with detainees?

2        A    I know -- yeah, down at central booking or the

3    prison they pretty much give them a whole set of clothing.

4    Like if you go to the prison I know -- central booking is

5    pretty new, but the prison, you go there, they would pretty

6    much strip them of what they had, and you got the -- I

7    think it's the orange colored uniform.  Sometimes it might

8    be green.  They pull their shoes off, you know, the prison

9    guards.  They check.  They'll even do a cavity search,

10   stuff like that.

11       Q    Okay.

12       A    So...

13       Q    But it was never the practice of Springettsbury

14   Police Department before July 8th, 2007, to have officers

15   remove the shoes or the belt?

16       A    Not to my knowledge.

17       Q    Okay.  Was it -- was it left to the officer's

18   discretion what items to remove from a detainee?

19       A    Not really discretion.  Like I said, we knew --

20   you knew.  You were trained from your training officer.

21   You know, you are going to again take the lighters, knives,

22   anything that, you know, anything that they could hurt

23   themselves with or hurt the property with or hurt you with,

24   they were the type of items that you would take.

25            Like I know some guys will take a jacket from the

1     Q    Okay.

2     A    You know, the only one I definitely know of is,

3  you know, if you have somebody back there, no matter what,

4  come hell or high water, no matter what's happening on the

5  street, if you hear of an officer, your fellow officer

6  being shot, you don't leave.  You stay there with your

7  prisoner.  That's the one I do know of, you know.

8     Q    Okay.  What was the policy -- this is again as of

9  July 8th, 2007.  What was the policy as to how to handle it

10  if an officer had to enter a holding room and deal with a

11  detainee?

12     A    Okay.  Normally what you would do, this comes

13  off, put it in the locker.

14         MS. FULTON:  By that you mean --

15  BY MR. KEEPERS:

16     Q    For the record, since you are on the record --

17     A    I'm sorry.  Your sidearm comes off, your pistol,

18  gun, comes off.  Thank you.  And you lock it up, you know,

19  put the key in your pocket, and then you go in.  That's

20  normally what you do, and then, you know, the only time you

21  can enter in there with it on is if it's like an emergency

22  situation where, you know, I need to get in there now so...

23     Q    Okay.  How long does it take to take your gun off

24  and lock it up?

25     A    Let's say 30 seconds.  You know, take it off, you

1    know, you got to, you know -- you got to actually -- a lot

2    of the locks are actually locked, so you got to unlock the

3    lock, take the lock off.  You know, it's just like a little

4    padlock, and they're black lockers.  I can picture those.

5    You know, put your gun in there, boom, boom, lock it and

6    put the thing in your pocket, so anywhere depending, I

7    guess, on how fast you're moving, 30 seconds, I guess 30

8    seconds, 30 seconds to a minute.

9        Q    How long was it from the time Utter and Whitaker

10   arrived at the station until you heard the gunshots?

11       A    See, now that, that I don't know because I went

12   back to piping.  I can tell you what I was piping, and what

13   -- this is very fresh.  I was -- I just finished up -- and

14   again this is not answering your question, how long,

15   because I don't know.  I really don't.  And I'll get to

16   that.  But I just finished up Danny Boy, and then I heard

17   the pop, pop.

18       Q    What did you do when you heard it?

19       A    This is -- this is -- I'm going to just -- again

20   stop me if I'm out of turn.  This is what went through my

21   mind.  I heard the pop, pop, and from as soon as you start

22   taking your firearms training up at the academy, pop, pop

23   is -- it's a drill.  I'm going to -- it's the, oh, shit

24   drill.  It's -- it's -- it's -- it's significant in the

25   fact that there's a drill when someone is too close to you.

1    Okay. It's called a push-away drill. You literally push

2    away, draw your sidearm, kind of keep it here, and just

3    boom, boom, you know, and we practice it to this day.

4            MS. FULTON:  And you are making a noise that the

5    court reporter is not going to be able take down.  You --

6            THE WITNESS:  Bang, bang.

7            MS. FULTON:  You went bang, bang, and is that --

8    you are saying it in quick succession.  Is that a double

9    tap?

10           MR. KEEPERS:  Just a second, please.

11           MS. FULTON:  I just -- it's not going to be clear

12   what he's saying on the record.

13           MR. KEEPERS:  Okay.

14           MS. FULTON:  So I just wanted to make it clear

15   for the record.  I'm not intruding on your questioning.  I

16   just want to make sure that the record is accurately

17   reflecting what the officer is testifying to.

18           MR. KEEPERS:  Okay.  I won't make an issue of it,

19   but you could -- you will have the opportunity to do that

20   when I'm done.

21           MS. FULTON:  I just thought it would be less

22   confusing.  I apologize.  I don't --

23           MR. KEEPERS:  It's okay.  You can go ahead.

24           MS. FULTON:  May I ask one question at this

25   point?

1          MR. KEEPERS:  Yes.

2          MS. FULTON:  What you are describing, would you

3    call that a double tap?

4          THE WITNESS:  Definitely.  It was -- I'll use the

5    word bang, bang, and that's what it was.  It was bang,

6    bang, but I remember even when the State Police --

7          MS. FULTON:  But again the court reporter can't

8    take down when you say bang, bang very quickly --

9          THE WITNESS:  Got it.

10         MS. FULTON:  -- she can't take down the time it

11   takes you to say those two words.

12         THE WITNESS:  Yeah, it was definitely -- I guess

13   we'll call it the double tap pop.  The trigger was pulled

14   instantly.  I mean, two trigger pulls within, my God, maybe

15   like a second.

16         MS. FULTON:  Okay.

17         THE WITNESS:  Maybe that, I mean, and that's what

18   -- because a lot of guys -- when you said earlier what do

19   guys ask you about, you know, they're like what made you go

20   in, you know, and I know I heard that, and my mind went

21   back to my training, because for 11 years now, 11 and some

22   years, that's instinctive in your heart and in your head.

23   When you hear that it's -- we jokingly called it the, oh,

24   shit drill.

25         Like, oh, man, something -- you know, I knew

1    something went wrong, and I clearly remember looking up at

2    the video, the camera, whichever where it was, and I

3    remember doing that.  I don't know what I was looking to

4    see because it was like, oh, my God, and then from there --

5    like I said, I'm still not answering the timeframe.  In my

6    mind everything moved slow there, you know what I mean.

7    Like I would tell you it took an hour in my mind.

8    Everything moved slow.

9              But I ran over to my vehicle which is a Saturn.

10   I had my wife's vehicle at that time.  I got the keys out

11   because I had my -- all my keys and my stuff laying on the

12   seat.  It wasn't locked, you know, parked in a police

13   station lot.  I remember holding my pipes for whatever

14   reason, I guess, because I knew it was like the, oh, shit

15   thing going on.  I'm sorry for cussing, but that's just --

16   it's very vivid.  I'm holding my pipes, and I run back to

17   the door.  I open up the door, you know, and from there I

18   go in, and, you know, I can remember --

19   BY MR. KEEPERS:

20        Q    I'll ask you some specific questions from there.

21        A    Okay.

22        Q    But --

23        A    Okay.  I don't know if that --

24        Q    Essentially you hear the shots, you go to your

25   car to get the keys so you can get in the building?

1   didn't.  No, I couldn't tell you what it did, what it was

2   honestly.

3        Q    Okay.  Did you at first try the door before going

4   for your keys?

5        A    I don't think I did.  I don't think I did.

6        Q    Okay.  Let's take it from where you get back to

7   the door with your keys.

8        A    Uh-hum.

9        Q    Take me from there.  What happens next?

10       A    Okay.  I open up the door, and I can vividly

11  remember smelling spent gunpowder.  I know that's bizarre,

12  but I remember even the State Police when they questioned

13  me that night over and over, I remember smelling that.  And

14  I was -- I was -- I was -- I'll be honest.  I was -- I was

15  terrified because I didn't have a gun.  I didn't have -- I

16  didn't have -- I didn't have crap except my bagpipes.  Why

17  in God's name I kept them in my hands I don't know.

18            But I opened up the door, and the reason I was

19  terrified, again going back to that, the quick shots, you

20  know, that I heard, I knew something, and just in my mind

21  I'm thinking this just wasn't a misfire.  Something bad

22  happened, and I need to get in there, and my legs were

23  telling me no.  They felt like lead.  I can remember that.

24  You know, I guess that's just all the adrenaline and

25  whatnot.  And I just kept thinking, my God, I don't have

1  anything to protect myself.  So I opened up the door, and I

2  smelled the spent gunpowder, and I remember boom, boom,

3  boom, you know what I'm saying.

4           MS. FULTON:  You are gesturing your heart

5  pounding?

6           THE WITNESS:  Yeah, my heart pounding.  I'm

7  sorry.

8           MS. FULTON:  That's okay.

9           THE WITNESS:  I'm sorry.  And I walked in, and

10  from there I kind of looked, and I didn't hear anything

11  which kind of sent chills through me, too, because now at

12  that point I'm thinking, you know, I hear the quick shots,

13  I smell the spent gunpowder, I don't hear anything, and I'm

14  thinking -- I'm just being honest.  I'm like, oh, my God,

15  who has the gun?  What am I doing?  But I think any

16  officer, you know, you do what you do.  Your training kicks

17  in.  I guess it's just like the military.  You don't think,

18  you know.  You just do what you're trained to do, and then

19  you throw up afterwards.

20           So I walked in.  I remember looking.  Remember

21  that common hallway I told you about where the ramp is, and

22  then there's like two steps down.  I looked there.

23  Nothing.  I walked into the lunch room.  I remember putting

24  my bagpipes on the very first table.  I can remember that.

25  I still don't hear anything.  I didn't even walk to the

1   squad room. I don't know why. I came back out to that

2   common hallway, and I walked down the hall, and then as I

3   walked down the hall and kind of like looking like that

4   because I don't know what I'm going to find.

5              MS. FULTON:  Looking to your left?

6              THE WITNESS:  Looking to my left.

7              MS. FULTON:  Okay.

8              THE WITNESS:  And I was concerned about what was

9   to my right because there's a wall there.  When you're down

10  -- when you're where I'm at, because of me being a short

11  guy, the walls -- if I go stick my head up on the wall,

12  it's bigger than me, so part of me is scared.  I'm like

13  what's on that side because again I don't know what the

14  heck happened.  And if I'm going too again fast stop me.

15             I looked to the left, and that's then when I see

16  Gary leaning up against the wall, and he would be leaning

17  up -- I can remember.  He would be leaning up against the

18  east facing wall.  I remember that.  And he just kind of

19  like -- he's just like shaking, you know.

20  BY MR. KEEPERS:

21       Q    Did Gary say anything at that point?

22       A    For a couple seconds I don't think either of us

23  said anything, and then I remember, you know, I'm like what

24  the flip?  What's going on?  What's going on?  You know,

25  what -- what -- what is this?  And I remember.  I remember

1   this.  He said, you know -- I don't know if it was -- these

2   were the words I remember, and I don't know if it was

3   exactly in this order.

4          But he said, you know, he was trying -- he was

5   trying to hang himself or trying to kill himself.  I

6   remember him saying he was fighting with me, and I remember

7   him saying, you know, he took my asp.  And then I'm -- and

8   it's still at that point, you know, a lot's going on, but I

9   can remember this.  It's so weird, but I can remember.  And

10  I'm like, you know, where is he, where is he?  And I just

11  remember he points to that solid wood door, and at that

12  point then it was just like I went to the door and opened

13  the door up, and then I saw what I saw, you know, and you

14  can ask anything you want.

15      Q    Okay.  He points to the door, you go to the door

16  and open it, correct?

17      A    Yeah.

18      Q    You didn't ask him is the guy down or is the guy

19  dead?

20      A    I'm going to be honest with this whole thing.  I

21  don't remember that part.  I honest to God don't.  I don't

22  remember if I asked him, you know what I'm saying.  I just

23  -- it was -- I probably didn't.

24      Q    Okay.

25      A    You know.

1      Q      And of the things you remember him saying, do you

2    remember him saying he shot Mr. Whitaker?

3      A      No, I really don't.

4      Q      Okay.

5      A      Like I said, I do remember, you know, he was

6    fighting with me, trying to, you know, trying to hang

7    himself.  I do remember trying to hang himself and fighting

8    with me, trying to hang himself, trying to kill himself,

9    and I remember him saying, you know, you know, he took my

10   asp, and at that point my mind is trying to process.  You

11   know, I'm thinking I don't -- what's going on?  You know,

12   I'm processing -- I'm on like overload.  You can probably

13   tell now even how I am.

14          I mean, every time I talk about this it just kind

15   of freaks me out, and I think the reason being is because,

16   you know, when you play, it's like your happy place, right?

17   I mean, it really is one of the greatest joys I have is

18   when I play my bagpipes.  I just really feel very blessed

19   to be able to play an instrument like that, you know, and I

20   love playing, and I was in my happy place, and it was like

21   that whole thing, you know, it was just like you were

22   thrown -- you know, you're off work.  You're -- in your

23   mind and in your heart you're no more violence for the

24   night, no more people hating each other and all that, and

25   then instantly you're thrown into a really bad situation,

1  and you're confused, and then you realize you don't have

2  anything.

3          It was really weird, you know, and that's what

4  I'm saying.  It's been -- I know it's been consistent with

5  what I wrote out that night and with the State Police.

6  It's never -- none of it has changed which is really kind

7  of -- you know, it's just like it's weird what you can --

8  what you can remember, you know, whenever.  I don't know.

9  I mean, I'm not trying -- just please keep asking if I'm

10  going off.

11      Q     Okay.

12      A     It was just -- that's the only thing I can

13  remember as far as what he said.

14      Q     What did you expect to find before you opened the

15  door?

16      A     Honest to God, I have no idea.  I really didn't.

17  I really had no idea what I was going to find, you know,

18  because there I think it was just like all right, the next

19  move is what's on the other side of the door, and I

20  honestly don't know what I expected to find.

21      Q     Did Officer Utter still have his gun on him?

22      A     He had -- he had his -- I believe it was

23  holstered because I do remember making mention of that, and

24  I definitely, I definitely remember seeing that, yes.

25      Q     Making mention of it to whom?

1    A    No.  Me?  Oh, like to the State Police.

2    Q    Oh, okay.

3    A    Yeah.

4    Q    You opened the door?

5    A    Yeah.

6    Q    What do you see?

7    A    I see Mr. Whitaker.  He's laying on his belly.

8    His head would be facing -- his head was facing south, and

9    his feet were closest to the door, and I remember seeing

10   the blood.  I remember seeing the blood on the floor, and I

11   remember seeing some blood on -- it was almost like if you

12   have blood on your hands and you might like touch the wall,

13   you know what I'm saying, to the left of you, to the left

14   side.

15         MS. FULTON:  To the left of Mr. Whitaker?

16         THE WITNESS:  To the left of Mr. Whitaker.  That

17   would be like in this hallway, like here (indicating), you

18   know what I'm saying, to like this side of the door.  From

19   there --

20   BY MR. KEEPERS:

21   Q    You are indicating the door opposite the holding

22   room?

23   A    Yes.  Well, like he's not right at the door

24   though, but like here's the holding room, and, you know,

25   like he's laying in here, you know what I'm saying.

1      Q      Yes.

2      A      And then there was some blood on the wall here,

3   and I remember it was like as if you had blood on your

4   fingers --

5      Q      Okay.

6      A      -- and like someone trying to climb a wall sort

7   of.

8      Q      Okay.  So you saw --

9      A      Yeah.

10     Q      So you saw blood on the wall in the hallway on

11   the wall opposite the --

12     A      Holding cell.

13     Q      The holding cell?

14     A      Yes, sir.

15     Q      Okay.

16     A      And then from there I ran past him, and I now go

17   into the fingerprint room.  There's a radio over here.  I

18   remember screaming on the radio for someone to bring me --

19   it's the Marine Corps blood clot pack.

20     Q      Okay.

21     A      And I don't -- God only knows what else I was

22   screaming.  I probably cussed and screamed and everything.

23   I have no idea, but I remember -- why do I remember that

24   but none of the other stuff I said?  I couldn't tell you,

25   but I remember asking for that.  And then in the same area

1    I put on rubber gloves, and then I went back over, and then

2    I remember that I -- I clearly remember this. I rolled him

3    over because you're taught if somebody, you know, is

4    severely injured you get them off their belly so they can

5    bleed -- or breathe, you know.

6         So I roll him over, and in a situation like this,

7    you know, if they have a broken neck or you suspect back,

8    no, obviously you don't, but this one, you know, I'm like

9    okay, I know that I heard gunshots. All right. I now know

10   this guy was shot. I need to, you know, render aid. So I

11   roll him over. I remember checking for a pulse, and I

12   remember that his eyes were open, and as I'm checking for a

13   pulse he gave the -- like the last breath type thing, you

14   know, and I remember thinking, oh, my God, you know, and

15   then I'm thinking okay, I got to find -- I got to find the

16   entrance holes.

17        Q    Let me stop you right there.

18        A    Okay.

19        Q    Before you roll him over did you see any bullet

20   holes in his body?

21        A    No, because he had a shirt on.

22        Q    Did you see any blood on the shirt?

23        A    There was blood. Like in my mind?

24        Q    Yeah.

25        A    There was blood everywhere.

1    Q    Okay.

2    A    It was like in my mind, you know what I mean,

3  because it was pretty freaking traumatic.  I've seen

4  bizillions of accidents.  I have picked up body parts on

5  Route 30, but I think -- again, you know, what the

6  psychologist told me was the reason it was so vivid and you

7  remember so much is because you literally were kind of like

8  transformed from your happy place to this place like that,

9  and everything just -- your body -- now I'm trying to talk

10  like a physician which I'm not, nor am I an artist, but,

11  you know, yeah, it was -- it was -- there was a lot of

12  blood.

13       So I remember, you know, pulling up the shirt

14  and just kind of like touching his body, and then I

15  remember finding -- I remember finding one hole.  It would

16  have been on the left side.  It was on the left side, and

17  this is weird.  I can remember thinking -- I said this to

18  the State Police.  You know how your mind is just so -- you

19  know, I don't know why I thought that, but I'm thinking, my

20  God, that's just like the perfect hole, and then I

21  remember, you know, thinking all right, I got to stop the

22  bleeding somehow.

23       Even though I said, you know, he took his last

24  breath, at least I thought, I'm not a paramedic either, but

25  I wanted to do everything that I could, and that's part of

1    your training, you know.  And then the paramedics came in,

2    and they came down, and I remember when they came in,

3    seriously I remember when they came in because I remember

4    saying this because I don't cuss much, but I remember like

5    saying get the fuck down here and help me, you know, not

6    that they weren't moving fast, but in my mind, you know, it

7    was just like what the heck, I'm supposed to be out playing

8    my bagpipes.

9        Q    Did you see a taser cartridge attached to him?

10       A    Yes, because I remember when we -- we loaded him

11   onto the gurney.  As we were going out the hallway, I

12   actually stepped on the wire and actually pulled the taser

13   cartridge out.

14       Q    Okay.

15       A    I definitely remember that.

16       Q    What part of the body was the taser cartridge

17   attached to?

18       A    See, that I couldn't tell you.

19       Q    Uh-hum.

20       A    I don't know because they're so -- you know,

21   that's it, and the darts are so tiny, you know.  You can

22   actually look at it.

23           MS. FULTON:  Just for the record, Officer Miller

24   is showing Mr. Keepers the cartridge from his taser.

25           THE WITNESS:  Yeah, they are tiny little darts,

1    pizza from Jim and Nena's or whatever, but other than that,

2    no.

3        Q    Okay.

4        A    You know, Gary and I had, you know, a good

5    working relationship but nothing outside of that.

6        Q    Other than being interviewed after the incident,

7    did you play any role in the investigation?

8        A    I don't believe so.  I mean, no.  Yeah.  Just

9    other than interviewed, no.

10        Q    Okay.

11        A    I mean, we weren't -- you know, we -- we -- once

12    the State Police got there -- well, once our guys got

13    there, like the chief and whatever, you know, that was --

14    you didn't walk in that area, you know.

15        Q    Who were you interviewed by?

16        A    I don't remember his name.  It was definitely the

17    State Police interviewed me.  I know at one point after

18    that, this might have been a couple days after, Lieutenant

19    Laird then did a complete, thorough interview, and then I

20    think I got interviewed again by the State Police, yeah.

21        Q    Okay.

22        A    But I don't remember the trooper's name at all.

23        Q    Okay.  During the investigation did anyone ask

24    you if you knew why Whitaker had not been handcuffed in the

25    holding room?

1  department's procedures when they're made?

2      A     Oh, yeah.  When we -- when like a new SOP is

3  enacted, yes, we all have to sit down.  The supervisors

4  actually read it verbatim so that all officers and you have

5  to sign off, I heard it.  You know, you have to sign off

6  the date and time, so there's no discrepancy there, yes.

7      Q     And you don't recall any new SOP after this

8  incident concerning detainees in holding cells?

9      A     This is terrible, no.  I know that we now

10  definitely remove belts and things of that nature.  I can't

11  tell you for sure whether there's an SOP on that one or

12  not.  I really don't know.

13     Q     Okay.

14     A     But yeah, we do remove all that stuff now.

15     Q     Okay.  And that practice began after this July

16  8th?

17     A     Yeah, whether it was just guys just, hey, saying,

18  hey, I'm not going to let that happen, you know, again, or

19  it was put into -- you know, enacted, I really don't know.

20         MR. KEEPERS:  Okay.  I think that's all I have.

21  Other counsel may have some questions.

22         MS. FULTON:  I don't have anything.

23         MR. KEEPERS:  Then we're done.  Thank you very

24  much.

25         MS. FULTON:  Brian, you don't have anything?