# EXHIBIT "J"

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND          :
DALEA LYNN, CO-ADMINISTRATORS        :
OF THE ESTATE OF RONALD TAYLOR       :
WHITAKER, JR.; AND RONALD T.         :
WHITAKER, SR., TAYLOR WHITAKER,      :
BRANDI WHITAKER AND CHRISTOPHER      :   CIVIL ACTION
HAMMERSTONE, INDIVIDUALLY,           :
        PLAINTIFFS                   :   NO: 1-08-CV-00627
                                     :
            V                        :
                                     :
SPRINGETTSBURY TOWNSHIP;             :
SPRINGETTSBURY TOWNSHIP POLICE       :
DEPARTMENT; CHIEF OF POLICE          :
DAVID ESHBACH AND POLICE             :
OFFICER GARY UTTER,                  :
        DEFENDANTS                   :   JURY TRIAL DEMANDED


            DEPOSITION OF:     CHRISTOPHER FORD

            TAKEN BY:          PLAINTIFFS

            BEFORE:            DIANE F. FOLTZ, RMR
                               NOTARY PUBLIC

            DATE:              JANUARY 20, 2009, 10:45 A.M.

            PLACE:             HAGGERTY & SILVERMAN, P.C.
                               240 NORTH DUKE STREET
                               LANCASTER, PENNSYLVANIA



HAFN
Hughes
Albright
Foltz
Natale

2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1    Q    -- before that?

2    A    No.

3    Q    Okay.  Any knowledge of Utter having been

4  involved in a warrant for Mr. Whitaker's arrest on a bad

5  check charge?

6    A    No, I'm not aware of that.

7    Q    Okay.  How did you first receive notice of the

8  incident at the Giant market relating to Mr. Whitaker?

9    A    I was dispatched to Giant for a subject that was

10  being physically restrained after trying to steal a cash

11  register at Giant.  It initially came across that he was

12  being restrained by subjects inside of Giant at that

13  time.

14    Q    Were you on patrol in your car when you got this

15  call?

16    A    Yes, I was.

17    Q    How far away from the Giant were you?

18    A    I was just around the Banana Max area which is to

19  estimate as the crow flies mileage wise maybe a half a mile

20  away.  I don't know.  That's an estimate.

21    Q    Okay.  How long did it take you to get there?

22    A    I don't have the call sheet in front of me, but I

23  would estimate, you know, one to two minutes.

24    Q    Okay.  Were you the first one on the scene?

25    A    Yes.

1    Q    Okay.  What did you see when you got there?

2    A    When I entered the Giant on the north exit or

3    entrance rather, I entered the store and observed the

4    subject later identified as Mr. Whitaker laying face down,

5    being physically restrained by several subjects to include

6    patrons of the store and what appeared to be employees of

7    the store at that time.  I also observed the cash register

8    and displays and whatnot knocked over, things on the floor,

9    and it appeared there had been some type of physical

10   altercation inside that store right in the area of where

11   Mr. Whitaker was laying.

12   Q    What did you do when you came upon --

13   A    I approached Mr. Whitaker.  I placed my knee in

14   the center of his back, upper shoulder area.  I told him

15   that if he resisted or struggled he would be tased.  I

16   assisted in placing his hands behind his back, and I

17   secured him with handcuffs.

18   Q    And during this time were you the only officer on

19   the scene?

20   A    Yes.

21   Q    Okay.  Did Mr. Whitaker appear to be under the

22   influence of alcohol?

23   A    Based upon my training and experience, when we

24   actually had a face-to-face conversation or a brief contact

25   there when he was standing up, after he was assisted in

```
 1        A    Charges were never completed.
 2        Q    Right.  Are you aware of what other charges were
 3   written up with regard to the Giant incident?
 4        A    Listed in the report?
 5        Q    Yes.
 6        A    Yes.
 7        Q    And what's your recollection of what they were?
 8        A    I completed the report, and I'm the one that
 9   entered the UCR codes into the report, and I'm familiar
10   with this charge that we just discussed as far as the
11   robbery, attempted robbery, and the public drunkenness, the
12   criminal mischief, and also I believe it was a harassment
13   charge.
14        Q    Okay.  And he was charged with public drunkenness
15   because he was displaying outward signs of intoxication; is
16   that correct?
17        A    Absolutely, and I mean it falls into conjunction
18   with the statute itself.  He was a harm to himself and/or
19   others at that point.
20        Q    So by the time he was even out of the Giant
21   store, you and other officers had determined that he was
22   intoxicated and was a harm to himself and/or others?
23        A    I'm not saying he was intoxicated.  I said he was
24   under the influence of something.
25             MR. GABRIEL:  Objection to the form of the
```

1    question.

2            MS. FULTON:  The same.

3    BY MR. KEEPERS:

4        Q    Okay.  It's a form objection.  You can answer.

5        A    I believe I just answered.  I'm not saying he was

6    intoxicated at that point in time.  I had the suspicions

7    that he was under the influence to the degree that he was a

8    harm to himself or others as the statute reads.

9        Q    Okay.

10       A    And as far as the rest of the charges, that's

11   pretty much a given.  There was victims there that were

12   assaulted or bitten by Mr. Whitaker, and furthermore there

13   was damage to property of the store which would constitute

14   a criminal mischief charge.

15       Q    And Mr. Whitaker I assume was handcuffed before

16   he was placed in the car, or don't you know?

17       A    I handcuffed Mr. Whitaker.

18       Q    Oh, that's right.  I'm sorry.  Yes.  I'm sorry.

19   You already testified you handcuffed him inside the store.

20   Okay.  And he was still restrained in cuffs when he was

21   placed in the car?

22       A    I don't believe I was present as I testified to,

23   that I was, you know, actually witnessing him going into

24   the car.  I testified that I saw him being patted down, so

25   I wasn't present for him being placed in the car.

1      A     We're a small department.

2      Q     How long after Mr. Whitaker was taken away was it

3  until you received the 911 call from Gary Utter?

4      A     You mean when he radioed the Signal 13?

5      Q     Yeah.

6      A     I really hate to estimate a timeframe when it

7  comes to that without looking at the actual transcript from

8  the or the radio log from York County Control.  I really --

9  if I had to estimate, I'd say ten minutes maybe, but again

10  to be quite, you know, quite honest with you I'd like to

11  look at the radio log to give you a specific answer

12  obviously.

13      Q     That's fine.  Were you still at the Giant at the

14  time?

15      A     Yes, I was.

16      Q     Okay.  Do you remember any of the words of the

17  call?  Do you remember anything that he said?

18      A     Yes.

19      Q     Go ahead.

20      A     Again it was kind of garbled.  There was yelling.

21  I identified it as being Gary given the voice.  Signal 13,

22  22, and I think the dispatcher said where are you at or

23  something like that, and he said Signal 2, Signal 13 or

24  something like that, 22, Signal 13.  It was -- like I said,

25  that part, at that point my mind was going trying to figure

1  A    Being escorted out to the ambulance.

2  Q    Do you recall whether the taser was still in

3  Mr. Whitaker's body?

4  A    I recall seeing taser leads, yes.

5  Q    Still attached to his body?

6  A    Those are projectiles, and then there is a wire

7  lead that attaches the projectile to the cartridge itself.

8  I recall seeing the long wire leads, and I don't -- I don't

9  recall if it was the EMS crew or if it was Jamie, Officer

10  Miller, removed that as they were being wheeled out the

11  door.

12  Q    Okay.  Were you involved in the department's

13  investigation of the shooting?

14  A    I was interviewed about it.

15  Q    Okay.  Who were you interviewed by?

16  A    Lieutenant Scott Laird.

17  Q    Anyone else?

18  A    I was interviewed by the Pennsylvania State

19  Police, I believe it was Trooper or Investigator, however

20  you want to say it, Bryan Henneman of the York Barracks.

21  Q    Okay.

22  A    Loganville Barracks.  And I also went through

23  the debriefing obviously through the Pennsylvania State

24  Police.

25  Q    Okay.  Do you recall Lieutenant Laird asking you

1    A    And obviously the circumstances surrounding why

2  the person was in custody and things of that -- things of

3  that degree.

4    Q    Okay.  Did you ever receive any training on how

5  to determine whether a detainee is at risk for attempting

6  suicide?

7    A    Other than, you know, MPOETC courses which we

8  received through updates, training, the academy, and things

9  of that nature, I mean, dealing with mentally unstable,

10  persons with disabilities, things like that, yes, we

11  receive training on that.

12    Q    Okay.  And you received that during the time that

13  you were employed with the department?

14    A    Yes, and also through the six-month academy or

15  five-month academy in Harrisburg, yes.

16    Q    Were you ever taught that a person who is under

17  the influence of alcohol is more likely to attempt suicide

18  than one who is not?

19    A    I don't recall if I was ever told that or not.

20    Q    Before July 8th, 2007, was it your practice to

21  remove your gun belt before entering a holding room where

22  there was a detainee?

23    A    Was it common practice, no.

24    Q    Was it yours?

25    A    Was it mine, no.

1   on that or not.

2       Q    Is there now?

3       A    I'm really unsure of that one, sir.  I know it's

4   fairly common even if the portable is on that it's -- it

5   doesn't work inside the building, but there are

6   wall-mounted radios within the station also.

7       Q    After July 8th, 2007, were there -- were there

8   new policies issued as to how to handle detainees?

9            MS. FULTON:  Objection to relevancy.

10           MR. KEEPERS:  You have produced the documents.

11           THE WITNESS:  Should I answer that question?

12           MR. GABRIEL:  You can answer the question.

13           THE WITNESS:  I don't think there were new

14  policies.  I believe there were amended or changes within

15  the current policies.

16  BY MR. KEEPERS:

17      Q    Okay.  And under the changed new policies, is the

18  practice now to remove the shoes and laces of the detainee

19  before putting them in the holding room?

20      A    Me personally, I do remove shoelaces, belts,

21  necklaces, things to that degree.

22      Q    And your understanding is that that is the

23  official position of the department?

24      A    That's my understanding, yes.

25           MR. KEEPERS:  Okay.  I think that's all I have for

1    the moment.

2    BY MR. GABRIEL:

3        Q    Officer Ford, very briefly, as I understood it

4    you were responsible for putting in the code numbers for

5    the charges that would have been brought against

6    Mr. Whitaker; is that right?

7        A    Yes.

8        Q    And was your input in that regard based upon

9    conduct that had occurred inside of the store before you

10   had arrived?

11       A    Yes.

12       Q    And with regard to the handcuffing or

13   unhandcuffing of a prisoner in the holding room, did I

14   understand your testimony to be at the time the SOP

15   indicated that an officer was to have secured his weapon

16   before either handcuffing or unhandcuffing the prisoner?

17       A    That's the understanding that I have of the SOP

18   prior to this incident, yes.

19       Q    And is it your or was it your testimony that that

20   same SOP provided for the situation where there was an

21   emergency?

22       A    To enter with your weapon on?

23       Q    Yes.

24       A    Yes.

25           MR. GABRIEL:  Okay.  That's all I have.  Thank

1     you.

2     BY MS. FULTON:

3         Q    I have one quick question for you, Officer Ford.

4     What was Mr. Whitaker's demeanor when you encountered him

5     at the Giant store, and by demeanor I mean was he compliant

6     or was he actively resisting?

7         A    Upon entering the store he appeared to be

8     compliant at that point in time, but again he had a fairly

9     large male which he had bitten on the right side of his

10    body, and again he was face down on the ground.  I believe

11    there was another male on his left side, and I believe

12    someone was laying on his legs.  He had three adults to

13    include one large man holding him on the ground, so I don't

14    know that he really had a choice at that point to be

15    compliant or noncompliant, but he was being compliant at

16    that point in time, and upon me handcuffing him he remained

17    compliant and did what I told him to do.

18        Q    At any time after you handcuffed him was he

19    anything other than compliant?

20        A    No, he remained compliant throughout the entire

21    process or rather through the entire contact I had with

22    him.

23             MS. FULTON:  That's all I have.  Thanks.

24    BY MR. KEEPERS:

25        Q    Just a little bit of follow-up.  So you had

# EXHIBIT "K"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND        :
DALEA LYNN, CO-ADMINISTRATORS      :
OF THE ESTATE OF RONALD TAYLOR     :
WHITAKER, JR.; AND RONALD T.       :
WHITAKER, SR., TAYLOR WHITAKER,    :
BRANDI WHITAKER AND CHRISTOPHER    :   CIVIL ACTION
HAMMERSTONE, INDIVIDUALLY,         :
            PLAINTIFFS             :   NO: 1-08-CV-00627
                                   :
            V                      :
                                   :
SPRINGETTSBURY TOWNSHIP;           :
SPRINGETTSBURY TOWNSHIP POLICE     :
DEPARTMENT; CHIEF OF POLICE        :
DAVID ESHBACH AND POLICE           :
OFFICER GARY UTTER,                :
            DEFENDANTS             :   JURY TRIAL DEMANDED


        DEPOSITION OF:     JOHN P. KRENTZ

        TAKEN BY:          PLAINTIFFS

        BEFORE:            DIANE F. FOLTZ, RMR
                           NOTARY PUBLIC

        DATE:              JANUARY 20, 2009, 9:07 A.M.

        PLACE:             HAGGERTY & SILVERMAN, P.C.
                           240 NORTH DUKE STREET
                           LANCASTER, PENNSYLVANIA




1    noes as opposed to the uh-huhs and the casual things that

2    we say in conversation.

3             We're looking for your personal knowledge and

4    recollection.  Please don't guess at an answer.  If you

5    don't understand a question, please let me know, and I'll

6    try to rephrase it until you're satisfied that you do

7    understand it.  If you don't recall or don't know an

8    answer, please feel free to tell me just that rather than

9    guessing, and if you'd like to take a break at any time,

10   just let us know, and we'll go off the record and take a

11   break.  Are you okay with all that?

12       A    That's fine, yes.

13       Q    Are you taking any medication or substance that

14   would affect your ability to understand and answer

15   questions today?

16       A    No.

17       Q    Okay.  Have you spoken with anyone other than

18   your attorney about your deposition?

19       A    No.

20       Q    Have you reviewed any documents in preparation

21   for your deposition?

22       A    Just my interview with I believe it was

23   Lieutenant Laird.

24       Q    Okay.  And Lieutenant Laird is with

25   Springettsbury Police Department?

```
 1        A    Yes.

 2        Q    Is that an interview that was conducted on August

 3   6, 2007?

 4        A    Yes.

 5        Q    Could we start for the record with your full name

 6   and address, please?

 7        A    John Paul Krentz, 936 Narnia Court, York, PA,

 8   17404.

 9        Q    Was that the same as of July 8th of 2007?

10        A    Yes.

11        Q    Could you tell us your educational background

12   beginning with high school, please?

13        A    I went to Johnstown Vocational Technical School,

14   data processing, graduated; went on to Shippensburg

15   University, a criminal justice degree; basically HACC, went

16   to HACC for, you know, Municipal Police Officers Education

17   and Training Commission, federal law enforcement training,

18   Glynco, Georgia, and that pretty much sums it up.

19        Q    What was your first law enforcement position?

20        A    It was a federal corrections institute in

21   Loretto, Pennsylvania.

22        Q    Okay.  How long did you -- what was your position

23   there?

24        A    It would have been materials handler leader.

25        Q    Okay.  How long did you stay there?
```

```
 1        Q    Okay.  Did you respond?

 2        A    Yes.

 3        Q    Was anyone at the station with you at that time?

 4        A    There was somebody else.  I can't really say for

 5   sure who it was.

 6        Q    Okay.  So you drove to the Giant market then?

 7        A    Yes.

 8        Q    Okay.  Were you the first one to arrive?

 9        A    No.

10        Q    Do you know who was?

11        A    I can't say.  I can just tell you I remember

12   Sergeant Witmer's vehicle was parked in front of the

13   Giant.

14        Q    Do you remember if there were any other vehicles

15   there when you arrived?

16        A    I don't remember any other vehicles.  I know

17   there were other vehicles there already, but I can't say

18   who it was.

19        Q    Okay.  What do you recall seeing when you got on

20   the scene?

21        A    When I walked in the door, they pretty much had

22   Mr. Whitaker down, face down on the ground.  He seemed to

23   be calm, and I think it was Polizzotto and Officer Utter on

24   either side.

25        Q    So both Polizzotto and Utter were there before
```

1       A       I believe it was Polizzotto and Utter, and they

2   just escorted him outside to the vehicle.

3       Q       Okay.  Did you see either one of them take him

4   away then?

5       A       Actually drive away in the police car?

6       Q       Yeah.

7       A       No, no.

8       Q       Okay.  What did you do on the scene?

9       A       I spoke with the -- I believe it was one of the

10  guys that actually tried to help assist in taking this guy

11  into custody, and apparently Mr. Whitaker had bit him, and

12  I was trying to convince this gentleman to get checked out

13  by the ambulance, go to the hospital, because human bites

14  are -- I know they're pretty -- they're one of the worst

15  bites you can get.

16          You know, I got his information.  I took some

17  photos of the scene, tried to talk to whoever was there,

18  what other witnesses, reviewed videotape.

19      Q       Who made the determination of what to charge

20  Mr. Whitaker with for the Giant incident?

21      A       Honestly I can't say.  I really don't know.

22      Q       Okay.  It wasn't you?

23      A       No, no.

24      Q       So did the -- the witnesses that you talked to,

25  did they tell you that Mr. Whitaker had become suddenly

Page 20

1    Q  How about Lieutenant Trott?

2    A  I don't remember that.

3    Q  Okay.

4    A  I thought it would have been Laird but --  I

5  guess it could have been Laird or Trott.  I really -- I

6  don't recall.

7    Q  Okay.  Let me show you what was produced to us

8  as State Police Bates No. 26.  Tell me if you recognize

9  that.

10    A  Okay.  I'm sorry.  I can't remember even sitting

11  there talking with him.

12    Q  Okay.

13    A  I know they were -- they all arrived, you know,

14  after that, but it's like a blur after.

15    Q  All right.  Any possibility that Trooper Henneman

16  just got your statement from the one you gave to Laird?

17    A  I guess it's possible.

18    Q  So you have no recollection of actually talking

19  to Trooper Bryan Henneman?

20    A  I remember the debriefing, you know, after a

21  critical incident stress, you know, talking to troopers

22  and things like that, but I don't remember anything like

23  that.

24    Q  Okay.  Do you know who was involved, what members

25  of the Springettsbury Township Department were involved in

1    ~~the investigation?~~

2              MR. GABRIEL:  A point of clarification.  You mean

3    the internal investigation by the police department or the

4    State Police investigation?

5              MR. KEEPERS:  I meant the township department's

6    own investigation, yeah.

7              THE WITNESS:  I can't say.  It doesn't say on

8    here, does it, who did the interview?

9    BY MR. KEEPERS:

10        Q     Well, if you are referring to your statement of

11   August 6, 2007, that's Bates No. RTW SPD 552.  It's been

12   represented to us that that was Lieutenant Laird.

13        A     Okay.

14        Q     And I think that's consistent with your testimony

15   so far.

16        A     Okay.

17        Q     Did you have any communications with anybody

18   after the incident about whether Mr. -- whether

19   Mr. Whitaker had been handcuffed in the holding room?

20        A     No, I don't recall anything.

21        Q     Any discussions about why Mr. Utter didn't remove

22   his weapon before entering the holding room?

23        A     After, after hearing how everything would have

24   transpired, I can't -- I could not say who exactly would

25   have told me what.  I just -- all's I can remember is what

```
 1    of any sanctions or discipline imposed on Mr. Utter by the
 2    department?
 3         A    No.
 4         Q    How about any ongoing investigations relating to
 5    any conduct by Mr. Utter?
 6         A    No.
 7         Q    Oh, did you -- were there any policies or
 8    procedures in place at the department before July 8th,
 9    2007, relating to assessing the risk that a detainee might
10    harm himself?
11         A    We would have had a little bit of training
12    somewhere along the lines there, but I can't recall because
13    you need to be able to recognize medical conditions, maybe
14    some mental issues.  You need to know what you're dealing
15    with as far as that goes.
16         Q    What would have been the source of this training?
17         A    It would have been from MPOETC, probably updates,
18    legal updates.
19         Q    That you attended while you were employed with
20    the department?
21         A    Yes.
22         Q    Okay.  Do you recall the substance of any of it,
23    like how do you determine whether someone is at risk for
24    suicide?
25         A    Basically their statements that they could say to
```

```
 1   you, like, you know, I want to die, or maybe, of course,
 2   their actions on what they might do to themselves, you
 3   know, while you're in their presence, maybe what you would
 4   hear, have heard from family members, those type of things.
 5        Q    Were you ever trained that an intoxicated person
 6   is more likely to attempt suicide?
 7        A    Somewhere along the lines I'm sure, you know,
 8   that's come up because alcohol is a depressant.
 9        Q    Do you know whether any sanctions or discipline
10   were imposed against Mr. Utter as a result of the accident
11   -- as a result of the incident of July 8th, 2007?
12        A    No, I'm not aware of anything.
13        Q    Do you know whether Chief -- do you know whether
14   Chief Eshbach was aware that officers were not in the
15   practice of removing the shoes from a detainee when putting
16   them in the holding room?
17        A    No, I'm not aware of anything.  I don't recall.
18        Q    Now, you've testified earlier, I believe, that
19   was it your practice to remove your gun belt before placing
20   a detainee in the holding room?
21        A    At least, at least the gun.
22        Q    Was it also your practice to remove your gun
23   before entering the holding room where there already was a
24   detainee?
25        A    I would.  It would be safer.  That would usually
```

1    rooms, and I realize you left in 2007, was there ever a

2    situation where you had to respond to an emergency in a

3    holding room, in other words, where you had to get there as

4    quickly as you can?

5        A    No, not that I can recall.

6        Q    And in that situation do you recall whether or

7    not under the standard operating procedures it would be

8    permissible to not secure your weapon or do anything else

9    because it was an emergency?

10        A    If it was an emergency I don't know how you would

11   have time to, you know, think of those things.  You've got

12   to act, you know.  You only have a few minutes and

13   depending upon what happens, you know, maybe to save a life

14   because it goes -- it happens fast.

15        MR. GABRIEL:  Okay.  That's all I have.

16   BY MR. KEEPERS:

17        Q    Just one follow-up question.  In your experience

18   as a police officer, would you agree that the detainee

19   handling procedures are put into place to prevent

20   emergencies from arising?

21        A    Err on the side of caution if you're -- yeah, you

22   definitely want to avoid an emergency.

23        MR. KEEPERS:  That's all I have.

24   BY MS. FULTON:

25        Q    I do have one question.  When you arrived at the

# EXHIBIT "L"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

```
RONALD T. WHITAKER, SR. AND          :
DALEA LYNN, CO-ADMINISTRATORS        :
OF THE ESTATE OF RONALD TAYLOR       :
WHITAKER, JR.; AND RONALD T.         :
WHITAKER, SR., TAYLOR WHITAKER,      :
BRANDI WHITAKER AND CHRISTOPHER      :  CIVIL ACTION
HAMMERSTONE, INDIVIDUALLY,           :
          PLAINTIFFS                 :  NO: 1-08-CV-00627
                                     :
             V                       :
                                     :
SPRINGETTSBURY TOWNSHIP;             :
SPRINGETTSBURY TOWNSHIP POLICE       :
DEPARTMENT; CHIEF OF POLICE          :
DAVID ESHBACH AND POLICE             :
OFFICER GARY UTTER,                  :
          DEFENDANTS                 :  JURY TRIAL DEMANDED
```

DEPOSITION OF:        GREGORY WITMER

TAKEN BY:             PLAINTIFFS

BEFORE:              DIANE F. FOLTZ, RMR
                     NOTARY PUBLIC

DATE:               JANUARY 20, 2009, 1:56 P.M.

PLACE:              HAGGERTY & SILVERMAN, P.C.
                    240 NORTH DUKE STREET
                    LANCASTER, PENNSYLVANIA



2080 Linglestown Road • Suite 103 • Harrisburg, PA 17110
717.540.0220 • Fax 717.540.0221 • Lancaster 717.393.5101

1    Q    Were you at the station when you got the call?

2    A    Yes, sir.

3    Q    Okay.  Why did you decide to respond personally

4    to that call?

5    A    Because the person was being reported as out of

6    control and a robbery involved incident, and I was the

7    shift supervisor.

8    Q    Okay.  Were you the first one on the scene?

9    A    No, sir.

10    Q    Who was?

11    A    Christopher Ford.

12    Q    Okay.  Anybody other than Mr. Ford get there

13    before you did?

14    A    I don't remember the exact sequence of who got

15    there when other than Chris Ford was out.

16    Q    Okay.  What do you recall seeing when you got

17    there?

18    A    When I walked into the vestibule of the main

19    customer area of the Giant, the person -- a white male

20    subsequently identified as Ronald Whitaker was laying prone

21    and already handcuffed in the area of the floor between the

22    customer service desk and the row of cash register aisles,

23    and there was quite a mess there.  There was money and part

24    of the -- the better part of a cash register machine laying

25    on the floor, and several customers, several employees and

1    other officers in that area at that time.

2        Q    Okay.  Was Gary Utter one of the other officers?

3        A    I don't remember.

4        Q    Okay.  At that moment when you first saw

5    Mr. Whitaker was Officer Ford physically restraining him?

6        A    He was standing beside him.  Whitaker was laying

7    prone, in essentially a prone position on the floor, and

8    Officer Ford was standing beside him.

9        Q    Okay.  Did you discuss with Officer Ford what had

10   occurred?

11       A    He explained to me what he had learned up to that

12   point.

13       Q    Okay.  What did he say?

14       A    Just that Mr. Whitaker had come in, was trying to

15   use the Coin Star machine to cash in coins into paper money

16   and that there had been some kind of discrepancy or dispute

17   or I don't know what you really want to call it at that

18   point with how much he said he put into the machine and how

19   much the store was going to do to alleviate that problem at

20   that particular hour, and he became upset with the store

21   personnel's decision at that point and indicated that he

22   would have to -- or he was told he would have to come back,

23   and when he got that response he subsequently attempted to

24   grab the cash register off the customer service counter and

25   apparently -- I would only be guessing, but the electrical

1   service lines into the cash register prevented the complete

2   removal, and the cash register subsequently fell to the

3   floor in the customer area, and that several customers

4   and employees subsequently took Mr. Whitaker into custody

5   until Officer Ford was there to come and complete the

6   custody.

7       Q    Did you -- have you spoken to anyone who had any

8   knowledge as to whether Mr. Whitaker intended to leave the

9   premises with the cash register?

10      A    No, sir.

11      Q    At some point it was determined -- I'll show you

12  documents marked RTW SPD Bates No. 16 through 21 that have

13  been produced in this case, and tell me if you recognize

14  those.

15      A    Yes, sir.

16      Q    Okay.  Now, do those pages indicate what the

17  department would have charged Mr. Whitaker with if he

18  hadn't died?

19      A    Yes, sir.

20      Q    Okay.  Who made that determination?

21      A    I don't remember.

22      Q    Okay.

23      A    I don't know who all was involved with the

24  discussion.

25      Q    All right.  Did you tell Mr. Whitaker that he was

1    Q    Has it -- did it include --

2    A    Yes, sir.

3    Q    -- training on how to recognize that somebody is

4    under the influence?

5    A    Yes, sir.

6    Q    Okay. And is it your understanding that somebody

7    who is under the influence is liable to be violent or

8    unpredictable in their behavior?

9    A    That could be one response, yes.

10   Q    Have you ever received training indicating that a

11   person who is under the influence is at a greater risk of

12   attempting suicide than one who is not?

13   A    I don't remember that specific aspect.

14   Q    Did Mr. Whitaker appear to be confused?

15   A    Not in the short time that I saw him, no.

16   Q    What do you remember him saying, if anything?

17   A    He was just overly apologetic to everyone there.

18   He was apologizing to the staff at the store, to the other

19   customers, to the police, asked if there's anything he

20   could -- we could do to work this out. I didn't get right

21   up to him. The other officers were there. That's why I

22   can say that I didn't smell alcohol on him.

23        My main concern at that point was making sure

24   everybody else was okay because we did have a customer that

25   came up and showed us a mark on his arm that he claimed was

1   caused by Mr. Whitaker biting him in the process of being

2   subdued.  So Mr. Whitaker seemed to be fully under control

3   at that point, remorseful for what he did, apologetic,

4   overly apologetic, and so then I focussed on making sure

5   everybody else there was okay and trying to get to the

6   bottom of what had actually occurred.

7        Q    All right.  Did you make any effort to determine

8   whether Mr. Whitaker might be under the influence of

9   something in addition --

10       A    I'm sorry, sir.  You are sort of mumbling.

11       Q    Did you make any effort to determine whether

12  Mr. Whitaker might be under the influence of something in

13  addition to alcohol?

14       A    At that point, no.  That was a thought that I

15  had, but it was just a preliminary encounter with him, and

16  I'm sure we would have gotten to that in a subsequent

17  interview back at the office, but in the short time that I

18  was with him at the store it was nothing more than just my

19  conjecture that that may be a possibility.

20       Q    Okay.  What did Mr. Utter do with regard to

21  Mr. Whitaker at the Giant market?

22       A    He was one of the officers that took Mr. Whitaker

23  out to the car, to the cruiser in the process of taking him

24  back to the store -- or from the store back to the office

25  for processing and so forth with respect to the crime that

1   he had just been alleged to have occurred, and as I recall

2   he was the lead officer that actually patted him down once

3   we got him out beside the cruiser to make sure that he

4   didn't have any weapons on his person prior to being placed

5   into the back of the car.

6        Q    Okay. So is it fair to say Mr. Utter had a

7   significant amount of contact with Mr. Whitaker in that

8   initial encounter at the Giant market?

9        A    I don't know if significant is the proper

10  adjective, but he had an opportunity to be with him.

11       Q    Okay. Did you see Mr. Whitaker being placed into

12  Mr. Utter's car?

13       A    Yes, sir.

14       Q    And was Mr. Whitaker handcuffed at that time?

15       A    Yes, sir.

16       Q    What did you do then? What did you do next?

17       A    Well, Mr. Whitaker made a reference to the fact

18  that he was there by himself but his -- a woman, I forget

19  if he said wife or girlfriend, needed to come to the store

20  to get the vehicle, some type of van that he was driving,

21  and that in the process of coming she would need the keys,

22  so he asked us and specifically Officer Utter if we could

23  possibly put the keys to the van into the van so that she

24  could get it, and that's about it at that point.

25       Q    Is that what you did, put the keys in the van?

1    A    No, I instructed Officer Utter to do that.

2    Q    Okay.  What did you do at that point?

3    A    I got into my car with the intention of going

4    back to the office to assist Officer Utter, but then we

5    subsequently got another disturbance call that I responded

6    to.

7    Q    Okay.  You and someone else?

8    A    Two other officers.

9    Q    And they were?

10    A    Officer Polizzotto -- or I'm sorry.  It was one

11    other officer, just Officer Polizzotto.  Officer Krentz

12    stayed at the Giant.

13    Q    Okay.  And at what point did you receive the

14    Signal 13 call?

15    A    I remember hearing it as I was driving on Concord

16    Road in the vicinity of the York County Prison as I was on

17    my -- ultimately on my way back to the office.

18    Q    Would you be able to estimate the amount of time

19    between when Officer Utter took Mr. Whitaker away from the

20    Giant and when the Signal 13 call came?

21    A    No.

22    Q    Had you already finished handling the subsequent

23    call involving the disturbance?

24    A    For what, sir?

25    Q    Okay.  You said after you left Giant you got

1   another call?

2       A    Yes, sir.

3       Q    Okay.  Did you resolve that entire matter before

4   Signal 13?

5       A    Oh, yes, sir.

6       Q    And when you got the Signal 13 call you were

7   about how far away from the station?

8       A    I'd say within a mile as the roads were laid out,

9   so to speak.

10      Q    Okay.  Before the Signal 13 call did you receive

11  a Nextel call from Officer Utter seeking permission to call

12  an ambulance for Mr. Whitaker?

13      A    He wasn't asking permission.  He was simply

14  indicating that he had been told by Mr. Whitaker that he

15  was subsequently experiencing pain from the process of

16  being subdued by the customers and staff and that he wanted

17  to know if it's best or he wanted to know if it would be

18  okay to get an ambulance, that he was going to do that, and

19  I simply confirmed that, yes, that's the proper response at

20  that point.

21      Q    Do you know whether Utter and Whitaker were at

22  the station or in the car?

23      A    I have no idea where it was at that point.

24      Q    And about how long after that Nextel call did the

25  Signal 13 call come?

1  duty.

2      Q    Okay.  And you gave a statement to Lieutenant

3  Laird, correct?

4      A    We had a question and answer session.

5      Q    And did you also give a statement to Trooper

6  Bryan Henneman?

7      A    I don't know if I did or not.

8      Q    I show you what's been produced to us as State

9  Police Bates No. 24.

10     A    Okay, I did.

11     Q    Do you recall it now?

12     A    Yes, this is the same thing as I have already

13  told you about, yes, but I don't remember specifically

14  giving -- talking to the trooper about that.

15     Q    Do you have any reason to believe that the

16  trooper may have just used your Laird interview and

17  completed his report based on the content of the Laird

18  interview?

19     A    No, I have no reason to believe that.  The Laird

20  interview was the 31st of July.  What's the date of the

21  trooper's report?

22     Q    July 18th.

23     A    Then no.  I think he did -- the trooper did come

24  back subsequent to that.  That's where that came from.

25     Q    What do you mean?

1    A    The trooper came back to our office after the

2    fact.  I'm assuming it was on the 18th if that's what date

3    he has on it, but he did come back to the station to try to

4    get more details.  That's why I don't remember really

5    talking to him that night.

6        Q    All right.  And then after the trooper you had

7    your interview with detective -- Lieutenant Laird?

8        A    Yes, sir.

9        Q    As of July 8th, 2007, was there any procedure in

10   the department for -- strike that.  As of July 8th, 2007,

11   was there any procedure in place dictating what items to

12   remove from a detainee before placing them in a holding

13   room?

14       A    I don't specifically remember, no.

15       Q    Was it the usual practice of Springettsbury

16   department officers to remove the shoes and laces of a

17   detainee before placing them in a holding room?

18       A    No.

19       Q    Was it ever done before July 8th, 2007?

20       A    Oh, it's been done depending on the demeanor of

21   the suspect, yes.

22       Q    Okay.  Was it the -- was it a matter for the

23   officer's discretion whether to remove these items from the

24   detainee before putting them in a holding room?

25       A    That's my interpretation, yes.

1     Q    Okay.  Your interpretation of what?

2     A    The best possible police procedure at that point.

3     Q    Okay.  Before July 8th, 2007, had you ever

4 removed the shoes and laces of a detainee before putting

5 them in a holding room?

6     A    I have taken shoes away from people but never had

7 them physically remove the laces that I recall.

8     Q    Well, if you take the shoes away they don't have

9 the laces anymore, right?

10    A    Yeah, that's what I mean.  I wouldn't let them

11 have their shoes and just take their laces.

12    Q    Right.  So rather than an across-the-board

13 procedure one way or the other, it was just left up to the

14 booking officer to determine how much property to remove

15 from the detainee?

16    A    Based on their demeanor, yes.

17    Q    Was that procedure changed after July 8th, 2007?

18    A    I don't know.  I only worked there a couple

19 months after that and then retired.

20    Q    Okay.  As of July 8th, 2007, was there any

21 procedure determining whether to keep the handcuffs on a

22 detainee when they are in a holding room?

23    A    Again, that was something that I remembered being

24 individual specific based on their demeanor and like the

25 extent of their crime, so on.

1   place in the department as to whether an officer should

2   enter a holding room alone?

3        A    No.

4        Q    Is there now?

5        A    I don't know, sir.  I only worked there another

6   month and a half after that date.

7             MR. KEEPERS:  Okay.  That's all I have for right

8   now.

9   BY MS. FULTON:

10       Q    I have just a few follow-up questions.  What was

11  Mr. Whitaker's demeanor at the Giant store when you

12  arrived?

13       A    While I was there he was totally apologetic,

14  falling over himself in a manner of speaking, apologetic,

15  apologizing to the staff, to the customers, to the police

16  officers.

17       Q    Compliant with the police officers?

18       A    Oh, at that point absolutely.

19       Q    At any time during your interaction with

20  Mr. Whitaker did you see him being anything other than

21  compliant with the officers?

22       A    No.

23       Q    Did you have any concerns based on what you

24  observed of Mr. Whitaker about Officer Utter going back to

25  the station alone with Mr. Whitaker?

# EXHIBIT "M"



IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

RONALD T. WHITAKER, SR. AND          :
DALEA LYNN, CO-ADMINISTRATORS        :
OF THE ESTATE OF RONALD TAYLOR       :
WHITAKER, JR.; AND RONALD T.         :
WHITAKER, SR., TAYLOR WHITAKER,      :
BRANDI WHITAKER AND CHRISTOPHER      :  CIVIL ACTION
HAMMERSTONE, INDIVIDUALLY,           :
      PLAINTIFFS                 :  NO: 1-08-CV-00627
                                 :
        V                          :
                                 :
SPRINGETTSBURY TOWNSHIP;             :
SPRINGETTSBURY TOWNSHIP POLICE       :
DEPARTMENT; CHIEF OF POLICE          :
DAVID ESHBACH AND POLICE             :
OFFICER GARY UTTER,                  :
      DEFENDANTS                 :  JURY TRIAL DEMANDED

DEPOSITION OF:      WILLIAM POLIZZOTTO, JR.

TAKEN BY:           PLAINTIFFS

BEFORE:             DIANE F. FOLTZ, RMR
                    NOTARY PUBLIC

DATE:               JANUARY 20, 2009, 1:04 P.M.

PLACE:              HAGGERTY & SILVERMAN, P.C.
                    240 NORTH DUKE STREET
                    LANCASTER, PENNSYLVANIA



11

```
1        A     Yes, I did.

2        Q     Okay.  Did anyone get there before you did?

3        A     Officer Ford.

4        Q     Okay.  Were you the second to arrive?

5        A     Basically we all arrived simultaneously

6   thereafter.  I was pulling in, and Sergeant Witmer was

7   pulling in, and Officer Utter and Officer Krentz were

8   basically just behind me, virtually the same time.

9        Q     Was it unusual for all four of you to respond to

10  a call at the same time?

11       A     No, not in a situation of what we were dispatched

12  for, absolutely not.

13       Q     Okay.  What did you see when you got there?

14       A     Myself and Sergeant Witmer entered in through the

15  north side doors of Giant at which time you are somewhat

16  immediately in the front aisle where the checkout counter

17  is and where customer service is, and when we walked in,

18  looking to our left we saw a bunch of people, Officer Ford

19  there and Mr. Whitaker in handcuffs laying on the floor.

20       Q     Okay.  Who came -- who came into the Giant market

21  with you?

22       A     Sergeant Witmer.

23       Q     And Utter and Krentz were just arriving?

24       A     They were just, I mean, just behind me as I was

25  walking in the door, I mean.
```

1    had already handcuffed him.

2        Q    Okay.  Did you assist in putting Mr. Whitaker

3    into Officer Utter's car?

4        A    Yes.

5        Q    And was Mr. Whitaker in handcuffs at that point

6    in time?

7        A    Yes, he was.

8        Q    After -- after Officer Utter took Mr. Whitaker

9    away in his car, what did you do?

10       A    I was dispatched to another call for a

11   disturbance, and I had to leave the scene there.

12       Q    Did you get to the location of the other call

13   before receiving the distress call from Mr. --

14       A    Yes, actually just as I was -- as I was

15   dispatched, Officer Utter was leaving.  I contacted

16   Sergeant Witmer by Nextel and advised him that had just

17   received a call from county regarding a disturbance, gave

18   him the address, and he and I both responded to that

19   location and handled that incident.

20       Q    Okay.  And were you at that location when the

21   Signal 13 came in?

22       A    No, we were cleared, and I was traveling west on

23   East Market Street about the 3400 block.

24       Q    Okay.  So the call subsequent to the Giant one

25   obviously didn't take very long to resolve?

1   he had said something to the effect of I think I feel a

2   pulse.  We need to get the EMTs inside which they were

3   basically filing in right behind me, so they were right

4   there immediately.

5       Q    Did you see Mr. Whitaker move or make any sound?

6       A    No, I didn't.

7       Q    Did you observe any spent casings on the floor of

8   the hallway?

9       A    No, I didn't.  Other than opening the door at

10  that particular point in time to look in, I didn't go back

11  in the back hallway again that night.

12      Q    Did you have any other conversations after July

13  7, 2007, with Mr. Utter about what happened?

14      A    Other than just questions to ask him how he was

15  doing with dealing with the whole incident.

16      Q    Did you ever discuss what took place in any

17  greater detail?

18      A    No, we didn't.

19      Q    Were you involved in the department's

20  investigation of the incident?

21      A    Yes, I was.

22      Q    In what capacity?

23      A    I was interviewed.

24      Q    By whom?

25      A    A trooper from the State Police as well as

```
1    Lieutenant Laird.

2         Q    Okay.  Was the trooper Bryan Henneman?

3         A    I believe that was his name, yes.

4         Q    Did you ever ask Utter why he took the handcuffs

5    off of Mr. Whitaker before putting him in the holding

6    room?

7         A    No, I didn't.

8              MR. GABRIEL:  Objection to the form of the

9    question.  You said took them off before putting him in the

10   holding room.

11   BY MR. KEEPERS:

12        Q    Let's put it this way.  Why he left Mr. Whitaker

13   in the holding room without handcuffs?

14        A    I don't remember if I specifically asked him that

15   or not.

16        Q    You don't recall --

17        A    No.

18        Q    -- discussing that matter with him at all?

19        A    (Shakes head from side to side.)

20        Q    Did you have any discussions with Mr. Utter about

21   why he entered the holding room with his handgun on?

22             MR. GABRIEL:  Just in terms of the form of the

23   question, when you say entered the holding room, do you

24   mean at the beginning or the second time or the third time

25   or --
```

1     Q    About how long does it take to take off your gun
2  and lock it up in one of those places?
3     A    Not very long, a few seconds.
4     Q    Was there a usual practice or a policy in the
5  department as of July 7, 2007, on whether you should take
6  the shoes and laces of a detainee before putting them in
7  the holding room?
8     A    Prior to that?  Prior to this incident?
9     Q    Yeah.
10     A    No.
11     Q    Was it a matter that was left to the officer's
12  discretion?
13     A    Yes.
14     Q    Okay.  What was your usual practice?
15     A    It depended on the demeanor of the person that
16  you're placing in there.
17     Q    Would the same be true of the decision whether to
18  keep the person in handcuffs in the holding room?
19     A    Yes.
20     Q    Left up to the officer's discretion?
21     A    Yes.
22     Q    Did you ever have any training on how to
23  determine whether a detainee is at risk for suicide?
24     A    No.
25     Q    It was not a part of your MPOE --

1      A     I never measured it.

2            MR. KEEPERS:  I'm not surprised.  That's all I

3      have.  Do you guys have anything?

4      BY MS. FULTON:

5      Q     Officer Polizzotto, what was Mr. Whitaker's

6      demeanor when you encountered him at the Giant store?

7      A     At that particular point in time he was calmed

8      down.  I believe he -- when he realized what he was facing

9      as far as charges wise, he was surprised, but he wasn't

10     physically or verbally abusive towards us.

11     Q     Would you describe him as compliant?

12     A     Oh, very much so.

13     Q     During your entire interaction with him was he

14     compliant the whole time?

15     A     Absolutely, yes.

16           MS. FULTON:  That's all I have.

17           MR. GABRIEL:  I don't have any questions.

18     BY MR. KEEPERS:

19     Q     Just one follow-up.  Mr. Whitaker was compliant

20     when you got to him, but you knew that he had just been

21     violent, that's the reason you were there, right?

22     A     Yes.

23     Q     And Mr. Utter had the same information you had,

24     correct?

25     A     Yes.