**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| RONALD T. WHITAKER, SR., et al. Co-Administrator of the Estate of Ronald Taylor Whitaker, Jr., et al., | : : : : | NO. 1:08-CV-627 |
| | : | (Judge Christopher C. Conner) |
| Plaintiffs, | : : | (Magistrate Judge Martin Carlson) |
| v. | : : | |
| SPRINGETTSBURY TOWNSHIP, et al., | : : | |
| Defendants. | : | Filed Electronically |

**DEFENDANTS' JOINT REPLY TO
PLAINTIFFS' BRIEF IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

Plaintiffs argue that the Court should deny Defendants' Motions for Summary Judgment for two reasons.

First, as expected, because they have no facts or evidence to support their claims, Plaintiffs attempted to preclude summary judgment as to Officer Utter by relying on mere speculation and conclusory allegations – which are expressly prohibited from preventing summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) – in an attempt to create a factual dispute where none exists. Specifically, Plaintiffs "contend" that the video of the incident shows that Officer Utter first shot Ronald T. Whitaker, Jr. ("Whitaker") while Whitaker was

running away. However, Plaintiffs' mere *conjecture*, which is the only "basis" presented by Plaintiffs to contradict Officer Utter's *factual* recollection of the incident, also contradicts the physical evidence, namely, that Officer Utter's shot – fired from less than 12 inches from Whitaker – entered Whitaker's lower left chest area and traveled *front to back*, and not back to front, as Plaintiffs want – and need – this Court to believe. *See* Pls'. Br. (Doc. 68) at pp. 2-3.

Second, Plaintiffs baldly declare, without citing a single case for support, that training police officers that, when they fire a gun, they should fire two shots in rapid succession – a "double tap" – constitutes deliberate indifference and subjects Springettsbury Township and Chief Eshbach to liability under *Monell*. *See id.* at p. 4.

In making these arguments, Plaintiffs ignore critical, undisputed facts and physical evidence and instead improperly rely upon fabricated facts and legal inaccuracies in an attempt to avoid the dismissal of Plaintiffs' claims. This short Reply Brief will point out some of those inaccuracies and demonstrate that Defendants are, in fact, entitled to summary judgment on all of Plaintiffs' claims.

I. **THE IRREFUTABLE PHYSICAL EVIDENCE CONCLUSIVELY DEMONSTRATES THAT OFFICER UTTER'S USE OF DEADLY FORCE WAS OBJECTIVELY REASONABLE**

Plaintiffs' sole basis for their opposition to Officer Utter's Motion for Summary Judgment is their groundless claim that there is a factual dispute

regarding when Officer Utter fired the first shot at Whitaker. Pls'. Br. (Doc. No. 68) at p. 3. However, this "dispute" is nothing more than a fabrication. Indeed, Plaintiffs' interpretation of the video is contradictory not only to Officer Utter's recollection of the incident in his sworn deposition testimony, but, more importantly, the irrefutable physical evidence.

In *Scott v. Harris*, 127 S. Ct. 1769, 1776 (2007), the United States Supreme Court considered whether a party opposing a motion for summary judgment could defeat the motion simply by denying facts which were clearly contradicted by objective evidence. *Scott* concerned a high speed police pursuit that culminated in a police car "pitting" plaintiff's vehicle. *Id.* at 1771. The defendant sought qualified immunity and alleged that the plaintiff was driving wildly and erratically and needed to be stopped for fear that he would endanger the public; defendants cited to the videotape in support of their position. *Id.* at 1773-75. The plaintiff flatly denied the defendants' factual allegations, and the Court of Appeals essentially accepted plaintiff's version of the facts and denied summary judgment. *Id.* at 1775. The Supreme Court reversed and held that, while factual disputes are generally to be resolved in favor of the non-moving party when considering a motion for summary judgment, courts had to view the facts in the light depicted by the physical evidence – a videotape that captured the events:

> When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no

3

> reasonable jury could believe it, the Court should not
> accept that version of the facts for purposes of ruling on a
> Motion for Summary Judgment.  That was the case here
> with regard to the factual issue of whether the respondent
> was driving in such fashion as to endanger human life.
> Respondent's version of events is so overly discredited
> by the record that no reasonable jury could have believed
> him. The Court of Appeals should not have relied on
> such visible fiction; it should have viewed the facts in a
> light depicted in the videotape.

*Id.* at 1776 (emphasis added).

The *Scott* case has particular application here, because Plaintiffs' characterization of the video is directly contradicted by not only Officer Utter's testimony, but the objective physical evidence in the case.  Therefore, the Court should not credit the fictional version created by Plaintiffs to avoid dismissal of their claims, but rather should accept the video of the incident, the autopsy report, and the ballistics report, all of which support Officer Utter's recounting in order to consider a version of events consistent with the physical evidence – and with reality.

Without any support whatsoever in the factual record, whether in testimony or the physical evidence – including the video – Plaintiffs baldly claim that "[a]t 23:55:23, decedent breaks free and tries to run," "[a]t 23:55:24, Utter shoots decedent in the back," and "[a]pproximately four seconds later after the first shot [at 23:55:28], Utter fires the second and final shot."  Pls'. Br. (Doc. No. 68) at p. 2; *see also* surveillance video from Springettsbury Police Department ("SPD")

4

"Holding Hall" camera, attached as Exhibit 1[1].  Plaintiffs know that Defendants will disagree with Plaintiffs' claim regarding the timing of the shots, ***because Plaintiffs' version is nothing more than a fiction***, created by Plaintiffs to avoid the dismissal of their claims.  However, Plaintiffs cannot create a disputed issue of fact where none exists, simply to avoid the entry of summary judgment.

Unfortunately, while there is a video of the underlying incident, there are limitations to the video.  Specifically, the video does not have sound, and it was recorded at only 3 or 4 frames per second, while the average home-use video camcorder records at 30 frames per second.  *See* http://camcorders.about.com/od/camcorders101/a/camcorder_frame_rate.htm.  As a result, the video from the incident appears choppy, rather than fluid, and only a

---

[1]  In accordance with the Court's November 16, 2009 Order (Doc. No. 69) Defendants are providing the Court and Plaintiffs' counsel, under separate cover, with a copy of a compact disc containing the surveillance video of the incident at Springettsbury Police Department, marked as Exhibit 1 hereto for reference.  The compact disc contains a "Viewer" application file, as well as two video files.  The video file beginning with "01" is from the camera positioned inside the holding cell, and the file beginning with "06" is from the camera positioned above the door at the north end of the hallway and shows the hallway where the holding cells are located.  To view the videos:

    1) Open the file marked "Viewer";
    2) Click on the "open folder" icon;
    3) Select File to be opened;
    4) Click buttons to play, pause, stop, fast forward, rewind, or move frame-by-frame.  The video can be advanced frame-by-frame by pausing the video and then clicking on either the "next image" button or the "previous image" button.

fraction of the action was recorded. Additionally, a portion of the incident – namely, when Officer Utter drew his weapon and, according to Officer Utter and the physical evidence, fired the first shot – takes place directly under, and out of the view of, the camera. *See* dep. tr. Utter at p. 181, ln. 14-25 (attached as Exhibit 2).

Plaintiffs attempt to take advantage of these limitations to create a dispute regarding when Officer Utter fired his weapon. But there is no factual support for Plaintiffs' claim that Officer Utter fired both shots after Whitaker had disengaged and had his back to Officer Utter. Indeed, under Plaintiffs' version, Officer Utter fired the second shot at 23:55:28, when Whitaker was lying face down on the ground at least 6 feet away from the Officer. *See* Pls'. Br. (Doc. No. 68) at p. 2; video still of 23:55:28 (attached as Exhibit 3). Defendants have no idea what the factual basis of Plaintiffs' factual recitation is, but it is certainly not based upon the physical evidence or a viewing of the video. Namely, as a result of the limitations of the video, there is nothing on the video to indicate when the shots were fired, such as a muzzle flash or the sound of gunshots. However, we do have Officer Utter's testimony regarding the incident and, more importantly, objective – and irrefutable – physical evidence that directly contradicts Plaintiffs' timing of the shots.

Specifically, it is undisputed, based upon the physical evidence, that:

6

> 1) Officer Utter fired the first shot *less than 12 inches from Whitaker*, and that first shot entered the lower left area of Whitaker's chest (inframammary region), traveling from the *front* to the back.

*See* Autopsy Report at p.1 (attached as Exhibit 4) (also referred to as PSP 0101)[2]; PSP 0006 (attached as Exhibit 5); Ballistics Report[3] ¶¶ 8-9 (PSP 0097-0098) (attached as Exhibit 6).

> 2) Officer Utter fired the second shot when *Whitaker was less than 3 feet from Officer Utter* – within an arm's length, and the second shot entered Whitaker's back and traveled from back to front.

*See* Autopsy Report at p.1 (Exhibit 4); PSP 0006 (Exhibit 5); Ballistics Report ¶¶ 8-9 (PSP 0097-0098) (Exhibit 6).

Given the distance of the first shot (less than 12 inches) and the point of entry (the front of Whitaker's body), Officer Utter undisputedly fired the first shot when the two men were still engaged in the struggle, most likely when Whitaker had Officer Utter backed against the door directly under the video camera (and thus out of view). Indeed, that is exactly what Officer Utter testified to at his

---

[2] Documents containing a "PSP ____" designation are also attached to Defendants' Joint Concise Statement of Material Facts "CSMF") (Doc. No. 50) as Exhibit A.

[3] The Pennsylvania State Police also conducted ballistics testing on the evidence from the incident, including Whitaker's clothing, and determined that Officer Utter's first shot was fired less than 12 inches from Whitaker, and the second shot was fired when Whitaker was less than 3 feet away from Officer Utter. *See* Ballistics Report ¶¶ 8-9 (Exhibit 6).

deposition in this case, when Plaintiffs' prior counsel showed Officer Utter the video from the "Holding Hall" camera. Specifically, Officer Utter testified that he fired the first shot out of the view of the camera:

> Mr. Silverman: Okay. So we can't see is what you're suggesting?
>
> Officer Utter: Right. The camera is directly above the door, and it's coming down.
>
> Mr. Silverman: All right.
>
> Officer Utter: So there's a dead space between what you could see there and where the actual door is.
>
> Mr. Silverman: All right.
>
> Mr. Gabriel: We're at 23:55:23.
>
> Mr. Silverman: All right. Now, in – do you believe that at this point the first shot had been fired?
>
> Officer Utter: The first shot's already been fired.

Dep. tr. Utter at p. 181, ln. 14-25 (attached as Exhibit 2); *see* video of Officer Utter's testimony (the relevant portion is marked as Exhibit 7, and a disc is being provided to the Court under separate cover).

Additionally, Officer Utter testified that he fired the second shot a second later, at 23:55:24:

> Mr. MacMain: That's at 23:55:23 you already have one shot fired.
>
> Mr. Silverman: And for the record, each scene is not necessarily a second. So 23 could be – going back as – and then you raised your weapon and –

      Officer Utter:     I discharged my second shot.

Dep. tr. Utter at p. 182, ln. 1-7 (Exhibit 2); *see* video of Officer Utter's testimony (Exhibit 7). Officer Utter's testimony is consistent with all of the physical evidence, specifically 1) the autopsy report, which states that the second shot entered the mid-scapular region of Whitaker's back (*see* Autopsy Report at p.1 (Exhibit 4)); 2) the ballistics report, which determined that the second shot was fired less than 3 feet from Whitaker – an arm's length (*see* Ballistics Report ¶¶ 8-9 (Exhibit 6)); and 3) the video of the incident (*see* "Holding Hall" video at 23:55:24 (Exhibit 1); video still of 23:55:24a (attached as Exhibit 8)).

      Officer Utter's testimony regarding the incident is also consistent with the findings of the independent state investigator, Pennsylvania State Trooper Bryan Henneman, who thoroughly investigated this incident, including viewing the video tape, interviewing Officer Utter, and reviewing the autopsy report and the ballistics report, and reached the following conclusions based upon this undisputed evidence:

> At 23:55:19, Whitaker is observed on video reaching around Utter's body towards his gun/ASP area of his duty belt. Approximately four seconds after Whitaker is observed reaching around Utter's gun belt [or at 23:55:23], Utter fired his first shot striking Whitaker in the lower left chest area. Immediately following the first shot, Whitaker is clearly observed with Utter's ASP baton and Whitaker spun to the left and began to travel south in the hallway. Utter was not aware if he had

>     struck Whitaker with the first shot and then aimed the
>     gun towards Whitaker and fired a second shot in the
>     hallway. Whitaker *then* fell to the floor facing a southern
>     direction….

PSP 0006 (Exhibit 5); *see* "Holding Hall" video at 23:55:19 to 23:55:24 (Exhibit 1); video stills for 23:55:19, 23:55:23, and 23:55:24 (attached as Exhibits 9, 10 and 11, respectively).

Finally, the Court should discredit Plaintiffs characterization of the video not only because it contradicts the objective physical evidence, but because it is obviously incorrect. For example, Plaintiffs claim that, on the video of the incident, at sometime between 23:55:21 and 23:55:23, Officer Utter Tasers Whitaker. Pls'. Br. at p. 2. However, at 23:55:19, Officer Utter's Taser can be clearly seen on the hallway floor, where it remains for the duration of the incident. *See* video still of 23:55:19 (attached as Exhibit 9).

As another example of the fallacy of Plaintiffs' description of the video, Plaintiffs suggest that, if Officer Utter was in fear for his life, he could have simply fled through "an immediately available exit." Pls'. Br. (Doc. No. 68) at p. 2. This innuendo is not only legally incorrect, but factually misleading. First, it is well-settled that, under Pennsylvania law, a police officer has no duty to retreat or desist from efforts to make a lawful arrest because of resistance or threatened resistance to the arrest. 18 Pa. C.S. § 508(a)(1) (2009). Second, the video clearly shows that, as he testified, Officer Utter attempted to leave through the door located

immediately under the camera, but Whitaker grabbed him and would not let the Officer escape. *See* "Holding Hall Video" at 23:55:16 to 23:55:24 (Exhibit 1). One can clearly see on the video that Officer Utter is attempting to hold Whitaker off with his left hand while he is attempting to open the door with his right hand, but he is unable to exit before Whitaker pulls him back, slams the door shut, and continues to both attack Officer Utter and reach for the Officer's gun belt, from which Whitaker successfully removed Officer Utter's expandable ASP baton. *See id.*; video still for 23:55:24 (Exhibit 11).

In sum, Plaintiffs continue to rely on conjecture and "mere allegations," which are not sufficient at the summary judgment stage of the proceedings. Moreover, the overwhelming – and irrefutable – physical evidence establishes that Officer Utter's use of deadly force was clearly justified. Thus, summary judgment should be entered in favor of Officer Utter and against Plaintiffs.

## II. <u>PLAINTIFFS' *MONELL* CLAIM FAILS AS A MATTER OF LAW</u>

Plaintiffs do not dispute or otherwise contradict the material facts[4] pertaining to the Township or Chief Eshbach, which speak to training, policies and supervision. (Joint CSMF (Doc. No. 50) at ¶¶ 72-132; Plaintiff's Resp. (Doc. No. 68-2 at ¶¶ 72-132)  Nevertheless, Plaintiffs posit that "[t]o double tap is to

---

[4] Plaintiffs object to Paragraphs 95, 120, 121 and 123, and admit all other material facts set forth in Paragraphs 72-132.

consciously disregard-deliberate indifference." Further complicating this abbreviated argument is Plaintiffs' assertion that Officer Utter did not double tap. In any event, Plaintiffs have completely ignored the need to furnish competent evidence of municipal/supervisory liability. Instead, they distort the description of the "double tap" technique contained in the record[5] and substitute imaginary testimony never provided. Thus, the premise of the "Question Presented" - "When Officer Utter testified that his training is to fire twice regardless of the circumstance . . ." – is false. In short, Plaintiffs have done nothing to shoulder their burden under a failure to train theory. Moreover, they proffer no evidence to establish the requisite fault or the causal connection between the training program and the alleged constitutional deprivation. *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 405-407 (1997); *City of Canton v. Harris*, 489 U.S. 378, 391-392 (1989); *Oklahoma City v. Tuttle*, 471 U.S. 808, 822-823 (1985).

### III.  CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' Motion for Summary Judgment and supporting Briefs, Defendants respectfully request that

---

[5] Paragraph 94, which is admitted by Plaintiffs, reads as follows: "STPD Officers, including Officer Utter, are, and were in 2007, trained to fire their service weapons using the 'double tap' technique, in which two shots are fired in quick succession."

the Court enter summary judgment in their favor and against Plaintiffs on all claims.

Respectfully submitted,

| | |
|---|---|
| /s/ Brian P. Gabriel | /s/ David J. MacMain |
| Brian P. Gabriel | David J. MacMain (I.D. #59320) |
| Campbell Durrant Beatty | Janelle E. Fulton (I.D. #80027) |
|    Palombo & Miller, P.C. | LAMB MCERLANE PC |
| 555 Grant Street, Suite 310 | 24 East Market Street, Box 565 |
| Pittsburgh, PA  15219 | West Chester, PA  19381-0565 |
| (412) 395-1267 | (610) 701-3263 |
| *Attorneys for Defendants Springettsbury Township, Springettsbury Township Police Dep't, and Chief of Police David Eshbach* | *Attorneys for Defendant Gary Utter* |

Dated: November 25, 2009

# CERTIFICATE OF SERVICE

I, David J. MacMain, hereby certify that on this 25th day of November 2009, I caused a true and correct copy of the foregoing Defendants' Reply to Plaintiffs' Brief in Support of Defendant Gary Utter's Motion for Summary Judgment to be served upon the following via the ECF system of the United States District Court for the Middle District of Pennsylvania:

>Matthew B. Weisberg, Esquire
>Prochniak & Weisberg P.C.
>7 South Morton Avenue
>Morton, PA  19070
>mweisberg@ppwlaw.com
>*Counsel for Plaintiffs*

This *Certificate of Service* and the said filing are intended to be available for viewing and downloading from the ECF system of the United States District Court for the Middle District of Pennsylvania.

>/s/ David J. MacMain
>David J. MacMain