## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **RONALD T. WHITAKER, SR.,** | : | |
| **Co-Administrator of the Estate of** | : | |
| **Ronald Taylor Whitaker, Jr., et al.,** | : | **Civil No. 1:08-CV-627** |
| | : | |
| **Plaintiffs** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **SPRINGETTSBURY TOWNSHIP,** | : | |
| **et al.,** | : | |
| | : | |
| **Defendants** | : | |

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

This case arises out of the tragic death of Ronald T. Whitaker, Jr., who was fatally shot by a police officer during the course of a violent late-night assault that Mr. Whitaker initiated at the Springettsbury Township Police Department, where Mr. Whitaker was being held following his arrest for robbery and criminal mischief shortly before midnight on July 7, 2007.  Plaintiffs, who serve as the co-administrators of the Estate of Ronald T. Whitaker, Jr., commenced this action under 42 U.S.C. § 1983 seeking to collect damages for alleged violations of the decedent's rights under the Fourth and Fourteenth Amendments to the United States Constitution, as well as supplemental state law claims under Pennsylvania's Wrongful

Death Act.[1]  The central thrust of this action is that Springettsbury Township Police Officer Gary Utter used excessive deadly force against Whitaker while defending himself from Whitaker's violent assault during the course of their altercation in the police station.  Plaintiffs have also brought a claim against Springettsbury Township, alleging that the township enacted municipal policies or procedures that caused or contributed to the deadly use of force that Plaintiffs contend was unconstitutionally excessive under the circumstances, and that the township faces liability as a result.

Defendants have moved for summary judgment, arguing that the Plaintiffs have failed to identify sufficient evidence to support his claims, and that the evidence of record demonstrates clearly that Plaintiffs' claims are without merit.  In support of their motion for summary judgment, Defendants have submitted a brief and a statement of material facts that is itself supported by more than 370 pages of documents and other evidence.  (Docs. 51, 50.)  Plaintiffs have opposed the motion with a short brief in opposition and a response to Defendants' statement of material facts that relies exclusively on limited argument and a single piece of evidence: a videotape that captured certain footage in the police station, including the brief, desperate struggle between Mr. Whitaker and Officer Utter that began with

---

[1]  Following the filing of Defendants' motion, Plaintiffs have withdrawn their claims under the Eighth Amendment, and have further withdrawn their asserted state-law claims based upon a theory that Defendants failed to protect Whitaker while he was in custody.  (Doc. 68.)

Whitaker's attack on the police officer, and ended with Mr. Whitaker being fatally shot in a corridor shortly before midnight on July 7, 2007.[2] Defendants filed a timely reply to Plaintiffs' opposition brief. The motion is now fully briefed and ripe for disposition. Upon consideration of the briefs submitted in support of and opposition to Defendants' motion, and following careful review of the evidence submitted, we will recommend that the Court find that Defendants have demonstrated an absence of evidence to support Plaintiffs' claims, and that summary judgment should therefore be entered.

---

[2] We recognize that plaintiff's counsel faced particular challenges in undertaking this case. Notably, Plaintiffs' counsel entered his appearance in this action approximately one week before Defendants' moved for summary judgment, following the withdrawal of Plaintiffs' original counsel. The lawyers who had originally filed this action and represented Plaintiff until the eve of summary judgment sought leave to withdraw after concluding that the evidence did not support any of Plaintiffs' theories of liability in this case. After becoming engaged on this matter, Plaintiff's new counsel sought an extension of time to file a brief in opposition to Defendants' motion of summary judgment, and further sought leave to file a brief up to 50 pages in length. Although the Court granted these requests, Plaintiffs eventually responded to the motion with a brief numbering four pages in length, and totaling 890 words. Counsel subsequently advised the Court that Plaintiffs would not be submitting a sur-reply or any further briefing on the issues submitted for adjudication. (Doc. 83.)

## II.    BACKGROUND[3]

### A.    Ronald Whitaker

Ronald T. Whitaker, Jr., was born on November 17, 1967, which made him 39 years old at the time of his death in July of 2007.  (Doc. 50, Defendants' Joint Concise Statement of Material Facts, ¶ 4) (hereafter, "SMF ¶ __".)  Whitaker was the father of three children, two of whom he had with his girlfriend, Dalea Lynn, one of the plaintiffs in this case.  (SMF ¶ 5-6.)  In addition to his fateful encounter with Springettsbury Township police officers on July 7, 2007, Whitaker had previously

---

[3]  The factual recitation set forth herein is taken principally from Defendants' Joint Concise Statement of Material Facts, to the extent the asserted facts either are admitted, or are not genuinely disputed.  In a number of instances, Plaintiffs have purported to dispute asserted facts, but Plaintiffs' either have not identified any evidence of record to support the denial, or improperly rely on mere argument to object to an asserted fact.  Local Rule 56.1 expressly provides that "[s]tatements of material facts in support of, or opposition to, a motion shall include references to the parts of the record that support the statements."  LR 56.1.  In furtherance of this necessary rule, the Local Rules additionally provide that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party."  Id.  In addition to the Joint Concise Statement of Facts, we have also drawn upon the objective visual evidence supplied by the parties in the form of video evidence that captured images from both the holding cell in which Whitaker was held following his arrest, and from the corridor where Whitaker assaulted Officer Utter, and where Whitaker was fatally shot.  The United States Supreme Court has recently confirmed that courts may – and perhaps must – consider the objective evidence depicted in such unadulterated video in the course of adjudicating a motion for summary judgment.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.")  Notably, it is the plaintiffs who urge the Court to consider the video evidence in this case, as it represents the only evidence that they have identified in support of their claims, and they maintain that it "is truly the only pertinent evidence for summary judgment purposes."  (Doc. 68, at 3.)

been convicted in 1999 of reckless driving and fleeing police, and in 2004 for purchasing crack cocaine from an undercover police officer. According to undisputed evidence in the record, Whitaker used both marijuana and crack cocaine, and according to an autopsy conducted following his death, Whitaker had cocaine and cannabinoids in his system at the time he died, and had consumed an unknown amount of alcohol prior to his arrest. (SMF ¶¶ 8-11.)

**B.    Police Officer Gary Utter**

In January 2002, Gary Utter was hired as a police officer by the Springettsbury Township Police Department ("STPD"). (SMF ¶ 13.) Prior to joining the STPD, Utter had been an officer with the Stewartstown Borough, where had worked since January 2000. (SMF ¶ 14.) Utter successfully completed his police academy training, and received his certificate of completion from the Harrisburg Area Community College on April 20, 2000. (SMF ¶ 15.) Following his completion of the police academy training and receipt of his certification, Utter received additional training, including required and elective courses. (SMF ¶ 16.)

**C.    Whitaker's Arrest**

On July 7, 2007, shortly before 11:30 p.m., STPD officers, including Gary Utter, were dispatched to the Giant supermarket on East Market Street, Springettsbury Township, York County, in response to a report that there was a robbery in progress.

(SMF ¶ 17.)  Upon arrival, officers observed the suspect, Ronald T. Whitaker, Jr., lying face down, being restrained by two customers and a store employee.  (SMF ¶ 18.)  Prior to the arrival of police officers, Whitaker had initiated, or become involved in, a dispute with employees at the supermarket over the amount of money he was to receive from a Coinstar machine.  (SMF ¶ 20.)  During the course of this dispute, Whitaker had become aggressive and confrontational, had attempted to steal a cash register, and had struggled with customers and store personnel.  (SMF ¶ 19.)  When the cashier with whom he was arguing refused to give Whitaker the amount of money he claimed he was owed, he became angry, yelled "give me my money, bitch!" and grabbed the cash register.  (SMF ¶ 20.)  This confrontation prompted customers and a store employee to come to the cashier's aid, and they tackled Whitaker and restrained him until police officers arrived.  (SMF ¶ 21.)  During his struggle with the intervening customers, Whitaker bit one of them on the shoulder, which required medical attention.  (SMF ¶ 22.)

Officer Christopher Ford was the first to arrive at the supermarket, followed shortly by Sergeant Gregory Witmer, and Officers Utter, Polizzotto, and Officer John Krentz.  (SMF ¶ 23.)  According to Officer Utter, when he arrived, Whitaker was calm and complacent, and he was handcuffed and taken into custody without further incident.  (SMF ¶ 24, 27.)  In contrast to his reported conduct with the cashier, during

his transport to the STPD station for processing, Whitaker was remorseful for his conduct, advised Utter that he had been drinking, and was otherwise calm, cooperative, and relaxed.  (SMF ¶ 25, 30.)  As a result of his alleged conduct at the Giant supermarket, Whitaker was to be charged with robbery and criminal mischief. (SMF ¶ 29.)

### D.    Events at the STPD Station Following Whitaker's Arrest

Upon arrival at the station, Officer Utter placed Whitaker in a holding cell, and removed Whitaker's handcuffs without incident.  (SMF ¶ 35.)  Utter removed the cuffs because, having observed him since his arrest, he did not think that Whitaker presented a problem or a threat.  (SMF ¶ 37.)  After placing Whitaker in the holding cell, Officer Utter left to begin preparing paperwork associated with the arrest, but continued to monitor Whitaker via the holding cell's surveillance monitor in the squad room of the station.  (SMF ¶ 38.)  A short time later, Utter returned to the holding cell and observed that Whitaker appeared to be in pain and was holding his side.  (SMF ¶ 39.)  Officer Utter asked Whitaker if he was hurt, and Whitaker said that it had become painful for him to breath, as his side hurt as a result of being tackled by customers at the supermarket.  (SMF ¶ 40.)  Out of concern for Whitaker's well-being, Utter left the holding cell and advised his supervisor, Sergeant Witmer, that he was summoning the Springettsbury EMS to have medical personnel evaluate

Whitaker's condition.  (SMF ¶ 41.)

As Utter was awaiting the ambulance, he completed paperwork and attended to other business within the station; before he left the squad room, Utter checked the surveillance feed from the holding cell and observed nothing out of the ordinary. (SMF ¶¶ 42-43.)  Upon returning to the squad room only a minute or two later, Officer Utter checked the surveillance monitor and saw Whitaker laying face down on the floor of the cell with his face toward the door.  (SMF ¶ 44.)  Officer Utter immediately left the squad room to attend to Whitaker, but he could only partially open the door to the holding cell because Whitaker's body was blocking it.  (SMF ¶ 45.)  Officer Utter could hear that Whitaker was having difficulty breathing, and it sounded as though Whitaker may have been snoring or gurgling.  (SMF ¶ 46.)

Officer Utter forced his way into the holding cell and saw that Whitaker had a string tied around his neck, with the other end attached to the door handle.  (SMF ¶ 47.)  Officer Utter immediately attended to Whitaker and attempted to remove the string from Whitaker's neck, but by this time Whitaker had become alert and combative and attacked Officer Utter, screaming and punching at him and attempting to bite the officer's arm and wrist.[4]  (SMF ¶ 48.)  Officer Utter was able to pull away,

---

[4]  Plaintiffs purport to deny this asserted fact, which is supported by Officer Utter's testimony and corroborated by the surveillance video that the parties submitted.  Plaintiffs do not identify any evidence to support their denial of the fact, but simply state that the fact is "[d]enied

and retreated into the hallway.  (SMF ¶ 49.)  As Whitaker continued to scream and throw punches, Officer Utter drew his Taser and fired, striking Whitaker and administering one five-second cycle.  (Id.)  Although the Taser succeeded in stopping Whitaker's aggression temporarily, the ligature remained around Whitaker's neck, so Officer Utter re-entered the holding cell, placed his Taser on the floor, and again tried to remove the string from Whitaker's neck.  (SMF ¶ 50.)  When Officer Utter had succeeded in removing the ligature partially from Whitaker's neck, the effects of the Taser diminished and Whitaker again became aggressive, screaming and punching Officer Utter in the holding cell.  (SMF ¶ 51.)  As Officer Utter searched for the Taser that he had placed on the floor, Whitaker stood and charged him.  (SMF ¶ 52.)  After recovering the Taser, Officer Utter attempted to subdue Whitaker by administering another cycle, but it had no effect upon Whitaker, who continued to charge Officer Utter, punching the officer repeatedly about the head and body.[5]  (SMF ¶ 53.)

Officer Utter retreated from Whitaker, who continued to scream and punch wildly, as the struggle continued into the corridor.  (SMF ¶ 54.)  As the confrontation continued, Officer Utter attempted to exit the corridor through a door at the end of the

---

as stated."  (Doc. 68, Ex. 1, at ¶ 48.)  We find that Defendants have sufficiently supported the fact, and we find that Plaintiffs' have failed to genuinely dispute it.

[5]  Upon review of the video supplied by the parties, it appears that Officer Utter may have actually have missed Whitaker when he attempted to use the Taser after the initial charge was administered.

hallway. (Id.) However, the officer was unable to retreat through the door, as Whitaker slammed the door shut while continuing to scream and land punches to Officer Utter's head and body, ultimately knocking Officer Utter's eyeglasses off of his face. (SMF ¶ 56.) During Utter's struggle with Whitaker, Officer Utter felt Whitaker pulling at the right side of the officers' utility belt, as if attempting to remove items from the that area of the belt, which included his firearm, his expandable baton/ASP, and OC spray. (SMF ¶ 58.) In fact, Whitaker succeeded in removing Officer Utter's expandable baton/ASP, which was located adjacent to Officer Utter's firearm on his utility belt.[6] (SMF ¶ 59.)

After becoming pinned in the corridor, and after Whitaker had relieved him of his expandable baton/ASP, Officer Utter drew his firearm and, while in close proximity to Whitaker, fired it once, striking Whitaker in the chest from close range.[7] Very shortly thereafter, Officer Utter fired a second round that struck Whitaker in the back, as Whitaker, expandable baton/ASP in hand, had disengaged from Officer Utter and was running back down the corridor in the direction of where the Taser appears

---

[6] It appears from the video submitted that Officer Utter's Taser was knocked free during the struggle, landing just outside of the holding cell door where it remained for the remainder of the brief struggle.

[7] Plaintiffs purport to deny that the first round was fired while Whitaker was facing Officer Utter, but the video does not support Plaintiffs version of this fact. Furthermore, the only other evidence submitted supports Defendants' assertion regarding the placement of Officer Utter and Whitaker when the first shot was fired.

to have been lying near the holding cell door.[8]  Upon being struck by the second shot,

Whitaker collapsed to the floor just outside of the holding cell.  Shortly after his

collapse, medical treatment was applied, first by police personnel, and subsequently

by EMS personnel who Officer Utter had originally summoned to examine

Whitaker's complaints about his painful ribs.  Notwithstanding the application of

medical care, the gunshots that Whitaker sustained ultimately proved fatal.

## III.  **PROCEDURAL HISTORY**

Plaintiffs are the duly appointed co-administrators of Mr. Whitaker's estate.

They commenced this action in this court on April 8, 2008, by filing a complaint with

this court that invoked federal question jurisdiction under 28 U.S.C. § 1331, and

supplemental jurisdiction under 28 U.S.C. § 1367.  Plaintiffs consist of Ronald T.

Whitaker, Sr., and Dalea Lynn, the co-administrators of the Estate of Ronald T.

Whitaker, Jr., as well as Ronald T. Whitaker, Sr., and the decedent's surviving

children, Taylor Whitaker, Brandi Whitaker, and Christopher Hammerstone.

Plaintiffs named Springettsbury Township, the STPD, Chief of Police David Eshbach,

---

[8]  The parties appear to dispute the timing of the second shot, with Defendants characterizing it as a "double tap" – or two shots fired in quick succession – and Plaintiff claiming that the second shot was fired approximately four seconds after the first shot.  As will be discussed, the video evidence, at minimum, supports Defendants' version of the events, and corroborates both Officer Utter's testimony, the ballistics report, and the conclusions that the Pennsylvania State Police reached as part of its investigation into the shooting, which found Officer Utter's conduct to have been appropriate under the circumstances.

and Officer Utter as defendants.

Plaintiffs originally brought claims alleging that Whitaker's rights under the Fourth, Eighth, and Fourteenth Amendments to the United States Constitution were violated in the course of his arrest, custody, and subsequent death at the STPD station. (Compl., Count I.) Plaintiffs also brought a <u>Monell</u> claim against Defendant Springettsbury Township, alleging that the township had either "encouraged, tolerated, ratified and has been deliberately indifferent to" a number of alleged policies, practices, and customs with respect to, *inter alia*, the use of force by police officers. (<u>Id.</u>, Count II.) Finally, Plaintiffs brought a claim under Pennsylvania's Wrongful Death Act, 42 Pa. C.S. § 8301, on behalf of Whitaker's three surviving children. (<u>Id.</u>, Count III.)

After the parties had completed discovery, on June 23, 2009, Plaintiffs' original counsel moved for leave to withdraw after concluding that the evidence obtained during discovery did not support Plaintiffs' claims for alleged violations of the Fourth, Eighth, or Fourteenth Amendments. (Doc. 43.) On June 26, 2009, the Court entered an order granting counsel leave to withdraw, granting Plaintiff an additional 60 days to find replacement counsel, and adjusting all pretrial dates accordingly. (Doc. 46.) On August 25, 2009, Plaintiff's current counsel entered his appearance in the case. (Doc. 48.)

12

On September 3, 2009, Defendants Utter and the Springettsbury Township defendants filed separate motions for summary judgment (Docs. 49, 52.) Defendants filed their briefs in support of the motions on the same day, along with a joint statement of undisputed facts. (Docs. 50, 51 & 53.) The parties stipulated that Plaintiffs' brief in opposition to the motions would be due on or before October 5, 2009, and the Court approved of the stipulation by order. (Docs. 56, 57.) On October 1, 2009, this action was referred to the undersigned to purposes of pretrial management. (Doc. 58.)

On October 5, 2009, the date on which their responsive brief was to be filed, Plaintiffs moved for an additional 30 days in which to file their brief, citing among other reasons, the "enormity of [the] briefing undertaking," as well as exigent circumstances that required counsel's attention. (Doc. 60.) Also in the motion, Plaintiffs sought leave to file a brief of up to 50 pages, and to stay the proceedings pending disposition of the motions for summary judgment. (Id.) On October 8, 2009, the Court entered an order directing that Plaintiffs' brief be filed on or before October 22, 2009, staying the action, and granting Plaintiffs leave to submit a brief not to exceed 50 pages in length. (Doc. 63.)

On October 21, 2009, Plaintiffs sought a second 15-day enlargement of time in which to file their brief, noting that counsel had been engaged in an intervening

trial in Philadelphia, and was at the same time working diligently to become familiar with the facts of a complex case in which he had only recently entered his appearance. (Doc. 64.) The following day, the Court entered an order granting Plaintiffs until November 12, 2009, to file their brief in opposition to Defendants' motions for summary judgment. (Doc. 66.)

On November 12, 2009, Plaintiffs filed a brief in opposition to the motions, and attached as an appendix a very brief response to Defendants' joint concise statement of material facts. (Doc. 68.) Despite having been granted leave to submit a brief of up to 50 pages, as requested, Plaintiffs' brief in response totals four pages of substantive argument. (Id.) In their response to Defendants' joint statements of fact, Plaintiffs concede that they rely on no evidence of record other than the videotape of from the STPD station that captured images of the struggle between Officer Utter and Whitaker following his arrest.[9] Also in their response, Plaintiffs withdrew their claims based on a theory that Defendants failed to protect Plaintiff, and claims alleging violations of the Eighth Amendment. (Id. at 3.) On November 25, 2009, Defendants collectively filed a consolidated reply brief in response to Plaintiffs'

---

[9] Indeed, Plaintiffs specifically "request[] this Honorable Court not literally weigh the length of opposing Motions for Summary Judgment against this response, but rather independently view the video - which is truly the only pertinent evidence for summary judgment purposes." (Doc. 68, at 3.)

opposition brief. (Doc. 70.) Thereafter, Plaintiffs submitted to the Court a CD-ROM containing the video feed captured in both the holding cell and the corridor at the STPD station from the time of Whitaker's placement in the holding cell until the conclusion of his struggle with Officer Utter. (Doc. 71.)

Defendants' motions for summary judgment are now ripe for disposition. Upon consideration of the briefs submitted by the parties, and following careful review of all of the evidence submitted, including the video images supplied to the Court, we recommend that Defendants' motions for summary judgment be granted and the case closed.

## IV.    STANDARD OF REVIEW

Defendants have moved for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, which provides that "[t]he judgment sought should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are material, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). A dispute about a material fact is genuine only if there is a sufficient evidentiary basis that would allow a reasonable fact finder to return a verdict for the non-moving party. Id. at 248-49.

The moving party has the initial burden of identifying evidence that it believes shows an absence of a genuine issue of material fact. Conoshenti v. Pub. Serv. Elec. & Gas Co., 364 F.3d 135, 145-46 (3d Cir. 2004). Once the moving party has shown that there is an absence of evidence to support the nonmoving party's claims, "the non-moving party must rebut the motion with facts in the record and cannot rest solely on assertions made in the pleadings, legal memoranda, or oral argument." Berckeley Inv. Group. Ltd. v. Colkitt, 455 F.3d 195, 201 (3d Cir. 2006); accord Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden at trial," summary judgment is appropriate. Celotex, 477 U.S. at 322. Summary judgment is also appropriate if the non-moving party provides merely colorable, conclusory, or speculative evidence. Anderson, 477 U.S. at 249. There must be more than a scintilla of evidence supporting the nonmoving party and more than some metaphysical doubt as to the material facts. Id. at 252; see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In making this determination, the Court must "consider

16

all evidence in the light most favorable to the party opposing the motion."  <u>A.W. v.</u>

<u>Jersey City Pub. Schs.</u>, 486 F.3d 791, 794 (3d Cir. 2007).

However, of particular relevance to this case is the Supreme Court's recent

admonition that: "At the summary judgment stage, facts must be viewed in the light

most favorable to the nonmoving party only if there is a 'genuine' dispute as to those

facts." <u>Scott v. Harris</u>, 550 U.S. 372, 380 (2007).  Thus, "[w]hen opposing parties tell

two different stories, one of which is blatantly contradicted by the record, so that no

reasonable jury could believe it, a court should not adopt that version of the facts for

purposes of ruling on a motion for summary judgment."  <u>Id.</u>

## V.   **DISCUSSION**

### A.   **Excessive Force Claims Against Officer Utter**

Officer Utter has moved for summary judgment on Plaintiff's claims, primarily

by arguing that his use of force against Whitaker at the STPD station was objectively

reasonable under the exigent circumstances presented.   Defendants insist that

Plaintiffs have failed to present evidence to support their allegations regarding Utter's

conduct, and further emphasize that the undisputed facts of the case and a substantial

quantity of evidence foreclose Plaintiffs' claims.  In particular, Defendants point to

a number of pieces of relevant evidence that they contend compel summary judgment

in their favor, including, *inter alia*, the facts testified to by Officer Utter, the autopsy,

and the evidence obtained in investigations conducted by the Pennsylvania State Police, the York County District Attorney's Office, and the STPD, all of which concluded that Officer Utter's use of deadly force was justified under the circumstances.

Notably, although they concede a great many of the facts that Defendants have identified as undisputed in this case, Plaintiffs oppose the motion for summary judgment, and insist that the images captured on the video that Plaintiffs have submitted both support their claims and compel the denial of summary judgment. We have reviewed all of the evidence submitted in support of the motion, and we have viewed the video taken from the STPD station objectively. Following this review, with due regard for the standard of review that governs motions for summary judgment, we find that Plaintiffs have failed to meet their burden of identifying disputed issues of fact. Indeed, confronted with immutable and irrefutable video evidence–evidence which shows that Whitaker instigated this tragic confrontation when Officer Utter tried to rescue him, then attacked the officer, pursued the officer down a corridor and was the aggressor in this assault–they have not fully presented the objective facts shown on the video evidence that they rely upon to survive summary judgment. In so doing, Plaintiffs have endeavored to create a dispute of fact where, in reality, none exists, and they have failed to demonstrate the existence of a

18

disputed issue of material fact. Because there is no genuine dispute of fact presented in this case, and because we find that the evidence developed in this case demonstrates that Officer Utter's conduct was objectively reasonable under the circumstances presented, and that no reasonable factfinder could conclude otherwise, we will recommend that the Court enter summary judgment in Defendants' favor.

In order to "state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999) (citing Brower v. County of Inyo, 489 U.S. 593, 599 (1989)). An officer seizes a person when he "restrains the freedom of a person to walk away[.]" Tennessee v. Garner, 471 U.S. 1, 7 (1985). It follows that there is "no question" that a shooting amounts to a seizure for purposes of the Fourth Amendment. Id. ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). In this case, it is undisputed that Officer Utter shot Whitaker, and ultimately the gunshot wounds Whitaker sustained proved to be fatal. Accordingly, the only question remaining for purposes of Plaintiffs' claims against Officer Utter is whether the shooting was reasonable. See Curley v. Klem, 499 F.3d 199, 203 n.4 (3d Cir. 2007) (explaining Fourth Amendment standard and noting that where it is undisputed that an officer used deadly force, the question

19

becomes whether the use of such force was reasonable).

In keeping with the foregoing, claims alleging the excessive use of force in the course of arrest are evaluated under the Fourth Amendment's objective reasonableness standard.  Graham v. Connor, 490 U.S. 386, 395 (1989).  When considering such claims, the reasonableness of a particular use of force is dependent upon context and must be "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight," while recognizing "that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary." Id. at 396-97.  When an officer "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or others," the use of deadly force may be permissible.  Garner, 471 U.S. at 11.[10]

Furthermore, district courts should consider "the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Id. at 396.  Weighing

---

[10]  Although it is not dispositive of the constitutional issues presented to the Court in this case, we note that, by statute, the Commonwealth of Pennsylvania authorizes police officers to use deadly force when they believe it is necessary to protect themselves against death or serious bodily injury.  18 Pa. C.S. § 505(b)(2).

these various factors "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Curley, 499 F.3d at 207 (quoting Graham, 490 U.S. at 396). Such balancing "must be conducted in light of the facts that were available to the officer." Id. (citing Maryland v. Garrison, 480 U.S. 79, 85 (1987)). In addition to the considerations that the Supreme Court recognized in Graham, the Third Circuit has identified other relevant factors that may apply in particular cases, including "the duration of the action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." Sharrar v. Felsing, 128 F.3d 810, 822 (3d Cir. 1997). Another factor with particular relevance to the case at bar is "the possibility that the persons subject to the police action are violent or dangerous." Estate of Smith v. Marasco, 318 F.3d 497, 515 (3d Cir. 2003).

Although the question of whether a particular use of force was reasonable is typically a matter for the jury, summary judgment may be entered if the court "'resolves all factual disputes in favor of the plaintiff and concludes that the use of force was objectively reasonable under the circumstances.'" Dull v. W. Manchester Twp. Police Dep't, 604 F. Supp. 2d 739, 749 n.5 (M.D. Pa. 2009) (Conner, J.) (quoting Graveley v. Speranza, 219 F. App'x 213, 215 (3d Cir. 2007)).

With these legal precepts governing our consideration of Plaintiffs' claims and Defendants' motions for summary judgment, we pause to observe the substantial quantity of undisputed facts in this case. In short, the parties entirely agree about the following facts, many of which, we note, are further confirmed or corroborated by the video images that Plaintiff has provided to the Court from the STPD surveillance camera:

- This encounter arises out of an unprovoked attack on a police office who was simply attempting to rescue a prisoner in his custody. Observing Whitaker apparently slumped on the ground, Officer Utter rushed to the holding cell and, seeing that Whitaker appeared to have been trying to hang himself from the door handle, attempted to remove a ligature that Whitaker had fashioned around his neck out of his shoelace. While attempting to save Whitaker, Whitaker violently attacked Officer Utter without provocation, screaming, punching, and attempting to bite him on the hand and arm.

- Attacked by Whitaker, Officer Utter was able initially to subdue Whitaker by administering a five-second cycle with his Taser. While Officer Utter continued to try to extricate Whitaker from the ligature he had fashioned, the effects of the Taser wore off and the Taser

subsequently became ineffective after its initial deployment, at which point Whitaker again became violent and aggressive, once again attacking the police officer.

- Whitaker's attack on Officer Utter moved from the door of the holding cell to the corridor, with Officer Utter retreating while Whitaker continued to scream, advance violently towards the office and land punches to Officer Utter's head and body.

- Pursued by Whitaker to the end of the corridor, Officer Utter appears to have attempted to further retreat through a door at the end of the corridor, but was prevented from doing so, while Whitaker continued to swing wildly at him.

- While Utter and Whitaker were locked in struggle at the end of the corridor, and while Whitaker continued to swing at Officer Utter, Whitaker began reaching around the right side of Officer Utter's utility belt, in the vicinity of Officer Utter's firearm, expandable baton/ASP, and OC spray.

- As Officer Utter attempted to fend Whitaker off, Whitaker succeeded in removing Officer Utter's expandable baton/ASP from the utility belt, and had the ASP in his possession.

23

- During this stage of the violent late-night struggle, Officer Utter's eyeglasses had been knocked off of his face.

- With Whitaker in possession of the ASP, and continuing to exhibit aggression and violence towards him, Officer Utter removed his firearm and discharged two rounds, which ultimately killed Whitaker.

This is where the agreed-upon facts seem to end. Plaintiffs dispute Officer Utter's testimony that he believed he had exhausted all less-than-lethal means of force that he might have used to subdue Whitaker, and that he was in fear that he might be severely injured or killed; yet Plaintiffs offer no evidence that might serve to support their purported dispute of fact. Plaintiffs also try to dispute the evidence supporting Officer Utter's assertion that he fired two shots at Whitaker in quick succession, the first of was fired within one foot of Whitaker and struck him in the chest, and the second of which was fired within three feet of Whitaker, and struck him in the back. In disputing this fact, Plaintiffs rely exclusively upon the video containing images of the violent struggle between Whitaker and Officer Utter. As discussed at more length below, Plaintiffs have attempted to create a dispute of fact where none exists by offering an interpretation of the evidence captured on the STPD video that the video simply contradicts, and which is further contradicted by other evidence of record.

Upon careful reflection, it is clear that the disagreements between the parties

either (a) do not relate to material facts, but rather to the application of the governing law to those facts (i.e., the parties disagree about whether Officer Utter's use of deadly force was reasonable under the circumstances), or (b) are disputes that stem from the Plaintiffs' assertion of a theory of liability that is entirely discredited by the video evidence, and therefore cannot be accepted as true for purposes of adjudicating the pending motions.  See Scott v. Harris, 550 U.S. 372, 380-81 (2007) (reversing court of appeals ruling with respect to application of qualified immunity in an excessive force case, noting that the court of appeals erred by accepting a version of facts that was shown to be a "visible fiction" and admonishing that the lower court "should have viewed the facts in the light depicted by the videotape.").

In this case, in an effort to define a disputed factual issue the  Plaintiffs urge the Court to accept, for purposes of adjudicating the pending motions, "operative facts" that are not reflected in the video. For example, the Plaintiffs suggest that the video shows that:

> At 23:55:23, decedent breaks free and tries to run.  At 25:55:24, Utter shoots decedent **in the back**.  Decedent falls to the floor face down with legs extended.  Utter points his firearm at the floor.  Approximately four seconds later after the first shot, Utter fires the second and final shot.  Thereafter, Utter leaves "Holding Hall" (through the always immediately adjacent exit)."

(Doc. 68, at 4) (original emphasis) (citations omitted).   In support of this

characterization of the facts, Plaintiffs cite to the video taken from the police station, but the video simply does not support Plaintiffs' version, and we cannot find that it shows what the Plaintiffs contend occurred, because it plainly does not. First, it appears from the video that at 23:55:23, Officer Utter and Whitaker remained entangled near the door at the end of the corridor, with Whitaker grappling with and punching Officer Utter, and at this point Utter appears to have discharged the first round from his .40 caliber firearm while facing Whitaker.[11] It is only then that Whitaker spins and begins to run back up the corridor, baton in hand, in the direction of Officer Utter's Taser. Within one second, at 23:55:24, the video appears to show Officer Utter firing the second round while Whitaker has turned away. Whitaker collapses to the floor almost immediately after being struck by the second .40 caliber round. Absolutely nothing on the video supports Plaintiffs' bald contention that Officer Utter fired the second round "another four full seconds later when decedent was incapacitated on the floor." (Doc. 68, Ex. 1, ¶ 60.)

Not only does the video fail to support Plaintiffs' asserted version of the events that led to Whitaker's death, any objective viewing thoroughly discredits it,

---

[11] The fact that Officer Utter appears on the video to have fired the first round while Whitaker was facing him is corroborated by the autopsy and ballistic reports which show that one shot struck Whitaker in the chest at point blank range, and one shot struck him in the back at a range of three feet. (Doc. 50, Ex. A, Autopsy Report; Doc. 70, Ex. 6, Ballistics Report ¶ 8, PSP 0097-0098.)

particularly when viewed in light of all the other evidence compiled in this case. As noted, rather than serving as evidence that Officer Utter fired two shots into Plaintiffs' back a full four seconds apart, with the second shot fired when Plaintiff was already down and incapacitated, at a bare minimum the video supports all of the physical evidence and testimony showing that Officer Utter fired two rounds in very quick succession – approximately one second apart – while struggling with Whitaker and that Whitaker fell only after being struck by the second round.[12]

Other immutable and irrefutable proof rebuts the Plaintiff's theory of liability here, which is premised upon an assertion that Whitaker was shot twice in the back. The physical evidence in the case corroborates what is shown on the video, with the ballistics report concluding that Officer Utter fired the first shot less than 12 inches from Whitaker, which the autopsy report found entered Whitaker's chest; and that the second shot was fired when Whitaker was less than 3 feet from Officer Utter, and

---

[12] We recognize and appreciate that there are limitations to the video evidence submitted. For example, there is no audio captured, so it is not possible to hear the precise time when Officer Utter fired the rounds. Similarly, there is no muzzle flash that might further help to isolate the timing of each shot. What is clear, however, is that the video does not support Plaintiffs' claim that both rounds were fired into Whitaker's back, that they were fired four seconds apart, or that Officer Utter coldly fired the second round into Whitaker's back when he was prone and incapacitated. There is absolutely no evidence that could reasonably be found to support Plaintiffs' version of the altercation or its ultimate, and tragic, conclusion. In contrast, any reasonable viewing of the video supports Defendants' asserted version of what occurred – which is further supported by other evidence of record, including Officer Utter's own sworn testimony, autopsy and ballistic reports.

entered Whitaker's back.  (Doc. 50, Ex A, Autopsy Report; PSP 0006; PSP 0097-0098, Ballistics Report.)

Simply put, the theory of litigation advanced by the Plaintiffs in their pleadings is premised on a claim that Whitaker was shot twice in the back without justification. However, every piece of physical evidence refutes this theory. We are, therefore, left with no basis for understanding how one can reasonably rely upon the video as support for a claim that Officer Utter fired both shots after Whitaker was turned away from him, or that Officer Utter fired the shots four seconds apart, or that Officer Utter discharged the second and final round into Whitaker's back while he was laying incapacitated on the hallway floor.

In short, the video tells an entirely different story from the unsupported theory of the case that Plaintiffs offer.  Furthermore, Plaintiffs have relied exclusively on the video evidence in an effort to create the appearance that there exist disputed issues of material fact that preclude summary judgment and require resolution by a factfinder.  Importantly, aside from a video that undermines and discredits their theory of the case, Plaintiffs have been unable to marshal any other evidence at all – be it factual or expert opinion testimony – to support their theory of this case.  As we have noted, the entire body of the evidence submitted supports Defendants' version of the events at the station, and no evidence supports the theory of liability that the

28

Plaintiffs have offered.

With all of that being said, our review of the undisputed facts leaves us with the firm conviction that what transpired at the Springettsbury Township Police Department shortly before midnight on July 7, 2007, was a terrible tragedy, both for Ronald Whitaker, who lost his life, and for Officer Utter, who was subjected to an unprovoked and vicious attack that he ultimately fended off through the use of deadly force. We are also constrained to find that the undisputed evidence in this case, including video evidence, witness testimony, and physical evidence in the form of an autopsy report, and a ballistics report, all demonstrate that Officer Utter's use of lethal force was a reasonable response to the exigent circumstances that he faced as a result of Whitaker's violent actions. There is, in the end, no dispute that requires resolution by a factfinder – the undisputed facts of record all support Officer Utter's verison of events, and there exists no evidence to support Plaintiffs' articulated theory of liability, or their claims against the officer. The entirety of the evidence supports only the conclusion that Officer Utter was justified in using deadly force in response to Whitaker's assault, and there is no question of fact regarding the reasonableness of Officer Utter's conduct that would permit this claim to go to a jury.

For the foregoing reasons, we will recommend that the Court grant summary

judgment in favor of Officer Utter on Plaintiffs' claims.[13]

### B.    Plaintiffs' <u>Monell</u> Claims

Similar to their claims against Officer Utter, Plaintiffs have offered virtually nothing to support their claims for municipal liability against Springettsbury Township under § 1983. Indeed, in their brief opposing the township's motion for summary judgment, Plaintiffs have reduced their municipal liability claim to a single, discrete theory: that Officer Utter's testimony that he was trained to discharge his firearm twice in quick succession presents a triable <u>Monell</u> claim. We liberally interpret Plaintiffs' position to be that because Springettsbury Township police officers are trained to use a "double tap" technique when firing their service weapons, there becomes a triable issue of fact if an officer actually discharges his weapon in this manner.

Municipalities and other local governmental entities may not be held liable under § 1983 for the acts of their employees under a theory of respondeat superior or vicarious liability. <u>Ashcroft v. Iqbal</u>, __ U.S. __, 129 S. Ct. 1937, 1948 (2009); <u>see also</u> <u>Colburn v. Upper Darby Twp.</u>, 946 F.2d 1017, 1027 (3d Cir. 1991). However,

---

[13]  Because we find it to be clear from the record that Officer Utter's actions and conduct were reasonable, and that Plaintiffs have been unable to demonstrate a triable issue on their claims against Officer Utter, we find it is unnecessary to engage in Officer Utter's alternative argument that he would be entitled to qualified immunity on Plaintiffs' claims.

a municipality may be held liable "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A plaintiff must "identify a municipal 'policy' or 'custom' that caused the plaintiff's injury" to prevail. Bd. of County Comm'rs of Bryan County v. Brown, 520 U.S. 397, 403 (1997). This custom must be "so widespread as to have the force of law." Id. at 404; see also Beck v. City of Pittsburgh, 89 F.3d 966, 971 (3d Cir. 1996) (a policy is an official proclamation or edict of a municipality, while a custom is a practice that is "so permanent and well settled as to virtually constitute law") (quoting Andrews v. City of Phila., 895 F.2d 1469, 1480 (3d Cir. 1990) (citations omitted).

The plaintiff must further "allege that a 'policy or custom' of [the defendants] was the 'moving force' behind the [constitutional] violation." Grayson v. Mayview State Hosp., 293 F.3d 103, 107 (3d Cir. 2002) (citing Brown, 520 U.S. at 404). A municipality can be held liable on the basis of failure to train when "that failure amounts to 'deliberate indifference . . . [of the constitutional] rights of persons. . . .'" Woloszyn v. County of Lawrence, 396 F.3d 314, 324 (3d Cir. 2005) (citations omitted). There must also be a causal nexus, in that the "'identified deficiency in [the] training program must be closely related to the ultimate [constitutional] injury.'" Id.

31

at 325 (citations omitted).  In summary, analysis of a claim under <u>Monell</u> requires

separate analysis of two distinct issues: "(1) whether plaintiff's harm was caused by

a constitutional violation, and (2) if so whether the [municipality] is responsible for

that violation." <u>Collins v. City of Harker Heights, Texas</u>, 503 U.S. 115, 120 (1992).

A municipality may be liable for constitutional violations resulting from

inadequate training or supervision of its employees if the failure to train amounts to

a custom of the municipality.   Such a failure must "amount[] to deliberate

indifference to the constitutional rights of persons with whom the police come in

contact." <u>Colburn</u>, 946 F.2d at 1028 (citing <u>City of Canton v. Harris</u>, 489 U.S. 378,

388 (1989)).  To prove municipal liability on a theory of deliberate indifference is an

especially difficult showing for a plaintiff to satisfy where the plaintiff has alleged

that insufficient training or supervision has caused constitutional violations.  <u>Reitz</u>

<u>v. County of Bucks</u>, 125 F.3d 139, 145 (3d Cir. 1997).  Such a showing requires that

"(1) municipal lawmakers know that employees will confront a similar situation; (2)

the situation involves a difficult choice or a history of employees mishandling; and

(3) the wrong choice by an employee will frequently cause deprivation of

constitutional rights." <u>Carter v. City of Phila.</u>, 181 F.3d 339, 357 (3d Cir. 1999).

Moreover, the plaintiff proceeding on such a theory must establish that the

municipality's "deliberate conduct . . . was the 'moving force' behind the injury

alleged." Reitz, 125 F.3d at 145 (quoting Brown, 520 U.S. at 404). The need for training, supervision, or other corrective action to avoid imminent deprivations of a constitutional right "must be so apparent that any reasonable policymaker or supervisor would have taken appropriate preventive measures." Horton v. City of Harrisburg, No. 06-2338, 2009 U.S. Dist. LEXIS 63428, *13 (M.D. Pa. July 23, 2009) (quoting Strauss v. Walsh, No. Civ. A. 01-3625, 2002 U.S. Dist. LEXIS 24717, 2002 WL 32341791, at *3 (E.D. Pa. Dec. 17, 2002)). Additionally, in order to recover for municipal liability on a failure-to-train theory, the alleged failure must be "closely related to the ultimate (constitutional) injury." Woloszyn, 396 F.3d at 325.

In this case, Plaintiffs' claim for municipal liability fails, as an initial matter, because they have failed to demonstrate the existence of a constitutional injury. A plaintiff who fails to establish a constitutional violation does not have a Monell claim for the alleged injury, and summary judgment is therefore warranted. See City of Los Angeles v. Heller, 475 U.S. 796 (1986); Brown v. Commonwealth of Pennsylvania Dep't of Health Emergency Med. Servs. Training Inst., 318 F.3d 473, 482 (3d Cir. 2003); Mills v. City of Harrisburg, 589 F. Supp. 2d 544, 555 (M.D. Pa. 2008). As explained above, Plaintiffs have not identified any facts or evidence to support their claim for the only constitutional injury alleged – namely, that Officer Utter's use of deadly force to subdue Whitaker was an unreasonable use of force in violation of the

Fourth Amendment. To the contrary, the entire body of evidence submitted thoroughly discredits this claim. Without a triable issue on Plaintiffs' claim of constitutional injury, Plaintiffs are without the predicate necessary to seek damages against the township and, as a matter of law, Monell liability is therefore unavailable.[14]

We also note, in passing, that even if Plaintiffs had managed to demonstrate a triable issue of fact regarding their Fourth Amendment allegation, Plaintiffs have failed to come forward with any evidence that Springettsbury Township has trained its officers inadequately, or failed to supervise them, or that the township has exhibited deliberate indifference to a known or obvious risk, much less any evidence that a policy of training officers to double tap when discharging their service firearms could be considered unconstitutional. Plaintiffs have simply failed to meet their

---

[14] We would also note that Plaintiffs have relied only on a distorted interpretation of Officer Utter's testimony regarding the use of a "double tap" technique that officers are to use when they discharge their firearms. Plaintiffs seem to suggest that officers are trained to use a double tap technique of shooting in controlled pairs "regardless of the circumstance[.]" (Doc. 68., at 5.) What Officer Utter testified to was that when circumstances would permit an officer to discharge their firearm, officers are trained to fire with a double-tap technique. The Supreme Court has held that officers may be authorized to use deadly force when they are dealing with suspects who are armed at close range, or who present the threat of imminent and serious bodily harm. Garner, 471 U.S. at 11. Indeed, at least one court of appeals has concluded, in a non-precedential opinion, that a policy of training officers to double tap is not unconstitutional. Luke v. Brown, 253 F. App'x 916, 918 (11th Cir. Nov. 15, 2007). Further complicating our analysis of Plaintiffs' Monell claim is that at some points in their brief, Plaintiffs dispute that Officer Utter utilized a double tap technique, and at other places argue that the policy of training officers to use the double tap technique is unconstitutional or somehow caused constitutional injury.

burden of production that the Supreme Court has prescribed for claims alleging municipal liability under 42 U.S.C. § 1983, and summary judgment is therefore warranted.  See Brown, 520 U.S. at 405-07; Harris, 489 U.S. at 391-92; see also Reitz, 125 F.3d at 145 (affirming summary judgment where plaintiffs "neither identified the specific training that the County should have offered which would have prevented the deprivation of their constitutional rights nor established that such training was not provided.").

Given the absence of evidence in support of Plaintiffs' Monell claims, summary judgment in favor of the township is warranted.

### C.    Claims Against Chief Eshbach

Plaintiffs also appear to have brought claims against Defendant Eshbach, the Springettsbury Township Chief of Police, under a supervisor liability theory, which appears essentially to be a recasting of the plaintiffs' claims against the township. Defendants have argued that Plaintiffs have not identified any evidence to support claims against Chief Eshbach, and that summary judgment should therefore be entered.  In their brief opposing summary judgment, Plaintiffs have ignored Defendants' arguments, and have further failed to address in any meaningful way the claims that they may have brought against Chief Eshbach in this action.

Supervisory liability under § 1983 utilizes the same standard as claims for

municipal liability.  Iqbal, __ U.S. __, 129 S.Ct. at 1948; Carter, 181 F.3d at 356.  A

supervisor will only be liable for the acts of a subordinate if he fosters a policy or

custom that amounts to deliberate indifference towards an individual's constitutional

rights.  Carter, 181 F.3d at 357.  To establish supervisory liability, a plaintiff "must

(1) identify the specific supervisory practice or procedure that the supervisor failed

to employ, and show that (2) the existing custom and practice without the identified,

absent custom or procedure created an unreasonable risk of the ultimate injury, (3)

the supervisor was aware that the unreasonable risk existed, (4) the supervisor was

indifferent to the risk; and (5) the underling's violation resulted from the supervisory

practice or procedure."  Brown v. Muhlenberg Twp., 269 F.3d 205, 216 (3d Cir.

2001) (citing Sample v. Diecks, 885 F.2d 1099, 1118 (3d Cir. 1989).

          As we found above, Plaintiffs have pointed to no evidence in this case to show

that a relevant policy or custom proximately caused the alleged use of

unconstitutionally excessive force that resulted in Whitaker's death, and Plaintiffs

have not identified evidence to support any other factor that must be shown to

establish a failure to supervise on the part of Chief Eshbach.  Given the absence of

evidence in support of this claim, and because we can perceive no basis for permitting

a claim for supervisory liability to go forward on the record developed, we will

recommend that the Court enter summary judgment in Chief Eshbach's favor with

respect to all claims.

### D.     Wrongful Death

Plaintiffs have also brought a claim against all defendants for wrongful death under Pennsylvania state law, predicated on an allegation that Whitaker's "death was the direct and proximate result of the conduct of the Defendants in violating the Constitutional Rights of the Decedent . . . ." (Compl, ¶ 66.)  Defendants have moved for summary judgment on this last claim, contending that because there was no underlying constitutional violation, there can be no claim for wrongful death that is itself based upon such an alleged violation.

Plaintiffs have not responded to this argument in their opposition brief. This failure to respond to this aspect of the Defendants' motion itself may compel summary judgment. Where a Plaintiff has brought a cause of action which is challenged through motion for summary judgment as legally insufficient, it is incumbent upon the Plaintiff to affirmatively respond to the merits of a summary judgment motion, and argue in some fashion the legal sufficiency of the complaint. Indeed, a Plaintiff's failure to respond to these arguments constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.  Adams v. Pennsylvania, 2009 WL 2707601, *8 (M.D. Pa. 2009) (citing Player v. Motiva Enters, LLC, 240 Fed. Appx. 513, 522 n.4 (3d Cir. 2007); Seals v. City of Lancaster, 553

F.Supp.2d 427, 432-433 (E.D. Pa. 2008); GNC Franchising LLC v. Khan, 2008 WL 612749, *8-9 (W.D. Pa. 2008)). See e.g., Hackett v. Cmty. Behavioral Health, No. 03-6254, 2005 WL 1084621, at *6 (E.D.Pa. May 6, 2005) (failure to address claims waives opportunity to contest summary judgment on that ground); Ankele v. Hambrick, 286 F.Supp.2d 485, 496 (E.D.Pa.2003); (deeming plaintiff's malicious prosecution claim waived for failing to respond to defendant's argument in summary judgment motion).

In any event, Pennsylvania law provides that a wrongful death suit may be brought only "for the death of an individual caused by the wrongful act or neglect or unlawful violence or negligence of another if no recovery for the same damages claimed in the wrongful death action was obtained by the injured individual during his lifetime." 42 Pa. C.S. § 8301. Police officers are immune from state tort liability for acts within the scope of their employment except when the alleged conduct involves "a crime, actual fraud, actual malice, or willful misconduct." 42 Pa. C.S. § 8550. Willful misconduct "has been defined . . . [as] conduct whereby the actor desired to bring about the result that followed or at least was aware that it was substantially certain to follow. . . . In other words, the term willful misconduct is synonymous with the term 'intentional tort.'" Renk v. City of Pittsburgh, 641 A.2d 289, 293 (Pa. 1994).

In this case, Plaintiffs do not appear to allege that Officer Utter should be liable for wrongful death under a negligence theory, for which Officer Utter would be immune in any event. Instead, they have predicated their claim for wrongful death on their principal contention that Defendants' alleged constitutional violations were the direct and proximate cause of Whitaker's death. But we have already concluded that Plaintiffs have failed adequately to support their claims that any Defendant committed a constitutional violation, and we therefore must conclude that a wrongful death claim predicated upon a claim of constitutional violation cannot survive Defendants' motion for summary judgment. Under the nomenclature used in the context of wrongful death claims, it appears that Plaintiffs are contending that Defendants should be exposed to liability under the wrongful death statute by virtue of having committed "willful misconduct" – in other words, an intentional tort. However, although Officer Utter's act of firing his weapon was no doubt intentional, Plaintiffs have presented no evidence from which a trier of fact could conclude that this action was tortious or otherwise constituted the intention to commit a *wrongful* act. To the contrary, the evidence overwhelmingly establishes that Officer Utter's use of force was intended to protect himself and to subdue Whitaker, who had precipitated a violent assault against him, and who was in the possession of the officer's expandable baton and moving in the direction of his Taser, while the officer

39

remained trapped in a corridor late at night within the police station.  We have

concluded that the evidence shows that Officer Utter's conduct was reasonable under

these circumstances, and it would be inconsistent with this finding to determine that

Plaintiffs maintain a triable issue on their supplemental state law claim for wrongful

death.  We will thus recommend that summary judgment be granted on this final

claim as well.

## VI.    RECOMMENDATION

For the reasons set forth above, it is hereby RECOMMENDED that the Court

GRANT Defendants' motions for summary judgment (Docs. 49, 52).

Plaintiffs are further placed on notice that pursuant to Local Rule 72.3:

> Any party may object to a magistrate judge's proposed
> findings,  recommendations or report addressing a motion
> or matter described in 28 U.S.C. § 636 (b)(1)(B) or making
> a recommendation for the disposition of a prisoner case or
> a habeas corpus petition within fourteen (14) days after
> being served with a copy thereof. Such party shall file with
> the clerk of court, and serve on the magistrate judge and all
> parties, written objections which shall specifically identify
> the portions of the proposed findings, recommendations or
> report to which objection is made and the basis for such
> objections. The briefing requirements set forth in Local
> Rule 72.2 shall apply. A judge shall make a de novo
> determination of those portions of the report or specified
> proposed findings or recommendations to which objection
> is made and may accept, reject, or modify, in whole or in
> part, the  findings  or  recommendations  made  by  the

magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this 19th day of April, 2010.

/s/ Martin C. Carlson
Martin C. Carlson
United States Magistrate Judge